*Confidential*

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF NEW YORK

IN RE: ROCK 'N PLAY SLEEPER
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

Case No.: 1:19-md-02903-GWC

## EXPERT REBUTTAL REPORT OF PETER E. ROSSI, PH.D.

## June 16, 2021

# TABLE OF CONTENTS

I.   Qualifications ........................................................................................................... 1

II.   Assignment and Background ..................................................................................... 3

    A.   Scope of Assignment ...................................................................................... 3

    B.   Compensation and Materials Relied On .......................................................... 4

    C.   Case Background ............................................................................................. 4

III.   Summary of Opinions ............................................................................................... 5

IV.   Mr. Weir's "Full Refund" Damages Methodology Cannot Determine Class-Wide Damages ........................................................................................................... 9

    A.   Mr. Weir's Full Refund Damages Calculation Is Not Consistent with Plaintiffs' Allegations .................................................................................... 10

    B.   Mr. Weir Provides No Evidence that his "Full Refund" Damages Calculation is Appropriate ................................................................................ 12

    C.   Evidence Indicates That the Rock 'n Play Sleeper Had Uses That Are Not Related to Sleep ..................................................................................... 13

    D.   Purchasers Who Valued Non-Sleep Attributes Cannot be Included in a Full Refund Damages Measure ...................................................................... 17

    E.   Mr. Weir's Full Refund Damages Model is Also Flawed Because It Does Not Account for Resales of the Rock 'n Play Sleeper ........................... 18

    F.   Mr. Weir Does Not Propose Any Method That Accounts for Different Prices Paid by Individual Proposed Class Members .................................... 20

V.   Mr. Weir's Alternative Proposed Damages Approach Cannot Measure Diminution In Value Damages ................................................................................. 24

    A.   Overview of Mr. Weir's Proposed Diminution in Value Damages Analysis ........................................................................................................ 25

    B.   Calculating a Reduction (if any) in Market Price ......................................... 27

    C.   Mr. Weir's "Diminution of Value" Damages Calculation Cannot Measure Overpayment Damages, if any, Because His Proposed Method is Simply a WTP Calculation, Which Does Not Measure Diminution in Value .......................................................................................... 32

    D.   Mr. Weir's Proposed "Market Simulator" Would Not Measure a Market Price Because Supply-Side Factors are Ignored and, Regardless, Contains Several Errors..................................................... 37

    E.   Mr. Weir's Attempted Justifications for Ignoring the Supply Side of the Market are Incorrect ............................................................................. 45

*Confidential*

F.   Mr. Weir Plans to Ignore Potential Non-Uniform Diminution in Value for Different Product Types and Among the Different Proposed Classes..................................................................................................51

G.   Mr. Weir Has Not Proposed to Quantify the Margin of Error of His "Price Premium" Estimates.............................................................54

H.   Mr. Weir's Diminution in Value Damages Model is Also Flawed Because It Does Not Account for Resales of the Product..........................................55

I.   Mr. Weir Does Not Take into Account Differences in the Percentage Diminution in Value for Used Products....................................................56

*Confidential*

## I.      QUALIFICATIONS

1.      I am the James Collins Professor of Marketing, Statistics and Economics at the Anderson School of Management, UCLA. I hold a joint appointment in the Anderson School and the Economics Department. I received my BA in 1976 from Oberlin College with a double major in mathematics and history. My graduate degrees are from University of Chicago (MBA (1980) and PhD (1984)). I received my PhD in Econometrics which is the science of the application of statistical methods to economic data. During my doctoral training, I completed a wide variety of courses in sampling theory, statistics, econometrics, and economics.

2.      My first faculty appointment was at the Kellogg Graduate School of Management where I served as assistant professor of Managerial Economics. In 1985, I moved to the University of Chicago's Booth School of Business where I was appointed as assistant professor of econometrics and statistics. In 1994, I was promoted to Professor of Econometrics and Marketing. In 1996, I received an endowed chair. At the University of Chicago, I taught both masters and doctoral courses in statistics, market research, econometrics and economics. In 2009, I joined the Anderson School of Management as the Collins Distinguished Professor. At Anderson, I have taught both doctoral and masters' levels courses in Econometrics, Bayesian Statistics, New Product Development, and Data Analytics.

3.      In Appendix A, I provide my Curriculum Vitae. I have authored over 65 refereed publications in leading journals in Statistics, Economics, Econometrics, and Marketing. I am the author of books published by John Wiley and Sons and Princeton University Press. My published research has received wide attention as evidenced by more than 20,000 citations on Google Scholar. I have been elected fellow of the American Statistical Association, the Journal

*Confidential*

of Econometrics, and the INFORMS Society of Marketing in partial recognition for my research contributions. My doctoral students are on the faculties of many leading research universities including The Ohio State University, Carnegie Mellon University, and the University of Rochester. I am senior editor of Marketing Science and founding editor of Quantitative Marketing and Economics (QME). These are two of the top three journals in the area of quantitative marketing.

4.      I developed Bayesian methods appropriate for marketing data, including choice-based conjoint. The most widely used methods for conjoint analysis, Hierarchical Bayesian Choice-Based Conjoint,[1] were developed by my student Greg Allenby, and then extended by both Professor Allenby and myself, working together and independently. I have written the bayesm R package, which is used worldwide to analyze conjoint data. This package is one of the most downloaded contributed R packages with over 600,000 downloads to date. I have also written articles for Sawtooth Software's Research Paper Series,[2] and I have presented at Sawtooth's annual conference.[3] I have also authored two recent articles on the valuation of product features of the sort considered in this matter.[4] In addition, I have co-authored an article on the economic foundations of conjoint for the reference handbook, The Handbook of the

---

[1] Peter E. Rossi, Greg M. Allenby, and Rob McCulloh, *Bayesian Statistics and Marketing*, England, John Wiley & Sons, Ltd., 2005.

[2] *See, e.g.*, Greg M.; Rossi Allenby, Peter E., "Perspectives Based on 10 Years of HB in Marketing Research," *Sawtooth Software Research Paper Series*, 2003.

[3] *See, e.g.*, Greg Allenby, Jeff Brazell, John Howell, and Peter E. Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," *Proceedings of the Sawtooth Software Conference*, October 2013.

[4] Greg M. Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, Vol. 12, No. 4, 2014, pp. 421-456; Greg M. Allenby, Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *The Journal of Law & Economics*, Vol. 57, No. 3, August 2014, pp. 629-663.

*Confidential*

Economics of Marketing.[5] I have also served as an expert in a number of cases involving conjoint surveys including *In re: General Motors LLC Ignition Switch Litigation, Riley Johannessohn et al. v. Polaris Industries, Inc.,* and *Paul Stockinger et al. v. Toyota Motor Sales, USA, Inc.*[6]

5.      I have also provided the list of my prior testimony in Appendix B.

## II.      ASSIGNMENT AND BACKGROUND

### A.      Scope of Assignment

6.      Colin B. Weir submitted a declaration dated February 8, 2021 (the "Weir Declaration"). Mr. Weir states that he was "asked by Counsel to ascertain whether it is possible to determine damages on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of the damages attributable to Plaintiffs' theory of liability in this case."[7] I have been asked by counsel for Defendants to review and, if appropriate, respond to Mr. Weir's damages opinions.[8] I have not been asked to evaluate the portion of Mr. Weir's declaration where he discusses possible steps he may take in designing a conjoint survey in this matter.[9]

---

[5] Greg M. Allenby, Nino Hardt, and Peter E. Rossi, "Economic Foundations of Conjoint Analysis," Vol. 1, First Ed., edited by Jean-Pierre Dube and Peter E. Rossi, Netherlands, Elsevier, 2019.

[6] *In re GM LLC Ignition Switch Litigation,* U.S. District Court, Southern District of New York, Case No. 14-MD-2543 (JMF); *Riley Johannessohn et al. v. Polaris Industries, Inc.,* U.S. District Court, District of Minnesota, Case No. 0-16-cv-033348-NEB-LIB; *Paul Stockinger et al. v. Toyota Motor Sales, USA, Inc.,* U.S. District Court, Central District of California, Case No. 17-CV-00035-VAP-KS.

[7] Declaration of Colin B. Weir, February 8, 2021 ("Weir Declaration"), ¶ 5.

[8] For purposes of my report, I assume, as Mr. Weir appears to have done, liability on the part of the Defendants. I have no opinion on Defendants' liability, which is beyond the scope of my expertise.

[9] Mr. Weir testified that he was asked "to set forth damages frameworks and an outline of damages methodologies pursuant to the court's order." Deposition of Colin B. Weir, March 11, 2021 ("Weir Deposition"), 138:17–19; *see also* Weir Declaration, ¶ 5. Mr. Weir's declaration (including Weir Declaration, Exhibit 3 on conjoint analysis) does not provide a designed or completed draft of a conjoint survey. A draft survey would include, among other things, a sampling plan, the full set of instructions to be provided to respondents, and questions to be asked (subject to

### B.    Compensation and Materials Relied On

7.    I have provided a list of the materials I have relied on in Appendix C.

8.    I am compensated for my work in this matter at the rate of $1,250/hour. I receive

compensation from Analysis Group, Inc. based on its collected staff billings for its support of me

in this matter.

### C.    Case Background

9.    Plaintiffs allege that Fisher-Price, Inc. and its corporate parent Mattel, Inc.

("Defendants")[10] had a "persistent and uniform marketing message portraying the Fisher-Price

Rock 'n Play Sleeper as safe for infant sleep, including for overnight and prolonged sleep," and

that this was "dangerously false, misleading, deceptive and unfair."[11]

10.    The Complaint in this matter names several named plaintiffs ("Plaintiffs").[12] In the

Motion for Class Certification, Plaintiffs define multiple proposed classes in this matter.

Plaintiffs define 12 proposed "Statewide Classes" (Arizona, Arkansas, California, Colorado,

Florida, Iowa, New Jersey, New York, Pennsylvania, Tennessee, Texas, and Washington) as

"[a]ll persons, other than Mattel and Fisher-Price, and their employees, who purchased any

---

different respondents having choice tasks with different products). For ease of exposition, I refer to Mr. Weir's "proposed survey." I understand that another expert, Dr. Olivier Toubia, is evaluating Mr. Weir's proposed survey.

[10] Consolidated Amended Complaint, *In Re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, 1:19-md-2903, October 28, 2019 ("Complaint"), ¶¶ 47-50.

[11] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *In Re: Fisher-Price Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, 1:19-md-2903, February 8, 2021 ("Motion for Class Certification"), p. 2.

I refer to "the Rock 'n Play Sleeper" or "the product" to include all different models of Rock 'n Play Sleepers.

[12] Complaint, ¶¶ 24-46 (naming, among others, Elizabeth Alfaro, Emily Barton, Linda Black, Luke Cuddy, Rebecca Drover, Megan Fieker, Karen Flores, Nancy Hanson, Jena Huey, Samantha Jacoby, Megan Kaden, Kerry Mandley, Cassandra Mulvey, Joshua Nadel, Melanie Nilius Nowlin, Daniel Pasternacki, Jessie Poppe, Katharine Shaffer, Emily Simmonds, Josie Willis, and Renee Wray).

model of Fisher-Price's Rock 'n Play Sleeper in [each state set forth herein] from October 1, 2009 until the date of notice."[13] Plaintiffs also define a proposed "Nationwide Class" as "[a]ll persons, other than Mattel, Inc. and Fisher-Price, Inc., and their employees, who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in the United States from October 1, 2009 until the date of notice."[14] Plaintiffs also propose a "Nationwide Purchaser Class" consisting only of purchasers.[15] I understand from counsel that Plaintiffs are seeking damages only for the Statewide Classes, not the Nationwide Class or Nationwide Purchaser Class.[16]

## III.    SUMMARY OF OPINIONS[17]

11.    In his declaration, Mr. Weir offers two non-statutory approaches to calculate damages: **1**. A full refund, and **2**. What he calls a "diminution of value" methodology which is based on calculations informed solely by a yet-to-be designed conjoint survey. Mr. Weir provides no support or economic analysis to justify his damages methodologies and neither of his approaches can be supported by valid economic reasoning.

12.    Mr. Weir's proposal of a full refund damages estimate is presented with no evidence that a full refund is economically appropriate. Mr. Weir gives no support for this damages methodology, and in fact, full refund damages are not consistent with the allegations contained in Plaintiffs' filings in this matter, including the Complaint and Motion for Class Certification.

---

[13] Motion for Class Certification, p. 19.

[14] Motion for Class Certification, p. 19.

[15] Plaintiffs define the Nationwide Purchaser Class as "[a]ll persons, other than Mattel, Inc. and Fisher-Price, Inc., and their employees, who purchased any model of Fisher-Price Rock 'n Play Sleeper in the United States from October 1, 2009 until the date of notice." Motion for Class Certification, p. 19.

[16] Motion for Class Certification, pp. 18-19.

[17] This summary does not contain all of my opinions in their entirety.

13.     In order to justify application of a full refund damage methodology, Mr. Weir must show that the product is valueless in the but-for world in which the alleged false advertising that the Rock 'n Play Sleeper is safe for infant sleep is not present. There is considerable evidence that the Rock 'n Play Sleeper has value independent of any use in sleep.[18] Therefore, even if there was an explicit prohibition on the use of the product for sleep in the but-for world, the product would still have value and therefore a full refund is not an appropriate measure of damages.

14.     Mr. Weir offers an alternative approach to calculate damages that he contends is related to a diminution of value economic analysis. Mr. Weir's full refund approach assumes that the sole source of value of the product is for uses in sleep (and that the product would be valueless in the but-for world). In contrast, a diminution of value analysis instead requires a method to isolate the impact of the alleged false advertising on the product's market value (as measured by the market price).

15.     In a proper diminution of value or "overpayment" theory of damages, proposed class members are awarded the difference between the price paid for the product and the market price that would have prevailed in a but-for world in which there is no alleged false advertising and the product is accurately portrayed to the marketplace. If the "but-for" product price is less than the price paid, then damages in the amount of that difference may be assessed.

16.     Any methodology which purports to implement a diminution in value economic theory of damages must be capable of computing a market price in the but-for world without the alleged false advertising. Economists endorse the fundamental principle that market prices are the result of what is known as a market equilibrium in which demand and supply are equal to each other.

---

[18] *See* footnote 23.

*Confidential*

That is, the market price is the price at which consumers are willing to buy the product *and* the sellers are willing to sell the product.

17.    A market price can only be computed if a complete supply schedule is available. A supply schedule or "curve" requires information on both the cost of supplying a product (including manufacturing, marketing, and distribution) as well as the set of competitive products available in the marketplace. With an appropriate supply schedule and a valid demand estimate, it is possible to find a price such that supply and demand are equated.

18.    Mr. Weir proposed a conjoint survey of consumers. In the end, any conjoint survey, no matter how well conceived and executed, can only measure demand for a product. Economists alternatively call the demand schedule the willingness to pay ("WTP") for a product. Without competitive assumptions, cost information, and an explicit model of industry equilibrium, it is simply impossible to compute a market price.

19.    Mr. Weir's proposed survey can only compute a change in WTP for the Rock 'n Play Sleeper which is not equal to the change in market price. In his declaration, Mr. Weir alleges that he has "considered supply,"[19] but in fact he has not, and therefore his arguments are completely without merit as he has provided no information whatsoever about the supply schedule nor does he plan to provide or obtain the information necessary to determine supply.

20.    Thus, because Mr. Weir has not incorporated supply into his proposed analysis, Mr. Weir's WTP approach is flawed and unreliable as it will overstate damages to Plaintiffs in the sense that the change in WTP is greater than the change in market price in almost all situations.

---

[19] Weir Declaration, Exhibit 3, ¶ 50.

*Confidential*

21.     Mr. Weir's proposed "market simulation" is also flawed because it would calculate a single "diminution in value" based on a single product meant to represent a certain model of the Rock 'n Play Sleeper. Mr. Weir's methodology would ignore any non-uniform diminution in value across the different models of the Rock 'n Play Sleeper. As Rock 'n Play Sleeper models differed in many respects, this error alone would lead to a diminution of value that is likely inaccurate for many models of the product. Mr. Weir's proposed simulation also contains further errors, including that he incorrectly fails to include competing products, does not provide any details on how he will determine the attributes of the products in his proposed simulation, and fails to provide a margin of error for his estimates.

22.     Neither of Mr. Weir's proposed damages methodologies would account for resales of the product, which would lead to the overpayment of damages to some members of the proposed class. Any member of the proposed class who resold the Rock 'n Play Sleeper would have recouped some of the purported damage incurred in purchasing the product. In both a full refund and diminution of value methodology, resale would have to be taken into account in order to accurately calculate damages. For Mr. Weir's diminution in value methodology to accurately incorporate resales, he would further need to evaluate the price of resold products in the but-for world, which he has not addressed.

23.     I reserve the right to update my opinions and analyses as appropriate if additional information or materials become available or Plaintiffs' experts present further opinions or testimony.

*Confidential*

## IV.    MR. WEIR'S "FULL REFUND" DAMAGES METHODOLOGY CANNOT DETERMINE CLASS-WIDE DAMAGES

24.    Mr. Weir's full refund damages is based on "a damages framework awarding full recovery to consumers."[20] Mr. Weir proposes to calculate full refund damages by multiplying the total retail units sold by the average retail price.[21] Mr. Weir states in his declaration that "full refund" damages are appropriate "*if* the Plaintiffs prove that the Product is unsafe and valueless."[22] As I discuss below, this statement is inconsistent with Plaintiffs' allegations of false advertising related to the use of the product for sleep. Even if a product has no value for only one of a number of separate uses, full refund damages would not be economically appropriate, as the product has value derived from its other uses.[23]

25.    The Weir Declaration also claims, incorrectly, that full refund damages would also be appropriate if the product "should not have been sold."[24] The Weir Declaration does not explain what Mr. Weir means by "should not have been sold," nor why this would support a full refund damages calculation. Contrary to Mr. Weir's opinion, a full refund damages calculation is only economically valid when a product is valueless. For example, suppose that a carton of eggs is sold that is supposed to contain 12 eggs, but contains only 6 eggs. Clearly, in a colloquial sense, the product "should not have been sold" with only 6 eggs, but the purchaser has lost only

---

[20] Weir Declaration, ¶ 16.

