**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 1:19-md-2903 |
| | Hon. Geoffrey W. Crawford |
| | This Document Relates to: ALL CASES |

**<u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND OPINIONS OF MR. COLIN B. WEIR (ECF 168)</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   LEGAL STANDARD ...........................................................................................6

III.  ARGUMENT .......................................................................................................9

A.    Mr. Weir's full refund damages calculation is sufficient because Mr. Weir is not required to prove liability or decide himself if the products are indeed valueless. ............10

B.    Mr. Weir's proposed conjoint analysis is a commonly used and reliable economic methodology to calculate diminished value damages and Defendants' criticisms go to the weight of Mr. Weir's testimony, not its admissibility .............................................12

C.    Mr. Weir's proposed conjoint analysis includes the actual supply of the product as it existed during the relevant time period for this litigation and therefore does not ignore supply-side market factors. ...................................................................................17

D.    Mr. Weir's proposed conjoint methodology is entirely consistent with Plaintiffs' theory of liability. ...................................................................................................21

E.    Defendants' argument that Mr. Weir's opinion is unreliable because he will rely on the Court to give him "direction" on his methodologies should be rejected .....................23

F.    Defendants' argument that Mr. Weir's methodologies are unreliable because they do not include "individualized analysis" should be rejected .............................................24

IV.   CONCLUSION ...................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*In re General Motors LLC Ignition Switch Litigation* ,
    407 F. Supp. 3d 212 (S.D.N.Y. 2019).................................................................................. 20

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    2020 WL 2280144 (E.D.N.Y. May 5, 2020) ......................................................................... 9

*Allen v. Hyland's Inc*.,
    300 F.R.D. 643 (C.D. Cal. 2014) ......................................................................................... 12

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)..................................................................................... 7, 17, 18

*Bacardi & Co. Ltd. v. New York Lighter Co., Inc.*,
    2000 WL 298915 .................................................................................................................. 17

*Bailey v. Rite Aid Corp*.,
    338 F.R.D. 390 (N.D. Cal. 2021) ........................................................................................... 2

*Banh v. American Honda Motor Co., Inc.*,
    2020 WL 4390371 (C.D. Cal. July 28, 2020)........................................................................ 2

*Bazemore v. Friday*,
    478 U.S. 385 (1986)............................................................................................................. 16

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996)..................................................................................................... 17

*Brown v. Hain Celestial Group, Inc.*,
    2014 WL 6483216 (N.D. Cal., Nov. 18, 2014) ..................................................................... 2

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)......................................................................................................... 6, 22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)..................................................................................................... passim

*de Lacour v. Colgate-Palmolive Co*.,
    338 F.R.D. 324 (S.D.N.Y. 2021) ....................................................................................... 2, 4

*Dzielak v. Maytag*,
    2017 WL 1034197 (D.N.J., March 17, 2017)......................................................................... 2

*Fero v. Excellus Health Plan, Inc.*,
    502 F. Supp. 3d 724 (W.D.N.Y. 2020) .................................................................................. 7

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*,
   326 F.R.D. 592 (N.D. Cal. 2018)..................................................................................... 2, 19

*Gill v. Arab Bank, PLC*,
   893 F. Supp. 2d 523 (E.D.N.Y. 2012) .................................................................................. 11

*Guido v. L'Oreal, USA, Inc.*,
   2014 WL 6603730 (C.D. Cal., July 24, 2014) ......................................................................... 2

*Hadley v. Kellogg Sales Co.*,
   324 F. Supp. 3d 1084 (N.D. Cal. 2018) ..................................................................... 2, 18, 19

*Hudock v. LG Elecs. USA, Inc.*,
   2020 WL 1515233 (D. Minn. Mar. 30, 2020) ........................................................................ 2

*Hughes v. The Ester C Company*,
   317 F.R.D. 333 ...................................................................................................................... 12

*Iacobelli Constr., Inc. v. Cnty. Of Monroe*,
   32 F.3d 19 (2d Cir. 1994)....................................................................................................... 11

*In re Arris Cable Modem Consumer Litig.*,
   327 F.R.D. 334 (N.D. Cal. 2018).............................................................................................. 2

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ..................................................................................... 23

*In re Kind LLC "Healthy & All Natural" Litig.*,
   337 F.R.D. 581 (S.D.N.Y. 2021) .......................................................................................... 9, 14

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 ................................................................................................................. 9

*In re MyFord Touch Consumer Litig.*,
   291 F. Supp. 3d 936 (N.D. Cal. 2018) ................................................................................... 19

*In re Namenda Indirect Purchaser Antitrust Litigation*,
   2021 WL 100489 (S.D.N.Y. Jan. 12, 2021) ............................................................................. 8

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) .................................................................................. 2, 4, 12, 24

*In re: Lenovo Adware Litigation*,
   2016 WL 6277245 (N.D. Cal., Oct. 27, 2016)......................................................................... 2

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
   311 F.R.D. 373 (S.D.N.Y. 2015) ............................................................................................. 24

*Kaupelis v. Harbor Freight Tools, Inc.*,
   2020 WL 5901116 (C.D. Cal. Sep. 23, 2020).................................................. 2, 19

*Khoday v. Symantec Corp.*,
   2014 WL 1281600 (D. Minn., March 13, 2014)................................................. 2

*Krommenhock v. Post Foods, LLC*,
   334 F.R.D. 552 (N.D. Cal. 2020)................................................................. 2, 19

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..................................................................................... 6, 8

*Kurtz v. Costco Wholesale Corp.*,
   818 F. App'x 57 (2d Cir. 2020)........................................................... 8, 16, 18

*Kurtz v. Kimberly-Clark Corp.*,
   321 F.R.D. 482 (E.D.N.Y. 2017)................................................................... 13

*Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*,
   97 F. Supp. 3d 485 (S.D.N.Y. 2015)............................................................. 11

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie,*
   *KBF*, 2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015) ...................................... 10

*M.B. ex rel. Scott v. CSX Transp., Inc.*,
   130 F. Supp. 3d 654 (N.D.N.Y. 2015)............................................................. 7

*Marshall v. Hyundai Motor America*,
   334 F.R.D. 36 (S.D.N.Y. 2019) .................................................................... 13

*Martinelli v. Johnson & Johnson*,
   2019 WL 1429653 (E.D. Cal. Mar. 29, 2019) .................................................. 2

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995).......................................................................... 17

*McMorrow v. Mondelez*,
   2021 WL 859137 (S.D. Cal. Mar. 8, 2021) ...................................................... 2

*Microsoft v. Motorola, Inc.*,
   904 F. Supp. 2d 1109 (W.D. Wash. 2012)............................................. 2, 16, 17

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005).......................................................................... 8

*Overstreet v Virts*,
   2019 WL 1331567 (W.D.N.Y. Mar. 25, 2019)............................................... 15

iv

*Perry v. Allegheny Airlines, Inc.*,
  489 F.2d 1349 (2d Cir. 1974)............................................................................. 11