[21] Weir Declaration, ¶ 16.

[22] Weir Declaration, ¶ 15 (emphasis added). Mr. Weir testified at deposition that he has not seen any evidence that the Rock 'n Play Sleeper was valueless, claiming that such inquiry was beyond the scope of his declaration. Weir Deposition, 191:13-22.

[23] I have not assessed the economic value of the Rock 'n Play Sleeper for sleep purposes. For the sake of my assignment, I am assuming that the Rock 'n Play Sleeper has no value for sleep in the but-for world.

[24] Weir Declaration, ¶ 15.

*Confidential*

one-half of the value.[25] As I explain below, if some or all consumers would have placed a positive value on the product in the but-for world in the absence of the alleged false advertising, then a full refund would be economically invalid, and the full refund methodology cannot determine class-wide damages.

### A.    Mr. Weir's Full Refund Damages Calculation Is Not Consistent with Plaintiffs' Allegations

26.    Plaintiffs' allegations relate to alleged false advertising with respect to the use of the Rock 'n Play Sleeper for sleep. For example, in the Complaint, Plaintiffs allege:

> The Fisher-Price Rock 'n Play Sleeper ("Rock 'n Play Sleeper") is an inclined "sleeper" that Defendants . . . marketed and sold for ten years as suitable for safe infant sleep, including prolonged and overnight sleep.[26]
>
> Defendants' marketing of this product as safe for infant sleep, including prolonged and overnight sleep, was intentional and overt.[27]
>
> Defendants' false and misleading marketing of this dangerous product, and knowing failure to disclose the grave risks of its use as a sleeper, including for overnight or prolonged sleep, allowed Defendants to reap vast profits at the expense of consumers who erroneously believed they were giving their babies a safe place to sleep.[28]
>
> Defendants' deceptive marketing of the Rock 'n Play Sleeper as a "Sleeper"… induced consumers who would not have otherwise purchased the product to purchase it, own, and use it when they

---

[25] At deposition, Mr. Weir testified about what he meant by "should not have been sold." When asked what he meant by that statement, after first clarifying that he is not a lawyer, Mr. Weir said, in his mind, if the product should not have been sold – because "it was illegal to sell or unlawful or whatever term you might use" – then that would be reason to give someone a full refund. Weir Deposition, 194:4–16.

[26] Complaint, ¶ 1.

[27] Complaint, ¶ 2.

[28] Complaint, ¶ 22.

*Confidential*

would not have otherwise owned and used it, and/or to pay a
higher price than they would have otherwise paid for the product.[29]

27.    In the Complaint, Plaintiffs also allege that "inclined sleepers, including the Rock 'n Play
Sleeper, are unsuitable for infant sleep,"[30] that "[t]he Rock 'n Play Sleeper is inherently unsafe
as a sleeper,"[31] and that marketing the Rock 'n Play Sleeper as "safe for infant sleep" is "material
to consumers' decision to purchase and or own the product."[32]

28.    Similarly, Plaintiffs' Motion for Class Certification claims that "[s]leep was [m]aterial to
Fisher-Price's [s]ale of the [Rock 'n Play Sleeper] in the United States."[33] It also states that
"there is little question that the Defendants' misrepresentation of the [Rock 'n Play Sleeper] as a
'sleeper' and being 'safe' for infant sleep would be material to reasonable consumers."[34]

29.    Consistent with this, Mr. Weir's description of Plaintiffs' allegations and theory of
liability, as set forth in his declaration, refers exclusively to allegations of false advertising

---

[29] Complaint, ¶ 191.

[30] Complaint, ¶ 1.

[31] Complaint, ¶ 3.

[32] Complaint, ¶ 190.

[33] Motion for Class Certification, p. 9.

[34] Motion for Class Certification, p. 30. *See also* a court hearing in this matter, in which Plaintiffs' counsel claimed that "the whole underlying theory of our case is [] that this product is unsafe for infant sleep" and that "[t]his is about a product that is unsafe for infant sleep… We say it's unsafe for infant sleep when used as instructed with the restraints." Transcript of Status Conference, *In re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, Case No. 1:19-md-2903, 16:23–17:2, 21:18–21.

Plaintiffs' Motion for Class Certification also states, "In the event this Court holds that any particular class claim fails to satisfy the requirements of Rule 23(b), Plaintiffs alternatively seek certification of relevant issue classes pursuant to Rule 23(c)(4)" concerning "whether a reasonable consumer would have been led to believe that the [Rock 'n Play Sleeper] was safe for infant sleep" and "whether a reasonable consumer would find the representations about the [Rock 'n Play Sleeper] as being an infant sleeper that was safe for infant sleep to be material." Motion for Class Certification, pp. 48–49.

*Confidential*

related to the use of the Rock 'n Play Sleeper for sleep.[35] At deposition, Mr. Weir testified that,

although he would defer to "plaintiffs' papers," his understanding of Plaintiffs' theory of liability

is that the Rock 'n Play Sleeper is "unsafe for all uses": "Again, I would defer to plaintiffs'

papers, but it's my understanding that [Plaintiffs] do not believe the product is safe for any

use."[36] However, Mr. Weir's testimony is contradicted by "plaintiffs' papers" – the Complaint

and Motion for Class Certification – as well as his description of Plaintiffs' allegations in his

declaration.

30.        Given these allegations, and assuming that in the absence of the alleged false advertising

the Rock 'n Play Sleeper would be valueless for sleep,[37] for the product to be "valueless" would

require that sleep was the sole use of the product. As I show below, the evidence shows that the

Rock 'n Play Sleeper has features and uses unrelated to sleep, implying that the product is not

valueless. As a result, Mr. Weir's proposed full refund damages calculation would be an

incorrect method to calculate damages.

## B.        Mr. Weir Provides No Evidence that his "Full Refund" Damages Calculation is Appropriate

31.        Mr. Weir has testified that "one incidence in which I understand that the full refund

method would be appropriate would be when that product has no market value" and that the

market value is "typically equated with the market price."[38] Therefore, a valid economic analysis

would start by considering what evidence supports the fundamental assumption underlying the

---

[35] Weir Declaration, ¶¶ 5, 9: "Plaintiffs allege inclined sleepers, including the Rock 'n Play Sleeper, are unsuitable for infant sleep and, in fact, are unsafe for infant sleep… Plaintiffs allege that the 'Rock 'n Play Sleeper is inherently unsafe as a sleeper...'"

[36] Weir Deposition, 147:20–25 (*see also* 141:12–15).

[37] As I discuss in footnote 23, above, I have not assessed the economic value of the Rock 'n Play Sleeper for sleep.

[38] Weir Deposition, 190:6–21.

*Confidential*

"full refund" damages theory: that the product is valueless to all proposed class members in the but-for world.

32.     Mr. Weir, however, has not undertaken or proposed to undertake any analyses or a review of any evidence to evaluate this question. When Mr. Weir was asked if he planned to do any analysis to determine if the Rock 'n Play Sleeper was "valueless" (to evaluate whether full refund damages may be economically appropriate), he testified that, "… I have no plans to do that type of analysis, the sort of liability work if you were."[39] Instead, the Weir Declaration states only that "Plaintiffs *allege* that these risks render the Products valueless,"[40] and he simply assumes that the Rock 'n Play Sleeper is valueless for purposes of his analysis.[41]

### C.     Evidence Indicates That the Rock 'n Play Sleeper Had Uses That Are Not Related to Sleep

33.     I have reviewed evidence on this topic, and I find that the product had non-sleep uses that were valued by customers. The evidence supports that proposed class members in the but-for world in which the alleged misrepresentation and omission were corrected would still ascribe a positive value to the product. If proposed class members valued the Rock 'n Play Sleeper for reasons unrelated to or in addition to sleep, then it would not make economic sense to calculate full refund damages for any of the proposed classes, because the product would not be valueless.

---

[39] Weir Deposition, 199:9–16. The Weir Declaration also does not provide any discussion of why a full refund damages calculation would be economically reasonable in light of Plaintiffs' theory of liability.

[40] Weir Declaration, ¶ 8 (emphasis added).

[41] A basic principle of damages measurement is to quantify the damages attributable to the alleged liability. Mr. Weir's calculation of full refund damages is not supported by any evidence, and also is not consistent with Plaintiffs' theory of liability as reflected in the allegations in Plaintiffs' Complaint and Plaintiffs' Motion for Class Certification (as I discuss in **Section IV.A** above).

*Confidential*

Hence, Mr. Weir's full refund damages methodology cannot be used to determine class-wide damages.

34.     Prior to the introduction of the Rock 'n Play Sleeper, Fisher-Price sold baby gear products in a variety of different product categories.[42] While the Rock 'n Play Sleeper was specifically designed so that it could be used for sleep, it also had many other uses and features that were present in other products that are not marketed for sleep. The features of different models of the Rock 'n Play Sleeper, for example, included a seat for babies to remain stationary for a period of time while a parent undertakes a task such as preparing food or a bottle, attached toys for a baby to play with, music and light shows to soothe and entertain, and rocking capabilities and swing-like motion to calm a baby.[43] The Rock 'n Play Sleeper was also lightweight and portable, allowing consumers to travel with the product and place their baby in it when on the go, or even just move from room to room as a place for their baby to sit.[44]

35.     The Rock 'n Play Sleeper was marketed as a product with multiple uses and features, some of which overlapped with other products that Fisher-Price sold.[45] For example, ███████ ████████████████████████████████████████████████████████████████████ ██████████████████████.[46] Consumer product reviews that Fisher-Price tracked indicated that consumers enjoyed the many features of the Rock 'n Play Sleeper, commenting, for example, "I like the kitty hanging at the loop," and "great to use during the day if [a baby is]

---

[42] *See* "Babygear 2018 BDO," FSHR0016472-FSHR0016643 at 483–484.

[43] *See* **Section IV.F**.

[44] *See, e.g.,* "Voice of the Consumer Baby Gear," 2013, FSHR0059256-FSHR0059277 at 261. *See also,* "Babygear Spring 2017 SILR," FSHR0069995 at p. 69.

[45] *See, e.g.,* Deposition of Sarah Ford, December 11, 2020 ("Ford Deposition"), 176:15–18.

[46] Ariana Moseley, "Fisher Price GCI 2019 Room Sharing Solution Concept Evaluation Report," December 2017, FSHR0017111-FSHR0017167 at 127.

*Confidential*

fussy as the rocking motion is a great soother."[47] These comments, along with other reviews I mention below, imply that consumers were interested in features of the Rock 'n Play Sleeper unrelated to sleep.

36.    Over time, Fisher-Price created Rock 'n Play Sleeper models with additional features applicable to non-sleep uses in response to consumers' preferences. For example, Fisher-Price included built-in music and a projection "light show" feature to entertain a baby.[48] These features would entertain an awake baby not in the context of sleep. Entertainment, playtime, and soothing are all features of the Rock 'n Play Sleeper that provided value to consumers.

37.    Some of the features of the Rock 'n Play Sleeper are also present in other infant products and drive sales for those products. For example, bouncers and swings have generated significant sales over the same time period that the Rock 'n Play Sleeper was sold. ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████.[49] The commercial success of these products implies that the Rock 'n Play Sleeper has value unrelated to use in sleep and would provide value to some or all purchasers in the but-for world.

38.    This evidence demonstrates that, even assuming as Plaintiffs allege, that the Rock 'n Play Sleeper was falsely advertised as safe for sleep and should not be used for sleep, it could still be used for play, soothing, entertaining, and to keep a baby stationary. A full refund damages theory requires that the Rock 'n Play Sleeper is valueless in the but-for world. Therefore, a full refund

---

[47] *See, e.g.,* "Voice of the Consumer Baby Gear," 2013, FSHR0059256-FSHR0059277 at 261.

[48] FSHR0060073-FSHR0060084 at 082–084.

[49] FSHR0060125 at unnumbered PDF p. 2. ██████████████████████████████ ██████████████████████████████████████████

damages theory is not economically appropriate due to the inherent value of the Rock 'n Play Sleeper for uses other than sleep.

39.    Dr. Ran Kivetz conducted a survey in which he asked respondents to provide the reasons for their purchase intent regarding the Rock 'n Play Sleeper.[50] Dr. Kivetz found that of his 357 respondents who viewed the stimulus with the Rock 'n Play Sleeper, only 41 respondents (11.5%) both had positive purchase intent for the product and referenced "sleep" or another variation of that word, and of these 41 respondents who mentioned "sleep," 82.9 percent mentioned at least one other reason for their purchasing decision.[51] Examples of responses that do not mention sleep as a purchase reason include:[52]

- A response that mentioned "high quality" and brand as reasons for purchase, stating, "[l]ooks like it would be high quality and is made by a reputable company and would make a good gift for a new parent."

- A response that mentioned "comfortable," stating, "because [the Rock 'n Play Sleeper] has songs and activities that keeps [the] baby calm and its [*sic*] provides cushion and [is] comfortable for [the] baby."

- A response that stated that the product had multiple functions: "I like multi function baby products like this one" and that Fisher-Price is "a brand I trust."

- A response that mentioned the appearance stated that the Rock 'n Play Sleeper "looks well made and has a cute design. I like that it has vibrations too."

40.    Further, evidence from Amazon reviews indicates that consumers valued the Rock 'n Play Sleeper for reasons unrelated to sleep. **Exhibits 1.A** and **1.B** contains reviews that illustrate

---

[50] Expert Report of Dr. Ran Kivetz, June 16, 2021 ("Kivetz Report"), ¶ 66. Dr. Kivetz's relevant questions include: QUESTION 40 ("What makes you say that you (INSERT ANSWER FROM Q.30A/Q.30B)? Please type your answer below. Please be specific and include details."); and QUESTION 41 ("Any other reason or reasons why you (INSERT ANSWER FROM Q.30A/Q.30B)? Please type your answer below. Please be specific and include details."). Kivetz Report, ¶ 50.

[51] Kivetz Report, ¶ 69.

[52] Kivetz Report, Exhibit N.

that consumers valued the Rock 'n Play Sleeper for playtime, interaction, sitting, and hanging out. For example, one reviewer wrote that "[t]he incline of the sleeper is just right for feeding a bottle to your baby or just playing with him/her." Another wrote "[i]t is a comfortable place for her to hang out at dinner time or to watch me get ready in the morning." Some reviews mention positive experiences using the product for non-sleep uses and do not mention using it for sleep. This is an indication that these reviewers valued aspects of the Rock 'n Play Sleeper unrelated to sleep.[53]

### D.     Purchasers Who Valued Non-Sleep Attributes Cannot be Included in a Full Refund Damages Measure

41.     As I discuss above, Mr. Weir provides no evidence that the Rock 'n Play Sleeper would be valueless in the but-for world, and the product had many uses that were unrelated to sleep, which means that it would not be valueless in the but-for world. Because the product would not be valueless in the but-for world, calculating full refund damages would not be correct. Mr. Weir testified that the change in market value is the correct standard for estimating damages: "an individual's subjective valuation is not the correct measure of the product's value. The correct measure would be the product's market value."[54] Mr. Weir's testimony implies that whether a proposed class member is awarded a full refund should not depend on how they would have valued the product in the but-for world.

---

[53] In addition, some of the named Plaintiffs in this matter used the Rock 'n Play Sleeper for reasons unrelated to sleep (potentially in addition to sleep). For example, Nancy Hanson testified that she used the Rock 'n Play for many things including to play with her grandchild, because "your hands are free, so you can play finger games with them or peek-a-boo or different things." Deposition of Nancy Hanson, March 25, 2021, 139:4–12. Jena Huey testified that she did not use the Rock 'n Play Sleeper for overnight sleep, and testified that the Rock 'n Play Sleeper was "very entertaining. [Her child] loved the little rattles. She would grab[] them, pull onto them. It was good for her motor." She also testified to using the light show, music, and vibration to soothe and entertain her child. Deposition of Jena Huey, April 16, 2021, 127:23–128:20, 177:24–178:3.

[54] Weir Deposition, 187:24–188:1.

*Confidential*

42.     Even if it were appropriate to calculate full refund damages for a subset of proposed class members who would find the product valueless in the but-for world (which it is not, because the product would not have a zero market value, as I discuss above), Mr. Weir's proposed full refund damages calculation still would be incorrect. In this scenario, any proposed class member who would not find the product valueless in the but-for world (such as because they valued its non-sleep attributes or otherwise used it for purposes not affected by the allegations of false advertising related to sleep) should not be included in Mr. Weir's calculation. Mr. Weir's proposed full refund methodology would therefore not be capable of determining damages on a class-wide basis even in this (incorrect) scenario because he has included all such persons in this calculation. Furthermore, whether each proposed class member would have found the product valueless in the but-for world could not be determined using any methodology that relies on class-wide information or information on a subset of the proposed class.

**E.     Mr. Weir's Full Refund Damages Model is Also Flawed Because It Does Not Account for Resales of the Rock 'n Play Sleeper**

43.     Mr. Weir proposes to calculate full refund damages as the average retail price multiplied by the number of "retail units."[55] However, Mr. Weir does not propose any method of allocating these damages to individual proposed class members. Instead, Mr. Weir testified that "I can't speak to what any one person would be entitled to"[56] and "because I haven't been asked to figure out a claims administration regime I have not laid forth such a method."[57]

---

[55] Weir Declaration, ¶ 16.

[56] Weir Deposition, 218:17–23.

[57] Weir Deposition, 219:5–7.