*Reyes v. Delta Dallas Alpha Corp.*,
  2000 WL 526851 (S.D.N.Y. May 2, 2000) ........................................................ 16

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)............................................................................ 4, 25

*Saavedra v. Eli Lilly & Co.*,
  2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) .................................................... 15

*Sali v. Corona Reg'l Med. Ctr.*,
  909 F.3d 996 (9th Cir. 2018) ............................................................................... 9

*Sanchez-Knutson v. Ford Motor Company*,
  310 F.R.D. 529 (S.D. Fla. 2015)........................................................................... 2

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ........................................................................ 8, 9

*Singleton v. Fifth Generation, Inc.*,
  2017 WL 5001444 (N.D.N.Y. Sept. 27, 2017) .................................................. 23

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
  No. 5:16-CV-125(GWC), 2019 WL 12323322 (D.Vt. July 15, 2019)................. 8

*Tait v. BSH Home Appliances Corp.*,
  289 F.R.D. 466 (C.D. Cal. 2012) ......................................................................... 9

*TV Interactive Data Corp. v. Sony Corp.*,
  929 F. Supp. 2d 1006 (N.D. Cal. 2013) ............................................................... 2

*U.S. Bank Nat. Ass'n v. James*,
  741 F. Supp. 2d 337 (D. Me. 2010) .................................................................... 12

*Washington v. Kellwood Co.*,
  105 F. Supp. 3d 293 (S.D.N.Y. 2015)................................................................... 7

*Weiner v. Snapple Beverage Corp.*,
  2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010)...................................................... 14

*Wendt v. Host Int'l, Inc.*,
  125 F.3d 806 (9th Cir. 1997) ........................................................................ 16, 17

*Zakaria v. Gerber Products Co.*,
  2017 WL 9512587 (C.D. Cal. Aug. 9, 2017).................................................. 20, 21

**Rules**

Fed. R. Civ. P. 23(b)(3)................................................................................. 6, 9, 24, 25

Federal Rule of Evidence 702............................................................................... passim

Federal Rule of Evidence 703................................................................................... 17

**Other Authorities**

*Reference Manual on Scientific Evidence* (3d ed.), 2011 WL 7724259 ...................................... 10

## I.      INTRODUCTION

Plaintiffs respectfully submit this memorandum of law in opposition to Fisher-Price, Inc. and Mattel, Inc.'s ("Defendants") Motion (ECF 168; the "Motion"[1]) to Exclude the Declaration and Opinions of Mr. Colin B. Weir (ECF 125-2; "Weir Decl." or "Declaration") in support of Plaintiffs' Motion for Class Certification (ECF 125).[2]

In his Declaration, Mr. Weir, who holds an MBA from Northeastern University and whose expert opinions concerning class-wide damages have been admitted by numerous federal courts, opined that it is possible to calculate damages on a class-wide basis in this case and outlined two separate damages methodologies for doing so: (1) full refund damages if Plaintiffs prevail on their theory of liability that the Fisher-Price Rock 'n Play Sleeper ("RNPS" or "Sleeper") is unsafe and valueless, or should not have been sold; and (2) diminution in value damages if the Court determines that full refund damages are not appropriate and the safety risks of the Sleepers resulted only in the diminution of its value. To calculate diminution in value damages, Mr. Weir proposes a choice-based conjoint survey, with the data analyzed by Hierarchical Bayes regression before application to a market simulation ("conjoint analysis"). Conjoint analysis is a widely used, peer reviewed, and generally accepted scientific methodology for reliably calculating the value of product features, including safety risks.[3] Weir Decl., ECF 125-2, Ex. 3 at ¶¶ 2-11. Indeed, conjoint

---

[1] Citations herein to specific pages or text of the Motion are located in Defendants' Memorandum of Law in support thereof, ECF 168-1.

[2] For the Court's convenience, Mr. Weir's Declaration is attached as Exhibit A to the concurrently filed Declaration of Demet Basar in Opposition to Motion to Strike ("Basar Decl." or "Basar Declaration").

[3] As detailed in Mr. Weir's report, "Conjoint analysis is a representative survey technique that permits an economist to analyze the value of various product attributes. Conjoint analysis can be used to determine market valuation/attribute information for a given product or attribute…In a typical conjoint analysis, survey panelists are confronted with various choices of product attributes, prices, and other alternatives, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof. Through conjoint analysis, by systematically varying the attributes of the product and observing how respondents react to the resulting product profiles, one can statistically gather information about a product's various attributes." Weir Decl., Ex. 3 at ¶¶ 2-5.

analysis has been accepted by federal courts throughout the country,[4] including by courts within the Second Circuit, as have conjoint analyses and related work Mr. Weir himself has done in consumer protection class litigations such as this one.[5] Mr. Weir's Declaration not only survives Defendants' challenge under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rules of Evidence 702, but also more than satisfies Plaintiffs' burden at class certification to submit a damages "outline, describing the likely methodology." 12/23/2019 Order on Discovery ("12/23/19 Order"), ECF 30 at 7.

As an initial matter, while Defendants argue that the Court should conduct a full *Daubert* analysis of Mr. Weir's Declaration and that, at class certification, "an even more rigorous *Daubert* standard" should apply (Mot. at 5-6), Defendants' previous position on this issue was that *Daubert* should not apply ***at all*** to Plaintiffs' damages expert reports. At the beginning of this case, Defendants went to great lengths to shield discovery on merits issues and successfully advocated that the Court should permit only class certification related discovery until it ruled on the issue. 9/16/2019 Hearing Tr., ECF 13 at 7:11-33:17; ECF 12 at 7-8. While attempting to further limit discovery even after bifurcation, Defendants opposed Plaintiffs' bid to compel production of

---

[4] *See e.g. Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 326 F.R.D. 592, 603-06 (N.D. Cal. 2018); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 367-373 (N.D. Cal. 2018); *Dzielak v. Maytag*, 2017 WL 1034197, at *6 (D.N.J., March 17, 2017); *Khoday v. Symantec Corp.*, 2014 WL 1281600, at *10 (D. Minn., March 13, 2014); *Sanchez-Knutson v. Ford Motor Company*, 310 F.R.D. 529, 538-39 (S.D. Fla. 2015); *In re: Lenovo Adware Litigation*, 2016 WL 6277245 at *21 (N.D. Cal., Oct. 27, 2016); *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *5, *10-14 (C.D. Cal., July 24, 2014); *Brown v. Hain Celestial Group, Inc.*, 2014 WL 6483216, at *19 (N.D. Cal., Nov. 18, 2014); *Microsoft v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1119-20 (W.D. Wash. 2012); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013).