44.     In particular, Mr. Weir has not proposed any valid method of computing damages in situations when a product has been resold.[58] Therefore, even if full refund damages were supported by evidence and valid economic reasoning, which as I have shown above they are not, Mr. Weir's full refund damage calculations cannot accurately evaluate damages on a class-wide basis. As I explain below, accurately evaluating damages for individual proposed class members would, in my opinion, require individualized analyses related to resales of the product.[59]

45.     Baby products such as the Rock 'n Play Sleeper can be resold once an owner's child has outgrown the product. According to a Mintel Group survey published in 2016, consumers have purchased baby durables secondhand through various channels.[60] When an owner of a Rock 'n Play Sleeper resold the product, they recouped some of the original purchase price. Therefore, a proposed class member who has resold the product would not be due full refund damages, as those damages would need to be offset by the amount they received from its resale. If this offset were not made, then a purchaser would end up receiving more in damages than the amount that they purchased for, net of the resale price, which is economically unreasonable.

46.     Mr. Weir has not identified how he would calculate full refund damages for individuals who have resold the product. As different individuals would have resold the product for different

---

[58] *See* Weir Deposition, 205:3–9.

[59] For a diminution in value damages analysis, there are additional difficulties related to resales, as I discuss further below in **Section V.H**.

[60] For example, 34 percent of respondents had purchased a baby durable in a "Mom-to-mom sale," 44 percent had purchased a baby durable at a garage sale or an estate sale, and 27 percent had purchased a baby durable on Craigslist, a secondhand marketplace. The survey also finds that 11 percent of respondents bought a majority of their baby durables secondhand. *Baby Durables, US - April 2016*, Mintel Group, April 2016, pp. 10, 41.

amounts, individual inquiry would be necessary to identify who the resellers were, and how much they resold the product for.[61]

47.     Resale prices may vary due to a variety of factors, such as the type of Rock 'n Play Sleeper, the age and/or wear of the product, or the relationship between the buyer and seller.[62] In addition, some owners who resold their product may have been willing to wait to find a buyer in order to obtain a higher price, while others may have wanted to get rid of the product, and therefore offered it for a very low price; the resulting price differences have more to do with the convenience to the seller than the actual value of the product.

48.     After identifying resellers and the amount they resold for, Mr. Weir would have to identify how much these resellers initially purchased the product for in order to calculate the difference in the initial purchase price and the resale price (*i.e.,* their "damages").

**F.     Mr. Weir Does Not Propose Any Method That Accounts for Different Prices Paid by Individual Proposed Class Members**

49.     Mr. Weir proposes to estimate full refund damages as a single "average retail price" multiplied by the quantity of units sold.[63] Mr. Weir does not propose any method of determining damages due to individual proposed class members. Different proposed class members would

---

[61] It is likely that many Rock 'n Play Sleepers were given as gifts. For example, according to a 2016 Mintel Group survey, 28 percent of parents received a majority of their baby-related durables as a gift. *Baby Durables, US - April 2016*, Mintel Group, April 2016, p. 41. The receipt of Rock 'n Play Sleepers as a gift does not by itself pose conceptual issues for full refund damages calculations; however, when the product was gifted by the purchaser and then resold by the recipient of the gift, there is an additional complexity of whether the resale amount is an offset to the initial purchase amount.

[62] For example, a seller may give a friend a discount, but would not give a discount to someone they did not know.

[63] Weir Declaration, ¶ 16.

*Confidential*

have purchased the product (when new, at retail) for different prices.[64] Mr. Weir does not propose any methodology that could account for these different prices paid.[65]

50.     In general consumers did not purchase a new Rock 'n Play Sleeper directly from Fisher-Price, rather they purchased from a retailer such as Target or Walmart.[66] These different retailers would be likely to have different average prices for the Rock 'n Play Sleeper. Additionally, the same retailer, such as Target, may have offered the Rock 'n Play Sleeper for different prices at different geographic locations.[67]

51.     Mr. Weir proposes to calculate a single average price that aggregates all of the different types of Rock 'n Play Sleeper variants. As I discussed in **Section IV.C**, different Rock 'n Play Sleepers have varying features which may be valued differently by consumers. These features are reflected in the various models of Rock 'n Play Sleepers. For example, the base models of the

---

[64] Re-sales of the product present additional issues, as I discuss above in **Section IV.E**.

[65] Given that the product was sold from 2009-2019, it is likely that most purchasers would not have receipts showing what they paid for the product, except perhaps for those who purchased it online.

[66] *See, e.g.,* Ford Deposition 24:10–25:14.

[67] For example, a Target in downtown New York City would have greater costs (particularly for real estate) that would give it incentives to charge a higher price than one in Upstate New York. Target would also have incentives to charge different average prices in New York compared to Arkansas.

*Confidential*

Rock 'n Play Sleeper had toys to play with and an optional vibration function. An example of a base level Rock 'n Play Sleeper is shown below.[68]



52.     Fisher-Price sold other Rock 'n Play Sleepers with additional features. For example, the "auto rock" Rock 'n Play Sleeper rocked on its own and included different songs and sound effects. Additionally, some Rock 'n Play Sleepers had the capability to connect to a smart device such as a cell phone. These "smart connect" Rock 'n Play Sleepers had other additional features such as different speeds of rocking that could be controlled with a smart device. Some premium Rock 'n Play Sleepers also had a canopy. An example of such a Rock 'n Play Sleeper is seen below.[69]

---

[68] "Baby Gear Spring 2016," FSHR0059366-FSHR0059439 at 414 (additionally stating that "[w]e are targeting … a retail price of $79.99").

[69] "Fisher Price Jonathan Adler buy buy Baby," FSHR0070087 at p. 70.

*Confidential*



53.    These different Rock 'n Play Sleepers are just a few examples of the different features available on different variants of the product, but they illustrate how different models may have varying features. Rock 'n Play Sleepers range from a model that must be rocked manually, to one that can be controlled with a smart phone. Consumers would have different preferences for these different models of the Rock 'n Play Sleeper.

54.    Additionally, the average retail prices of different types of Rock 'n Play Sleepers varied widely; for example, the "Carnival RNP Sleeper" (launched in 2016) averaged a retail price of ███ while the "JA RNP Sleeper" (launched in 2018) averaged a retail price of ████[70] The average prices paid for a particular Rock 'n Play Sleeper variant might also have varied over

---

[70] FSHR0012772. ████████████████████████████ Ford Deposition 19:13–21.

*Confidential*

time.[71] By calculating an average retail price, Mr. Weir's calculation would ignore these variations in the prices paid throughout different retailers, locations, and years.

55.     Mr. Weir's declaration states that he has "been provided with sales data both from Fisher Price and retailers of the Products. … The available retailer data similarly identifies unit and dollar sales."[72] Mr. Weir could have used those retailer sales data to confirm that different types of Rock 'n Play Sleepers sell for substantially different average retail prices.

## V.     MR. WEIR'S ALTERNATIVE PROPOSED DAMAGES APPROACH CANNOT MEASURE DIMINUTION IN VALUE DAMAGES

56.     As an alternative theory of damages, Mr. Weir endorses an approach in which damages are based on the diminution in value of the Rock 'n Play Sleeper.[73] As a matter of economics, a proponent of this theory must provide a measure of this reduced "value" attributable to the alleged false advertising. As an economist and damages expert, the only meaningful, sensible, and logically defensible measure of value is a market price, defined (as discussed further below) as a computation of both supply and demand. The value of products in the actual world is properly measured by the market price paid for these products by proposed class members.[74]

57.     The difficult problem when calculating a change in market value is to assess the market price that would prevail in the absence of the alleged false advertising – namely, the market price in what some call the "but-for" world. For example, consider a proposed class member who purchased a Rock 'n Play Sleeper for $80. We know what market price was paid for that product

---

[71] *See, e.g.,* FSHR0012772.

[72] Weir Declaration, ¶ 18.

[73] Weir Declaration, ¶ 25.

[74] Mr. Weir testified similarly. *See, e.g.,* Weir Deposition, 248:21–249:3.

*Confidential*

($80). What we do not know is what the market price for that product would have been in the absence of the alleged false advertising.

58.    Mr. Weir does not plan to estimate both demand and supply in the absence of the alleged false advertising. Mr. Weir plans only to calculate a change in demand as measured by consumer WTP, which is not a change in market value of a Rock 'n Play Sleeper. Mr. Weir's proposed methodology would neither compute nor be able to compute market prices, and therefore would be unable to reflect Plaintiffs' theory of damages.[75]

### A.    Overview of Mr. Weir's Proposed Diminution in Value Damages Analysis

59.    Mr. Weir says that he plans to field a conjoint survey (although he has yet to design one) and apply the results to estimate a diminution of value. I am not opining on Mr. Weir's proposed survey itself, but I do opine on the calculation of damages that would come from the survey results. To calculate the diminution in value attributable to the alleged false advertising (if any), Mr. Weir proposes a conjoint simulation:

> I will have the market simulator compare two Rock 'n Play Products that are identical in all respects except that one does not disclose the safety risk of the Rock 'n Play while the other makes plain the alleged truth about such risks. I would then use the market simulator to simulate a condition where the price of the second product is reduced to the level where both products obtain equal market share. At this market equilibrium, market participants are indifferent as between a Rock 'n Play without a proper disclosure at a higher price and the Rock 'n Play with a statement of risks at a reduced market value. The diminution in value equals

---

[75] In multiple instances in Mr. Weir's declaration he uses terms such as "market value," "market price," or "price premium," even though his analysis does not compute a market price because of his failure to model supply and compute an equilibrium price. For example, Mr. Weir claims his "market simulation enables the calculation of the economic market value of the Safety Warning in the market scenario where the truth about the feature is made known to consumers," and that he "will take several steps to ensure that this survey was appropriately designed to measure the true diminution in market value attributable to the risks." Weir Declaration, Exhibit 3, ¶ 45, 52.

> the difference between the two prices that compensates for the understanding of the true risks of the Rock 'n Play.[76]

60.     That is, Mr. Weir will compare a "baseline" Rock 'n Play Sleeper representing the actual world (and the alleged false advertising) with a Rock 'n Play Sleeper in the but-for world without the alleged false advertising. Though Mr. Weir does not describe the characteristics of his baseline product, baselines are vitally important in a simulation aiming to calculate a change in consumer WTP. The choice of the baseline product's characteristics would be expected to affect both the dollar amount of the price premium as well as Mr. Weir's diminution in value percentage calculation.[77]

61.     Mr. Weir plans to run a single market simulation, which would use a single set of characteristics to represent a Rock 'n Play Sleeper.[78] But, because Rock 'n Play Sleepers have varying characteristics, his proposed single market simulation would not accurately reflect consumers' WTP across different models. Mr. Weir offers no analysis on this point.

62.     Mr. Weir states that he will use a conjoint simulation tool from Sawtooth Software, and quotes the president of Sawtooth Software explaining that:

> the simulator is used to convert raw conjoint (partworth utility) data into something much more managerially useful: simulated market choices. Products can be introduced within a simulated market scenario and the simulator reports the percentage of respondents projected to choose each product. A market simulator lets an analyst or manager conduct what-if games to investigate issues such as new product design, product positioning, and pricing

---

[76] Weir Declaration, Exhibit 3, ¶ 49.

[77] There is no reason to believe that Mr. Weir would find the same percentage price premium when using different baseline products. If Mr. Weir calculated the same price premium for baseline products with different prices, the percentage premium would differ simply because of the different denominator. In addition, if Mr. Weir finds that the impact of changes in price varies (*e.g.*, a change from $50 to $51 is different than a change from $100 to $101), then the price of the baseline product will impact Mr. Weir's WTP calculation (in dollars).

[78] Weir Declaration, Exhibit 3, ¶ 49.

strategy. Market simulators are commercially available or can be
constructed using spreadsheet programs.[79]

63.     Mr. Weir claims that the simulation represents a "market equilibrium" where "[t]he
diminution in value equals the difference between the two prices" of the actual Rock 'n Play
product without the disclosure and a but-for product with the disclosure.[80] Mr. Weir claims that,
"[a]t this market equilibrium, market participants are indifferent as between a Rock 'n Play
without a proper disclosure at a higher price and the Rock 'n Play with a statement of risks at a
reduced market value."[81] Here Mr. Weir is confusing indifference with equilibrium. WTP
calculations are defined by computing the amount by which price must be lowered to make
consumers indifferent between two products. Market equilibrium price is not defined by
consumer indifference but by the point at which demand and supply forces are equated.

64.     As I explain below, Mr. Weir's proposed methodology is unreliable and incorrect as a
matter of basic economic principle.

### B.     Calculating a Reduction (if any) in Market Price

65.     It is useful to start with how the market prices are obtained in economics. In basic
economics, a market price is determined by the intersection of the demand and supply curves.
The demand curve shows the willingness to pay ("WTP") of consumers for a given product.

---

[79] Weir Declaration, Exhibit 3, ¶ 44 and footnote 24, citing "Bryan Orme, Sawtooth Software, on 'Market
Simulators for Conjoint Analysis.' https://www.sawtoothsoftware.com/download/techpap/introsim.pdf."

I explain conjoint simulators further below in **Section V.D.1**.

[80] Weir Declaration, Exhibit 3, ¶ 49. Mr. Weir also claims that his market simulation would "provide[] a statistically
robust … estimate of any price premium that purchasers paid solely as a result of the Safety Warning" and would
"enable[] the calculation of the economic market value of the Safety Warning." Weir Declaration, Exhibit 3, ¶ 45.

[81] Weir Declaration, Exhibit 3, ¶ 49. Mr. Weir's deposition testimony suggests that he is claiming that market
participants *as a whole* would be indifferent, not that *each* market participant would be indifferent. Weir Deposition,
246:12–247:17.

*Confidential*

**Figure 1: Illustrative Example of Supply and Demand**



66.    For example, the red, downward sloping curve in **Figure 1** represents a demand curve for

a specific product for illustrative purposes.[82] For each price along the horizontal axis, the curve

---

[82] For ease of exposition, Figure 1 and my description thereof simplifies some of the complexity of this matter. There are many different at-issue products, not just one as in Figure 1. There would be differences in the demand and supply factors for these products (both in the actual world and in the but-for world). There might also be differences in price based on other variations such as geographic location. Mr. Weir ignores this in his declaration, and offers no analysis or explanation for how he would deal with this, which is yet another flaw in his analysis. I discuss this issue further below in **Section V.F**.

I assume that, other than the product whose supply curve is being described, all decisions relating to other products (for either the same or other companies) are held fixed. Economists understand that many markets are most accurately characterized as consisting of companies that react to each other's decisions by changing, among other things, prices and/or quantities. The determination of economic outcomes in these markets is more complex, but it does not change the general principles articulated here. As I discuss in **Section V.D**, Mr. Weir incorrectly assumes that other products are irrelevant to a consumer's purchasing decision, and that other companies would not react to Fisher-Price's different product in the but-for world. This is wrong as a matter of basic economics. It is necessary to consider competitors, as I do in my paper on calculating the economic valuation of product features. *See* Greg M.

shows how many consumers would purchase that product at that price, with more consumers being willing to buy a product as its price declines. For example, consider a price of $90. A relatively small number of consumers would be willing to pay $90 for that product. Clearly, if the price is lowered, more consumers would be willing to purchase the product at the lowered price. This is why the demand curve slopes downward. It should be emphasized that the demand curve measures willingness to pay only. That is, consumers who might be willing to pay as much as $200 for the product do not necessarily have to pay that amount unless the market price is set at $200. The demand curve does not address supply at all.

67.     How then is the market price determined? A market price will be the price at which Demand *equals* Supply.[83] Just as the demand curve is defined by the willingness to pay of consumers, the supply curve is defined by the willingness to supply by the seller, and shows how many units are supplied at any given price, with the number of products supplied increasing as the price of such products increases.  Demand equals Supply at the one and only point at which the willingness to pay of consumers is equal to the willingness to sell of the seller. This is shown on **Figure 1** as the intersection of the red demand curve and the purple supply curve. At this point, and only at this point, the market clears with the marginal buyers and seller having the same willingness to pay and sell.

---

Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, Vol. 12, No. 4, 2014, pp. 421-456. As mentioned in this paper, one can also consider competitors' reactions to a product feature change.

[83] "The supply curve shows the quantity of a good that producers are willing to sell at a given price . . . The demand curve shows how much of a good consumers are willing to buy as the price per unit changes…. The two curves intersect at the equilibrium, or market-clearing, price and quantity." *See* Robert S. Pindyck and Daniel L. Rubenfield, *Microeconomics* Eighth Edition Ed., Pearson, 2013, pp. 22–25.

*Confidential*

68.     In this illustration, the market price of this particular at-issue product as represented is $50. What, then, is the market price in the "but-for" world in which the alleged misrepresentation, such as a product mislabeling, is eliminated?[84] This market price is determined by demand and supply factors in the same way as the market price of the product is represented. For the sake of illustration, I draw a new demand curve that corresponds to a reduced WTP of consumers when the alleged misrepresentation is eliminated.[85] This curve is portrayed in **Figure 1** by a green curve. The curve is shifted downward by $20 (40% of $50) to illustrate Mr. Weir's proposed damages methodology.[86] Demand curves only measure WTP by consumers and, as noted above, do not consider supply factors at all. In this illustration, eliminating the alleged misrepresentation results in a reduction in WTP of $20. This does NOT, contrary to Mr. Weir's presumption, mean that the market price declines by $20. The new market price is set by the intersection of the supply curve and the reduced "but-for" demand.[87] The new price is only $10 lower at $40. In this example, a reduction in WTP approach would yield

---

[84] To be clear, I am not asserting that overpayment damages are actually owed here (or that the method described in this Section would accurately measure overpayment damages).

[85] In this example I assume that in the but-for world demand decreases, and therefore the demand curve shifts downward. This is not necessarily what would occur in the absence of an alleged misrepresentation. The demand curve in the but-for world might be the same, such as if consumers were not affected by the alleged misrepresentation. Or demand might increase in the but-for world, causing the demand curve to shift upwards.

[86] A downward shift in aggregate demand is caused by reductions in WTP on an individual consumer basis. This does not mean that each consumer has the same reduction in WTP but merely that the average reduction in WTP is $20.