[5] *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 344-46 (S.D.N.Y. 2021); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 412-414, 416 (S.D.N.Y. 2015); *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 408-11 (N.D. Cal. 2021); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1103-10 (N.D. Cal. 2018); *Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at *3-4 (E.D. Cal. Mar. 29, 2019); *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 573-76 (N.D. Cal. 2020); *Hudock v. LG Elecs. USA, Inc.*, 2020 WL 1515233, at *15 (D. Minn. Mar. 30, 2020); *Koenig v. Vizio, Inc.*, Los Angeles Superior Court Case No. BC702266 (L.A. Super. Ct. Aug. 24, 2020); *Banh v. American Honda Motor Co., Inc.*, 2020 WL 4390371, at *18 (C.D. Cal. July 28, 2020); *Kaupelis v. Harbor Freight Tools, Inc.*, 2020 WL 5901116, at *4-6 (C.D. Cal. Sep. 23, 2020); *McMorrow v. Mondelez*, 2021 WL 859137, at *3-10 (S.D. Cal. Mar. 8, 2021).

damages-related documents and made representations to the Court that directly contradict the

position they now take in their Motion:

> THE COURT: [W]hat is your view of the plaintiffs' concern that they are required to sort of present a completed economic damages model for consideration at class certification, if that wasn't done, would you say, you're out of court, you didn't get that homework to the judge in time?

> [DEFENSE COUNSEL]: Well, candidly, [Y]our Honor, the burden of proof for the judge as the trier of fact *is not to impose a Daubert standard to a damages model*. ….[Plaintiffs] have to come up with *a concept of damages* that the Court believes would be sufficient. Not – *this is not an evidentiary hearing where there is the burden of proof is complete and admissible evidence and otherwise*. …. *This is a procedural motion*. [Counsel arguing against discovery of the veracity of Defendants' marketing and state of mind because those are "merits inquiries" that "will be engaged once we get past class certification."]

> THE COURT: …[B]ut with respect to … how far [Plaintiffs] have to go to complete their damages calculation, just for purpose of class certification, how do you see that?

> **

> [DEFENSE COUNSEL]: … [I]t's left to your judgment. There is no clear bright-line on damages models in class action cases as to what is sufficient … to establish a sufficient model of commonality for purposes of class certification…. *But I will say to you that it is a procedural motion not a merits motion. … Nor is it held to, a damages analysis, held to a Daubert standard for purposes of whether or not the Court will determine it passes muster*.

12/9/2019 Hearing Tr., ECF 31 at 35:19-37:23 (emphasis added).

Given Defendants' representations, the Court denied Plaintiffs' request for the damages-

related documents, and ruled that it "*does not require a completed expert evaluation* for purposes

of determining commonality. An *outline*, describing the *likely methodology*, will suffice."

12/23/19 Order, ECF 30 at 7 (emphasis added). Defendants did not take issue with the ruling.

Defendants have now done a complete about face and move to strike Mr. Weir's

Declaration under *Daubert* precisely because it is an outline describing his proposed

methodologies, instead of a completed expert report. Their Motion lacks any valid basis to exclude

Mr. Weir's Declaration under *Daubert* or Rule 702. With respect to Mr. Weir's full refund

damages methodology, Defendants do not challenge that it can calculate class-wide damages, only that it's a matter of arithmetic to calculate such damages, so the Court does not need Mr. Weir's assistance. With respect to Mr. Weir's proposed conjoint methodology, Defendants argue Mr. Weir should have actually designed, pretested and conducted a conjoint survey populated with data and established that the conjoint analysis would yield reliable results. Defendants complain that Mr. Weir "has undertaken no steps to illustrate that [he] is right." Mot. at 8. They find fault that he "failed to design or employ a survey"; that he "has obtained no data, and thus he has not performed any analysis"; that "he does not even attempt to show that his proposed methods could produce sound results"; and that he "fails to demonstrate his method would provide reliable estimates of willingness to pay." *Id.* at 11. In other words, Defendants now claim that, on class certification, Mr. Weir should have designed a functioning damages model, and, because he did not, his Declaration fails under *Daubert* and Rule 702. Defendants' position not only ignores the Court's 12/23/19 Order that Your Honor does not require completed expert evaluation on class certification, but is inconsistent with the law of this Circuit. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("*Comcast*…did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance."); *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 344 ("A plaintiff's expert is not required to *perform* their analysis at the class certification stage.") (citation omitted; emphasis in original); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 414 ("[N]othing in *Comcast* requires an expert to perform his analyses at the class certification stage)." Moreover, Defendants are wrong as a matter of fact. Mr. Weir's Declaration does in fact describe in detail the steps he intends to take in conducting his conjoint analysis at the merits stage. *See* Weir Decl., ECF 125-2, Ex. 3 at ¶¶ 14-60.

In any case, under *Daubert* and the lenient admissibility standards of Rule 702, Mr. Weir's Declaration and opinions are plainly admissible. Defendants do not dispute – and therefore concede – that Mr. Weir is an experienced economist well-qualified to give an expert opinion on damages in this case, and that conjoint analysis is a scientific and reliable method for calculating price premium damages on a class-wide basis. Indeed, Defendants' own experts, Professors Olivier Toubia and Peter Rossi, routinely conduct conjoint analyses, and both have authored articles and book chapters supporting its use. *See* Toubia Decl., ECF 166-3, ¶¶ 3-5 and Appendix A; Rossi Decl., ECF 166-2, ¶ 4, Appendix A. Instead, relying on the opinions of these two highly compensated academicians,[6] Defendants attack Mr. Weir's proposed damages methodologies ***on the merits***, as though Mr. Weir had already designed and presented a fully functional damages model. Thus, Defendants argue that Mr. Weir, in opining on a proposed conjoint survey that could be designed and used to calculate damages class-wide, did not cross the "t"s and dot the "i"s by, for example, selecting final attributes and levels for his proposed conjoint survey. Mot. at 10. Mr. Weir, in fact, did choose the attributes and levels for the proposed survey – and more – but on a preliminary basis, subject to change after merits discovery. *See* Weir Decl., ECF 125-2, ¶¶ 13, 30 and Ex. 3, ¶¶ 24-28. Defendants also argue that Mr. Weir's proposed conjoint methodology is deficient because it supposedly does not take supply-side factors into account. Mot. at 13-16. This is also plainly untrue (*see* Weir Decl., ECF 125-2, Ex. 3, ¶¶ 50-57). Defendants just disagree that Mr. Weir did it correctly. In short, Defendants' criticisms go to the ***weight*** of Mr. Weir's opinions, not their admissibility.

---

[redacted]

Defendants separately contend Mr. Weir's Declaration should be stricken because he supposedly misunderstands Plaintiffs' theory of liability. In doing so, Defendants improperly conflate the analysis of two distinct inquiries under *Daubert* and *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Defendants' argument is properly considered in ruling on Plaintiffs' class certification motion, not in a *Daubert* analysis. In any case, contrary to Defendants' baseless argument, Mr. Weir's proposed methodologies ***are*** firmly anchored to Plaintiffs' theory of the case that the Rock 'n Play Sleeper is inherently unsafe for infant sleep due to its 30-degree incline and therefore lacks any value. *See* Weir Decl., ECF 125-2, ¶¶ 8-11.