For simplicity, this example assumes that the demand curves in the but-for and actual worlds have the same slope. This example abstracts away from the fact that Fisher-Price charges a wholesale price, while retailers charge a retail price to customers. The same underlying economics would hold when considering both changes to wholesale prices and their impact on retail prices. However, the dollar amount by which retailers mark up the price of the product would not necessarily be the same in the actual and but-for worlds.

[87] I use an upward sloping (but not vertical) supply curve, which illustrates that a company is willing to supply a lower quantity at lower prices and a higher quantity at higher prices. Most economists believe that supply curves are typically upward sloping. *See, e.g.,* John Shea, "Do Supply Curves Slope Up?," *The Quarterly Journal of Economics*, Vol. CVIII, No. 1, February 1993, pp. 1-32 at p. 1.

*Confidential*

damages of $20 per class member while the proper market price approach would yield damages of only $10 per class member, or half as much. Anyone who uses reduction in WTP as a measure of damages will overestimate the reduction in market price.

69.　　It should be emphasized that in order to compute a market price, one must construct a true supply curve. Mr. Weir asserts that to properly account for supply, one only needs to consider the market price actually paid by proposed class members.[88] This is false. Merely noting market prices in the "actual" world of non-disclosure does not say anything about supply in the "but-for" world. To properly account for supply, we must have a supply curve and a market equilibrium, which means we must model competition with other firms and consider costs of production.[89] Mr. Weir does not propose to do this, which renders his opinions unreliable.

70.　　When asked if the market price "is the intersection between the demand curve and the supply curve," Mr. Weir testified "It's generally not. There are only the rarest of circumstances where the price is pushed to that 'X' marks the spot interaction of supply and demand," and also testified that the only circumstance in which this occurs is "perfect competition, which exists only in economic textbooks and to my knowledge never in the real world."[90] Contrary to Mr. Weir's testimony, prices are determined through a combination of competition and supply-side and demand-side factors. The model of perfect competition used to illustrate this concept in a basic economics class can be replaced (as I have done in my own research) with

---

[88] Weir Declaration, Exhibit 3, ¶ 53.

[89] The economic insights do not differ if Fisher-Price is thought of as choosing the price of its products, as opposed to quantities. If Fisher-Price chooses a particular price, this corresponds to a specific quantity sold. Or if Fisher-Price chooses a particular quantity to sell, there is a specific price at which it can sell that entire quantity (but no more).

[90] Weir Deposition, 190:22–191:12.

*Confidential*

more complicated models of competition between firms, but the essential truth stills holds that

one must construct the supply response of firms to shifting demand conditions.

### C.   Mr. Weir's "Diminution of Value" Damages Calculation Cannot Measure Overpayment Damages, if any, Because His Proposed Method is Simply a WTP Calculation, Which Does Not Measure Diminution in Value

71.    Mr. Weir's proposed damages method does not and cannot reliably compute the

difference in market prices between products with and without the alleged false advertising.

Mr. Weir's proposed method is simply a WTP calculation. I will explain why his method is

unreliable at this fundamental conceptual level.

**Figure 2: Illustrative Example of Mr. Weir's Proposed Method of WTP Calculation**



*Confidential*

72.     **Figure 2** shows the same illustration of hypothetical demand for a product with and without disclosure of an alleged mislabeling. The red demand curve is the demand curve for a product in the actual world without disclosure of an alleged mislabeling. Mr. Weir's entire proposed survey process boils down to the computation of only one number – how much the demand curve will decline (if at all) if an alleged mislabeling were fully disclosed. As in **Figure 1**, the demand for this product is purportedly reduced if the alleged mislabeling is disclosed.

73.     Rather than also calculating the change in the number of units of the product supplied,[91] Mr. Weir proposes to compute the amount by which price must fall in order to keep quantity sold constant. This is exactly the vertical difference in WTP between the red "actual" demand curve and the green "but-for" demand curve shown in **Figure 2**. This vertical distance is shown in **Figure 2** by the purple line. In this example, if we consider the world in which a full disclosure is made, demand will shift down from the red to the green curve. If we would like exactly the same number of consumers to be willing to buy the product in this full-disclosure "but-for" world, we would simply reduce the price by the vertical distance in WTP. At this lowered price, exactly the same number of consumers will be willing to buy the product. This is simply a definition of the reduction in WTP caused by the disclosure of an alleged mislabeling. Thus, Mr. Weir's proposed methodology involves simply computing a reduction in WTP, which is not a change or reduction in market price. This vertical difference between demand curves has nothing to do with supply considerations of any kind.

---

[91] Mr. Weir simply ignores the supply curve, which is illustrated in **Figure 1** above by the purple line.

*Confidential*

74.     A proper calculation of economic damages requires a market price of the product with full disclosure, which requires measuring the changes in both demand and supply. Mr. Weir's proposed analyses do not compute market prices. The only prices that Mr. Weir claims to consider in his damages calculation are the market prices of the products actually paid by proposed class members. But a reduction in WTP caused by full disclosure is not the same as calculating a new market price under full disclosure. This must be done by developing a supply curve that is based on costs of production and other inputs, which would represent the seller's willingness to produce and sell those types of products at that price.[92] Mr. Weir provides no analysis regarding whether and how this could be done in this case.

75.     Mr. Weir claims that, because he plans to use actual price data to determine the range of prices in his proposed survey, he has "considered" the supply side.[93] This is wrong as a matter of basic economics for numerous reasons. Assuming that Mr. Weir uses price points consistent with actual prices, at best he would simply construct an estimate of a demand curve in the range of actual prices paid. This is not the same as constructing a supply curve.[94] Moreover, Mr. Weir fails to identify any way in which he has "considered" supply in the world of greater disclosure (for example, whether a company would be willing to pay the costs of production for the same

---

[92] As is made clear in Allenby et al. (2014), computing a market price involves modeling market equilibrium as well as the costs of production, which both figure in the determination of market price. Allenby et al. (2014) use the so-called Nash-Bertrand model of competition which is standard in the analysis of many industries that sell consumer products. *See* Greg M. Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, Vol. 12, No. 4, 2014, pp. 421-456, pp. 422, 424–425.

[93] Weir Declaration, Exhibit 3, ¶ 52.

[94] Even if the price points used reflected the actual market prices that the Rock 'n Play Sleepers were sold at (while new, at retail), they do not purport to reflect the prices of the "but-for" world. Similarly, Mr. Weir's proposed use of the actual quantity of such products sold as part of his diminution in value calculation (Weir Declaration, ¶ 28) does not necessarily reflect the quantity that would be produced in the "but-for" world.

In addition, there are no actual world prices that represent the price of the Rock 'n Play Sleeper in the world of greater disclosure because there is no actual world product that is identical to the Rock 'n Play Sleeper but without the alleged false advertising. This is an additional reason why Mr. Weir is incorrect to claim that his planned use of actual price data to determine the range of prices in his proposed survey amounts to considering the supply side.

number of units if they can only sell them for the lower price). Only a rigorous calculation of market prices in the world of full disclosure can provide valid damages estimates for an overpayment analysis. The only other information used by Mr. Weir is the total number of products purchased by proposed class members. As I will explain below, this is also incorrect. What is missing is any supply side information on prices in the "but-for" world, which must be used to compute market prices.

76.     Put another way, Mr. Weir proposes to compute the market price reduction required to estimate damages by solely using conjoint survey data. This is an inaccurate way to estimate market prices. For example, my co-authored article in the *Handbook of the Economics of Marketing* states that:

> [i]t should be emphasized that conjoint analysis can only estimate demand. Conjoint survey data, alone, cannot be used to compute market equilibrium outcomes such as market prices… Clearly, supply assumptions and cost information must be added to conjoint data in order to compute equilibrium quantities.[95]

77.     This is further corroborated by Bryan Orme, the President of Sawtooth Software, the company whose software Mr. Weir plans to use:

> Conjoint simulators may be used to answer questions about new products and new product introduction … A market simulator lets you input multiple products and place them in simulated competition with one another. … **The market simulator focuses on the demand side of the marketing equation; but it is also important to pay attention to the supply side and take the cost of producing different products/services into consideration.**[96]

---

[95] Greg M. Allenby, Nino Hardt, and Peter E. Rossi, "Economic Foundations of Conjoint Analysis," Vol. 1, First Ed., edited by Dube and Rossi, Netherlands, Elsevier, 2019, p. 153.

[96] Bryan K. Orme, *Getting Started with Conjoint Analysis* Third Ed., Research Publishers LLC, 2014, p. 96 (emphasis added). *See also*, John R. Hauser, Felix Eggers, and Matthew Selove, "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science*, Vol. 38, No. 6, 2019, pp. 1059-1081 at 1061: "WTP

*Confidential*

78.     Mr. Weir has claimed that the market for the Rock 'n Play Sleeper was "an 'ordinary' market, subject to competitive pressures," and that Fisher-Price and retailers had "a willingness to adjust prices in response to changing economic conditions and consumer preferences."[97] This claim does not support Mr. Weir's proposed methodology. What Mr. Weir ignores is that in such an "ordinary" market, a company such as Fisher-Price would have also had a willingness to adjust the quantity that it supplied in response to these same factors. It is widely accepted among economists that companies are able to adjust supply in response to changes in demand.[98] Any adjustment to supply *must* be taken into account to obtain an accurate damages estimation.

79.     In summary, Mr. Weir does not explain how his proposed method can compute valid overpayment damages defined as the difference between the price paid by proposed class members and the price that would have been paid in the absence of the alleged false advertising. Mr. Weir does not take into account competition and supply-side costs, which are the basis of any valid analysis of market prices.[99] As such, Mr. Weir's proposed methodology is unreliable.

---

provides valuable diagnostic information for pricing and attribute-level decisions and has been used to motivate and interpret valuations in patent/ copyright cases …, but WTP does not account for competitive response. WTP does not indicate how marketplace prices will respond to new products or changes in a product's attributes."

[97] Weir Declaration, Exhibit 3, ¶ 57 (citing Form 10-Ks for Mattel, Walmart, Target, and Toys "R" Us).

[98] *See, e.g.,* Robert S. Pindyck and Daniel L. Rubenfield, *Microeconomics* Eighth Edition Ed., Pearson, 2013, Chapter 2. Mr. Weir quotes portions of Mattel's 10-K stating that its products involve "low barriers to entry," which further reinforces that Mattel could adjust the quantities of its products. Weir Declaration, Exhibit 3, ¶ 57. If there are low barriers to entry, this suggests that, among other things, companies do not experience high fixed costs that limit their ability to adjust quantity.

[99] A company's decision about what quantity to produce takes into account supply side factors such as marginal cost, the demand in the market, and competition. *See* Gregory Mankiw, *Principles of Economics* Sixth Ed., Boston, MA, Cengage Learning, 2011, Chapters 14-15.

*Confidential*

**D.      Mr. Weir's Proposed "Market Simulator" Would Not Measure a Market Price Because Supply-Side Factors are Ignored and, Regardless, Contains Several Errors.**

80.      The simulation that Mr. Weir plans to run would at best measure only a change in WTP (if any). Therefore, the simulation would not provide estimates of a diminution in market value as measured by market price. In addition, Mr. Weir has not discussed if or how he would perform any valid analysis of the supply side of the market.

### 1.      *Overview of Conjoint Simulators*

81.      Before beginning this discussion, I will briefly explain how a conjoint survey is supposed to work, and what conjoint practitioners term "market simulators." Conjoint surveys are best viewed as an attempt, with survey methods, to approximate the purchase decisions of actual consumers. In the conjoint survey, several hypothetical products are presented to the survey respondent in what is called a "choice task." The respondent is asked to pick one of the alternatives presented for purchase. This choice task is repeated with different sets of hypothetical products.

82.      After a conjoint survey is complete, the choice data collected is analyzed with conjoint software. While the statistical analysis is complicated, the results are a set of weights (called "partworths") for each of the respondents. These weights embody the tradeoffs that the respondents make between attributes. For each respondent, the weights for each attribute correspond to the relative importance of attributes to that respondent.

83.      In order to translate the partworths into something more useful for the sponsor of a conjoint, the partworths are used to simulate or forecast demand for a set of competing products. These demand forecasts are typically in the form of predicted market shares. For example, a

*Confidential*

company might be interested in what would happen if a specific new feature was added to a popular product. The conjoint survey (if it included the new feature) would be used to see if the addition of this feature to an existing product would result in appreciably increased sales or market share in competition with other products, which the company could use (in conjunction with its own production costs) to decide whether to add that feature to its product. This is how "market simulators" came to be popular applications of conjoint analysis. But Mr. Weir does not plan to use "market simulators" for their intended purpose, as I will explain below.

> 2. *Mr. Weir Mischaracterizes a "Market Simulator" as Measuring Market Prices When It Measures Only Demand*

84.    Mr. Weir misuses and mischaracterizes what conjoint practitioners refer to as "market simulations." Mr. Weir proposes to use these "market simulators" to compute a value that he incorrectly claims is a change in market price, but which in fact is only a change in WTP (if any) due to a change in a product feature.[100] Contrary to Mr. Weir's claims, "conjoint simulations" measure only WTP. An article that I co-authored in the *Handbook of the Economics of Marketing* comments that:

> Conjoint practitioners have chosen the unfortunate term 'market simulation' to describe demand predictions based on conjoint analyses. These practices are not simulations of any market outcome…[101]

---

[100] Mr. Weir plans to use his incorrectly designed "market simulator" to compute the price reduction required to bring the demand for a hypothetical product with his safety warning to that of the demand for the product without disclosure. This is the definition of a change in WTP for the product. Greg M. Allenby, Nino Hardt, and Peter E. Rossi, "Economic Foundations of Conjoint Analysis," Vol. 1, First Ed., edited by Dube and Rossi, Netherlands, Elsevier, 2019, p. 162.

[101] Greg M. Allenby, Nino Hardt, and Peter E. Rossi, "Economic Foundations of Conjoint Analysis," Vol. 1, First Ed., edited by Dube and Rossi, Netherlands, Elsevier, 2019, p. 153.

*Confidential*

85.     As is recognized in the academic and technical literatures, a conjoint analysis measures the demand side of the market, rather than the supply side. One way of measuring the demand side of the market is to survey consumers, as Mr. Weir proposes to do. However, Mr. Weir offers no methodology for constructing a supply curve or evaluating the supply side of the market. Because Mr. Weir only proposes to survey consumers, his conjoint, however carefully done, cannot measure supply and therefore cannot be used to compute market prices.

86.     Mr. Weir incorrectly proposes to use the "market simulator" capability of Sawtooth Software to compute his purported "reduced market value."[102] In this section, I illustrate further errors made by Mr. Weir in proposing to use the "market" simulation even for the purpose of demand forecasts alone, which make his proposed analysis unreliable.

87.     Sources cited by Mr. Weir in his declaration agree that his proposed "market simulation" analysis is a demand forecast only that does not calculate market value or market price. In chapter 10 of *Getting Started with Conjoint Analysis* (cited by Mr. Weir), Mr. Orme (the president of Sawtooth Software) explains the purpose of "market simulations" and also describes some common mistakes used in their application. It is clear that Mr. Orme views market simulators as pure demand forecasts.[103]

88.     The idea of a market simulator is simple. One creates a hypothetical market that contains a set of products designed to represent the principal products in the market place. Products are specified by brand and a bundle of other attributes including prices. That is, in order to execute a "market simulation" one must first determine the major competing products and set hypothetical prices for these products. For example, a new product feature might be available and the

---

[102] Weir Declaration, Exhibit 3, ¶ 49.

[103] Bryan K. Orme, *Getting Started with Conjoint Analysis* Third Ed., Research Publishers LLC, 2014, Section 10.5.

*Confidential*

"market" simulator would be used to forecast enhanced demand for a firm's product(s) with this added feature. Clearly, this is simply a demand forecast without any supply considerations. That is, prices are fixed and are inputs to this procedure. There is no determination of market price.

89.    Mr. Weir does not propose to use market simulations for demand forecasting, which is what they were invented for. "Market simulators" are designed to make demand forecasts with some view as to the extent of competition and conditional on prices.  Mr. Weir's proposed method thus would not determine market prices at all.

90.    For example, Mr. Orme, whom Mr. Weir cites repeatedly in his declaration as an authority on conjoint, agrees that conjoint analysis does not provide estimates of market value, and rather provides WTP estimates only, stating

> One can use conjoint simulations to find WTP. To do this, we simulate a set of competing products A and B. Product A possesses the feature and has the current price. Product B lacks the feature and we set its price so that A and B each have 50% share. **The difference in price that equalizes the shares is an estimate of WTP.**[104]

91.    Mr. Weir appears to propose to calculate a diminution in value (if any) using the exact same simulation described by Mr. Orme.[105] Importantly, Mr. Weir plans to use a simulation meant to estimate changes in WTP to draw implications about market value, which is in contrast to the intended purpose of a conjoint simulation.

---

[104] Bryan K. Orme and Keith Chrzan, "Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros," 2017, p. 194 (emphasis added).

[105] Weir Declaration, Exhibit 3, ¶ 49 and footnote 26 (Mr. Weir cites generally to this same text, Orme and Chrzan (2017), but does not cite to a specific page number). Though this text discusses other methods of simulation that involve competing products, the only simulation it discusses that resembles the simulation described in the Weir Declaration is the one that I quote here.