There can be no serious doubt that Mr. Weir's economic damages theories are relevant to the decision the Court must make on class certification – whether Plaintiffs have met the predominance requirement of Fed. R. Civ. P. 23(b)(3) by establishing damages are calculable on a class-wide basis – and Defendants do not argue otherwise. Plaintiffs should not be deprived of the tools, including Mr. Weir's expert testimony, that will enable them to present their best arguments at a critical stage of this multi-district litigation. Defendants' misguided and meritless *Daubert* Motion should be denied in all respects.[7]

## II.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admission of testimony by expert witnesses. The current iteration of Rule 702 is the result of amendments adopted in 2000 to bring the Rule into harmony with Supreme Court rulings in *Daubert* and succeeding cases detailing the standard, including *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Among the non-exclusive factors the *Daubert* Court provided to evaluate the methodology underlying testimony

---

[7]If the Court should find any shortcomings in Mr. Weir's outline of his proposed damages methodologies, Plaintiffs' respectfully request an opportunity to submit a further expert report that addresses those issues, consistent with Mr. Weir's reservation of rights to amend or modify his testimony. Weir Decl., ¶¶ 13, 30.

are testing, peer review and publication, error rate, the existence of standards for its application, and acceptance within the relevant scientific community. 509 U.S. at 592-4.

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Fero v. Excellus Health Plan, Inc.*, 502 F. Supp. 3d 724, 749 (W.D.N.Y. 2020) (quoting *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015)) (cross motions to exclude expert testimony under *Daubert* denied as moot). "Ultimately, the party proffering the expert has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria." *Fero*, 502 F. Supp. 3d at 749. "As the courts and Advisory Committee have made clear, 'the rejection of expert testimony is the exception rather than the rule.'" *Id.* (quoting *M.B. ex rel. Scott v. CSX Transp., Inc.*, 130 F. Supp. 3d 654, 665 (N.D.N.Y. 2015) (quoting Fed. R. Evid. 702, Advisory Committee's Note)).

The Supreme Court emphasized that "[t]he inquiry envisioned by Rule 702 is…a flexible one." *Daubert*, 509 U.S. at 594. "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).[8] As noted by Justice Rehnquist, concurring in part, "I do not doubt that Rule 702 confides to the judge some gatekeeping responsibility in deciding questions of the admissibility of proffered expert testimony. But I do not think it imposes on them either the obligation or the authority to become amateur scientists in order to perform that role." *Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 5:16-CV-

---

[8] The outcome in *Amorgianos* (excluding the expert opinions in question) is inapposite here, because it concerned whether expert testimony could be offered at trial, after their reports had been completed.

125(GWC), 2019 WL 12323322, at *5 (D.Vt. July 15, 2019) (quoting *Daubert*, 509 U.S. at 600–01).

The *Daubert* Court also made clear that exclusion of expert testimony is *not* warranted merely because the opinions of competing experts differ. In such cases, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596. Indeed, the Second Circuit has noted that Rule 702 "embodies a more liberal standard of admissibility" than the "more restrictive" *Frye* standard, and that the shift signaled a "more permissive approach to expert testimony." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). "[I]f an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016) (quoting *Kumho Tire*, 526 U.S. at 153).

Neither the Supreme Court nor the Second Circuit has ruled on whether expert opinion testimony must be admissible under Rule 702 or *Daubert* when offered at the class certification stage, as opposed to when offered as evidence to the trier of fact at trial. *See Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 n.3 (2d Cir. 2020) ("*Costco*"). While Defendants rely on *In re Namenda Indirect Purchaser Antitrust Litigation*, 2021 WL 100489 (S.D.N.Y. Jan. 12, 2021), to argue that the Southern District of New York holds reports must be found to be admissible at trial to be used in class certification, they fail to inform the Court that another judge in the same district reached the opposite conclusion, just over two months later. Senior District Judge William Pauley held that "the question is not whether a jury should be permitted to rely on the expert's testimony, but rather whether the Court may utilize an expert's report in deciding whether the

requisites of Rule 23 have been met." *In re Kind LLC "Healthy & All Natural" Litig.*, 337 F.R.D. 581, 604 (S.D.N.Y. 2021) (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 471);[9] *see also Chipotle*, 315 F.R.D. at 56 ("[T]he scope of the *Daubert* analysis is cabined by its purposes at [the class certification] stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23").[10] If there is any valid basis to challenge the admissibility of Mr. Weir's Declaration – and Plaintiffs submit there is none – this limited *Daubert* inquiry is appropriate here, where there has been no merits discovery, at Defendants' request, and the expert was tasked with presenting only an "outline" of a "likely" methodology, not a full report as would be submitted at trial. 12/23/19 Order, ECF 30 at 7.

## III.   ARGUMENT

Regardless of whether the Court undertakes a limited or full *Daubert* analysis, Mr. Weir's qualifications, the reliable application of his methods to the facts of this case, and the aid it will provide to the Court in determining whether damages are calculable on a class-wide basis, dictate that his Declaration and testimony are admissible for class certification. Numerous other courts have reached the same conclusion.[11]

---

[9] Similarly, Defendants quote *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, to argue that *Daubert* analysis is to be applied. 2020 WL 2280144 (E.D.N.Y. May 5, 2020). Defendants omit the next sentence in the order, which holds, like *In re Kind*, that "courts limit the scope of their *Daubert* analysis to determining whether or not the expert reports are admissible to establish the requirements of Rule 23." *Restasis*, 2020 WL 2280144, at *2 (internal quotation marks omitted).

[10] Defendants also rely on a litany of non-controlling cases from other Circuits supporting their assertion that expert opinions offered in support of class certification must be admissible under a full *Daubert* analysis (Mot. at 6), but conveniently omit the fact that the Ninth Circuit, where many consumer protection cases are litigated, has held that admissibility under a *Daubert* standard should ***not*** be dispositive but rather goes to the weight given to the evidence at the class certification stage. *See Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018); *see also Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal. 2012) ("[D]istrict courts are not required to conduct a full *Daubert* analysis.").

[11] *See* cases listed *supra* note 5.