*Confidential*

92.     As I describe above, the simulation methods offered by conjoint analysis programs such as Sawtooth Software are built around the demand side of a market, and are used by companies to forecast demand, without any supply side considerations. They are not intended to calculate market outcomes that require estimation of both demand and supply. Using these methods to try and imply something about market price as Mr. Weir intends to do would be a misrepresentation of the market simulation and would lead to unreliable results.[106]

3.     *Mr. Weir's Proposed Use of a Market Simulator Does Not Even Accurately Estimate Demand, As Mr. Weir Does Not Account for Other Products in the Market*

93.     The usefulness of a demand estimate depends critically on whether all major competitors are included in the analysis. Mr. Weir's proposed simulation would compare just two products: one with Mr. Weir's proposed safety warning, and one without Mr. Weir's proposed safety warning. This simulation would not realistically represent the decision a consumer faces, as I discuss in this section. Instead, to accurately estimate consumer demand, any major competing product, produced by either Fisher-Price or another company, must be included in the analysis.[107]

---

[106] Mr. Weir testified that "the output of the market simulation would determine the market price of the product in the but-for world, which is the same as the willingness to pay of the marginal consumer." Weir Deposition, 255:9-12. As I have previously articulated, Mr. Weir is incorrect that his proposed market simulation would determine the market price of the product in the but-for world. Tautologically, if a consumer has willingness to pay for a product equal to the market price, they would be "marginal" because they would not purchase it if the price were any higher. This tautology does not support Mr. Weir's incorrect claim that his market simulation can determine a market price.

[107] The set of actual competitor products to the Rock 'n Play Sleeper also would have included other similar products offered by Fisher-Price, such as the Soothing Motions Bassinet and On-the-Go Baby Dome. The earliest reviews from the official product webpages for each of the Fisher-Price Soothing Motions Bassinet and On-the-Go Baby Dome date back to "4 years ago," while the Rock 'n Play Sleeper was still on the market. "Soothing Motions Bassinet," https://www.fisher-price.com/en-us/product/soothing-motions-bassinet-dpv72, accessed on June 2, 2021; "On the Go Baby Dome," https://www.fisher-price.com/en-us/product/on-the-go-baby-dome-drf13, accessed on June 2, 2021.

*Confidential*

94.    The problem of using unrealistic sets of products to characterize a market has long been known by conjoint practitioners. In fact, Orme (2014) uses a "Gilligan's Island" example of the danger of not including all major competitive products in a demand simulator.[108] In this example, Mr. Orme considers the wealthy Howells and their demand for transportation off of Gilligan's Island. The Howells have a high WTP to leave the island and would certainly buy even expensive transportation off the island. However, if there was a cheap ferry established, they would not buy the expensive alternatives anymore. Thus, in order to simulate demand in a realistic setting, one needs to carefully specify the set of competing products in order to properly account for competitive effects.

95.    One of my peer-reviewed publications on valuation of product features concludes:

> Most practitioners of conjoint are aware that, for realistic market simulations, the major competing products must be used. This means that the product attributes in the study should include not only functional attributes … but also the major brands.[109]

96.    Similarly, Mr. Orme finds that:

> If a firm wants to assess the incremental demand resulting from offering specific features for its product … it should be estimated within a realistic competitive context. […] [T]he success of the simulation approach hinges on a number of assumptions, including … the relevant competitive offerings are reflected in the simulation model.[110]

---

[108] Bryan K. Orme, *Getting Started with Conjoint Analysis* Third Ed., Research Publishers LLC, 2014, pp. 90–91.

[109] Greg M. Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, Vol. 12, No. 4, 2014, pp. 421-456 at 433.

[110] Bryan K. Orme, *Getting Started with Conjoint Analysis* Third Ed., Research Publishers LLC, 2014, pp. 91–92.

97.     Mr. Weir agrees that Fisher-Price is subject to competitive pressures.[111] Yet he plans to run a simulation that ignores all products except for the products intended to represent the actual and but-for Rock 'n Play Sleepers. This is unrealistic, because customers would never face a decision between these two products, as Fisher-Price would produce one in the actual world, and one in the but-for world. Instead in each of the actual and but-for worlds, a customer would choose between the appropriate version of Rock 'n Play Sleeper and its competitors.

98.     If Mr. Weir plans to equate market shares of the actual and but-for products, he would need to, at the very least, consider these other products and find prices to equate the relevant market shares in the actual and but-for worlds. Equating the market shares of the actual and but-for products would not be expected to lead to accurate results, as competing products and the option to purchase nothing must be taken into account.

99.     Mr. Weir's proposed "market simulation" is unreliable and not valid even as a demand estimate because it lacks even the presence of competing products.[112] Mr. Weir neither plans to include any competing product in his "market simulation," nor provides any information on how he would identify any competing products to include in that simulation.[113]

---

[111] Weir Declaration, Exhibit 3, ¶ 57: "I have also considered that the market for the Products was an 'ordinary' market, subject to competitive pressures that both Defendants and retailers identified as risks to their business."

[112] Mr. Weir refers to his "market simulation" calculations as estimates of a change in "market value" or a "price premium." As I have explained, they are not.

[113] Even if Mr. Weir included competitors in his simulation, he would also need to consider how they might respond to the changes to the Rock 'n Play Sleeper in the but-for world. In response to the different characteristics of the Rock 'n Play Sleeper, other companies might change the prices of their competing products or non-price characteristics. For example, another company might add its own disclosure, or change its marketing to focus more on safety aspects of its product. Consumer's preferences for the competing products would then shift, which would impact market shares in the but-for world. Mr. Weir does not address this issue at all.

4.      *Mr. Weir's Proposed Use of a Market Simulator is Further Flawed Because Mr. Weir Does Not Provide Any Details about the "Baseline Product" in His Proposed Market Simulation*

100.    Mr. Weir's proposed simulation is also unreliable because it fails to describe the baseline product that he will use in his simulation, or how he will choose the attributes of that product. Mr. Weir has provided hardly any details about what levels of the attributes he would use for his baseline product in his proposed market simulation. Mr. Weir's "diminution in value" percentage would likely change in magnitude depending on the product he uses as the baseline in his simulations. Changes to attributes of the baseline product, such as price, would have an effect on consumer preferences in the actual and but-for worlds and would therefore affect Mr. Weir's "diminution in value" percentage. As a result, Mr. Weir's lack of detail about these attributes is a critical hole in his proposed analysis. Mr. Weir has not provided evidence sufficient to evaluate whether his selection of these attributes would be reliable.

101.    Mr. Weir also does not provide any details about how he would choose the non-price attributes of the baseline product (without his safety warning) in his market simulation."[114] As a result, the reliability of Mr. Weir's method for determining the attributes of this baseline product cannot be evaluated. There is also no unique set of attributes that corresponds to the at-issue products, because Fisher-Price sold a variety of different Rock 'n Play Sleepers with different features and characteristics.[115] Therefore, even if Mr. Weir had stated that he would base the

---

[114] Weir Declaration, Exhibit 3, ¶ 48: "My analysis of the conjoint data will be grounded in market reality by relying on the actual prices advertised and actual sales price data in selecting a market-based product price point for the simulation analysis."

[115] As discussed in **Section IV.C**, there are many different types of Rock 'n Play Sleepers, including models with automatic rocking capabilities, models that can be controlled with a smart device, and other models with different features. *See, e.g.,* FSHR0012772.

attributes of the baseline product on actual Rock 'n Play Sleepers (which he has not), this would not be sufficient to evaluate the reliability of his method for choosing these attributes.

102.    Mr. Weir states that for the baseline product in his market simulation, he would choose a "market-based product price point" using "actual prices advertised and actual sales price data."[116] However, "actual advertised prices" and "actual sales price data" might systematically differ. Mr. Weir has not provided any method for using those data to determine a price point. In addition, different Rock 'n Play Sleeper products would have different price points. Furthermore, there is presumably variation in retail price for the same product (such as differences based on retailer, geography, or over time). Mr. Weir has not provided crucial relevant details on how he would determine the price point used for the baseline product in his market simulation.[117]

### E.    Mr. Weir's Attempted Justifications for Ignoring the Supply Side of the Market are Incorrect

#### 1.    *Actual Sales Being a Matter of History Is Not Relevant to the Sales in the But-for World*

103.    Mr. Weir attempts to justify his ignoring the supply side of the market in the but-for world by stating that "the quantity of Rock 'n Plays supplied is a known quantity, and fixed as a matter of history."[118] This is not relevant to calculating a price premium. Damages may be attributed to units that were sold in the actual world, but the calculation of a price premium depends on the market value, as determined by the market price, in the but-for world. The quantity sold being fixed and a matter of history in the actual world has no bearing on the market

---

[116] Weir Declaration, Exhibit 3, ¶ 48.

[117] If Mr. Weir were to find substantially different "diminution in value" percentages (if any) when varying the attributes of the baseline product, this would imply that his analysis is unreliable.

[118] Weir Declaration, Exhibit 3, ¶ 55. Mr. Weir also claims that "the number of units sold to the class will not change as a result of the calculation of the price premium." Weir Declaration, Exhibit 3, ¶ 50.

*Confidential*

price and quantity in the but-for world. Rather, both quantity and price would adjust in the but-for world if there are changes in demand in the absence of the alleged false advertising.

104.    Mr. Weir claims that his use of "real world price points" in his proposed survey would reflect "the supply side factors then extant in the marketplace."[119] The only effect of using "real world price points" in the proposed survey is to ensure that Mr. Weir estimates demand over a relevant range of prices. Certainly, this would be preferred to a conjoint design in which the price points used in the proposed survey are spread over an irrelevant range such as $10 to $30 or $150 to $400 but this does not, in any way, provide the information required to estimate a supply schedule or to compute a market equilibrium. Prices in the actual world do not give insight into how price and quantity would be adjusted in the but-for world.[120]

105.    What is more important is whether Mr. Weir's proposed analysis accurately accounts for supply side factors in the but-for world (which, as I have explained, it does not). Mr. Weir's use of historical prices would not account for the supply side factors in the but-for world.[121] Prices in the but-for world would reflect the value of a product in the absence of the alleged false advertising, and the market price of this product in the but-for world would have to be estimated considering demand side factors such as consumer preferences, and supply side factors such as

---

[119] Weir Declaration, Exhibit 3, ¶ 53: "I will conduct research of actual retail sales and market data and included these real world price points in the survey. These real-world transactions occurred at prices that *already* reflect the supply side factors then extant in the marketplace."

[120] As I describe in footnote 94 above, there are no actual world prices that represent the price of a Rock 'n Play Sleeper without the alleged false advertising.

[121] Prices used in the actual world reflect a combination of supply side and demand side factors. Mr. Weir's use of historical prices in his survey has no relation to and therefore does not support Mr. Weir's incorrect assumption that Fisher-Price would have supplied the same quantity in the but-for world regardless of changes in consumer demand.

production costs. The market price would come from developing a supply curve in conjunction with a demand curve, which Mr. Weir's methodology completely ignores.[122]

106.     To calculate damages, Mr. Weir plans to multiply his "diminution in value" percentage (if any) by the total dollar value of sales of Rock 'n Play Sleepers.[123] This fails as a matter of economic analysis for two reasons. First, Mr. Weir's "diminution in value" is not based on the correct but-for prices but merely on a change in WTP. What Mr. Weir needs, but cannot provide, is the change in market price between the actual price paid and the price that would prevail in the but-for world. Second, his analysis only provides a dollar value of the change in WTP for the hypothetical product considered in his "market simulation." Since there are different products that make up the Rock 'n Play Sleeper product line, Mr. Weir must provide evidence that the change in market price is the same when viewed as a percentage for each of the different products. Mr. Weir's conjoint analysis cannot even provide the change in market price for one product much less the multiple Rock 'n Play Sleeper products.

107.     In his deposition, Mr. Weir cites to a "reference manual" as support for his claim that one should not consider changes in the quantity sold in the actual world when considering the but-for world. In particular, Mr. Weir testified that "the quantity of Rock 'N Play is […] one of the things that pursuant to the reference manual should be held constant."[124] However, the source that he references, the "Reference Guide on Estimation of Economic Damages" portion of the

---

[122] Additionally, if Mr. Weir used these "real world price points" in his market simulation, that also would not capture the supply side of the market in the but-for world. As I explain above in **Section V.B**, Mr. Weir's market simulation at best can estimate the demand side of the market in the but-for world, and has no bearing on the supply side.

[123] Weir Declaration, ¶ 28, stating that Mr. Weir will calculate diminution in value damages as "%Diminution in Value Factor × $Units Sold = Damages."

[124] Weir Deposition, 249:21–24. The source which Mr. Weir references is Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, 2011, pp. 425-502.

*Confidential*

Reference Manual on Scientific Evidence, does not support his claim. In fact, one section of the

reference guide states that

> [t]he plaintiff may assert that, absent the defendant's wrongdoing,
> a higher price could have been charged and therefore that the
> defendant's harmful act has eroded the market price. The
> defendant may reply that the higher price would lower the quantity
> sold. The parties may then dispute how much the quantity would
> fall as a result of higher prices.[125]

108.    In this matter, Plaintiffs allege (as an alternative to their full refund damages theory) that

Defendants' harmful act artificially inflated the price of the at-issue product, and that prices

would be lower in the but-for world. But as a matter of basic economics, lower demand (if any)

would lead to a lower equilibrium quantity as discussed above, and Mr. Weir needs to account

for this in order to obtain a change in market price. Mr. Weir simply ignores this.[126]

> 2.      *Mr. Weir Incorrectly Claims That His Proposed Diminution in Value*
> *Analysis is "Conservative" Because Individuals Who Did Not Purchase in*
> *the But-For World Should Receive a Full Refund*

109.    Mr. Weir suggests that the "price premium" he would calculate in his proposed

diminution in value analysis is "conservative" because "the appropriate remedy" for any

proposed class member who would have not purchased in the but-for world "might be" a "full

refund" rather than his "price premium":

> Furthermore, if one were to assume, *arguendo*, that Defendants
> would not have lowered the price in concert with demand

---

[125] Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, 2011, pp. 425-502 at 440.

[126] The amount that the quantity would change in the but-for world would depend on, among other things, how much demand would change in the but-for world. Instead of acknowledging this, Mr. Weir claims that he can ignore the supply side of the market, *no matter how much demand changes*. This is clearly unreasonable. Mr. Weir has done no analysis of the supply side of the market at all, let alone provided evidence that, in the but-for world, Fisher-Price would supply the same number of Rock 'n Play Sleepers as in the actual world regardless of the change in price.

*Confidential*

(indicating that Defendants priced above the market clearing price), then the economic outcome would be that many or all of the purchases would not have taken place at all. As such, the price premium(s) determined using conjoint analysis are inherently conservative measures (as compared to a full refund, which might be the appropriate remedy if a class member would not have made the purchase at all).[127]

110.    I have discussed above how Mr. Weir's purported "price premium" is not conservative, as changes in WTP are larger than changes in market prices, implying that Mr. Weir's estimated "price premium" would be too large.

111.    Mr. Weir argues that, as part of his diminution in value analysis, any proposed class member who would have not purchased the product in the but-for world should receive a full refund instead of his "price premium." Mr. Weir's argument is not grounded in any rigorous economic analysis and there are a number of problems with it:

- Mr. Weir's argument suggests that class-wide damages cannot be calculated in this matter without individual inquiry.

- Mr. Weir's argument conflicts with his opinion that damages in this matter can be calculated using a price premium analysis.

- It would be economically unreasonable to provide a full refund to any proposed class member who would not have purchased in the but-for world.

---

[127] Weir Declaration, Exhibit 3, ¶ 51. Mr. Weir incorrectly states that if Defendants lowered the price by less than any reduction in consumer WTP they would have "priced above the market clearing price." That is, Mr. Weir suggests that if, in the but-for world, Defendants lowered the price by less than any reduction in consumer WTP they would have "priced above the market clearing price." However, in this scenario Defendants would not be setting a price above the market clearing price because the quantity would also change in response to a reduction in consumer demand.

I discuss each of these points in turn.

112.    Even accepting Mr. Weir's argument that any proposed class member who would have not purchased in the but-for world should receive a full refund (instead of Mr. Weir's "price premium"), accurately evaluating damages for individual proposed class members would require individual inquiry. Mr. Weir seems to claim that the "appropriate remedy" would be a full refund for some proposed class members, and a price premium (if any) based on a diminution in value analysis for others. If the "appropriate remedy" for some proposed class members was a full refund, but Mr. Weir's methodology provided these proposed class members with only damages based on a "price premium," he would understate damages for these proposed class members, perhaps substantially. Therefore, Mr. Weir would need to determine which proposed class members would purchase the product in the but-for world. As this depends on each individual's preferences, it would not be possible to determine class-wide damages using the records Mr. Weir intends to use, and individual inquiry would be necessary to accurately determine any alleged harm.[128]

113.    Mr. Weir's testimony contradicts his claim that proposed class members who would not have purchased in the but-for world should receive a full refund. Specifically, Mr. Weir testified that "an individual's subjective valuation is not the correct measure of the product's value. The correct measure would be the product's market value."[129] If the change in market value is the

---

[128] Mr. Weir claims he can "determine class-wide damages in this case using Defendants' own available business records, third-party records, and industry resources." Weir Declaration, ¶ 14. These materials would not aid Mr. Weir in evaluating which proposed class members would or would not purchase the Rock 'n Play Sleeper in the but-for world. To do that, data on individual proposed class members would be required. This would also render incorrect Mr. Weir's statement that, for his conjoint analysis, "[n]o individualized analyses, or Class-Member-specific inquiry will be required." Weir Declaration, Exhibit 3, ¶ 13.

[129] Weir Deposition, 187:24–188:1.

*Confidential*

correct standard for estimating damages, as Mr. Weir asserts, then whether a proposed class member receives a full refund should not depend on what they would have done in the but-for world.[130]

114.    It is economically incorrect for Mr. Weir to claim that his "price premium" is "conservative" because any proposed class member who would not have purchased in the but-for world should receive a full refund. As I discussed in **Section IV**, a full refund would only be economically appropriate if the Rock 'n Play Sleeper was valueless. Suppose for the sake of argument that damages owed to a proposed class member should depend on their preferences, rather than a change in market value as measured by a diminution in value analysis. In this scenario, just because a proposed class member would not have purchased the product in the but-for world does not mean that the product would be valueless to them. Not purchasing only means that either they would prefer a different product instead or their WTP for the Rock 'n Play Sleeper would be lower than the market price. Full refund damages would be economically reasonable only if the individual would not be willing to pay any positive amount for the product; that is, their WTP for the product would need to be zero (or less).