A. **Mr. Weir's full refund damages calculation is sufficient because Mr. Weir is not required to prove liability or decide himself if the products are indeed valueless.**

All of Defendants' arguments for striking Mr. Weir's full refund damages methodology lack merit. Defendants contend Mr. Weir has done no analysis tying the appropriateness of full refund damages to this case and that Mr. Weir himself should have determined "whether from an economic/market perspective the product is valueless." Mot. at 7. Questions of liability and value, however, are for the trier of fact to decide. "Damages quantification operates on the premise that the defendant is liable for damages from the defendant's harmful act." *Reference Manual on Scientific Evidence* (3d ed.), Reference Guide on Estimation of Economic Damages, 2011 WL 7724259, at 429; *see also Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie, KBF*, 2015 WL 5459662, at *10 (S.D.N.Y. Sept. 16, 2015) ("a damages expert[] is entitled to assume liability for purposes of calculating damages"). Thus, Mr. Weir was only asked to opine on a framework for calculating damages attributable to the theories of liability in this case, one of which is that the Sleepers lack all value because they are not fit for their intended use. Weir Decl., ECF 125-2, ¶ 13.[12] Consol. Am. Compl. ("CAC"), ECF 19 ¶ 7, Mem. of Law in Supp. of Pls.' Mot. for Class Certification ("Pls.' Motion"), ECF 125-1, ¶¶ 41-43. Mr. Weir opines that *if* the RNPS is in fact proven to be unsafe and completely valueless, full refund damages to purchasers would be appropriate, and provides a calculation for full refund damages: "*Retail Units x Average Retail Price = Full Refund Damages*." Weir Decl., ECF 125-2, ¶¶ 15-16. As Mr. Weir explains, that formula can determine damages across any prescribed period and across geographic regions, "given any of the possible liability scenarios that may arise in this litigation." *Id*. at ¶ 17.

---

[12] Mr. Weir testified he is not involved in any "liability work" and is not offering an opinion on whether the Sleepers have value. Weir Dep. Tr. at 182:19-23. Relevant portions of the Weir Dep. Tr. are attached as Exhibit C to the Basar Declaration.

Defendants allege that Mr. Weir's opinion on full refund damages would not be useful to the trier of fact because his formula is nothing more than "third-grade multiplication," but there is no reason to make the calculation more complicated than it needs to be. Mot. at 7. Defendants challenge its admissibility without citing any authority. Further, Defendants' argument ignores the voluminous data cited by Mr. Weir that he considered in drafting his Declaration, including retail sales data, which must be compiled and aggregated into a more readily accessible format to calculate the average retail price that would be used in his formula. Weir Decl., ECF 125-2, Ex. 2. There is nothing "simple" about dealing with this volume of data, and certainly no layperson is capable of performing this analysis. The Second Circuit and district courts within have found that such aid from experts is admissible. *See Perry v. Allegheny Airlines, Inc.*, 489 F.2d 1349, 1353 (2d Cir. 1974) (admitting expert testimony that "amounted merely to an arithmetical calculation" and holding "[w]here the evidence is complicated or extensive and involves numerous figures, the use of an expert economist's testimony is permissible in the trial judge's discretion, provided (as here) it is based upon proof before the jury."); *Iacobelli Constr., Inc. v. Cnty. Of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994) ("Given the inherently voluminous and highly technical nature of the data in such cases, the parties … usually must retain experts to summarize and interpret that data."); *Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*, 97 F. Supp. 3d 485 (S.D.N.Y. 2015) (economist expert "did more than simply add a few numbers – she combed through at least 100 pages of sales reports, compiled and aggregated that data…'saving the jury time and avoiding unnecessary confusion.'" (quoting *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 536 (E.D.N.Y. 2012)); *U.S. Bank Nat. Ass'n v. James*, 741 F. Supp. 2d 337, 342 (D. Me. 2010) ("[w]hile a lay person might be able to add up each of the figures presented by Mr. Byers in his report, he/she would likely be unable to extract those figures from the voluminous documentation in this case.

11

Thus, his exercise will assist the factfinder to determine a fact in issue—the amount of damages claimed … I conclude that his testimony should not be excluded on this basis.").

The law is clear that if a product is determined to be completely valueless, individuals who previously purchased it are entitled to a full refund. *See Scotts EZ Seed*, 304 F.R.D. at 412; *Hughes v. The Ester C Company*, 317 F.R.D. 333, n. 31 (E.D.N.Y. 2016); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 671 (C.D. Cal. 2014). To determine full refund damages on a class-wide basis, one must look at the number of products sold and the average retail prices the consumers paid. That task, which involves the evaluation and selection of relevant portions of extensive sales data, is exactly what Mr. Weir's proposed methodology involves (Weir Decl., ECF 125-2, ¶¶ 15-17), thus his opinion on full refund damages is admissible.

**B.      Mr. Weir's proposed conjoint analysis is a commonly used and reliable economic methodology to calculate diminished value damages and Defendants' criticisms go to the weight of Mr. Weir's testimony, not its admissibility.**

Defendants' contention that Mr. Weir's proposed combination of a conjoint survey, regression analysis, and a market simulation to find a price premium has no "clear analytical connection between the expert's methodology and his conclusions" making his conclusion *ipse dixit* (Mot. at 7-8) lacks merit and should be rejected out of hand.

Mr. Weir proposes to use conjoint analysis to determine a price premium that consumers paid for the Sleeper, which Plaintiffs contend was falsely marketed as safe for infant sleep. In his Declaration, Mr. Weir provides a detailed discussion of the conjoint analysis he would conduct and how it could be applied in this litigation. *See* Weir Decl., ECF 125-2, Ex. 3. He describes how he would conduct exploratory research (interviews of consumers) (*id.* at ¶¶ 14-18) and how he would complete a draft of the design of the conjoint survey and what that would include. *Id.* at ¶¶ 19-60. He includes the medium by which the survey is to be administered (online), the minimum

sample size (approximately 300 respondents), how the initial screening questions would function, and a list of the attributes from which respondents would choose (*e.g.* brand, padding, frame, sounds/vibrations, risk of mold, risk of mechanism failure, safety warnings and price). *Id.* at ¶¶ 21, 24, 33. He explains the process of pretesting the design (*id.* at ¶¶ 31-32), how the survey would be administered (using Sawtooth Software) and identifies the reputable survey vendor (Dynata) he would likely retain. *Id.* at ¶¶ 35-36.

As set forth above, conjoint methodology is a widely accepted for calculating the diminution in value of a consumer product. *See Marshall v. Hyundai Motor America*, 334 F.R.D. 36, 58 (S.D.N.Y. 2019) (accepting choice-based conjoint survey to estimate the diminution in market value that class vehicles would have experienced due to the disclosure of the brake defect); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 551 (E.D.N.Y. 2017) (confirming that conjoint analyses "have previously been approved in consumer class actions as reliable methodologies available for calculating the price premium attributable to a product characteristic").[13] Mr. Weir's conclusion is that Plaintiffs can demonstrate class-wide injury in the form of a price premium by using conjoint analysis.

When stripped of the hyperbole, Defendants' primary argument asserts that the particular manner in which Mr. Weir proposes to conduct the survey for his conjoint analysis is unreliable. As set forth below, Mr. Weir's proposed conjoint methodology is a sound application of conjoint analysis to the facts of this case and the arguments Defendants make go to the weight of Mr. Weir's expert opinion, not its admissibility.