> F.      **Mr. Weir Plans to Ignore Potential Non-Uniform Diminution in Value for Different Product Types and Among the Different Proposed Classes**

115.    There are at least 118 different types of Rock 'n Play Sleeper models that could have been purchased over a ten year span, such as the Deluxe Rock 'n Play or the Auto Rock 'n Play.[131] The purchasers of these different product types would likely have had systematically

---

[130] As I have explained above, Mr. Weir's "price premium" methodology will not calculate the change in the product's market value, as it only considers demand-side market forces.

[131] FSHR0012772.

different preferences, for reasons such as the examples below. Therefore, any "diminution in value" would likely also be different for these product types. Estimating a single diminution in value as Mr. Weir plans to do would obscure these differences.[132] The different Rock 'n Play Sleeper models varied substantially on price,[133] and therefore purchasers of different product types would be expected to have differences in income. Purchasers with systematically different incomes would likely also have differences in preferences for product characteristics. These differences in preferences might lead to a non-uniform diminution of value percentage (if any) for different product types.

116.    A Rock 'n Play might have been purchased new or used. It also might have been purchased for the buyer himself or herself, purchased as a gift unsolicited, or purchased as a gift off of a registry. Different types of Rock 'n Plays might have had different propensities to be purchased as a gift (such as because of differences in price or other characteristics), and purchasers who bought as a gift might have systematically different preferences than other purchasers.[134] Different products may also be more or less likely to be resold, or handed down. This implies that individuals who purchase the different products may have systematically different preferences, leading to differences in diminution of value for these products. Meaning,

---

[132] Additionally, consumers' preferences related to Mr. Weir's proposed safety warning might depend on the other attributes of the product. If Mr. Weir's analysis assumes that respondents' utility for each product attribute, including his safety warning, is additive, it does not allow for the possibility that the preferences for Mr. Weir's proposed safety warning depend on the other product attributes. The utility of product attributes is not necessarily additive. For example, a consumer's utility for durability might interrelate to their utility for product features that extend the ages a product is suited for. Mr. Weir's declaration and testimony do not discuss this potential issue or how he might test for it.

[133] FSHR0012772.

[134] This might be because purchasers buying as a gift have different characteristics than other purchasers, or because the act of purchasing as a gift induces differences in preferences. Different types of Rock 'n Plays may be more likely to be obtained used as opposed to new due to durability or price.

*Confidential*

applying a single diminution of value percentage across total sales is not a reliable basis for calculating damages on a class-wide basis.

117.    Further, Plaintiffs seek to certify 12 statewide damages classes.[135] Importantly, the members of these proposed classes might have, in aggregate, different preferences from the general population of the U.S. as a whole. Mr. Weir plans to calculate a reduction in WTP (if any) based off of a single survey that he would presumably apply across each of the 12 statewide classes.[136] Mr. Weir states that his single sample "will be drawn from the general population of the U.S. who had purchased or used at least one Rock 'n Play Product."[137]

118.    Mr. Weir has asserted that he does not believe it necessary to survey at a more granular level.[138] However, Mr. Weir neither provides evidence to support his claim that it would not be necessary to use more granular samples nor proposes any method to evaluate whether it is necessary to survey at a more granular level. It is unreliable for Mr. Weir to plan to apply a national survey to the proposed statewide classes that may be certified without planning to do any analysis supporting the reasonableness of that decision.

---

[135] The states are: New York, Arizona, Arkansas, California, Colorado, Florida, Iowa, New Jersey, Pennsylvania, Tennessee, Texas, and Washington. Plaintiffs also seek a national class of purchasers and a national class of purchasers and owners, but I understand from counsel that Plaintiffs do not seek damages for the national classes. Motion for Class Certification, pp. 18–19.

[136] That is, Mr. Weir claims that his calculation "can be performed on a class-wide basis, across different geographies, and for any defined time period, including the proposed class period in this litigation." Weir Declaration, ¶ 29.

[137] Weir Declaration, Exhibit 3, ¶ 34.

[138] Weir Declaration, Exhibit 3, ¶ 34, footnote 19: "Although I do not believe it would be necessary, it would be possible to re-run the survey with more granular samples."

*Confidential*

### G.     Mr. Weir Has Not Proposed to Quantify the Margin of Error of His "Price Premium" Estimates

119.     Mr. Weir's proposed ultimate calculation is a reduction in "market value" expressed as a percentage, a complicated calculation performed on conjoint survey data. The respondents to Mr. Weir's survey would at best be a representative sample of the relevant population, not the entire population. Any calculation based on a sample of a population rather than the entire population will inherently have a margin of error. For example, if a statistician were to take a small sample of U.S. adults and measure the proportion of that sample that has brown eyes, it would be irresponsible for them to pretend that this estimate does not have sampling error.

120.     All calculations that have a degree of uncertainty should be accompanied by a margin of error calculation.[139] In fact, an estimate without such a margin of error is unreliable as the precision of the estimate cannot be evaluated. If Mr. Weir finds a reduction in "market value" but also finds that the margin of error of this estimate is at least as large as the estimate itself, then he has not ruled out random chance as an explanation for the reduction in "market value." The data would be consistent with no reduction in "market value."

121.     Mr. Weir's proposed analysis is unreliable because he offers no discussion or analysis in his declaration regarding if and how he would address the margin of error of his estimates of the percentage reduction in "market value."

---

[139] "[A]n estimate based on a sample will differ from the exact population value, because of random error. The standard error gives the likely size of the random error. If the standard error is small, random error probably has little effect. If the standard error is large, the estimate may be seriously wrong." *See* David H. Kaye and David A. Freedman, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence*, 2011, pp. 211-302, at p. 246. "Experts who collect survey data, along with the professions that rely on those surveys, may differ in some of their methodological standards and principles. An assessment of the precision of sample estimates and an evaluation of the sources and magnitude of likely bias are required to distinguish methods that are acceptable from methods that are not." *See* Shari Seidman Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, 2011, pp. 359-423, p. 364, footnote 16.

*Confidential*

### H.    Mr. Weir's Diminution in Value Damages Model is Also Flawed Because It Does Not Account for Resales of the Product

122.    It is clear that a number of proposed class members resold their Rock 'n Play products.[140]

Any diminution in value analysis must take into account these resales to avoid overcompensating proposed class members. For example, consider a consumer who purchased the product new at $100 and resold the product for $50. If it is determined that this consumer overpaid by $10 at the original new purchase, then some, if not all, of this overpayment amount is recouped at resale. Therefore, it would be inappropriate to award this consumer a damages amount of $10. In general, the entire group of proposed class members who resold their Rock 'n Play products must be treated separately in any damages calculation. It is not economically correct to simply award Mr. Weir's same diminution in value percentage (if any) to the entire class, including purchasers who resold the product, as apparently advocated by Mr. Weir.[141]

123.    The diminution in value or overpayment amount represents the impact (if any) of the alleged false advertising claim on market price. Mr. Weir has not provided any valid economic reason to believe this amount depreciates as the product is used and then later resold. In any event, it is incumbent on Mr. Weir to determine the impact of resale on damage awards which includes an analysis and estimate of the extent to which the diminution in value amount has been offset by resale.

124.    Mr. Weir provides no discussion of the problem that resale poses for his diminution in value damages methodology. At his deposition, he testified that economic injury occurs at the

---

[140] I discuss above in **Section IV.E** that consumers have purchased baby durables secondhand through various channels.

[141] *See* Weir Declaration, ¶¶ 28–29.

point of first purchase and there can be no offset to this injury amount by subsequent resale.[142] This is incorrect as a matter of basic economic logic.

125.    Mr. Weir also makes the argument that adjustments for resale are part of the "allocation" of the class-wide damages amount to specific class members.[143] Mr. Weir has not proposed any uniform method for allocation of class-wide damages to proposed class members.[144] In his view, any such allocation is an administrative task. In effect, he is passing on to a claims administrator the task of economic analysis of damages. Mr. Weir further requires the claims administrator to undertake individual inquiry regarding resale of the products in order to correctly allocate some class-wide damage amount.

### I.    Mr. Weir Does Not Take into Account Differences in the Percentage Diminution in Value for Used Products

126.    Plaintiffs define the proposed classes to include all purchasers of Rock 'n Play products, including those who purchased the product used.[145] Mr. Weir plans to calculate only a single percentage diminution in value and would apparently apply the same percentage diminution in value to all products regardless of whether these products were purchased new from a retailer or, for example, purchased used at a flea market.[146] He offers no justification for this arbitrary assumption. His conjoint survey is clearly designed only for those who are contemplating purchases of new products and is not designed for used purchases.[147] Therefore, Mr. Weir has no

---

[142] *See* Weir Deposition 143:24–144:9, 203:13–24.

[143] Weir Deposition, 204:2–10.

[144] Weir Deposition, 205:11–21.

[145] I discuss the proposed classes in **Section II.C**, above.

[146] Weir Declaration, ¶¶ 28-29.

[147] Weir Declaration, Exhibit 3, ¶ 23 (respondents "should imagine that they are going to purchase a new sleeper").

*Confidential*

way of verifying that any percentage of diminution in market value is appropriate for purchases of used products.

Respectfully submitted,

Peter E. Rossi
June 16, 2021

*Confidential*

**Exhibit 1.A**
**Selected Amazon Reviews on Use of Fisher-Price Rock 'n Play Sleeper - Playtime/Interaction**

| Row | Review |
|---|---|
| 1 | We use the RNP in our living room for our son (he uses his crib at night). This thing is invaluable! **He loves it for his naps (we swaddle him and put him in here), to watch TV, even just to sit in when we play with him.** It's so lightweight and folds up nicely whenever you need to take it someplace. I did not have to buy anything extra for him to make it softer - he seems to like it just the way it is (we got it when he was 7 weeks). |
| 2 | I don't know what I would do without the Rock n' Play. It's easy to fold and take with us when we go to visit people for a day, so our baby has a comfortable, familiar place to rest. It's light so it's easy to drag around the house when you want to keep your baby close. **We don't let our baby sleep in it at night, we only use it during the day when we need a safe place to put him for a little while. We often attach an arch with hanging toys for him to play with.** |
| 3 | I bought this item in February for my newly-adopted grandson.  His mother and I agree that it's the  best thing we've found!  Since then, I have bought two for our church nursery and two more for baby  shower gifts.  **Our baby takes short naps in it, and sometimes just lies there playing with a toy.**   Also, he has had some trouble with spitting up, and this thing keeps him at a little angle which  helps keep the reflux down. |
| 4 | We use this rocker for our now three month old baby.  She doesn't sleep overnight in it, but we do use it every single day.  **I like that it is up high, which makes it easier for me to interact with her while I am standing up and working in the kitchen or out in the yard.**  It is very sturdy, and folds easily.  It is nice and light and travels well.  I really wish this had been around when my other kids were tiny! |
| 5 | One of the best baby purchases I ever made!! Easy to move around the house, easy to clean, baby is very cozy, helped with bad acid reflux issues! She slept in this crib exclusively for several months. **also great for playtime!** |
| 6 | I really loved this little thing.  **Our LO coo'd and rocked and played in the daytime.**  Took great naps in it too.  We traveled with it and it was comforting to have a familiar bed on trips.  Never had any head flattening or anything like that.  I also did add extra padding just for comfort as she was so small.  But by 8mos we were done and moved it along. |
| 7 | **My baby loves this rock n play for both sleeping and playing.** It's one of the few places he will nap for longer than 20 minutes! |
| 8 | I bought this product at first because the price was reasonable and the customer ratings were really good.  My baby loves it and she naps in it really well.  **It's also nice after feeding because it let's her sit a little upright so that she won't spit up or get gassy.** It's also very compact and light weight which is nice to bring around the house or travel with. But just seeing the shape of it I don't recommend you let the baby sleep in it for long periods of time.  It can't be good on the babies back sleeping sitting up and bent at the hips for hours at a time. I just read a lot of the new reviews and people have been complaining about all the problems their babies developed. Problems like mild torticollis (shortened/tight neck muscles) and plagiocephaly (flat head).  **So I do recommend this product for napping and playing in but not for sleeping in for long periods of time.** |
| 9 | I purchased this item for my daughter who has slient reflux; I am very pleased. **Perfect angle for sleeping and playing too!** |
| 10 | I LOVE this sleeper. It is easy to use, looks adorable and my baby loves being in it. It is the right height to use while you are sitting down. You can even recline while rocking it with your foot. The rocking is smooth and gentle. The design is cute and the cover is easy to remove and clean. **The incline of the sleeper is just right for feeding a bottle to your baby or just playing with him/her.** I have a little trouble getting it to fold up properly, but that is not much of an issue since I use it constantly. Of all the baby items I have, this is one that I will keep for any future children. I recommend this to everyone. |

**Note:**
I identify Rock 'n Play Sleeper reviews as those that contain "Fisher-Price … Sleeper" in the variable "product_title." The Rock 'n Play Sleeper reviews available in the Amazon data span from December 20, 2009 through August 31, 2015. The selected reviews are all verified purchases, as indicated by "Y" in the variable "verified_purchase." Emphasis added.

**Source:**
Amazon Customer Reviews Dataset: Baby, available at https://s3.amazonaws.com/amazon-reviews-pds/tsv/amazon_reviews_us_Baby_v1_00.tsv.gz, accessed on March 16, 2021.

*Confidential*

**Exhibit 1.B**
**Selected Amazon Reviews on Use of Fisher-Price Rock 'n Play Sleeper - Sitting/Hanging Out**

| Row | Review |
|---|---|
| 1 | We ordered this when my daughter was 4 weeks old, she instantly began sleeping through the night. We were able to use this till she was wanting to turn over during the night. **Then we used it as a chair for her to play in while I got ready for work.** She is now 9 months old and we still pull it out occasionally when she is sick and needs to be inclined . Definite recommend to any new mom for their little one from day one. Great for travel or to take to grandmas for an overnight trip. It will wash, but just gentle or it may tear. Even then throw a blanket over it and good to go. LOVE , willd definitely be giving as a gift and using for upcoming children. |
| 2 | Light weight, easy to move from one room to another. **My daughter sits there while I do quick things in my house** |
| 3 | We bought this as a travel bassinet for a trip this summer. **It worked great for this purpose and we have also been using it as an &#34;extra seat&#34; when I need to set my 4 month daughter down. She can watch what's going on around her due to the incline.** I highly recommend! |
| 4 | Buy this now!  It is comfortable. It is lightweight and folds so storing or hauling is so easy.  We take it back and forth to my parents to use. My son us 6 months old and is 31 &#34; long and 21 lbs. I put him in it while cleaning and such.  Plus it has a toy ring it comes with. **My son likes to sit up in it now even though he's buckled** |
| 5 | My baby girl loves it!  I don't let her sleep in at night, but during the daytime the Rock-n-play is a God send...it makes naps an actual event in our household! YIPPEE!  **She sleeps wonderfully in it and now that she is 2 months she loves just sitting up in it(it is at a great angle) and looking around.**  I am not real sure where the \\"play\\" part of the product comes in but really who cares, b/c she loves this thing!  Best $35 I spent on a baby product. |
| 6 | A friend recommended getting this and it has been the things we've used most. **If you have a baby with acid reflux or just want to sit your baby comfortably while guests are in, this is the product.** My friend uses hers as a co-sleeper. I don't know what we would do without it! |
| 7 | My daughter loves this! **She sleeps in her pack and play at night in our room but everywhere we go or if we are relaxing in the living room or cooking in the kitchen she likes being in this.** I take it into the bathroom with me when I have to potty or shower and I don't have to worry about her being alone. **She likes it because she can sit up and look around.** Sometimes if I'm really tired and don't want to walk all the way to the pack n play I'll set this beside my bed so all I have to do is reach over and grab her. |
| 8 | I held off on purchasing this item because this is my third baby and I didn't want to load up on all of the \\"gadgets\\" that I would only use temporarily.  Well, he is a VERY fussy baby with colic and reflux and he refused to sleep laying down or even in his swing so I gave in.  I wish I had done it much sooner.  **He naps in it, likes to just hang out in it and look at you and sleeps in it at night.**  I can move it from room to room while I am doing housework and he doesn't mind at all.  If he starts squirming it begins to rock and often lulls him back to sleep.  Truly a must-have for newborns, espcially if they have reflux |
| 9 | My daughter absolutely loves her Rock N Play and still takes her naps in it at almost 6 months old. **It is a comfortable place for her to hang out at dinner time or to watch me get ready in the morning.** It is a must-have baby item. |
| 10 | My daughter refused to sleep without being held until.this arrived in the mail. It totally.changed her sleeping pattern. **Now she is too big to sleep in it but still lines to.hang out in there with the vibrations on.** Good for babies that spit up a lot. |

**Note:**
I identify Rock 'n Play Sleeper reviews as those that contain "Fisher-Price … Sleeper" in the variable "product_title." The Rock 'n Play Sleeper reviews available in the Amazon data span from December 20, 2009 through August 31, 2015. The selected reviews are all verified purchases, as indicated by "Y" in the variable "verified_purchase." Emphasis added.

**Source:**
Amazon Customer Reviews Dataset: Baby, available at https://s3.amazonaws.com/amazon-reviews-pds/tsv/amazon_reviews_us_Baby_v1_00.tsv.gz, accessed on March 16, 2021.

**Appendix A**

CURRICULUM VITAE
PETER E. ROSSI
(January 2021)

Date of Birth: November 25, 1955
Citizenship: United States

<u>Business address</u>

Anderson School of Management/UCLA
110 Westwood Plaza, B5.15
Los Angeles, CA 90095

email: perossichi@gmail.com

## Education

B.A., 1976, Oberlin College (Mathematics and History).
M.B.A., 1980, Graduate School of Business, The University of Chicago (Management Science).
Ph.D., 1984, Graduate School of Business, The University of Chicago (Econometrics).
Dissertation Title: "Specification and Analysis of Econometric Production Models."