Defendants' heavy reliance on *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010), is misplaced. The expert's report in *Weiner* was submitted in support of

---

[13] *See also* cases listed *supra* notes 4 and 5.

summary judgment, not class certification, and, in any event, is drastically different from Mr. Weir's expert Declaration. In *Weiner*, the expert did not design or conduct any survey, did not cite any specific studies or market research from which he gathered data, and did not review any documents from discovery in forming his opinion. *Id*. at *7-8. Here, Mr. Weir reviewed numerous documents provided to him including pleadings, hearing transcripts, and discovery documents from Defendants and third-party retailers when formulating his opinions. Weir Decl., ECF 125-2, ¶ 18 and Ex. 2. Mr. Weir further conducted market research by analyzing retail websites, conjoint survey-related software websites, economic journals, and conjoint analysis articles and studies. *Id*. at Ex. 2. Mr. Weir selected a specific method by which he proposes to calculate diminution in value – conjoint analysis combined with Hierarchical Bayes regression, holdout performance testing, and market simulation. *Id*., Ex. 3 at ¶¶ 37-49. Mr. Weir's analysis thus far has enabled him to identify product attributes to be tested that are key purchase influencers for the subject products, whereas the expert in *Weiner* only guessed. Mr. Weir's detailed outline of his conjoint methodology is nothing like the expert's "bare-bones" report given to the court in *Weiner*. 2010 WL 3119452 at *7. [14] While Mr. Weir's survey has not been fielded and is subject to amendment if dictated by further discovery in the case, Mr. Weir testified it is a fully developed outline based on the evidence available thus far. Weir Dep. Tr. at 272:22-275:14.

Defendants cite another inapposite case involving the use of conjoint analysis to determine diminution in value of a prescription drug, which that court noted was not an efficiently functioning market due to regulations, restrictions, insurance, and "a complex array of contracts" between entities in the market. *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014). The expert there had not designed his survey and method, had not collected any data, and

---

[14] Judge Pauley distinguished *Weiner* on similar grounds in *In re Kind*, 337 F.R.D. 581, 605-06.

14

had not selected attributes to include in the model. *Id.* at *6. Through the analysis of market data, Mr. Weir has determined that the market for the Sleepers was an "ordinary" market, without these complications. Weir Decl., ECF 125-2, Ex. 3 at ¶ 57. Again, the expert in *Saavedra* did far less work than Mr. Weir did in this case. Mr. Weir *has* designed his method, *has* collected data, *has* identified key attributes from that data[15] and *has* selected a formulation of the attribute of interest – the Safety Warning: "This inclined infant sleeper carries the risk of infant fatality or other serious health problems." *Id.*, Ex. 3 at ¶ 28. Mr. Weir has provided sufficient detail of the proposed conjoint methodology as it applies to the facts of ***this*** case, which demonstrates that his opinion is reliable.

The question of reliability in the *Daubert* setting rests solely on principles and methodology, not on the conclusions that they generate. *See Overstreet v Virts*, 2019 WL 1331567, at *21 (W.D.N.Y. Mar. 25, 2019) (the "court must 'focus on the principles and methodology employed by the expert, *without* regard to the conclusions the expert has reached or the court's belief as to the correctness of those conclusions'"; denying motion to preclude expert's opinion testimony) (citation omitted); *see also Reyes v. Delta Dallas Alpha Corp.*, 2000 WL 526851, at *1 (S.D.N.Y. May 2, 2000) (admitting expert testimony and explaining that in "examining reliability, the focus must be *solely* on principles and methodology, not on the conclusions that they generate") (quoting *Daubert*, 509 U.S. at 589). Defendants do not and cannot credibly claim the principles and methodology underlying Mr. Weir's opinions are not reliable.

Defendants' criticisms relate to choices Mr. Weir made in his expert judgment about the execution of the conjoint survey, and therefore go to the weight given to the survey rather than its

---

[15] Mr. Weir has identified the key attributes directly related to the Rock 'n Play Sleeper based on the data he has reviewed. While he states in his report that those "might" include the ones he lists, this is only to account for the potential that merits discovery may contain additional relevant information. In his deposition, Mr. Weir testified that "[b]arring further evidence these are the attributes that will be used." Weir Dep. Tr. at 272:22-275:14.

admissibility. *See Costco,* 818 F. App'x. at 62; *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology go to the weight given the survey, not its admissibility."); *see also Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012) ("Microsoft's criticisms of Mr. Sukumar's survey go to issues of methodology, survey design, reliability...and critique of conclusions, and therefore go to the weight of the survey rather than its admissibility."). Mr. Weir's damages methodology was accepted in *Costco*, a case in which the defense similarly contended that Mr. Weir's damages methodology failed to account for major variables. 818 F. App'x. at 62. The court rejected this argument and found that Mr. Weir's chosen variables accounted for a wide range of substantial drivers of consumer purchases, and that "failure to include variables will affect the analysis' probativeness, not its admissibility." *Id.* (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

Defendants also make various arguments challenging Mr. Weir's methodology based on Professor Toubia's report, which alleges, for example, that Mr. Weir does not describe how he selected his attributes. However, Mr. Weir testified that he did research looking at "many different SKUs and the product descriptions including the different features involved with those SKUs" when selecting attributes, and listed competing brands that he knew made a competing product based on his review of Defendants' internal documents. Weir Dep. Tr. at 207:25-209:21. Defendants assert that Mr. Weir has not done exploratory research based on selected paragraphs of his report where he describes *further* research he would conduct. This ignores the body of work as a whole, which shows that he has researched the subject product, the market, the competition, the retailers, and the consumers. Defendants' nitpicking of Mr. Weir's decision-making process in choosing attributes, the amount of time he spent researching, and his design for planned pretests go to the weight of his testimony, not its admissibility. *See McCullock v. H.B. Fuller Co.*, 61 F.3d

1038, 1044 (2d Cir. 1995); *Amorgianos*, 303 F.3d at 267; *Bacardi & Co. Ltd. v. New York Lighter Co., Inc.*, 2000 WL 298915, at *2; *Microsoft*, 904 F. Supp. 2d at 1120; *Wendt*, 125 F.3d at 814.

Moreover, even if Defendants were correct that Mr. Weir's opinion was based on assumptions – and, as the discussion above demonstrates, Defendants are wrong – Mr. Weir's opinion still survives their *Daubert* challenge because contentions that an expert's assumptions are unfounded also primarily go to the weight of his testimony, not its admissibility. *McCulloch*, 61 F.3d at 1044 ("Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony."); *see also Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony. A district court has discretion under Federal Rules of Evidence 703 "to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.") (citation and internal quotations omitted). Moreover, "a minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible" at trial, let alone at the class certification stage. *Amorgianos*, 303 F.3d at 267.