## Fellowships, Honors, and Grants

Phi Beta Kappa Zeta of Ohio, elected 1975.

University of Chicago Fellowship, 1978-1980. G.M. Fellowship, University of Chicago, 1980-1981.

Kellogg Research Chair, Northwestern University, 1983-84.

1987 Savage Prize for best dissertation in Bayesian Econometrics and Statistics.

I. B. M. Scholar, Graduate School of Business, University of Chicago, 1988-89.

Bozell, Jacobs, Kenyon and Eckhardt Faculty Scholar, Graduate School of Business, University of Chicago, 1994-95.

Elected Fellow, American Statistical Association, June 1998.

1999 Mitchell Prize for Best Applications Paper in Bayesian Statistics for "Estimating Price Elasticities with Theory-based Priors (with A. Montgomery)," awarded by American Statistical Association, Bayesian Statistics Section.

2000 Arthur Kelly Faculty Price, GSB, U of Chicago, (awarded bi-annually for service to school).

"Bayesian Analysis of Stochastic Volatility Models" named one of most influential articles in twentieth anniversary issue of *Journal of Business and Economic Statistics* (2002).

Named Fellow, *Journal of Econometrics*, 2001.

2010 Long-term Impact Award, *Marketing Science Society* (with Greg Allenby).

2016 Dean's Prize for Exceptional Faculty Mentorship of PhD Students.

2019, Elected INFORMS Society of Marketing Fellow.

## Areas of Research Interest

*Marketing*: Brand Choice, Target Marketing, Price Promotions, Consumer Heterogeneity, Couponing, Search Theory, Direct Marketing

*Econometrics*: Hypothesis testing in systems of equations, non-nested hypothesis-testing procedures, Bayesian methods, limited dependent variable models, non-parametric time series methods.

*Microeconomics*: demand analysis applied to individual consumer expenditure data.

## Positions Held

Analyst, Abt Associates Inc., 1976-1977.
Consultant, SRI International Inc., 1978.
Research Assistant, University of Chicago, 1979-1981.
Lecturer in Managerial Economics, Kellogg Graduate School of Management, Northwestern University, 1981-1983.
Assistant Professor of Managerial Economics, Kellogg Graduate School of Management, Northwestern University, 1983- 86.
Visiting Assistant Professor of Econometrics and Statistics, Graduate School of Business, The University of Chicago, 1985-1986.
Assistant Professor of Econometrics and Statistics, Graduate School of Business, The University of Chicago, 1986- 1990.
Associate Professor of Econometrics and Statistics, Graduate School of Business, The University of Chicago, 1990- 1994.
Professor of Marketing, Econometrics and Statistics, Graduate School of Business, University of Chicago, 1994- 1997.
Joseph T. and Bernice S. Lewis Professor of Marketing and Statistics, Booth School of Business, University of Chicago, 1997- 2010.
James Collins Professor of Marketing, Statistics, and Economics, Anderson School of Management, UCLA, 2010-present.

**Appendix A**

Consultant for RFG Options, Harris Bank, Hull Trading, GE Capital, Ernst and Young, KPMG Peat Marwick, Abbott Labs, Department of Defense, Booz Allen and Hamilton, Arthur Andersen, Kestnbaum and Company, Oliver, Wyman and Co.

Expert Witness for various legal proceedings involving statistical analysis, survey sampling, marketing and pricing, anti-trust, valuation of lost personal and business income, franchise rights, patent and trademark infringement, bio-statistics and job discrimination, and trademark infringement. Law firms involved include: Ross and Hardies, Rudnick and Wolfe, Seyfarth and Shaw, Sidley and Austin, Winston and Strawn, Arnold, White and Durkee, Hinshaw and Culbertson, Kirkland and Ellis, Cravath, Swaine and Moore, Mayer, Brown and Platt, Howrey, Bryan Cave LLP, Jones Day, Latham and Watkins, WilmerHale.

**Publications**: (click on links below to open full article in pdf)

Google Scholar Cites: 19,750+, H-index: 51 as of 1/21/2021.  Google Scholar Citations.

**Software**

R package, bayesm, 600,000+ Rstudio downloads as of 1/2021. More than 200,000 downloads in 2020 alone.

**Books**

*Modelling Stock Market Volatility: Bridging the Gap to Continuous Time* (1996), San Diego: Academic Press (editor).

*Bayesian Statistics and Marketing*, with G. Allenby and R. McCulloch (2005), John Wiley & Sons, Probability and Statistics Series.

*Bayesian Semi-Parametric and Non-Parametric Methods in Marketing and Micro-Econometrics* (2014), Princeton University Press.

*Handbook of the Economics of Marketing* (2019), Elsevier (co-editor with JP Dube).

**Working Papers**

Available on SSRN

**Articles**

All articles are the sole copyright of the respective publishers.  Materials are provided for educational use only.

"Scalable Target Marketing: Distributed MCMC for Bayesian Hierarchical Models," (2020) with R. Bumbaca and S. Misra, *Journal of Marketing Research,* forthcoming.

"State Dependent Demand with Initial Conditions Correction," (2020) with A. Simonov, JP Dube, and G. Hitsch, *Journal of Marketing Research, 57, No. 5, 789-809*.

"Inferences for Product Competition and Separable Demand" (2019) with A. Smith and G. Allenby, *Marketing Science, 38, No. 4, 690-710*.

"The Value of Flexible Work: Evidence from Uber Drivers" (2019) with J. Chevalier, K. Chen, and E. Olsen, *Journal of Political Economy 127, No. 6, 2735-2794*.

"Income and Wealth Effects on Private Label Demand" (2018) with G. Hitsch and JP Dube, *Marketing Science, 37, No. 1, 22-53*.

"Economic Valuation of Product Features" (2014) with G. Allenby, J. Howell, and J. Brazell , *Quantitative Marketing and Economics 12, 4, 421-456*.

"All Roads Lead to Arnold" (2014), *Econometric Reviews* 33, 1-4, 421-423.

"Even the Rich Can Make Themselves Poor: a critical examination of the use of IV methods in marketing" (2014), *Marketing Science*, 33, No. 5, 655-672.

"Valuation of Patented Product Features" (2014) with G. Allenby, J. Howell, and J. Brazell , *Journal of Law and Economics*, 57, 629-663.

"Plausibly Exogenous" (2012) with T. Conley and C. Hansen, *Review of Economics and Statistics*, 94, pp. 260-272.

"State Dependence and Alternative Explanations for Consumer Inertia" (2010) with J. P. Dubé,and G. J. Hitsch, Rand Journal of Economics, Vol 41, No 3, 417-445.

"A Model for Trade-Up and Change in Considered Brands" (2010) with G. M. Allenby and M. J. Garratt , *Marketing Science*, 29, No. 1, January-February, pp. 40-56.

"Do Switching Costs Make Markets Less Competitive?" and "Commentaries and Rejoinder to Shin and Sudhir and to Cabral" (2009) with G. J. Hitsch and J. P. Dubé, *Journal of Marketing Research*, Vol. XLVI, August.

"Bayesian Analysis of Random Coefficient Logit Models Using Aggregate Data" **(2009)** with R. Jiang and P. Manchanda, *Journal of Econometrics*, Vol.149, April, pp. 136-148.

"Teaching Bayesian Statistics to Marketing and Business Students" (2008) with G. Allenby, *The American Statistician*, August, 62, No. 3, 195-198.

"A Semi-Parametric Bayesian Approach to the Instrumental Variable Problem" (2008) with T. Conley, C. Hansen and R. McCulloch, *Journal of Econometrics*, 144, 276–305.

"Category Pricing with State Dependent Utility," (2008) with J. P. Dubé, G. J. Hitsch, and M. Vitorino , *Marketing Science*, 27, No. 3, May–June, pp. 417–429.

"Product Attributes and Models of Multiple Discreteness" (2007) with J. Kim and G. Allenby (2007), *Journal of Econometrics*, 138, pp. 208-230.

"Structural Modeling in Marketing: Review and Assessment" (2006) with P. Chintagunta, T. Erdem and M. Wedel (2006), *Marketing Science*, Vol. 25, No. 6, November–December, 581-605.

"A Direct Approach to Data Fusion" (2006) with Z. Gilula and R. McCulloch, *Journal of Marketing Research*, Vol. XLIII, February, 73-83.

"Structural Modeling and Policy Simulation" (2005) with B.Bronnenberg and N.Vilcassim, *Journal of Marketing Research*, Vol. XLII, February, 22–26.

"Response Modeling with Non-random Marketing Mix Variables" (2004) with P. Chintagunta and P. Manchanda, *Journal of Marketing Research*, Vol. XLI, November, 467–478.

"The Role of Retail Competition and Retail Strategy as Drivers of Promotional Sensitivity." (2004) with P. Boatwright and S. Dhar, *Quantitative Marketing and Economics*, 2, 169–190.

"Bayesian analysis of stochastic volatility models with fat-tails and correlated errors" (2004) with E. Jacquier and N. Polson, *Journal of Econometrics*, 122, 185-212 .

"Bayesian Statistics and Marketing" (2003) with G. Allenby, *Marketing Science*, 22, Summer, 304-329.

"Why Don't Prices Rise During Periods of Peak Demand?" (2003) with J. Chevalier and A. Kashyap, *AER*, 93(1), 15-37.

"Modeling Consumer Demand for Variety" (2002) with G. Allenby and J. Kim , *Marketing Science*, 21, Summer,  229-250.

"Overcoming Scale Usage Heterogeneity: a Bayesian Hierarchical Approach" (2001) with G. Allenby and Z. Gilula, *Journal of the American Statistical Association* 96, 20-31

"Bayesian Analysis of the Multinomial Probit Model with Fully Identified Parameters" (2000) with R. McCulloch, *Journal of Econometrics*, 99, 173-193.

"Statistics and Marketing" (2000) with G. Allenby, *Journal of the American Statistical Association,* 65, 635-638.

"Account-Level Modeling for Trade Promotion: An Application of a Constrained Parameter Hierarchical Model" (1999) with P. Boatwright and R. McCulloch , *JASA* , 94, December,  1063-1073.

"Estimating Price Elasticities with Theory-Based Priors," (1999) with A. Montgomery, *Journal of Marketing Research* 36, 413-423.

"Marketing Models of Consumer Heterogeneity" (1999) with G. Allenby, *Journal of Econometrics*, 89, 57-78.

"Similarities in Choice Behavior Across Product Categories" (1998) with A. Ainslie , *Marketing Science*, 17, 2, 91-106.

"On the Taxation of Capital Income," (1997),  *Journal of Economic Theory*, 73, 93-117(with L. Jones and R. Manuelli).

"The Value of Purchase History Data in Target Marketing" (1996) with G. Allenby and R. McCulloch, *Marketing Science*, 15, 4,  321-340.

"Modelling the Distribution of Price Sensitivity and Implications for Optimal Retail Pricing" (1995) with B. Kim and R. Blattberg , *Journal of Business and Economics Statistics*, 13, 291-304.

"Determinants of Store-level Price Elasticity" (1995) with S. Hoch, B. Kim and A. Montgomery, *Journal of Marketing Research*, 32, 17-29.

"Advances in Random Utility Models," (1994)  with Joel Horowitz, et al, *Marketing Letters*, 5, 311-322.

"Bayesian Analysis of Stochastic Volatility Models" (1994) with N. Polson and E. Jacquier , *Journal of Business and Economic Statistics*, 12 , 371-418.

"Purchase Frequency, Sample Selection and Price Sensitivity," (1994) with B. Kim , *Marketing Letters* (1994), 5, 57-68.

"An Exact Likelihood Analysis of the Multinomial Probit Model" (1994) with R. McCulloch (1994), *Journal of Econometrics*, 64, 207-240.

"A Marginal-Predictive Approach to Estimating Household Parameters" (1993) with G. Allenby, *Marketing Letters*, 4, 227-239.

"Nonlinear Dynamic Structures" (1993) with A. R. Gallant and G. Tauchen, *Econometrica* 61, 871-908.

"Optimal Taxation in Models of Endogenous Growth" (1993)  with L. Jones and R. Manuelli, *Journal of Political Economy*, 485-517.

"A Bayesian Approach to Estimating Household Parameters" (1993) with G. Allenby, *Journal of Marketing Research,*  XXX, 171-182.

"Bayes Factors for Nonlinear Hypotheses and Likelihood Distributions" (1992) with R. McCulloch, *Biometrika* 79, 4, 663-676.

"Stock Prices and Volume" (1992) with A. R. Gallant and G. Tauchen , *Review of Financial Studies*, 5, 199-242.

"Quality Perceptions and Asymmetric Switching Between Brands" (1991) with G. Allenby, *Marketing Science,* 10, 185-204.

"Posterior, Predictive, and Utility-Based Approaches to Testing the Arbitrage Pricing Theory," (1991) with R. McCulloch, *Journal of Financial Economics* 2,8, 7-38

"A Bayesian Approach to Testing the Arbitrage Pricing Theory" (1991) with R. McCulloch, *Journal of Econometrics* 49, 141-168.

"There is No Aggregation Bias: Why Macro Logit Models Work" (1991) with G. Allenby *Journal of Business and Economic Statistics*, 9, 2-14.

"*Econometric Theory* Interview with Arnold Zellner" (1989) *Econometric Theory*, 5 , 287-317.

"Comparison of Functional Forms in Production" (1985) *Journal of Econometrics* 30 (1985) 345-361.

"Bayesian Analysis of Dichotomous Quantal Response Models" (1984) with A. Zellner , *Journal of Econometrics,* 25, 365-394.

"Asymptotic Search Behavior Based on the Weibull Distribution" (1979) *Economics Letters* 3, 211-213.

"The Cost of Search and Rational Random Behavior" (1979),  *Economics Letters,* 3, 5-8.

"The Independence Transformation of Specific Substitutes and Specific Complements" (1979), *Economics Letters,* 2, 299-301.

"Body Time and Social Time: Mood Patterns by Menstrual Cycle Phase and Day of the Week" (1977) with A. S. Rossi, *Social Science Research,* 6, 273-308.

# Appendix A

**Book Chapters**

"Economic Foundations of Conjoint Analysis," (2019) with G. Allenby and N. Hardt, in *Handbook of the Economics of Marketing*, J.P. Dube and P. Rossi, eds. Elsevier.

"Inference for Marketing Decisions" (2019) with G. Allenby in *Handbook of the Economics of Marketing*, J.P. Dube and P. Rossi, eds. Elsevier.

"Bayesian Econometrics" (2018) with G. Allenby in *Handbook of Marketing Analytics*: Methods and Applications in Marketing Management, Public Policy, and Litigation Support, N. Mizik and D. Hanssens, eds, Edward Elgar Publishing.

"Causal Inference in Marketing Applications" (2018) in *Handbook of Marketing Analytics*: Methods and Applications in Marketing Management, Public Policy, and Litigation Support, N. Mizik and D. Hanssens, eds, Edward Elgar Publishing.

"Feature Valuation Using Equilibrium Analysis" (2018) with J. R. Howell and G. Allenby in *Handbook of Marketing Analytics*: Methods and Applications in Marketing Management, Public Policy, and Litigation Support, N. Mizik and D. Hanssens, eds, Edward Elgar Publishing.

"Economics Models of Choice" (2017 ) with G. Allenby and J. Kim  in *Handbook of Marketing Decision Models*, B. Wierenga and R. Lands, eds, 199-222, Springer.

"Bayesian Applications in Marketing" (2011)  with G. Allenby in *Handbook of Bayesian Econometrics* (Geweke, Koop, and Van Dijk eds), Chapter 8, pp. 390-438, Oxford: Oxford University Press.

"Choice Models in Marketing: Economic Assumptions, Challenges and Trends" (2009) with S. Chandukala, J. Kim, T. Otter, and G. Allenby in *Foundations and Trends in Marketing*, 2, No. 2, 97-184, Now Publishers.

"Hierarchical Bayes Models: A Practitioner's Guide" (2006)  with G. Allenby  in *Handbook of Marketing Research*, R. Grover and M.Vriens (eds.), Sage Publications."

"When BDT in Marketing Meant Bayesian Decision Theory: The Influence of Paul Green's Research" (2004) with E. Bradlow, P. Lenk, and G. Allenby, in *Marketing Research and modeling: Progress and Prospects, A Tribute to Paul Green*, Y. Wind and P.E.. Green (eds.), p. 17-39, Kluwer Academic Press.

"Bayesian Analysis of Multinomial Probit Model" (2000) with R. McCulloch *Simulation-Based Inference in Econometrics*, (Mariano, Weeks and Schuermann, eds), Cambridge: Cambridge University.

"Existence of Bayes Estimators for the Binomial Logit Model" (1996) in D. Berry, K. Chaloner, and J. Geweke (eds), *Bayesian Statistics and Econometrics: Essays in Honor of Arnold Zellner* , New York: John Wiley and Sons, 91-100.

"Bayes Factors for Testing the Equality of Covariance Matrix Eigenvalues" (1996) in  *Modelling and Prediction*, W. Johnson (ed), New York: Springer, 305-314.

"Hierarchical Modelling of Consumer Heterogeneity: An Application to Target Marketing" (1995) in *Case Studies in Bayesian Statistics*, Kass and Singpurwalla (eds), New York: Springer Verlag, 323-350.

"Comparison of Dynamic Factor Demand Model," (1987) in *Austin Symposia in Economics: Dynamic Econometric Models*, Cambridge: Cambridge University Press.

"Evaluating the Methodology of Social Experiments" (1985) in *The Income Maintenance Experiments* edited by J. Peckman, Boston: Federal Reserve Bank of Boston (with A. Zellner).

**Misc Articles**

"Calculating Reasonable Royalty Damages Using Conjoint Analysis," (2017) with G. Allenby, L. Cameron, J. Verlinda and Y. Li, *AIPLA Quarterly Journal*, 45, 234-253.

"The HB Revolution" (2004) with G. Allenby and D. Bakken, (2004), *Marketing Research,* Summer, 20-25.