### C.    Mr. Weir's proposed conjoint analysis includes the actual supply of the product as it existed during the relevant time period for this litigation and therefore does not ignore supply-side market factors.

Numerous courts have approved of the use of conjoint analysis to measure diminution in value damages and have found that conjoint analysis adequately accounts for supply-side factors, because the prices used in the surveys underlying the analysis reflect the actual market prices that were prevalent during the class period, and the quantities assumed to be used in the calculations reflect the actual quantities of products sold during the class period. *Hadley v. Kellogg Sales*

*Company*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018); *see also Costco*, 818 F. App'x. at 62 (holding that while model fails to account for other possible values means that the model may not ultimately prove plaintiff's claims, it still serves as common evidence of plaintiff's theory of injury).[16] As noted above, Mr. Weir's damages methodology was accepted in *Costco*.

Defendants claim that Mr. Weir's survey considers only demand for the RNPS, but not supply-side factors that would contribute to market price. Mot. at 14. Mr. Weir explains that this litigation, however, is "unlike in a Lanham Act or IP litigation where a but-for quantity of sales may need to be determined." Weir Decl., ECF 125-2, Ex. 3, ¶ 50. The number of units that were actually sold to the class members will not change as a result of the calculation of the price premium, or in other words, the "quantity supplied" factor will always be the actual number of units sold by the defendants in the time period. *Id*. For this reason, Defendants' argument is routinely rejected by courts throughout the country where the number of units sold and price at which they were sold is fixed as a matter of history. *See Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116, at *6 (C.D. Cal. Sept. 23, 2020) ("Courts have also found that conjoint analyses can adequately account for supply-side factors — and can therefore be utilized to estimate price premia without running afoul of *Comcast* — when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period."); *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 576 (N.D. Cal. 2020) (rejecting argument that "Weir made no attempt to account for competitors' actions in the market" because "the model utilized prices that 'mirror' those actually observed in the market and based on actual sales data, and also holds quantity constant"); *Hadley*, 324 F. Supp.

---

[16] *See also* cases listed *supra* in notes 4 and 5.

3d at 1106 (collecting cases, and holding that the proposed conjoint "adequately accounts for supply-side factors and does not merely measure demand-side willingness-to-pay"); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018) (the "conjoint survey does consider supply-side factors" because "the conjoint survey "used actual market-clearing prices as the basis for the prices in the survey, actual competitor products,…and [] took into account the fixed quantity of supply of Canada Dry because those sales occurred in the past."); *accord In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969-71 (N.D. Cal. 2018).

Mr. Weir further explained in his deposition that in this particular type of framework, every aspect of the but-for world and the actual world have to stay the same except for the harmful conduct as that is what is being measured. Weir Dep. Tr. at 266:12-23. The analysis to calculate the diminished value that the harmful conduct caused would be confounded and "the resulting market price would not tell you solely the impact of the harmful conduct" but would consider an additional and unnecessary factor. *Id*. Mr. Weir therefore includes the appropriate and required supply-side factors for the calculation of diminution in value of the product in his proposed survey. Weir Decl., ECF 125-2, Ex. 3 at ¶¶ 50-58.

Defendants rely on *In re General Motors LLC Ignition Switch Litigation* to posit that conjoint will only calculate willingness to pay, but that case is distinguishable. 407 F. Supp. 3d 212 (S.D.N.Y. 2019). In *General Motors*, the expert did not use real world market-based price points for the vehicles at issue but, instead, used prices for only option packages and extrapolated from these prices to determine the diminution in value of the entire vehicle. *Id*. at 235. In this case, Mr. Weir has used real world, market-based prices for actual Sleepers, and was not forced to make a hypothetical extrapolation to model the impact on the but-for price of the products. Furthermore, the *General Motors* opinion hinges on the fact that the defective product in question, a vehicle,

was reparable, as evidenced by the hypothetical the court used to illustrate supply-side considerations. *Id.* at 237-238. In the example, the court posits that a company selling widgets for $100 discovers there is a defect that lowers market value by $25, but costs only $5 to fix. In that scenario, the widget maker would be better off fixing the problem for $5 than just selling widgets for $75, so they would do that – meaning that in the but-for world, the consumer would still have paid $100 and the widget maker would have lost $5 in profit. *Id.* In this case, the alleged defect of the Sleeper is inherent in its design and cannot be fixed. This is further evidenced by Defendants' decision to recall the product entirely.

Contrary to Defendants' assertions, *General Motors* is an outlier in holding that conjoint analysis cannot account for supply-side factors. Much of the *General Motors* reasoning relies on *Zakaria v. Gerber Products Co.* 2017 WL 9512587 (C.D. Cal. Aug. 9, 2017), aff'd, 755 F. App'x 623 (9th Cir. 2018). In *Zakaria* and in *General Motors* the expert proposed using only conjoint analysis, without any additional regression analysis, such as the hierarchical Bayes regression Mr. Weir proposes here. Additionally, the experts in *Zakaria* and in *General Motors* did not use real-world historical pricing data for the products at issue. Mr. Weir has testified that he has done that here. Weir Dep. Tr. at 296:21-297:7. For these reasons, *General Motors* is incorrectly decided (as evidenced by the fact that the weight of authority holds that conjoint analysis damages models do adequately account for supply-side factors[17]), but, even if the Court disagrees, the hypothetical from *General Motors* shows that this case, with a product that cannot be repaired or made safe, is distinguishable.

Finally, Defendants rely on Dr. Rossi's assertion that Mr. Weir does not adequately account for supply-side factors. While Dr. Rossi frames his criticism of Mr. Weir's proposal as "ignoring"

---

[17] *See* cases listed *supra* notes 4 and 5.

supply-side factors, reading his report shows that he *disagrees with the method* that Mr. Weir employs to account for them. As noted above, the Court is not obligated to become an "amateur scientist" during a *Daubert* analysis and decide which competing expert is factually correct – that job is reserved for the trier of fact. *Daubert*, 509 U.S. at 600–01 (Rehnquist C.J., concurring in part and dissenting in part). Here, Mr. Weir has shown that he has accounted for supply-side factors using methods accepted by numerous courts. Dr. Rossi's disagreement is an insufficient ground to exclude his Declaration and testimony.

**D.     Mr. Weir's proposed conjoint methodology is entirely consistent with Plaintiffs' theory of liability.**

Defendants believe that Mr. Weir's understanding of the plaintiff's theory of liability is that the RNPS is unsuitable for all purposes. Mot. at 17. They point out that in Mr. Weir's deposition, he fails to mention that Plaintiffs' theory of liability is premised on the product being unsafe for sleep in particular. *Id*. at 18. Defendants claim that Mr. Weir's alleged omission will result in methodologies and results for damages that have nothing to do with sleep. *Id*. at 19. Defendants are wrong. Mr. Weir fully understands that Plaintiffs' theory of liability is that the Sleeper is unsafe for all its intended uses and that the product was marketed and sold primarily as a sleeper for infants. Weir Decl., ECF 125-2, ¶¶ 8-10.