"Making Sense of Scanner Data" (2000) with P. Delurgio and D. Kantor , *Harvard Business Review, March-April*, 24.

**Discussions**

"Both Network Effects and Quality are Important"  (2009) Journal of Marketing Research, XLVI, April.

"Discussion: 'Statistical Properties of Generalized Method of Moments Estimates Using Financial Market Data'" (1986) *Journal of Business and Economic Statistics,* 4, 417-419.

## PhD Students

Eric Gyhsels (84), Professor of Economics, University of North Carolina
Greg Allenby (88), Kurtz Professor of Marketing, Ohio State University
Eric Jacquier (91), Associate Professor of Finance, HEC Montreal
Byung-Do Kim (92), Professor of Marketing, Seoul National University
Alan Montgomery (94), Associate Professor of Marketing, CMU
Peter Boatwright (98), Associate Professor of Marketing, CMU
Andrew Ainslie (98), Professor of Marketing, Simon School of Business, University of Rochester
Renna Jiang (09), Assistant Professor of Marketing, UC Davis

## Professional Activities

Associate Editor, *Journal of Business and Economic Statistics* (1986- 1988)
Associate Editor, *Journal of Econometrics*, 1987 - 1995.
Member, Editorial Board *Marketing Science*, 1994 -2003.
Member, Editorial Board, *Journal of Marketing Research*, 1998- .
Associate Editor, *Journal of American Statistical Association* (applications section), 1995 – 2001.

Founding Editor (with Rajiv Lal), *Quantitative Marketing and Economics, 2000-2010*.

Senior Editor*, Marketing Science, 2015-2018*.

Chair, Business and Economics Section, American Statistical Association, 1995.
Seminar Leader, NBER/NSF Seminar on Bayesian Inference in Econometrics, 1995-1998.
Member, Savage Award Committee, ASA, 1995-2000.
Member, Advanced Research Forum Program Committee, AMA, 2000-2003

Referee for *Econometrica, Journal of Econometrics, Journal of Political Economy, Journal of the American Statistical Association, American Statistician, Econometric Theory, Journal of Applied Econometrics, Journal of Business, Marketing Science, Review of Financial Studies, Review of Economics and Statistics, Management Science, Journal of Marketing Research, Journal of the Royal Statistical Society.*

## Service Activities

### Anderson/UCLA

Vice-Chair, FEC (faculty policy committee advisory to Dean), 2013-2014.
Chair, Staffing Committee, 2012-13.
Chair, MFE Review Committee, 2012.
Member, Committee to propose and develop MSBA (MS in Business Analytics) degree, 2015- .

### Chicago Booth

Director, Strategic Marketing Management (short course exec ed program), 96-09.
Chair, Deans Reappointment Committee, 05.
Elected member, Dean's Search Committee, 96.
Elected member, Dean's Policy Committee, 96-09.
Chair of Recruiting, Marketing Group, 96-00, 01-03, 05-09.
Course Scheduler, Marketing Group, 96- 00.
Founder, Kilts Center for Marketing

Appendix B

Trial and Deposition History
*Peter E. Rossi*

1990

    deposition in EEOC v. Commonwealth Edison Case, United States District
        Court, Northern District of Illinois, Eastern Division, Civil Action
        no. 88 C 2745
        sex discrimination in hiring case, settled out of court
        retained by Sidley and Austin, defendants counsel

1992

    deposition and trial testimony, Kenneth J. Grudoff v. American Airlines,
    United States District Court, Northern District of Illinois, Eastern Division,
    Civil Action no. 90 C 7462
        wrongful separation and lost wages, settled out of court
        retained by plaintiffs attorneys

1992

    trial testimony, James P. Free v. Howard Peters III, Michael P. Lane, and
    Neil F. Hartigan , United States District Court, Northern District of Illinois,
    Eastern Division, No. 89 C 3765
        petition to void death penalty on the grounds of confusion regarding
        the Illinois uniform pattern jury instructions
        retained by Winston and Strawn on behalf of petitioner

1994

    Prepared expert report and gave deposition testimony, General Electric v.
    Emerson Electric Company and Inter-City Products Corp. , United States
    District Court, Eastern District of Missouri, Eastern Division, Civil Action
    NO. 4:92CCV2450

        patent infringement for variable speed motor products
        retained by Arnold, Durkee and White on behalf of defendants

1995/96

    Prepared expert report and gave deposition testimony, Baxter International
    Inc. and Baxter Healthcare Corp. v. Cobe Laboratories, 89 C 9460
        Patent infringement for blood separation technology
        Retained by Arnold, Durkee and White on behalf of defendants

1997

    Testified in Federal Tax Court.
    Nick Kikalos and Helen Kikalos, Petitioners V. Comissioner of Internal
    Revenue, respondent, United States Tax Court, Docket No. 10244-96
        retained by George Brode Jr on behalf of the petitioner.

**Appendix B**

1998

    Prepared Expert Report and gave deposition testimony, Richard Kaufman et al v. Motorola, United States District Court, 95 CV 1069.  Retained by defendants.

        Securities fraud involving disclosure of sales performance data and trade promotion policies.

2000

    Prepared Expert Report and gave deposition and trial estimony, United States v. Dentsply International Inc, CA No 99-005.  Retained on behalf of defendants for Howrey and Simon.

        Antitrust involving channels of distribution and exclusive dealing.

2001

    Prepared Expert Report and gave deposition testimony, Sparks v. ATT Corporation and Lucent Technolgies, Cause 96-LM-983.  Retained on behalf of the defendants for Brian, Cave, LLP.

2002

    Prepared Expert Report and gave deposition testimony, Baker et al V. Dominick's Finer Foods and Jewel Food Store,  Cook County Court.  Retained on behalf of the defendants for Latham and Watkins (Tim Hardwick).

        Allegations of price-fixing.

2003

    Prepared Expert Report and gave deposition testimony,  Solaia Technology LLC vs. Arvinmeritor and Rockwell Automation, United States District Court CA 02 C 4704. Retained by Howrey and Simon on behalf of defendants.

        Patent Infringement for Truck Engine Governors

2004

    Prepared Expert Report and gave deposition testimony, Expanse Networks v. Catalina Marketing Corp, United States District Court, CA 02 CV 2857.  Retained by Storm and Hemingway on behalf of defendant.

        Patent Infringement for targeted marketing software.

2006

    Prepared Expert Report and gave deposition testimony, Feuerabend et al. v. USSTC
Retained by Latham and Watkins on behalf of defendant
        Anti-trust class action lawsuit

2008

    Prepared Expert report and gave deposition testimony, Vident v. Denstply
Retained by Howrey and Simon on behalf of the defendant (Rick Ripley)
        Anti-trust

2009

    Prepared Expert report and gave deposition testimony, Ethicon Surgical Systems V. Hologic
Retained by Wilmer Hale on behalf of defendant

Patent infringement – damages based on lost profit claims – medical devices

2010    Evert Fresh Corp V. Pactiv Corp, US District Court, Southern District of Texas
Prepared Expert report and testified on trial.  Retained by Howrey Simon on behalf
of the Defendant.
Breach of contract and trademark infringement

2010    Craft et al V. Phillip Morris Inc., Missouri State Court
prepared expert report, and gave deposition testimony. Retained by Winston and
Strawn on behalf of the defendants.
Consumer fraud

2010    Travelers Vs. AIG, US District Court
retained as an statistical expert by Winston and Strawn on behalf of the plaintiff.

2011    Jackson Hewitt V. H&R Block, US District Court, New York. Retained by JonesDay
on behalf of the defendants. Prepared expert report and gave deposition testimony.
Lanham Act

2011    Chocolate Manufacturer Class Action Anti-Trust,  US District Court, Middle District
of Pennsylvannia.  Retained by CWT/McDermott Will and Emery/Kirkland and
Ellis on behalf of the defendants.  Prepared expert report and testified at class
certification hearing.
Anti-trust

2011    Simple-Air Inc V. AWS Convergence Technologies et al, US District Court, Eastern
Division of Texas.  Retained by Sidley Austin on behalf of Research In Motion, Inc.,
one of the defendants.  Prepared expert report and gave deposition testimony.
Patent Infringement on smart phones.

2012    Apple V. Samsung,  US District Court, Northern District of California, San Jose
Division.  Retained by Wilmer Hale on behalf of Apple.  Prepared expert report and
gave deposition testimony.
Patent Infringement involving smart phones and tablets.

2012    Microsoft V. Motorola,  US District Court, Western District of Washing.  Retained
by Sidley Austin on behalf of Microsoft.  Prepared expert report and gave deposition
testimony, and testified at ITC hearing.
Patent Infringement on consumer gaming products

2013    Brown et al V. American Tobacco et al, California Supreme Court.  Retained by
Phillip Morris USA.  Prepared expert report, gave deposition testimony.
Consumer Fraud

2013    Apple V. Samsung (II),  US District Court, Northern District of California, San Jose
Division.  Retained by Wilmer Hale on behalf of Apple.  Prepared expert report and
gave deposition testimony.

**Appendix B**

Patent Infringement involving smartphones and tablets.

2015    ContentGuard V. Amazon, et al. US District Court, Eastern District of Texas. Retained by Sidley and Austin on behalf of the defendants. Prepared expert report and gave deposition testimony.
Patent infringement involving digital rights software.

2015    Western Sugar Cooperative V. Archer-Daniels-Midland et al, US District Court, Central Division of California. Retained by Winston and Strawn on behalf of the defendants. Prepared expert report and gave deposition testimony. Settled during trial.
Lanham Act false Advertising Claims

2015    Dean v. Colgate-Palmolive Co., *US District Court, Central District of California*. Prepared expert report and gave deposition testimony.

2016    In re Anthem, Inc. Data Breach Litigation, *US District Court, Northern District of California, San Jose Division*. Prepared Expert Report and gave deposition testimony.

2016    FTC and State of Florida V. Inbound Call Experts, LLC, US District Court, Southern District of Florida. Retained on behalf of the defendants. Prepared expert report.
Deceptive Advertising Claims

2016    Alvin Todd, et al V. Tempur-Sealy, US District Court, Northern Division of California. Retained by plaintiffs. Prepared expert report and gave deposition testimony.
Class Certification for Consumer Fraud

2016    Dzielak et al V. Whirlpool Corporation,  US District Court, District of New Jersey. Retaiend by Wheeler Trigg O'Donnell LLP on behalf of the defendants**.**  Prepared Expert Report and gave deposition testimony. On going matter.
Class Certification for Consumer Fraud

2017    McCleery et al V. Allstate, California state court. Retained as a rebuttal expert.
Class Certification in a labor law dispute

2017    Dyson V. SharkNinja. Retained as rebuttal damages and economics expert.
Patent Infringement. Prepared report and provided deposition testimony.

2017    California V. GM LLC. Retained as a rebuttal damages and economics expert.
Deceptive Advertising. Prepared report and gave deposition testimony.

2017    GM LLC ignition Switch Litigation, US District Court, NY.
Retained as rebuttal expert in class certification.  Prepared report and provided depo testimony.  Class certification denied.

**Appendix B**

2018 Nestle Middle East V. Crest Foods, International Chamber of Commerce, International Court of Arbitration. Retained by Mayer Brown on behalf of Nestle. Retained as damages expert, breach of contract. Testified in International Court Proceedings in London. Judgment confidential but substantially in favor of Nestle.

2018 Nestle USA V. Crest Foods, US District Court, Central District of California. Retained by Mayer Brown on behalf of Nestle USA. Retained as damages expert, breach of contract. On-going.

2018 USA V. ATT/Time Warner, US District Court, Washington DC. Retained by Time Warner. Anti-trust. Prepared report, gave deposition and trial testimony regarding various estimates of customer losses used by Justice department experts. ATT/Time Warner prevailed upon appeal.

2018 In re Navistar Maxxforce Engines Mktg., Sales Practices and Products Liability Litigation, *US District Court, Northern District of Illinois, Eastern Division.* Retained by Plaintiffs. Prepared Expert Report and gave deposition testimony. Settlement reached.

2018 In Premera Blue Cross Customer Data § Security Breach litigation, *US District Court, Oregon.* Retained by Plaintiffs Prepared Expert Report and gave deposition testimony. Ongoing matter.

2018 Jimenez et al V. Allstate, California state court. Retained as a rebuttal expert. Prepared report and provided depo testimony. Labor class action. Plaintiffs' survey was excluded by Court based in a Daubert motion, on-going matter.

2018 Blitz V. Monsanto, US District Court, Western District of Wisconsin. Retained by Monstano (Winston and Strawn). Prepared Expert Report and gave deposition testimony. Product Liability. Class Certification rejected by the court.

2018 Johannessohn et al V. Polaris Industries, US District Court, Minnesota . Retained by Kirkland and Ellis on behalf of Polaris. Prepared Expert Report. Product Liability. Class certification denied.

2019 STOCKINGER et al v. TOYOTA MOTOR SALES, U.S.A. Retained by Toyota (Morgan Lewis). Prepared Expert Report. Product Liability. Class certification denied.

2019 Various Matters v. JUUL Laboratories, retained by JUUL (Kirkland and Ellis/Paul Weiss) Prepared expert declaration and provided depo testimony in NC case.

2020 Nemet et al v. VW, Retained by VW (Sullivan Cromwell). Product liability, prepared expert report and gave deposition testimony. Class cert denied.

**Appendix B**

2020   Earl et al v. Boeing and Southwest airlines, retained by Boeing (McGuire Woods). Product liability, prepared expert report, provided deposition testimony on-going matter.

2020   Tomilson et al v. Monsanto, retained by Monsanto (Winston and Strawn). Product liability, prepared expert report, on-going matter.

2020   Cardenas et al v. Toyota, retained by Toyota (Morgan Lewis). Product liability, on-going matter.

2020   Various Matters v. Keurig, retained by Keurig (Buchanan and Cleary) False advertising and anti-trust, prepared expert report, gave deposition testimony, on-going matter.

2020   Epic Games V. Apple Inc., retained by Epic (Cravath) Anti-trust, prepared expert report, provided deposition and trial testimony

2021   Zimmer V. Heraeus Medical retained by Heraus(Buchanan) Prepared expert report, on-going matter.

*Confidential*

## Appendix C
## Materials Relied Upon

### Legal Documents

Consolidated Amended Complaint, *In Re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, 1:19-md-2903, October 28, 2019.

Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *In Re: Fisher-Price Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, 1:19-md-2903, February 8, 2021.

Transcript of Status Conference, *In re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, Case No. 1:19-md-2903.

### Expert Reports and Declarations

Declaration of Colin B. Weir, February 8, 2021.

Expert Report of Dr. Ran Kivetz, June 16, 2021.

### Depositions

Deposition of Colin B. Weir, March 11, 2021.

Deposition of Jena Huey, April 16, 2021.

Deposition of Nancy Hanson, March 25, 2021.

Deposition of Sarah Ford, December 11, 2020.

### Bates-Stamped Documents

FSHR0060073-FSHR0060084.

FSHR0060125.

FSHR0012772.

"Baby Gear Spring 2016," FSHR0059366-FSHR0059439.

"Babygear 2018 BDO," FSHR0016472-FSHR0016643.

"Babygear Spring 2017 SILR," FSHR0069995.

"Fisher Price Jonathan Adler buy buy Baby," FSHR0070087.

"Voice of the Consumer Baby Gear," 2013, FSHR0059256-FSHR0059277.

Moseley, Ariana, "Fisher Price GCI 2019 Room Sharing Solution Concept Evaluation Report," December 2017, FSHR0017111-FSHR0017167.

*Confidential*

## Public Documents

Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, 2011, pp. 425-502.

Allenby, Greg, Jeff Brazell, John Howell, and Peter E. Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," *Proceedings of the Sawtooth Software Conference*, October 2013.

Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, Vol. 12, No. 4, 2014, pp. 421-456.

Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *The Journal of Law & Economics*, Vol. 57, No. 3, August 2014, pp. 629-663.

Allenby, Greg M., Nino Hardt, and Peter E. Rossi, "Economic Foundations of Conjoint Analysis," Vol. 1, First Ed., edited by Jean-Pierre Dube and Peter E. Rossi, Netherlands, Elsevier, 2019.

Allenby, Greg M.; Rossi, Peter E., "Perspectives Based on 10 Years of HB in Marketing Research," *Sawtooth Software Research Paper Series*, 2003.

Amazon Customer Reviews Dataset: Baby, available at https://s3.amazonaws.com/amazon-reviews-pds/tsv/amazon_reviews_us_Baby_v1_00.tsv.gz, accessed on March 16, 2021.

*Baby Durables, US - April 2016*, Mintel Group, April 2016.

Diamond, Shari Seidman, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, 2011, pp. 359-423.

Hauser, John R., Felix Eggers, and Matthew Selove, "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science*, Vol. 38, No. 6, 2019, pp. 1059-1081.

Kaye, David H., and David A. Freedman, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence*, 2011, pp. 211-302.

Mankiw, Gregory, *Principles of Economics* Sixth Ed., Boston, MA, Cengage Learning, 2011.

Orme, Bryan K., *Getting Started with Conjoint Analysis* Third Ed., Research Publishers LLC, 2014.

Orme, Bryan K., and Keith Chrzan, "Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros," 2017.

"On the Go Baby Dome," https://www.fisher-price.com/en-us/product/on-the-go-baby-dome-drfl3.

Pindyck, Robert S., and Daniel L. Rubenfield, *Microeconomics* Eighth Edition Ed., Pearson, 2013.

Rossi, Peter E., Greg M. Allenby, and Rob McCulloh, *Bayesian Statistics and Marketing*, England, John Wiley & Sons, Ltd., 2005.

*Confidential*

Shea, John, "Do Supply Curves Slope Up?," *The Quarterly Journal of Economics*, Vol. CVIII, No. 1, February 1993, pp. 1-32.

"Soothing Motions Bassinet," https://www.fisher-price.com/en-us/product/soothing-motions-bassinet-dpv72.