Defendants' reliance on *Comcast* is misplaced. In *Comcast*, the Supreme Court held that "a model purporting to serve as evidence of damages in a class action must measure only those damages attributable to that theory." 569 U.S. at 35. Mr. Weir's proposed model does exactly that. It proposes to measure the price premium attributable to the disclosure of the safety risk that Defendants concealed in their marketing and packaging. Plaintiffs allege that the product is unsafe for infant sleep and that Defendants knew this but misleadingly portrayed it as safe. Mr. Weir's proposed Safety Warning is "This *inclined sleeper* carries the risk of infant fatality or other serious

21

health problems." Weir Decl., ECF 125-2, Ex. 3, ¶ 28 (emphasis added). The record clearly proves that (1) the fact that the product was on an incline and (2) that it was designed, intended, and marketed to be used for sleep are the exact aspects of the product that rendered it unsafe. CAC, ¶ 227; Statement of Mr. Chuck Scothon before the House Committee on Oversight and Reform, June 7, 2021, at *2.[18] Therefore, Mr. Weir's proposed safety warning and subsequent methodology falls in line with the underlying theory of liability presented.

Mr. Weir's safety warning and focus attributes deal particularly with the products use for infant sleep. Mr. Weir wishes to specify that the safety risk is present when the product is used as a *sleeper* and he does this by including the specific phrase in his chosen warning. Weir Decl., ECF 125-2, Ex. 3, ¶ 28. Defendants' criticism that Mr. Weir doesn't specify sleep as a separate and unique use of the RNPS, *when it is included in the name of the RNPS and the name of the entire product category it created*, strains credulity. Mr. Weir's proposed warning properly isolates the effect of the alleged misrepresentations and/or omissions by stating that the advertised *inclined sleeper* has a safety risk that matches the real-world harm caused to infants in the Sleepers. *Id*. The safety warning attribute in Mr. Weir's survey will yield a value which he can use to measure a price premium attributable to Defendants' false marketing of the Rock 'n Play Sleeper as safe for infant sleep, and failure to disclose that it is dangerous to use for infant sleep.

Moreover, Defendants' attack on the admissibility of Mr. Weir's declaration and testimony based on *Comcast* is a fundamental misunderstanding of the relationship between that decision (on class certification standards) and Rule 702 and the *Daubert* line of cases (on evidentiary admissibility standards). The two inquiries, while they may arise in proximity to one another in

---

[18] A copy of Mr. Scothon's statement is attached as Exhibit D to the Basar Declaration. In it, he stated: "As the name suggests, we designed, marketed, and sold the Rock 'n Play Sleeper as a product intended for sleep, as well as to entertain babies when they were awake. When introduced, the Rock 'n Play Sleeper met the CPSC and consensus standards applicable to bassinets, which are also products intended for sleep."

22

litigation, are distinct. "Admissibility turns on whether Weir's methodology is sufficiently reliable; whether it satisfies *Comcast* and shows that a class should be certified is another question altogether—one which the court will address *infra* in conducting a Rule 23(b)(3) predominance analysis." *Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444, at *7 (N.D.N.Y. Sept. 27, 2017) (quoting *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015)).

**E.**   **Defendants' argument that Mr. Weir's opinion is unreliable because he will rely on the Court to give him "direction" on his methodologies should be rejected.**

Defendants mischaracterize Mr. Weir's Declaration and testimony when they assert that he believes the Court should give him direction on how to design his survey. Mot. at 20. Under Fed. R. Evid. 702, expert testimony is admissible if, among other things, it assists the trier of fact to understand the evidence or to determine a fact in issue. Mr. Weir's Declaration does that here. As described above, Mr. Weir has proposed a fully developed outline of a conjoint survey and is merely letting it be known to the parties and the Court that, if new information during discovery came to light, he would be ready and willing to modify his survey to fall in line with new data. Weir Dep. Tr. at 275:4-14. Further, Mr. Weir's statement that he would use more appropriate or alternate language in his survey if the Court required it, does not speak to Mr. Weir's lack of ability to testify as an expert. Mr. Weir is merely proposing that if the Court would like him to further simplify or elaborate on a specific matter, he is able to do so. Mr. Weir's showing of respect and deference to the Court, and scientific honesty to acknowledge that further pertinent information could arise in a case with bifurcated discovery, is not a basis to disqualify him as an expert. Notably, Defendants are unable to cite a single case that supports their baseless position.

**F.      Defendants' argument that Mr. Weir's methodologies are unreliable because they do not include "individualized analysis" should be rejected.**

Defendants' contention that Mr. Weir's damages methodology does not account for individual differences has nothing to do with the admissibility of his opinions, and Defendants cannot credibly claim it does. It is clearly part of the predominance inquiry under Fed. R. Civ. P. 23 and Plaintiffs will address these issues in their forthcoming reply on their class certification motion. However, it bears noting that Plaintiffs' proposed statewide classes for damages are comprised solely of direct purchasers and do not include consumers who purchased the product in the secondary market or received it as a gift. Pls.' Motion, ECF 125-1, 18-19. Moreover, it is well-settled that even if some class members may have received credits or refunds, it does not preclude certification. *See Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 382 (S.D.N.Y. 2015) (explaining that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification"); *see also Scotts EZ Seed*, 304 F.R.D. at 413 ("[t]he fact that some prospective...class members may have received credits or refunds does not preclude certification pursuant to Rule 23(b)(3).") (citation omitted); In the Second Circuit, the existence of individualized damages determinations is not fatal to class certification (*Roach*, 778 F.3d at 409) let alone grounds for excluding an expert report as unreliable under *Daubert*. Again, Defendants do not rely on any authority to support their position.

**IV.      CONCLUSION**

For the reasons set forth above, the Court should deny Defendants' Motion to Exclude the Declarations and Testimony of Mr. Colin B. Weir.

Dated: September 1, 2021                           Respectfully submitted,

                                                                   */s/ Demet Basar*

24

**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
W. Daniel Miles, III
Demet Basar
James B. Eubank
Paul W. Evans
218 Commerce Street
Montgomery, Alabama 36104
Tel:  (334) 269-2343
Fax:  (334) 954-7555
Dee.Miles@BeasleyAllen.com
Demet.Basar@BeasleyAllen.com
James.Eubank@BeasleyAllen.com
Paul.Evans@BeasleyAllen.com

*Plaintiffs' Lead Counsel*

**CONNORS LLP**
Terrence M. Connors
Andrew M. Debbins
1000 Liberty Building
Buffalo, NY 14202
(716) 852-5533
tmc@connorsllp.com
amd@connorsllp.com

*Plaintiffs' Liaison Counsel*

25