UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

IN RE: ROCK 'N PLAY SLEEPER
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY
LITIGATION

MDL No. 1:19-md-02903

Hon. Geoffrey W. Crawford

**REBUTTAL EXPERT REPORT OF DR. RAN KIVETZ**

CONFIDENTIAL

# TABLE OF CONTENTS

A. ASSIGNMENT AND QUALIFICATIONS ........................................................ 5

B. INTRODUCTION AND SUMMARY OF CONCLUSIONS ............................ 6

  B.1.  The Dennis Survey is Fatally Flawed .......................................................... 7

  B.2.  Dr. Dennis's Critique of the Kivetz Survey is Unsubstantiated, Erroneous, and Biased ........................................................................................................ 10

  B.3.  The Silverman Report is Unscientific, Unsubstantiated, and Unreliable ............. 12

C. EVALUATION OF THE DENNIS SURVEY ................................................ 15

  C.1.  Overview of the Dennis Survey ................................................................. 15

  C.2.  The Dennis Survey's "Materiality" Test Involving a Supposed "Disclaimer" is Highly Leading, Biased, and Conducive to Severe Demand Effects ...................... 24

  C.3.  The Dennis Survey's "Perception" Test Relied on Extremely Leading Closed-Ended Questions that Generated Severe Demand, Focalism, Yea-Saying, and Order Biases ........................................................................................................ 36

    C.3.1.  *The Dennis Survey's "Perception" Test Relied Solely on Closed-Ended Questions* ......................................................................................... 36

    C.3.2.  *Dr. Dennis Failed to Include Any Filter Questions Prior to His "Perception" Questions* ...................................................................... 38

    C.3.3.  *The Dennis Survey's "Perception" Questions were Extremely Leading, Repetitive, Focused Participants on the Plaintiffs' Hypotheses While Omitting Options Consistent with Fisher-Price's Position, and Generated Severe Demand Effects* .................................................... 40

    C.3.4.  *The Dennis Survey's "Perception" Questions Suffered from Severe "Yea-Saying" and Order Biases* ..................................................... 44

    C.3.5.  *The Dennis Survey's "Perception" Questions were Vague and Confusing, Thereby Increasing Guessing Behavior and Survey "Noise"* ................... 46

  C.4.  The Dennis Survey's "Meaning-Specific Materiality" Questions were Extremely Leading and Created Severe Demand Effects and Focalism .................................. 48

  C.5.  The Dennis Survey Violated Marketplace Conditions by Presenting Truncated, Distorted Stimuli and by Artificially Focusing Consumers on the Disputed Packaging ................................................................................................... 53

  C.6.  The Dennis Survey Failed to Include Any Survey Control .................................. 62

  C.7.  The Dennis Survey's Results, if Anything, Demonstrate a *Lack* of Commonality and Therefore are *Not* Consistent with the Plaintiffs' Position in this Litigation . 68

  C.8.  The Dennis Survey is Fatally Flawed: Conclusion .......................................... 73

D. **RESPONSE TO THE DENNIS DECLARATION'S CRITICISMS AND CLAIMS REGARDING THE KIVETZ SURVEY** .......................................................................... 73

    D.1.   Response to the Dennis Declaration's Criticisms of the Research Question Tested in the Kivetz Survey ....................................................................... 74

    D.2.   Response to the Dennis Declaration's Claim that the Kivetz Survey Failed to Control for Participants' Preexisting Beliefs and Prior Experience ..................... 79

        D.2.1.   *A Cause-Effect Experimental Design was the Appropriate and Proper Survey Methodology in this Litigation* ........................................................ 80

        D.2.2.   *The Kivetz Survey Sampled the Relevant Consumer Universe, and Dr. Dennis's Assumption that the Kivetz Survey's Participants were Familiar with and Predisposed to Purchase the Disputed Products is Unsubstantiated and Erroneous* .................................................................. 82

        D.2.3.   *The Kivetz Survey Did Control for Preexisting Beliefs, in Accordance with Standard Survey Principles Prescribed by Multiple Survey Treatises (Including Those Cited in the Dennis Declaration)* .................................... 87

        D.2.4.   *Dr. Dennis's Proposed "Corrective Steps" for the Kivetz Survey are Inappropriate, Would Result in a Flawed and Biased Survey, and Evinces Dr. Dennis's Fundamental Misunderstanding of Survey Design* .............. 92

    D.3.   Response to the Dennis Declaration's Criticism of the Kivetz Survey's Control .............................................................................................................. 100

    D.4.   Response to the Dennis Declaration's Claim that a Choice-Based Conjoint Survey Would be the Appropriate Methodology in this Litigation ...................... 111

    D.5.   Response to the Dennis Declaration's Other (Unelaborated and Unsubstantiated) Claims Regarding the Kivetz Survey ..................................................................... 112

E. **EVALUATION OF THE SILVERMAN REPORT** ..................................................... 115

    E.1.   Mr. Silverman Fails to Provide Any Scientific Basis for His Opinions Regarding Consumer Perceptions or Purchase Intentions ...................................................... 115

    E.2.   Mr. Silverman's Conclusions Regarding Packaging in General and the Alleged Packaging Misrepresentations and Omission are Unsubstantiated and Unscientific ...................................................................................................... 123

        E.2.1.   *Mr. Silverman's Conclusions Regarding the General Effectiveness of Packaging are Inaccurate and Irrelevant to the Plaintiffs' Allegations* .. 124

        E.2.2.   *Mr. Silverman's Opinion that the Product Name ("Rock 'n Play Sleeper") Would Convey a Material Benefit to Consumers is Unsubstantiated and Inconsistent with Academic Literature, Industry Research, and the Kivetz Survey's Results* ............................................................................ 126

E.2.3.  *Mr. Silverman's Opinion that the Claim "Baby can sleep at a comfortable incline all night long!" Would be Material to Consumers is Unsubstantiated* ........................................................................................131

E.2.4.  *Mr. Silverman's Opinion that the Claim "Extra-plush fabrics for extra-comfy sleep" Would be Material to Consumers is Unsubstantiated* ........133

E.2.5.  *Mr. Silverman's Opinion that the Claim "Nighttime sleeper and playtime seat!" Would be Material to Consumers is Unsubstantiated* ...................134

E.2.6.  *Mr. Silverman's Opinion that the Images of Sleeping Infants and a Mom "Curled Up in Her Bed" Would be Material to Consumers is Unsubstantiated* ........................................................................................134

E.2.7.  *Mr. Silverman's Opinion that the Presence of the Fisher-Price Logo on the Package Would be Material to Consumers is Unsubstantiated and Irrelevant* .............................................................................................136

E.2.8.  *Mr. Silverman's Opinion that "Omitted" Safety Information Would Have Been Material to Consumers is Unsubstantiated* ............................138

E.3.    Mr. Silverman's Opinions Regarding the Kivetz Survey are Unsubstantiated, Unscientific, and Evince Mr. Silverman's Lack of Survey Expertise...................140

**EXHIBIT A: CURRICULUM VITAE OF DR. RAN KIVETZ** ........................................... 148

**EXHIBIT B: LIST OF CASES IN WHICH DR. RAN KIVETZ PROVIDED SWORN TESTIMONY IN DEPOSITION AND/OR TRIAL DURING THE PAST FOUR YEARS** ....................................................................................................... 176

**EXHIBIT C: DOCUMENTS MADE AVAILABLE TO DR. KIVETZ IN CONNECTION WITH PREPARATION OF THIS *REBUTTAL EXPERT REPORT*** ........................... 178

**EXHIBIT D: EXAMPLES OF INCLINED BABY PRODUCTS AND PACKAGING *WITH A SLEEP-RELATED DISCLAIMER*** ........................................................... 187

## A.    ASSIGNMENT AND QUALIFICATIONS

1.    My name is Dr. Ran Kivetz. I previously provided an *Expert Report* in this matter on June 16, 2021. I have been asked by counsel for the Defendants Fisher-Price, Inc. and Mattel, Inc. (hereinafter, "Fisher-Price" or "the Defendants") to evaluate: (*i*) Dr. Michael Dennis's rebuttal declaration and expert report (hereinafter, "the Dennis Declaration"),[1] including the survey that he conducted in this litigation on behalf of the Plaintiffs (hereinafter, the "Dennis Survey"); and (*ii*) Mr. Bruce Silverman's report (hereinafter, "the Silverman Report").[2]

2.    I have personal knowledge of the matters set forth in this *Rebuttal Expert Report* and, if called to testify at a hearing or trial in this matter, would so state.

3.    I am the Philip H. Geier, Jr., Professor of Marketing at Columbia University Business School. A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

4.    I earned a Ph.D. in Business from Stanford University, Graduate School of Business; a Master's degree in Psychology from the Stanford University Psychology Department; and a Bachelor's degree from Tel Aviv University with majors in Economics and Psychology.

5.    My field of expertise encompasses consumer behavior; survey methods; marketing management; behavioral economics; human judgment, perception, and decision making; consumer and sales incentives; and branding. Most of my research has focused on buyers' purchase behavior; survey design; and the effect of product characteristics (*e.g.*, brand, features, quality, price), the competitive context, and marketing activities (*e.g.*, promotions, incentives, loyalty programs, advertising, branding) on buying decisions and perceptions.

---

[1] "Rebuttal Declaration to Ran Kivetz, Ph.D. and Expert Report of J. Michael Dennis, Ph.D.," dated October 12, 2021 (hereinafter, "the Dennis Declaration").
[2] "Report of Bruce G. Silverman," dated October 13, 2021 (hereinafter, "the Silverman Report").

6. A list of cases in which I provided sworn testimony at trial and/or by deposition during the past four years is included in Exhibit B. I am being compensated in this matter at a rate of $850 an hour. My compensation does not depend in any way on my opinions or the outcome of this matter.

7. I incorporate by reference the analysis and conclusions in my June 16, 2021 *Expert Report* in this litigation.[3] That report also sets out my qualifications in greater detail. My analyses in this litigation are based on, among other things, the brands, products, packaging, advertising, and websites relevant to the baby products market; existing scientific research and treatises regarding survey design, consumer behavior, and decision making; general principles of marketing and psychology; industry research; market research conducted on behalf of Fisher-Price; deposition testimony; and the consumer survey that I conducted in this litigation.[4] In conducting my analyses, I, or support staff at my direction, reviewed certain documents, including, but not limited to, documents that were made available to me in connection with the preparation of this *Rebuttal Expert Report*. Those documents are referenced herein and/or listed in Exhibit C. I also visited several brick-and-mortar, as well as online, stores that sell baby products, including Fisher-Price products.

8. Any, and all, of the opinions expressed herein are held to a reasonable degree of professional certainty. The information on which I relied consists of the type of information that is reasonably relied upon in my field of expertise.

## B.     INTRODUCTION AND SUMMARY OF CONCLUSIONS

9. The Plaintiffs allege that the disputed Fisher-Price products' packaging and advertising contain alleged misrepresentations and omissions pertaining to sleep. According to the Plaintiffs, these alleged "sleep-related" misrepresentations and

---

[3] June 16, 2021 Expert Report of Dr. Ran Kivetz (hereinafter, "my June 16, 2021 *Expert Report*" or the "*Kivetz Expert Report*").
[4] Set forth in Sections C and D of my June 16, 2021 *Expert Report*.

omissions commonly misled the putative class members into buying, and paying a higher price for, the disputed products.[5]  In their Complaint, for example, the Plaintiffs state:[6]

> Defendants' deceptive marketing of the product as a "Sleeper" that is safe for infant sleep, including overnight or prolonged sleep, is material to consumers' decisions to purchase and/or own the product, because it causes consumers to reasonably believe the product is safe.  Defendants should not have marketed the product as a "Sleeper" suitable for infant sleep, including prolonged or overnight sleep.

Similarly, the Plaintiffs claim in their Class Certification Motion:[7]

> Here, there is little question that the Defendants' misrepresentation of the RNPS as a "sleeper" and being "safe" for infant sleep would be material to reasonable consumers […].

10.  I have reviewed, inter alia, Dr. Dennis's declaration, Mr. Silverman's report, and their respective deposition transcripts.[8]

11.  Based on the materials and scientific analyses on which I have relied, along with my background and expertise, I have reached the following conclusions, summarized in the subsections below.

B.1.  <u>The Dennis Survey is Fatally Flawed</u>

12.  Dr. Dennis's survey does *not* provide any valid or reliable data about consumers' perceptions and purchase decisions regarding the disputed Fisher-Price products, because Dr. Dennis failed to follow multiple fundamental survey design principles.  Specifically, the Dennis Survey was acutely biased in the following respects.

13.  **The Dennis Survey used a highly leading and biased "materiality" test involving a supposed "disclaimer" ("THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS").**  Dr. Dennis presented participants with a "disclaimer" (and accompanying language) that, contrary to his characterization in the Dennis Declaration, was *not* neutral and that *did* in

---

[5] *See, e.g.*, *Consolidated Amended Complaint* in the case *In re Rock 'N Play Sleeper Marketing, Sales Practices, and Products Liability Litigation* (hereinafter, "*Complaint*"), ¶¶ 185 & 190 – 191.
[6] *Id.*, ¶ 190.
[7] *Memorandum of Law in Support of Plaintiffs' Motion for Class Certification* (hereinafter, "*Class Certification Motion*"), p. 30.
[8] November 4, 2021 Deposition of J. Michael Dennis (hereinafter, the "Dennis Deposition"); October 28, 2021 Deposition of Bruce Silverman (hereinafter, the "Silverman Deposition").

fact call attention to purported actual infant deaths and injuries that have occurred in real life.[9]  Dr. Dennis's test of "materiality" based on his "disclaimer" was extremely leading, biased, and conducive to severe demand effects.  This supposed "materiality" test, inter alia: (*i*) communicated to participants the variable of interest and the "expected" answer (*i.e.*, of not preferring a product that has caused babies to die); (*ii*) suffered from a severe order bias (*e.g.*, with participants already "primed," or conditioned, to think about safety from the preceding "perception" questions); (*iii*) deviated dramatically from any disclaimer that consumers could encounter on competing baby products' packaging in the marketplace; and (*iv*) failed to include a "don't know" option in the purchase likelihood measure.

14.    **The Dennis Survey's (closed-ended) "perception" questions were extremely leading and biased.**  In attempting to assess consumer perceptions regarding the disputed products' packaging, Dr. Dennis relied on a series of exclusively closed-ended questions (unpreceded by *any* filter questions)[10] that: (*i*) focused participants on (and repeatedly probed about) options classified by Dr. Dennis as mapping to the Plaintiffs' theory of liability; (*ii*) omitted options consistent with Fisher-Price's position, thereby artificially constraining the set of plausible "perceptions" that participants could select as answer choices; (*iii*) suffered from severe "yea-saying" (acquiescence) and order biases; and (*iv*) were vague and confusing, thereby inflating guessing behavior and survey "noise."

15.    **The Dennis Survey's "meaning-specific materiality" questions were extremely leading and biased.**  Dr. Dennis's "meaning-specific materiality" questions

---

[9] Prior to indicating their purchase intentions for the disputed product (described to carry a warning label on the packaging front), the Dennis Survey's participants were told: "Suppose the manufacturer of the product put this warning label on the front of the packaging because of actual injuries and fatalities that occurred in real life.  **THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS**" (emphasis in the original); *see* Dennis Declaration, Attachment C, p. 130.  By contrast, Dr. Dennis stated in his declaration that his "warning disclaimer does not call attention to actual deaths that have occurred as a result of babies' use of the Defendants' products […]"; Dennis Declaration, ¶ 102.

[10] As detailed subsequently in this *Rebuttal Expert Report*, filter questions assess whether participants have any perceptions, opinions, or beliefs about the topic(s) of interest in the first place.

(*i.e.*, whereby participants reported their purchase likelihood based on their understanding of each "meaning" that they previously indicated the package to be communicating) were highly nonstandard, leading, biased, and conducive to demand effects. Like the survey's "perceptions" questions, these "meaning-specific materiality" questions pertained only to the packaging as whole, and therefore cannot isolate any effects attributable to the alleged "sleep-related" misrepresentations in this litigation.

16.     **The Dennis Survey used instructions and distorted stimuli that violated marketplace conditions.** The Dennis Survey failed to approximate marketplace conditions because, among other severe problems, it: (*i*) showed participants only incomplete portions of some panels from the disputed package (while omitting other contextual information, including multiple representations unrelated to sleep); and (*ii*) unrealistically instructed participants to base their answers *only* on the packaging.

17.     **The Dennis Survey failed to include any survey control.** The absence of an external control condition (stimulus) and an internal control question means that the Dennis Survey lacked any benchmark or means by which to account for the "noise" generated by factors such as participants' preexisting beliefs and the survey's numerous severe biases.

18.     **The Dennis Survey's results are *inconsistent* with the Plaintiffs' position.** Strikingly, notwithstanding the Dennis Survey's multiple flaws and *one-sided biases*, the results demonstrate a substantial *lack* of commonality in consumers' purchase intentions and thus *contradict* the Plaintiffs' position. For example, even after being shown Dr. Dennis's highly leading and biased "disclaimer," nearly 60% of participants still reported that they would purchase the product, whereas only about 30% of participants indicated that they would *not* purchase the product.

19.     Overall, the Dennis Survey is fatally flawed, is *not* based on scientific methodologies that are reasonably relied upon in this field of expertise, and does *not*

provide reliable and valid estimates of either consumers' perceptions or the materiality of the alleged "sleep-related" misrepresentations and omission.

B.2.  Dr. Dennis's Critique of the Kivetz Survey is Unsubstantiated, Erroneous, and Biased

20.     As summarized below, Dr. Dennis's criticisms and claims regarding my survey (as set forth in my June 16, 2021 *Expert Report*; hereinafter, the "Kivetz Survey") are unsubstantiated and inconsistent with multiple survey treatises, including the same sources cited in the Dennis Declaration.

21.     **Contrary to Dr. Dennis's claim, the Kivetz Survey appropriately tested the Plaintiffs' hypotheses.**  My understanding is that the Plaintiffs' allegations regarding the disputed products' packaging relate to various affirmative "sleep-related" misrepresentations, as well as an omission (*e.g.*, the absence of a "disclaimer" on the outside of the packaging).[11]  Accordingly, the Kivetz Survey tested whether the alleged "sleep-related" packaging misrepresentations and omission commonly drove the putative class members to purchase the disputed products—that is, compared to a counterfactual scenario in which these misrepresentations and omission were "remedied."

22.     **Contrary to Dr. Dennis's claim, the Kivetz Survey did control for preexisting beliefs.**  Dr. Dennis's core criticism of my survey is that I purportedly did not control for participants' preexisting beliefs about (and prior experience with) the disputed products and/or the Fisher-Price brand.  However, this argument is unsubstantiated and erroneous.  As outlined below, Dr. Dennis's assumptions and claims regarding preexisting beliefs are contradicted by multiple sources (including those cited by Dr. Dennis):

(*i*)     A cause-effect experimental design was the proper survey methodology in this litigation.  The Kivetz Survey's test versus control research design is highly standard, well-established, and capable of detecting whether an

---

[11] *See* Subsection D.1 of this *Rebuttal Expert Report* for further discussion.

alleged misrepresentation is or is not commonly material in consumers' purchase decisions.

(*ii*)    The Kivetz Survey sampled the relevant consumer universe, and Dr. Dennis's assumption that my participants were already familiar with and were predisposed to purchase the disputed products is unsubstantiated and mistaken. In fact, verbatim responses from the Kivetz Survey are *inconsistent* with Dr. Dennis's speculation.

(*iii*)    The Kivetz Survey controlled for preexisting beliefs by including a proper control stimulus, in accordance with standard survey principles as prescribed by multiple survey treatises. In fact, the *same* articles and texts cited in the Dennis Declaration warn specifically against survey designs with no controls and leading questions (such as the Dennis Survey), and instead support the Kivetz Survey's methodology of employing a control to account exactly for, inter alia, preexisting beliefs.

(*iv*)    Dr. Dennis's various proposed "corrective steps" for the Kivetz Survey are inappropriate, would result in a flawed and biased survey, and evince a fundamental lack of understanding of survey design. For example, Dr. Dennis's suggestions to use a fictitious or "brand-neutral" package[12] and to instruct participants to base their answers solely on the product packaging are completely improper and nonstandard. Doing so would have grossly violated marketplace conditions, distorting participants' perceptions and decision-making (relative to those of consumers in the actual marketplace). Likewise, Dr. Dennis's recommendation of using a "manipulation check" would be tautological and inappropriate when applied to the Kivetz Survey—as his own quoted sources on manipulation checks indicate.

---

[12] Note that the Dennis Survey did not use a "brand-neutral" stimulus.

23.     **Contrary to Dr. Dennis's claim, the Kivetz Survey's control package was proper and followed standard survey principles.**  Dr. Dennis speculates that the Kivetz Survey's control stimulus (*i*) made only "slight changes" to the disputed Fisher-Price package; and (*ii*) was not sufficiently different from the test stimulus and instead retained the allegedly deceptive elements (*e.g.*, Dr. Dennis argues that consumers would perceive "soother" and "sleeper" similarly because soothing "inexorably" leads to sleeping).  However, Dr. Dennis's conclusions are not only completely unsubstantiated by any empirical evidence or scientific analysis, but they are also at odds with the Plaintiffs' allegations; with the opinions of Plaintiffs' other expert, Mr. Silverman; and with the Kivetz Survey's results and participant verbatim responses.

24.     The Dennis Declaration's other criticisms of the Kivetz Survey—such as Dr. Dennis's assertion that I should have conducted a conjoint survey, along with multiple claims that he raises but never elaborates on, are also unsubstantiated and inaccurate.

25.     In summary, Dr. Dennis's analysis of the Kivetz Survey is flawed, erroneous, and reveals a lack of understanding of key principles of survey design.

B.3.    The Silverman Report is Unscientific, Unsubstantiated, and Unreliable

26.     As delineated below, Mr. Silverman fails to provide any scientific basis for his opinions in this litigation, and his approach is diametrically opposed to fundamental scientific standards.

27.     **The Silverman Report lacks *any* scientific basis for its conclusions regarding consumer perceptions or purchase intentions.**  Mr. Silverman reaches conclusions about how individual claims and images on Fisher-Price packaging supposedly influenced purchasers of the disputed products, (*i*) without conducting any empirical survey; (*ii*) without analyzing secondary (*e.g.*, market) data; (*iii*) without reviewing and analyzing existing academic and industry research; and (*iv*) relying on fundamental principles in marketing and consumer behavior that apply to the particulars

of this litigation. Instead, Mr. Silverman makes his determination about consumers' perceptions and purchase motivations by reviewing (or "eyeballing") various Fisher-Price packages and citing to his experience working at advertising agencies (on projects that he admitted were not about durable baby products).

28.　　The Silverman Report relies extensively on aphorisms, circular reasoning, and speculation (*e.g.*, based on Mr. Silverman's subjective impressions of what is versus is not plausible). Further, while he is *not* a survey expert (by his own admission), Mr. Silverman nevertheless expresses erroneous opinions about two surveys (*i.e.*, the Kivetz Survey and a 2011 Fisher-Price research study[13]). I have rarely encountered such completely unsubstantiated and unscientific opinions as those articulated in the Silverman Report.

29.　　**Mr. Silverman's conclusions regarding packaging in general as well as the alleged packaging misrepresentations and omission are unsubstantiated and unscientific.** Mr. Silverman's conclusions about both the effectiveness of packaging in general and the materiality of the specific alleged packaging claims (and alleged omission) are either irrelevant to the Plaintiffs' allegations, wholly unsubstantiated, or unsupported by his cited sources. For example, Mr. Silverman claims that various "sleep-related" misrepresentations and imagery (*e.g.*, the "sleeper" name in the product, pictures of sleeping infants) are important to consumers without citing any peer-reviewed academic research or performing any other scientific analysis. Instead, at various points, Mr. Silverman refers to adages (*e.g.*, "A picture is worth a thousand words"), anecdotes, and documents that are irrelevant to *consumers'* perceptions (*e.g.*, Fisher-Price internal marketing materials).

30.　　Not only are the Silverman Report's conclusions unsubstantiated, but they are also inconsistent with the testimony of the Plaintiffs' other expert, Dr. Dennis (who

---

[13] FSH0004127 (hereinafter, the "2011 Research").

testified that his survey did *not* allow him to opine about the materiality of specific packaging claims); with the Kivetz Survey's results; with academic and industry research; with the declaration of Fisher-Price's senior marketing manager; and with deposition testimony (including of the named Plaintiffs) in this litigation.

31.     **Mr. Silverman's opinions regarding the Kivetz Survey are unsubstantiated, unscientific, and evince Mr. Silverman's lack of survey expertise.** Rather than offering a scientific evaluation of the Kivetz Survey, Mr. Silverman dismisses the survey as flawed based on his subjective impressions and speculation. Notably, Mr. Silverman objects to the Kivetz Survey's control stimulus for the *opposite* reason as Dr. Dennis (the Plaintiffs' other expert)—namely, because comparing a "sleeper" with a "soother" (what Mr. Silverman characterizes as a "completely different" product) makes "little sense" to him.  In fact, the test versus control experimental design used in the Kivetz Survey allowed for a proper test of *exactly* the alleged misrepresentations and omission deemed by Mr. Silverman to be material.

32.     Mr. Silverman's rejection, on the one hand, of the Kivetz Survey (which found the alleged "sleep-related" misrepresentations and omission to be neither common, nor material, purchase factors) and endorsement, on the other hand, of the 2011 Research (whose results were *erroneously* treated by Mr. Silverman as consistent with his assumptions that consumers prefer the name "Sleeper" to "Soother") reveals an elevation of one's own opinions (or conviction) over scientific evidence.  As Mr. Silverman testified, he would *not* change his opinions even if he learned of empirical evidence that was inconsistent with his opinions.

33.     To conclude, the Silverman Report does *not* provide any scientific substantiation for either consumer perceptions or purchase decisions attributable to the alleged "sleep-related" misrepresentations and omission.  In lieu of scientific evidence or relevant substantiation, Mr. Silverman relied on his subjective opinions, experience, and speculations that *assume*, rather than provide a fair test of, the Plaintiffs' allegations.

34.     Next, I elaborate on each of my aforementioned conclusions in the following three sections, in which I: (*i*) evaluate the Dennis Survey; (*ii*) respond to the Dennis Declaration's criticisms of the Kivetz Survey; and (*iii*) evaluate the Silverman Report.

## C.     EVALUATION OF THE DENNIS SURVEY

35.     The Dennis Declaration consists of two components: (*i*) a critique of the empirical consumer survey that I conducted in this litigation (*i.e.*, the Kivetz Survey); and (*ii*) a report of Dr. Dennis's own survey that he conducted in this litigation (*i.e.*, the Dennis Survey).  In the remainder of this section, I evaluate the Dennis Survey in relation to various fundamental survey principles.  In Section D, I respond to Dr. Dennis's criticisms of the empirical consumer survey that I conducted in this litigation; my response builds on the concepts and methodological principles discussed in the present section.

### C.1.    Overview of the Dennis Survey

36.     The Dennis Survey attempted to test: (*i*) consumers' perceptions of the disputed Fisher-Price product packaging; (*ii*) the materiality for consumers' purchase decisions of such supposed "perceptions"; and (*iii*) the materiality for consumers' purchase decisions of a "disclaimer" (or warning) on the product packaging.  Regarding his survey assignment, Dr. Dennis states:[14]

> I was asked to design, conduct, and report on a consumer survey to measure the extent to which consumers' perceptions of the Defendants' products are consistent with the Plaintiffs' theory of liability, that is, that the packaging of the products misled the consumers into believing that the products are safe for use by babies, including for overnight or prolonged sleep.  I also was asked to measure whether these alleged misleading representations and omissions are material to consumers' purchasing decisions.

37.     In order to evaluate the reliability and validity (or lack thereof) of the Dennis Survey's methodology and results, it is instructive to first overview the survey's procedures, stimuli, questions, and controls (or lack thereof).

---

[14] Dennis Declaration, ¶ 78.

38.     The Dennis Survey was conducted over the Internet among Dynata panelists who, among other criteria,[15] indicated that they will purchase, "for a baby who is, or will be, zero to three months old," a "baby product to put a baby to lay, sit, sleep, be soothed, or play in" during the next six months.[16]

39.     Participants who qualified for the main questionnaire were instructed to consider only the product packaging:[17]

**In answering the survey questions, it is very important that you base your answers <u>only</u> on the packaging that we showed you.**
There are no right answers or wrong answers.
**We are <u>not</u> asking you whether the meanings are true or false.**

40.     Participants were also asked to reaffirm their compliance with the instructions as follows:[18]

Please let us know if you agree with our two instructions.
    1. To base your answers only on the packaging we just showed you.
    2. To tell us what you believe the packaging is communicating to you.
    ○  I agree with the instructions
    ○  I do not agree with the instructions

Those who did not indicate their agreement with the above instructions were terminated from the survey.[19]

41.     Next, participants were shown an image with a (cropped) front panel of a Fisher-Price package, purportedly based on the Fisher-Price My Little Snugapuppy Deluxe Rock 'n Play Sleeper product (*see* Figure 1 below), which is the package that I used in my survey (I used all six panels of the package in my survey; Dr. Dennis did not).

*****************

---

[15] *See id.*, Attachment C, pp. 84 – 95 for the Dennis Survey's screener questionnaire.
[16] *See id.*, p. 92.  As Dr. Dennis acknowledged, he used the same key screening questions that I used in my consumer survey; *see* Dennis Declaration, ¶¶ 83 – 84.
[17] *Id.*, Attachment C, p. 98.  Emphases in the original.
[18] *Id.*, p. 99.
[19] *Ibid.*

**Figure 1: Screenshot of the Dennis Survey's Stimulus (Cropped Package Front)** [20]

Below is the front of the product packaging. Please examine it like you are shopping. You can click on the image to enlarge it.



42.    On (presumably) the next screen,[21] participants were told that they could click on three thumbnail images to "view the rest of the product package"; these images corresponded to portions of three other panels from the disputed product's packaging.[22] Notably, Dr. Dennis did not allow participants to see all six panels of the packaging, nor did he allow participants to see the entirety of any single panel.

**Figure 2: Screenshot of the Dennis Survey's Stimulus (Portions of Other Panels From Package)** [23]

To view the rest of the product package, click on any or all of the thumbnail images.



---

[20] *See* Dennis Declaration, Attachment B, p. 7.
[21] As of the date of this *Rebuttal Expert Report*, no link to the underlying survey instrument has been produced in this litigation.  Therefore, I am unable to verify several aspects of the Dennis Survey, including whether participants were shown the packaging stimuli and certain questions on separate screens, as well as the randomization of various questions and answer choices.
[22] Dennis Declaration, Attachment C, p. 102.
[23] *Ibid*.

43.     Afterward, in the Dennis Survey's first "materiality" question (hereinafter, "the 'baseline materiality' question"), participants were asked to state their intention to purchase the product they viewed "based on the product packaging," along with the same (cropped) image from the package's front panel:[24]

> Now we just want to know about your purchase interest, if any, in the product based on the product packaging we showed you.
>
> How <u>likely</u> or <u>not likely</u> are you to purchase this product based on the product packaging we have shown you?
>
> o   Extremely unlikely
> o   Unlikely
> o   Neither likely nor unlikely
> o   Likely
> o   Extremely likely

44.     Then, in the Dennis Survey's "perception" test, participants were asked nine closed-ended "perception" questions, preceded by the following instructions:[25]

> Next, we want to know what you understand the product packaging to be communicating.
>
> We will show you some possible ways that people might or might not understand the meaning of the words on the packaging
>
> We want you to tell us whether you think the packaging is communicating that meaning or whether you think the packaging is not communicating that meaning.

45.     Each of the nine questions was asked separately[26] on its own screen (with each question offering participants the option to view the cropped packaging again):[27]

> Q.1_1   Based on the product packaging, do you believe the packaging <u>is</u> or <u>is not</u> communicating this meaning?
>
> **The product is designed to be used for babies.**
>
> Please select one.
>
> o   The packaging is communicating this
> o   The packaging is <u>not</u> communicating this
> o   Don't know / not sure

---

[24] *Id*., p. 104.

[25] *Id*., p. 105.

[26] *See* Dennis Declaration, ¶ 97 ("Each possible meaning was asked separately (i.e., nine separate questions).").

[27] *See id*., Attachment C, pp. 106 – 121.  *See also* Dennis Declaration, Attachment B, pp. 15 – 18.  Below each "perception" question, an instruction prompted participants as follows: "Click here [hyperlinked] to see the packaging again if that would help you answer the question."  Participants who clicked on the "here" link apparently were then presented with the front panel of the packaging shown earlier; *see* Attachment B, p. 14.

Q.1_2  Based on the product packaging, do you believe the packaging <u>is</u> or <u>is not</u> communicating this meaning?

**The product is safe for babies to use.**

Please select one.

- o   The packaging is communicating this
- o   The packaging is <u>not</u> communicating this
- o   Don't know / not sure

Q.1_3  Based on the product packaging, do you believe the packaging <u>is</u> or <u>is not</u> communicating this meaning?

**The product will help babies feel better when they have colic.**

Please select one.

- o   The packaging is communicating this
- o   The packaging is <u>not</u> communicating this
- o   Don't know / not sure

Q.1_4  Based on the product packaging, do you believe the packaging <u>is</u> or <u>is not</u> communicating this meaning?

**The product is stable and won't turn over because of the baby's movements.**

Please select one.

- o   The packaging is communicating this
- o   The packaging is <u>not</u> communicating this
- o   Don't know / not sure

Q.1_5  Based on the product packaging, do you believe the packaging <u>is</u> or <u>is not</u> communicating this meaning?

**The product is intended for babies to be able to sleep and nap in it.**

Please select one.

- o   The packaging is communicating this
- o   The packaging is <u>not</u> communicating this
- o   Don't know / not sure

Q.1_6  Based on the product packaging, do you believe the packaging <u>is</u> or <u>is not</u> communicating this meaning?

**The product will not cause a baby to develop health problems.**

Please select one.

- o   The packaging is communicating this
- o   The packaging is <u>not</u> communicating this
- o   Don't know / not sure

Q.1_7  Based on the product packaging, do you believe the packaging <u>is</u> or <u>is not</u> communicating this meaning?

**The product won't cause a baby to be hurt.**

Please select one.

- o   The packaging is communicating this
- o   The packaging is <u>not</u> communicating this
- o   Don't know / not sure

Q.1_8   Based on the product packaging, do you believe the packaging <u>is</u> or <u>is not</u> communicating this meaning?

**<u>The product is made with high quality materials.</u>**

Please select one.

- o   The packaging is communicating this
- o   The packaging is <u>not</u> communicating this
- o   Don't know / not sure

Q.1_9   Based on the product packaging, do you believe the packaging <u>is</u> or <u>is not</u> communicating this meaning?

**<u>The product is portable (for when you are "on the go").</u>**

Please select one.

- o   The packaging is communicating this
- o   The packaging is <u>not</u> communicating this
- o   Don't know / not sure

46.     Although the order of Questions 1_2 through 1_9 was (apparently) randomized across participants, the order of the answer choices for each of the nine questions was *not* randomized or rotated.[28]

47.     Next, only participants who answered any of the nine "perception" questions in the affirmative[29] were asked a corresponding series of questions asking about their purchase likelihood based on their previously reported "perceptions" (hereinafter, "the 'meaning-specific materiality' questions"):[30]

MATERIAL1_#     How <u>likely</u> or <u>not likely</u> are you to purchase this product because of your understanding that the packaging is communicating this message:

**[INSERT STATEMENT CORRESPONDING TO Q.1_1 – Q.1_9 ABOVE]**

- o   Extremely unlikely
- o   Unlikely
- o   Neither likely nor unlikely
- o   Likely
- o   Extremely likely

Click <u>here</u> to see the packaging again if that would help you answer the question.

---

[28] *See* Dennis Declaration, Attachment B, p. 15.  The programmer instruction states: "DO NOT RANDOMIZE RESPONSE LISTS" (referring to the answer options for each of the nine "perception" questions).

[29] That is, according to the programmer instructions, if a participant did not indicate that the packaging is communicating a given meaning, then he/she would *not* see a corresponding "meaning-specific materiality" question asking about that meaning.  *See id*., p. 19.

[30] *Ibid*.  *See also* Dennis Declaration, Attachment C, pp. 123 – 128.

48.     Participants were then shown the following introduction and instructions:[31]

Suppose the manufacturer of the product put this warning label on the front of the packaging because of actual injuries and fatalities that occurred in real life.

**THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS.**

49.     The next screen asked participants another "materiality" question (hereinafter, "the 'disclaimer materiality' question"), reiterating the disclaimer ("warning label") along with the same (cropped) image from the package front (*see* Figure 3):[32]

We just want to know about your purchase interest, if any, in the product based on the product packaging we showed you and having this warning label added to the packaging:

**THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS.**

How <u>likely</u> or <u>not likely</u> are you to purchase this product based on the product packaging we have shown you?

- o   Extremely unlikely
- o   Unlikely
- o   Neither likely nor unlikely
- o   Likely
- o   Extremely likely

**Figure 3: Screenshot of the Dennis Survey's Stimulus (Cropped Package Front) Appearing After "Disclaimer Materiality" Question** [33]



---

[31] Dennis Declaration, Attachment C, p. 130.
[32] *Id.*, p. 131.
[33] *Ibid.*

50.     Finally, participants were asked the below open-ended question (hereinafter, "the 'awareness of issues' question"), after which the survey concluded:[34]

> Please tell us in your own words about any issues you have heard or read about involving baby products such as the product you examined earlier, or type in **NONE**.



51.     Based on his survey's results, Dr. Dennis opines as follows:[35]

> I conclude that the reasonable consumer was in fact misled by Defendants' labelling practices, as indicated by a substantial majority of my respondents understanding the Defendants' packaging to convey meanings consistent with the Plaintiffs' allegations. Large majorities of consumers perceived the Defendants' product packaging [*sic*] communicate that the products were safe for babies, that they were intended to be used for sleeping and napping, and that they would not hurt the babies. Furthermore, these consumer perceptions are material to consumers' purchasing decisions. Finally, my survey found that a simple warning disclaimer on the products [*sic*] packaging would cause a substantial decrease in consumers' interest in purchasing the products.

52.     However, to reach valid and reliable conclusions about consumers' purchase decisions and perceptions regarding the disputed Fisher-Price products, Dr. Dennis should have followed several well-accepted principles before designing his survey and deriving any conclusions. Surveys conducted for purposes similar to those of the Dennis Survey must be designed and conducted based on scientific methodologies that are relied upon in the relevant field of expertise and according to well-established survey standards, including, but not limited to, the factors listed in the *Manual for Complex Litigation*.[36] Such surveys must also, inter alia: (*i*) use non-leading and unbiased survey questions (including, when appropriate, a sequence of filter questions) to

---

[34] *Id.*, p. 133.
[35] Dennis Declaration, ¶ 127.
[36] *Manual for Complex Litigation* (2004), Federal Judicial Center, Fourth, Section 11.493, pp. 112 – 113. Although I am not an attorney, I find it helpful to refer to legal authorities, as well as prior court and NAD (*i.e.*, the *National Advertising Division of the BBB National Programs*) decisions, to illustrate the types of issues and principles that arise when evaluating surveys used in litigation and in adversarial proceedings. *See also* Diamond, Shari Seidman (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, 3rd ed., Washington, D.C.: The National Academies Press.

avoid inducing severe demand effects, "focalism," yea-saying, and order biases that, individually and combined, artificially inflate the "net deception" and materiality estimates; (*ii*) employ adequate survey controls to account for survey "noise"; and (*iii*) approximate marketplace conditions and depict advertising, packaging, and challenged claims in a non-distorted manner and in context.

53.      The Dennis Survey violated every principle and requirement of scientific surveys referenced above.  It is well-established that while an adequate survey can provide useful reliable information, the findings of a survey are often largely determined by its methodology.  For example, as I have shown in my own research,[37] the choice of methodology can determine whether the survey will demonstrate a significant consumer preference for one alternative or another, making it essential that the most suitable survey method be chosen and used.  Indeed, there is little doubt that, by choosing a biased, seriously flawed methodology, one can create "evidence" of various consumer preferences and perceptions that, in reality, do not exist.  In particular, a survey's sample, methodology, questions, stimuli, and control are all critical determinants of the survey's findings.

54.      Dr. Dennis's survey methodology consisted of a series of highly biased and repetitive questions, including a "baseline materiality" question, nine "perception" questions, up to nine "meaning-specific materiality" questions, and a "disclaimer materiality" question,[38] all asked of the same participants and without any survey controls.  This survey method is highly nonstandard and does *not* conform to fundamental principles of consumer materiality and perception surveys.

55.      Based on my various analyses set forth in this *Rebuttal Expert Report*, my professional opinion is that Dr. Dennis's survey is fatally flawed and is *not* based on

---

[37] *See, e.g.*, Kivetz, Ran and Itamar Simonson (2002b), "Self-Control for the Righteous: Toward a Theory of Pre-Commitment to Indulgence," *Journal of Consumer Research*, 29 (2), 199 – 217.  This article was a finalist for the award for the Best Article published in the *Journal of Consumer Research* (the major journal on consumer behavior) between 2002 and 2005.

[38] *See, e.g.*, Dennis Declaration, Attachment C, pp. 100 – 131.

scientific methodologies that are reasonably relied upon in this field of expertise. As such, Dr. Dennis's conclusions are unsubstantiated and do *not* provide reliable and valid estimates of either (*i*) the materiality (causal impact) on consumers' purchase decisions of the alleged packaging misrepresentations and omission, or (*ii*) consumers' perceptions regarding the disputed products' packaging (or alleged misrepresentations thereof). Strikingly, despite the Dennis Survey's numerous one-sided biases (favoring the Plaintiffs), the results, if anything, **contradict** the Plaintiffs' position in this litigation. Next, I explain each of my conclusions.

C.2.  The Dennis Survey's "Materiality" Test Involving a Supposed "Disclaimer" is Highly Leading, Biased, and Conducive to Severe Demand Effects

56.    As Professor McCarthy points out, a survey and its questions must not be leading.[39] A leading question or survey procedure suggests to participants particular answers, thus creating a bias and producing invalid results. Indeed, seminal research shows that people's survey responses are often distorted based on the survey context and on leading phrases and questions.[40] Participants' reactions to leading survey questions

---

[39] McCarthy, J. Thomas (2007), *McCarthy on Trademarks and Unfair Competition* (*McCarthy*), §32:172; *see also Manual for Complex Litigation* (2004), Section 11.493.

[40] Kahneman, Daniel and Amos Tversky (1981), "The Framing of Decisions and the Psychology of Choice," *Science*, 211(4481), 453 – 458; Loftus, Elizabeth and Guido Zanni (1975), "Eyewitness Testimony: The Influence of the Wording of a Question," *Bulletin of the Psychonomic Society*, 5(1), 86 – 88. For a review, *see* Weinberg, Howard I., John Wadsworth, and Robert S. Baron (1983), "Demand and the Impact of Leading Questions on Eyewitness Testimony," *Memory & Cognition*, 11(1), 101 – 104. For example, Dr. Loftus and her colleagues studied the impact of question wording on subsequent eyewitness testimony. Consider an eyewitness who is asked one of two question versions: (*i*) How fast were the cars going when they contacted? or (*ii*) How fast were the cars going when they smashed? Loftus and colleagues showed that the latter phrasing produced higher speed estimates. *E.g.*, Loftus, Elizabeth, Diane Altman, and Robert Geballe (1975), "Effects of Questioning Upon a Witness' Later Recollections," *Journal of Police Science and Administration*, 3(2), 162 – 165; Loftus and Zanni (1975); Loftus, Elizabeth (1975), "Leading Questions and the Eyewitness Report," *Cognitive Psychology*, 7, 550 – 572; Loftus, Elizabeth and John C. Palmer (1974), "Reconstruction of Automobile Destruction: An Example of the Interaction between Language and Memory," *Journal of Verbal Learning and Verbal Behaviour*, 13, 585 – 589. In another such study, observers estimated the duration of an event they had themselves experienced two weeks earlier (a person disrupting a university class). Participants who were asked to estimate how long it took the person to *walk* through the class as opposed to *run* through the class gave longer duration estimates. Burt, Christopher D. and Jennifer S. Popple (1996) "Effects of Implied Action Speed on Estimation of Event Duration," *Applied Cognitive Psychology*, 10(1), 53 – 63.

about decontextualized information can reflect a number of background considerations (*e.g.*, social desirability concerns),[41] whereas the true influence, if any, of various representations and disclaimers in the actual marketplace is difficult for survey participants to accurately identify, predict, and verbalize.[42]

57.     Relatedly, a fundamental forecasting survey principle is that a survey must avoid creating strong "demand effects" (or "demand characteristics"),[43] whereby survey participants use cues provided by the survey's questions, answer choices, and/or stimuli to figure out the purpose of the study and provide the answers expected by the researcher. Such demand effects, which often arise from leading survey questions, stimuli, and procedures, produce predictable and biased responses.[44]  Courts have recognized the importance of demand effects, and such problems have contributed to the rejection and criticisms of surveys.[45]

---

[41] *See, e.g.*, Fiske, Susan T. and Shelley E. Taylor (1991), *Social Cognition* (2nd ed.), New York, NY: McGraw-Hill.

[42] *See, e.g.*, Nisbett, Richard E. and Timothy D. Wilson (1977), "Telling More Than We Can Know: Verbal Reports on Mental Processes," *Psychological Review*, 84(3), 231 – 259; Wilson, Timothy D. and Daniel T. Gilbert (2003), "Affective Forecasting," in *Advances in Experimental Social Psychology Vol. 35*, Zanna, Mark P. (ed.), San Diego, CA: Elsevier, pp. 345 – 411; Wilson, Timothy D. and Jonathan W. Schooler (1991), "Thinking Too Much: Introspection Can Reduce the Quality of Preferences and Decisions," *Journal of Personality and Social Psychology*, 60(2), 181 – 192.

[43] *See, e.g.*, Orne, Martin T. (1962), "On the Social Psychology of the Psychological Experiment," *American Psychologist*, 17(11), 776 – 783; Darley, William K. and Jeen-Su Lim (1993), "Demand Artifacts in Consumer Research: An Alternative Perspective," *Journal of Consumer Research*, 20(3), 489 – 495; *see also* Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds.), Chicago, IL: American Bar Association, 243 – 259.

[44] In the doctoral courses that I teach at Columbia University, I spend considerable time analyzing the conditions that produce demand effects.  Demand effects are particularly problematic when a survey's design, questions, answer choices, and/or stimuli presentation: (*i*) suggest the expected answer; and/or (*ii*) cause participants to consider or ignore claims, stimuli, and other aspects that they would not have considered or would have ignored outside the context of the study.  *See, e.g.*, Simonson and Kivetz (2012).

[45] *See, e.g.*, *Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033; 2000, U.S. Dist. S.D. Indiana; *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, "Opinion & Order," 06 Civ. 550 (U.S. SDNY; Aug. 2007); *Government Employees Insurance Company v. Google Inc., et al.*, East. Dist. of Virginia, 2005 U.S. Dist. LEXIS 18642; 77 U.S.P.Q.2D (BNA) 1841; *THOIP v. The Walt Disney Co. et al.*, OPINION AND ORDER, (08 Civ. 6823; S.D. NY; Feb. 2010).

58.     Although Dr. Dennis conceded that his survey (*i.e.*, both the "perception" and "materiality" questions) did not test the specific alleged packaging misrepresentations at issue in this litigation,[46] he purports to have measured the "materiality" of the alleged omission by eliciting participants' purchase interest in the disputed Fisher-Price product after showing a "warning disclaimer."[47]  As I explain below, such a "materiality" test is extremely leading and biased, induces severe demand effects and order biases, and sharply deviates from what consumers would typically experience or encounter in the marketplace.

59.     *First*, the "disclaimer" language presented to the Dennis Survey's participants is highly leading and biased, and it is *inconsistent* with Dr. Dennis's (incomplete) description of such a "disclaimer."  Notably, in his declaration, Dr. Dennis characterizes his construction of what he claims to be a "conservative"[48] and "neutral, undramatic" disclaimer"[49] in the following terms:[50]

> […] I attempted to cure the alleged omission by providing the respondents a warning disclaimer for the product.  I purposefully worded a **neutral, undramatic disclaimer that warns the product "carries the risk of infant fatalities or other serious health problems."**  My warning disclaimer **does not call attention to actual deaths that have occurred as a result of babies' use of the Defendants' products**, nor does my disclaimer use the more direct language from the U.S. Surgeon General on cigarette products. [Emphases added]

60.     Dr. Dennis proceeds to describe and present his "second overall materiality question"[51] as follows:[52]

---

[46] *See* Dennis Deposition, pp. 286, 297 – 298, 312 – 315, & 317.
[47] Dennis Declaration, ¶ 102.
[48] *Ibid*.
[49] *Ibid*.
[50] *Ibid*.  At his deposition, Dr. Dennis similarly testified that his disclaimer is "conservative" because it does not mention actual deaths: "Q. And you believe your disclaimer is conservative?  A. I do.  Q. Why is that?  A. I very cautiously worded it to not actually talk about the history of – the documented history of injuries and – and actual deaths that have occurred. So I kept the language high level to talk about the risk of these injuries and possible mortality without actually calling out the history and saying, essentially, what has happened in the past to babies using this product"; Dennis Deposition, p. 171.
[51] Dennis Declaration, ¶ 104.
[52] *Ibid*.

My survey then administered the second overall materiality question having the neutral warning disclaimer. The survey question does provide the respondent [*sic*] ability to see the product packaging again (without the warning disclaimer). The survey question is shown below:



We just want to know about your purchase interest, if any, in the product based on the product packaging we showed you and having this warning label added to the packaging:

**THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS.**

How <u>likely</u> or <u>not likely</u> are you to purchase this product based on the product packaging we have shown you?

- ○ Extremely unlikely
- ○ Unlikely
- ○ Neither likely nor unlikely
- ○ Likely
- ○ Extremely likely

61. Beyond the fact that presenting the "disclaimer" shown above (*i.e.*, that warns about "the risk of infant fatalities or other serious health problems") is exceedingly leading on its own and is far from a "neutral, undramatic disclaimer,"[53] an examination of the survey language in the attachments to the Dennis Declaration reveals a contradiction between Dr. Dennis's description and what participants were actually shown in the survey. Specifically, the Dennis Survey's "disclaimer" materiality question was immediately preceded by language that *does* "call attention to actual deaths that have occurred as a result of babies' use of the Defendants' products,"[54] directly contradicting Dr. Dennis's above-quoted claim. In particular, the Dennis Survey presented participants with the following introduction on a separate screen:[55]

Suppose the manufacturer of the product put this warning label on the front of the packaging because of actual injuries and fatalities that occurred in real life.

**THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS**

62. Thus, in reality, the Dennis Survey's participants first read about "actual injuries and fatalities that occurred in real life" that necessitated a warning label on the

---

[53] *Id.*, ¶ 102.
[54] *Ibid.*
[55] *Id.*, Attachment B, p. 20; *see also* Dennis Declaration, Attachment C, p. 130.

front of the packaging, followed by the text of the "disclaimer" itself in bold, uppercase letters. Participants were then again exposed to this "disclaimer" on the next screen, which asked for their purchase interest in the product "based on the product packaging […] and having this warning label added to the packaging: **THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS**."[56]

63.     The above presentation of information related to the "disclaimer," disassociated from the product packaging, induced a "focalism" bias (or "focusing illusion").[57] Seminal research in psychology has found evidence of such a bias, whereby survey participants are manipulated to focus on specific aspects, causing these aspects to receive more attention and weight than they do under real marketplace conditions. As a result, survey participants focus too much on the information that is presented to them and not enough on the effects of other information, which the researcher makes less salient or unavailable.[58]

64.     Having been primed, or cued, to associate "actual injuries and fatalities that occurred in real life"[59] with the accompanying "disclaimer," many participants in the Dennis Survey were likely to conclude that the Fisher-Price product to which they were exposed must have caused the actual deaths of babies (otherwise, why would such

---

[56] *See, e.g.*, Dennis Declaration, Attachment C, p. 131.

[57] Schkade, David A. and Daniel Kahneman (1998), "Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction," *Psychological Science*, 9(5), 340 – 346 (p. 340). *See, e.g.*, Schkade and Kahneman (1998); Kahneman, Daniel, Alan B. Krueger, David Schkade, Norbert Schwarz, and Arthur A. Stone (2006), "Would You Be Happier If You Were Richer? A Focusing Illusion," *Science,* 312(5782), 1908 – 1910; Wilson, Timothy D., Thalia Wheatley, Jonathan M. Meyers, Daniel T. Gilbert, and Danny Axsom (2000), "Focalism: A Source of Durability Bias in Affective Forecasting," *Journal of Personality and Social Psychology*, 78(5), 821 – 836; *see also* Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427 – 448 (This article was a finalist for the 2005 O'Dell Award, given to the *Journal of Marketing Research* article that has had the greatest impact on the marketing field in the previous five years.).

[58] *See, e.g.*, Schkade and Kahneman (1998); Kahneman et al. (2006); Wilson et al. (2000).

[59] Dennis Declaration, Attachment B, p. 20; *see also* Dennis Declaration, Attachment C, p. 130.

information be mentioned in the first place?).[60] Such participants would be led to provide the "expected" answer (of not preferring to buy a product that has supposedly led to babies dying).

65. Moreover, whereas the "disclaimer" itself was framed in terms of the product posing a "risk," the written introduction to the "disclaimer" specifically highlighted *actual deaths* that occurred in real life. Thus, many participants who then read the "disclaimer" were likely to have associated the product as *certainly* causing (rather than *possibly* causing) infant fatalities and other serious health problems.

66. Dr. Dennis's failure to properly disclose in his declaration the actual language presented to participants results in a misleading characterization of his survey. As Professor Diamond explains,[61] it is important that a report provide complete, detailed, and accurate information regarding all relevant study characteristics. According to Professor Diamond:[62]

> The completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey.

67. *Second*, the method and question structure chosen by Dr. Dennis to test for the "materiality" of his "disclaimer" is also extremely leading. The Dennis Survey's research design was akin to a "within-subjects" (or "within-group") research design, in which survey participants provide a response to a dependent variable measure (*e.g.*, likelihood of purchasing a product) given a comparison between levels of an independent variable (*e.g.*, presence vs. absence of a claim or disclosure). By contrast, in a "between-

---

[60] My understanding is that the Plaintiffs allege that the use of the disputed Fisher-Price products as a "sleeper" directly caused infant fatalities and injuries (*see, e.g.*, ¶ 3), but I am informed that such an allegation has not been established as a fact in this litigation; *see, e.g., Answer to Consolidated Amended Complaint*.
[61] Diamond (2011), pp. 415 – 416.
[62] *Id.*, p. 415.

subjects" design, different groups of participants respond to the dependent variable of interest given only one level of the independent variable.[63]

68.　　A major drawback of a within-subjects design such as that used by Dr. Dennis is that it reveals to participants the factor being investigated and the research hypothesis.[64]　Undoubtedly, Dr. Dennis's "disclaimer materiality" question made it obvious to participants that the survey is assessing their preferences between a product that *does* versus one that *does not* warn them about "infant fatalities or other serious health problems."　This, in turn, led participants to guess the "expected" answer—to select the answer choice that is easiest to justify—as opposed to exhibiting the true impact (if any) that a (realistic and non-leading) disclaimer would have on their purchase decisions.　That is, Dr. Dennis's "materiality" question was highly leading because it directly communicated to participants the variable of interest (*i.e.*, the presence of a warning about infant injuries) and the "expected" result.　By explicitly forcing participants to indicate their purchase likelihood based on the presence of the "disclaimer" as the sole differentiating attribute, Dr. Dennis's question created the presupposition—which may not have been previously held by participants—that such a disclaimer must be important and should influence their purchase preferences.

69.　　*Third*, Dr. Dennis's second (*i.e.*, "disclaimer") materiality question suffered from a severe order bias.　In particular, research on conversational norms[65] and order

---

[63] For example, one group of participants would indicate their likelihood of purchasing a disputed Fisher-Price package with the alleged misrepresentations and omission, while a second group of participants would indicate their likelihood of purchasing an otherwise identical product but with the alleged misrepresentations and omission *removed* (or modified so as to be no longer allegedly deceptive).　The Kivetz Survey employed such a between-subjects design.

[64] *See, e.g.*, Kahneman, Daniel and Amos Tversky (1996), "On the Reality of Cognitive Illusions," *Psychological Review*, 103(3), 582 – 591; Kivetz and Simonson (2000).

[65] *See, e.g.*, Grice, H. Paul (1975), "Logic and Conversation," in *Syntax and Semantics 3: Speech Acts*, Cole, Peter and Jerry L. Morgan (eds.), New York, NY: Academic Press, pp. 41 – 58; Schwarz, Norbert (1994), "Judgment in Social Context: Biases, Shortcomings, and the Logic of Conversation," *Advances in Experimental Social Psychology*, 26, 123 – 162.

effects[66] (*e.g.*, how one question influences responses to subsequent questions) indicates that the answers to the Dennis Survey's "disclaimer materiality" question were highly likely to be biased by an order effect due to the preceding "perception" questions. Order effects in survey research have been documented extensively. They have been shown to be especially pronounced under conditions like those that existed in the Dennis Survey—namely, when participants perceive the questions as related.[67]

70.    In the Dennis Survey, *all* participants saw the "disclaimer materiality" question (which asked about their purchase interest in the product after learning about the "disclaimer") only *after* answering: (*i*) the "baseline materiality" question; (*ii*) a series of nine "perception" questions; and (*iii*) a follow-up series of "meaning-specific" materiality questions (corresponding to the "perception" questions for which participants provided an affirmative response). Thus, by the time participants were asked to speculate about the effect of Dr. Dennis's "disclaimer"—which warns about "infant fatalities and other serious health problems"—participants had already been repeatedly exposed to multiple statements about the product's safety, including those stating that the product would *not* cause a baby to develop health problems or to be hurt.[68]

71.    The repetitive questioning in the nine "perception" questions is highly leading and conducive to focalism and demand effects, and was likely to prompt participants to infer or guess the "expected" answer to the "disclaimer materiality" question for the repeated sequence of questioning to make sense. Participants were (artificially) primed, or conditioned, to think about safety and health prior to reporting

---

[66] *See, e.g.*, Strack, Fritz (1992), "Order Effects in Survey Research: Activation and Information Functions of Preceding Questions," in *Context Effects on Social and Psychological Research*, Schwarz, Norbert and Seymour Sudman (eds.), New York, NY: Springer-Verlag.

[67] *See, e.g., ibid*.

[68] *See, e.g.*, Dennis Declaration, ¶ 101. The "meanings" tested by Dr. Dennis that he classifies as consistent with the Plaintiffs' allegations were: "Safe for babies to use"; "Stable and won't turn over because of the baby's movements"; "Intended for babies to be able to sleep and nap in it"; "Product will not cause a baby to develop health problems"; "Product won't cause a baby to be hurt"; and "Designed to be used for babies."

their purchase intentions—for a product that is described as carrying a "disclaimer" that warns precisely of safety and health problems.

72.    It is noteworthy that when asked at his deposition about the leading nature of his "within-subjects" survey design, Dr. Dennis stated that the "risk" of such a design lay in "if the respondents are conditioned by – by answering the questions related to consumer perceptions."[69]  While I agree with Dr. Dennis's concern about such a "conditioning impact,"[70] I disagree with his claim that such a "risk" is "mitigated by the fact that all [] respondents are going through the consumer perception questions."[71]  To the contrary, Dr. Dennis's argument (*i.e.*, that "conditioning" or priming is less problematic due to all participants being commonly exposed to the nine "perception" questions) not only is erroneous and nonsensical, but also is further testament to the leading nature of the Dennis Survey.  Moreover, there is *no* benchmark (*i.e.*, via a control) by which to measure or correct for such a "conditioning" bias or priming effect (*see* Subsection C.6 for a discussion of the Dennis Survey's lack of any survey control).

73.    *Fourth*, the Dennis Survey's "disclaimer materiality" question is highly unrepresentative of consumers' purchase experiences in the real world (*see also* Subsection C.5).  In the actual marketplace, consumers would encounter disclaimers (to the extent that any disclaimers are displayed at all) in a realistic packaging context, which would in turn shape their perceptions, preferences, expectations, and purchase behaviors. Unlike the Dennis Survey's participants, consumers who are making decisions regarding a baby product in an actual retail setting would have access to the entirety of the product packaging; would *not* be prompted about a product's manufacturer putting a warning on the packaging front "because of actual injuries and fatalities that occurred in real life";[72]

---

[69] Dennis Deposition, p. 183.
[70] *Ibid*.
[71] *Ibid*.  Dr. Dennis goes on to claim: "So if there is any kind of conditioning impact of seeing those consumer perception questions, that impact is being felt across the entire sample"; *ibid*.
[72] Dennis Declaration, Attachment B, p. 20; *see also id*., Attachment C, p. 130.

would *not* view a (truncated) front label of a package alongside a disclaimer appearing separately from the packaging;[73] and would *not* consider two products that are completely identical except for the presence of a single disclaimer that is said to appear on only one product.

74.     Further, the specific "disclaimer" that Dr. Dennis chose[74] fails to reflect marketplace conditions (or reality) in that such a disclaimer deviates from any statement that would realistically—or even plausibly—appear on a (commercially viable) product competing in the relevant category.

75.     Unlike Dr. Dennis, who conducted no research into the display or packaging of other inclined products in the marketplace,[75] I visited multiple stores that carry baby gear products such as the disputed products and observed the packaging of multiple competitors in the category.  In particular, a review of some inclined baby products in the marketplace indicates variation in the presence (vs. absence) of warnings or disclaimers that relate to sleep.[76] Exhibit D to this *Rebuttal Expert Report* shows examples of inclined baby products that displayed a "sleep-related" warning (highlighted in red ovals).

76.     As Exhibit D demonstrates, among those products that did include a "sleep-related" disclaimer on the packaging, such disclaimers: (*i*) were displayed in small font (*e.g.*, in fine print in most cases); (*ii*) were *not* located on the front panel of the product packaging (*e.g.*, were on the back or bottom panels in almost all cases); (*iii*) did *not*

---

[73] At his deposition, Dr. Dennis stated that he deliberately presented the disclaimer apart from a packaging context, but he provided no basis that such a decision is valid considering its deviation from marketplace reality; Dennis Deposition, p. 331.  In fact, Dr. Dennis later conceded that his presentation of the disclaimer is *not* how a consumer would actually encounter it in the real world: "Q. Is the disclaimer, as you put it on page 10 – 131 – is that how a consumer would see it in the real world?  […] A. No.  Again, I was designing a survey test and wanted to see the impact of this disclaimer"; *id.*, p. 332.

[74] At his deposition, Dr. Dennis claimed to have come up with such a disclaimer on his own; *see id.*, p. 104.  Note that the Plaintiffs' designated expert, Mr. Colin Weir, also stated that he intended to use a *nearly identical* disclaimer in his proposed conjoint survey; *see* February 8, 2021 Declaration of Colin B. Weir (hereinafter, the "Weir Declaration,") Exhibit 3, ¶ 28 ("This inclined infant sleeper carries the risk of infant fatalities or other serious health problems.").

[75] *See* Dennis Deposition, pp. 170 – 171.

[76] As observed in Buy Buy Baby, Target, and Burlington stores in Manhattan, New York.

contain any language referencing any fatalities, deaths, injuries, or other health problems connected to the product; and (*iv*) did not *categorically* apply a warning to usage of the product in general but rather to a specific usage (*i.e.*, "prolonged periods of sleeping"). As these examples make clear, Dr. Dennis's disclaimer is idiosyncratic and does *not* represent the stimuli and scenario that prospective purchasers of the disputed products (*i.e.*, the putative class members) would have encountered in the actual marketplace.

77. *Fifth*, the Dennis Survey's "disclaimer" is highly leading, biased, and *not* conservative. Dr. Dennis characterizes his chosen "disclaimer" as "conservative"[77] compared to an "alternative" disclaimer that he *claims* he could have used. Dr. Dennis describes this "alternative" disclaimer as a "more direct statement based on the Surgeon General's warning on cigarette products":[78]

> **U.S. CONSUMER PROTECTION SAFETY COMMISSION: THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS**

78. However, given the already egregiously leading nature of Dr. Dennis's chosen "disclaimer," the above "alternative" disclaimer amounts to a "straw man" that does not serve as an appropriate point of comparison. Moreover, Dr. Dennis asserts that his survey's "disclaimer" is conservative without offering *any* empirical substantiation that "[a] more direct disclaimer attributed to a U.S. federal government authority would have caused an even sharper decrease in consumers' purchases [*sic*] interest in the products based on the product packaging."[79] Nor does Dr. Dennis cite any examples of any baby products on which such an extreme disclaimer has been used.

79. Although Dr. Dennis attempts to draw a connection between the disputed baby products at issue and cigarette products by referring to the "more direct language from the U.S. Surgeon General,"[80] he provides no justification or evidence for why such

---

[77] Dennis Declaration, ¶ 102.

[78] *Id*., ¶ 103.

[79] *Id*., ¶ 102.

[80] *Ibid*.

a comparison is valid.  In fact, the nature of the product category and products at issue in this litigation indicate that the disputed baby products are *not* akin to tobacco products. Whereas tobacco products are used only for smoking (*i.e.*, such that the act of consuming, compared to not consuming, cigarettes may lead to health problems), I understand that the disputed Fisher-Price Rock 'n Play Sleeper products could be used, were marketed to be used,[81] and were in fact used[82] in a variety of (non-sleep) ways that are *not* alleged to lead to either infant fatalities or other serious health problems.

80.     In this respect, by linking "infant fatalities and other serious health problems" with the "sleeper product" in general rather with than with a specific use of the product, Dr. Dennis's "disclaimer" likely led many participants to believe that the Fisher-Price Rock 'n Play Sleeper is inherently dangerous, regardless of how it is used.  Hence, the Dennis Survey failed to account for the possibility that a consumer may choose to purchase the disputed product for reasons *other* than using it to put a baby to sleep.

81.     *Finally*, contrary to a basic survey design principle,[83] Dr. Dennis failed to include a "don't know" option in his "baseline materiality" and "disclaimer materiality" questions.  This omission exacerbated the leading nature of the Dennis Survey's "materiality" test, as participants were essentially forced to choose (or guess) one of the

---

[81] For example, the disputed Rock 'n Play products could be used to, inter alia, play with a baby, keep a baby entertained, soothe a baby (*e.g.*, through rocking motions, vibrations, etc.) while the baby is awake, stimulate a baby's eyesight (*e.g.*, through light projections), and move a baby from one place to another. *See, e.g.*, June 16, 2021 Declaration of Sarah Ford [senior marketing manager at Mattel/Fisher-Price] (hereinafter, the "Ford Declaration"), ¶ 16.  *See also* Ford Deposition, pp. 178 – 180.

[82] Many of the named Plaintiffs in this litigation testified that they did *not* use the Rock 'n Play Sleeper for overnight sleep, and instead used it for various other purposes (*e.g.*, as a temporary "parking spot" for the baby while doing something else; to play with the baby; to entertain the baby).  *See, e.g.*, Cuddy Deposition, pp. 155 & 182 – 184; Hanson Deposition, pp. 104 – 105 & 139 – 142; Huey Deposition, pp. 127 – 129, 134 – 135, & 173 – 174; Nowlin Deposition, pp. 188 – 189 & 197; Simmonds Deposition, pp. 95 – 96 & 106 – 108.

[83] *See, e.g.*, Jacoby, Jacob (2012), "Are Closed-Ended Questions Leading Questions?," in Diamond, Shari S. and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys*, Chicago, IL: American Bar Association, p. 274.

five answer options in each of the two purchase likelihood questions (*i.e.*, "Extremely likely", "Likely", "Neither likely nor unlikely", "Unlikely", and "Extremely Unlikely").[84]

82.     Overall, for the aforementioned reasons, Dr. Dennis's two "materiality" questions do *not* constitute a scientific or valid test of the materiality (causal impact), if any, of the alleged omission on consumers' purchase decisions.

C.3.    The Dennis Survey's "Perception" Test Relied on Extremely Leading Closed-Ended Questions that Generated Severe Demand, Focalism, Yea-Saying, and Order Biases

83.     The Dennis Survey's "perception" questions suffered from multiple fatal flaws, including: (*i*) a sole reliance on *closed-ended* questions to measure consumers' perceptions regarding the disputed products' packaging; (*ii*) the lack of *any* filter questions prior to the "perception" questions; (*iii*) a reliance on extremely leading questions that focused participants on the Plaintiffs' hypotheses (or theory of liability), omitted options consistent with Fisher-Price's position, and generated severe demand effects; (*iv*) the use of questions that suffered from severe "yea-saying" (acquiescence) and order biases; and (*v*) the use of vague and confusing questions that inflated guessing and survey "noise." Consequently, the Dennis Survey's "perception" questions were highly suggestive and gave rise to one-sided biases in favor of the Plaintiffs. Next, I explain each of the aforementioned four severe flaws in the Dennis Survey's "perception" questions.

C.3.1. *The Dennis Survey's "Perception" Test Relied Solely on Closed-Ended Questions*

84.     Recall that Dr. Dennis's "findings" regarding perceptions of the disputed packaging rely on a sequence of closed-ended questions (Q.1_1 – Q.1_9) in which participants were prompted to consider whether the product packaging communicates each of nine possible "meanings." In particular, participants were asked to indicate

---

[84] *See, e.g.*, Dennis Declaration, Attachment C, pp. 104 & 131.

whether they believe the packaging "is or is not communicating"[85] the following "meanings," presented separately:[86]

Q.1_1   The product is designed to be used for babies.
Q.1_2   The product is safe for babies to use.
Q.1_3   The product will help babies feel better when they have colic.
Q.1_4   The product is stable and won't turn over because of the baby's movements.
Q.1_5   The product is intended for babies to be able to sleep and nap in it.
Q.1_6   The product will not cause a baby to develop health problems.
Q.1_7   The product won't cause a baby to be hurt.
Q.1_8   The product is made with high quality materials.
Q.1_9   The product is portable (for when you are the "on the go").

85.      The closed-ended and extremely leading nature of the aforementioned "perception" questions induced severe demand, focalism, and order biases, as well as guessing behavior.  In many cases, closed-ended questions have a disadvantage (compared to open-ended questions) because the closed-ended questions give participants hints about the answers that are expected or preferred.[87]  The answer choices provided in a closed-ended question—as well as the topics raised in a set of closed-ended questions— can steer participants toward or away from a particular answer, and can prompt survey participants to report perceptions or opinions (offered as answer choices) that are not actually formed or held by consumers in the marketplace.

86.      Accordingly, many courts prefer open-ended questions based on the notion that such questions are less leading, less susceptible to demand effects, and more likely to elicit participants' spontaneous perceptions and opinions.  In a chapter from a survey treatise on trademark and deceptive advertising surveys (the same treatise cited in the Dennis Declaration), Keller explains:[88]

---

[85] *See, e.g.*, Dennis Declaration, Attachment B, pp. 15 – 18.  Emphases in the original.  Participants could also choose "Don't know / not sure" in each of the nine questions.

[86] *See, e.g., id.*, pp. 15 – 16; *see also id.*, Attachment D, pp. 63 & 66 (all emphases in the original).

[87] *E.g.*, Diamond (2011), pp. 391 – 394.  Note that Dr. Dennis opined at his deposition that "[m]ost traditional survey researchers avoid open-ended questions and use them for specific purposes […]"; Dennis Deposition, p. 219.  Such a claim is not only unsubstantiated but is erroneous and inconsistent with the same sources cited by Dr. Dennis in his declaration.

[88] Keller, Bruce P. (2012), "Survey Evidence in False Advertising Cases," in Diamond, Shari S. and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys*, Chicago, IL: American Bar Association, p. 189.

One of the most common problems in surveys is leading questions, which "suggest[] an answer." One way to avoid suggestive or leading questions is to ask open-ended questions, which require respondents to formulate answers in their own words. Although courts prefer open-ended questions because they tend to be less leading, the value of these questions depends on the information the survey is designed to elicit. [FNs omitted]

87.     Critically, the results attained from closed-ended questions may be misleading and biased if the provided list of answer choices—or the set of possible alternatives (*e.g.*, the possible "meanings" or "perceptions" suggested to the survey participants)—is incomplete, as was the case in the Dennis Survey (and as is explained later in this subsection). As Professor Diamond cautions:[89]

Closed-ended questions have some additional potential weaknesses that arise if the choices are not constructed properly. If the respondent is asked to choose one response from among several choices, the response chosen will be meaningful only if the list of choices is exhaustive—that is, if the choices cover all possible answers a respondent might give to the question. If the list of possible choices is incomplete, a respondent may be forced to choose one that does not express his or her opinion. [FN omitted]

88.     Professor Diamond also discusses the following related weakness of closed-ended questions:[90]

[…] the survey can ask all respondents to answer the question (e.g., "Did you understand the guarantee offered by Clover to be a 1-year guarantee, a 60-day guarantee, or a 30-day guarantee?"). **Faced with a direct question, particularly [a closed-ended] one that provides response alternatives, the respondent obligingly may supply an answer** even if (in this example) the respondent did not notice the guarantee ... Such answers will reflect only what the respondent can glean from the question, or they may reflect pure guessing. [Emphasis added]

89.     Concerns regarding closed-ended questions are particularly relevant when the survey does *not* include an adequate (external) control stimulus or (internal) control question that can serve as a benchmark for evaluating the obtained estimates and for accounting for the biases inherent in the survey's methodology. As subsequently discussed in Subsection C.6, Dr. Dennis failed to include any survey control.

******************

---

[89] Diamond (2011), p. 393.
[90] *Id.*, pp. 389 – 390.

## C.3.2. *Dr. Dennis Failed to Include **Any** Filter Questions Prior to His "Perception" Questions*

90.     As survey treatises have indicated,[91] it is important to include filter questions to reduce participant guessing.  Filter questions assess whether participants have any perceptions, opinions, or beliefs—in the first place—about the topics of interest.[92]  Thus, the standard methodology of most perception studies is to start with general questions about the topic of interest or about the messages communicated by the package or advertisement, and only then proceed with gradually more pointed *open-ended and non-leading* questions that inform the researcher about consumers' perceptions or beliefs with regard to the issues being investigated.[93]  Importantly, prior to the key questions that inquire about consumers' perceptions regarding the issues being investigated, consumer perception surveys should employ filter questions, to reduce the likelihood that survey "noise" (*e.g.*, guessing behavior and "yea-saying") will affect the results.  This ensures that the subsequent substantive questions (from which the survey's perception or "deception" estimates are derived) are asked *only* of those participants who actually had perceptions or opinions regarding the issues of interest or who actually took away messages from the product packaging or advertisement.

---

[91] *See, e.g.*, Keller (2012), p. 188 ("Filter questions are used to screen out respondents who do not have an opinion on the questions posed by the survey; guessers; and 'yea-sayers' who will give an answer that they believe the interviewer is seeking.  After asking questions such as, 'What was the main message of the commercial?' and 'What other messages does the commercial communicate?,' a commonly used filter question is 'Did the commercial communicate anything to you about [x]?'"); Diamond (2011), pp. 389–391.

[92] For example, survey participants may not have any belief, opinion, or perception regarding an issue; may not have perceived certain messages from a package or advertisement about which they are questioned; and/or may not understand a question asked of them.  Note that at his deposition, Dr. Dennis erroneously characterized filter questions as attention checks, that is, as questions used to "identify[] respondents that essentially should not be in the survey" and also conflated filter questions with control questions; Dennis Deposition, p. 213 ("Q. What is the – what is – what is a control question?  A. A control question – I think sometimes called a 'filter question' in the literature, if we're talking about the same thing – those are questions that I've seen experts use for identifying respondents that essentially should not be in the survey. These are respondents that potentially are not engaged with the survey. These are respondents that may not have been receptive to the stimulus.").  Dr. Dennis's definition of "filter questions" is unsubstantiated and erroneous.

[93] *See, e.g.*, Keller (2012).

91.     Dr. Dennis failed to use *any* filter questions to assess whether participants even noticed, perceived, or thought about the various topics mentioned in the nine "perception" questions, including sleep, safety, harm to the baby, and health problems. By completely avoiding filter questions, the Dennis Survey's leading "perception" questions insinuated to participants that they are expected to have perceptions and beliefs in the first place regarding each of the proffered "meanings." The increased "yea-saying" and guessing behavior that ensued grossly inflated the estimates of supposed beliefs that the packaging *does* communicate a particular meaning. Consequently, the Dennis Survey overestimates the (purported) proportion of consumers who hold beliefs about each of the "perceptions," severely biasing the results in the Plaintiffs' favor.

92.     Further, due to the lack of a control condition or stimulus (*see* Subsection C.6), this bias cannot be accounted for. As such, the Dennis Survey does *not* provide any reliable or valid measurement of consumers' true perceptions about the disputed packaging.

93.     Overall, instead of using such fatally flawed close-ended "perception" questions, Dr. Dennis should have employed filter questions, and only then asked participants non-leading, *open-ended* questions about what, if anything, the packaging communicates to them.

C.3.3. *The Dennis Survey's "Perception" Questions were Extremely Leading, Repetitive, Focused Participants on the Plaintiffs' Hypotheses While Omitting Options Consistent with Fisher-Price's Position, and Generated Severe Demand Effects*

94.     The Dennis Survey employed highly leading and repetitive questions that, as delineated below, generated demand effects and artificially constrained the set of plausible "meanings" or perceptions that participants could express.

95.     *First*, prior to answering the nine "perception" questions, participants were told: "We will show you some possible ways that people might or might not understand

the meaning of the words on the packaging."[94]  Thus, rather than allowing participants to

form their own impressions of the disputed products' packaging, the Dennis Survey

focused participants on a selected set of interpretations, represented as what supposedly

(other) people may understand the "words on the packaging" to mean.  Importantly,

because Dr. Dennis did not include *any* question whereby participants could specify their

own (open-ended) perceptions from the packaging, participants in the Dennis Survey

were completely prevented from expressing any opinion other than the nine statements

suggested by Dr. Dennis.

      96.    *Second*, the Dennis Survey's "perception" test induced a focalism bias by

highlighting statements deemed relevant to the Plaintiffs' theory of liability, while

excluding alternative statements that represent Fisher-Price's position in this litigation.

Of the nine listed "meanings" in the Dennis Survey, three were classified by Dr. Dennis

as "other packaging's meanings,"[95] while six were classified by Dr. Dennis as

purportedly "mapp[ing] to one of the Plaintiffs' 'key allegations'":[96]

> Q.1_1  The product is designed to be used for babies.
> Q.1_2  The product is safe for babies to use.
> Q.1_4  The product is stable and won't turn over because of the baby's movements.
> Q.1_5  The product is intended for babies to be able to sleep and nap in it.
> Q.1_6  The product will not cause a baby to develop health problems.
> Q.1_7  The product won't cause a baby to be hurt.

It is noteworthy that four of the six statements that supposedly correspond to the

Plaintiffs' allegations are similar, representing variations of the same theme of safety or

health (*i.e.*, "The product is safe for babies to use"; "The product is stable and won't turn

---

[94] *See, e.g.*, Dennis Declaration, Attachment C, p. 105.

[95] Dennis Declaration, ¶ 98.  Specifically, Dr. Dennis classifies the following three statements as not relating to the Plaintiffs' allegations: Q.1_3 ("The product will help babies feel better when they have colic."); Q.1_8 ("The product is made with high quality materials."); and Q.1_9 ("The product is portable (for when you are the 'on the go').").  At his deposition, Dr. Dennis referred to Questions 1_8 and 1_9 as "distracters" [*sic*], and to Question 1_3 as a less "pure" test of the Plaintiffs' theory of liability; *see* Dennis Deposition, pp. 300 – 301.

[96] Dennis Declaration, ¶ 98.  In his declaration, Dr. Dennis does not provide substantiation or justification for why these six "meanings" map to the Plaintiffs' allegations in this litigation.

over because of the baby's movements"; "The product will not cause a baby to develop health problems"; and "The product won't cause a baby to be hurt").[97]

97.    However, the aforementioned list of possible "perceptions" or "meanings" provided to participants—which highlighted safety—was not comprehensive, as Dr. Dennis admitted at his deposition.[98]  The Dennis Survey omitted multiple relevant alternative interpretations such as, inter alia, that the product: is versatile or adaptable to different activities or functions; can be used to play with a baby; can be used to keep a baby entertained; can be used as a temporary seat for a baby while the parent or caregiver is doing a task nearby; and can be used to soothe or calm a baby (while the baby is awake).[99]  Such perceptions, which pertain to uses of the product that are *not* related to sleep, are consistent with Fisher-Price's position in this litigation but were inappropriately excluded from the pool of possible "meanings" in Dr. Dennis's "perception" test.

---

[97] At his deposition, Dr. Dennis characterized his survey as testing only "the plaintiffs' theory of liability and the allegations that the plaintiffs made" based on the *Complaint* (Dennis Deposition, p. 34), and that he measured "consumer perceptions with respect to consumers' understanding of the product packaging with respect to it's [*sic*] conveying health benefits, safety benefits, and similar outcomes" (*id.*, p. 137).

[98] *See, e.g., id.*, pp. 296 – 297 ("Q. Were you aware that Defendants contend that the product is a multi-use product, marketed for different things and things other than sleep and that the purchase interest of a consumer could depend on the different and varying marketing messages on the package? […] A. Well, I have a much better understanding after spending today here about that. I – no, **I did not make an attempt to find out what Defendants' research needs were or what your Defendants' theories were.** I had a pretty clear assignment to see if the plaintiffs' allegations had merit. [Emphasis added]") & 310 – 311 ("Q. That kind of goes to my next question and my point; that, in your survey, you're only trying to test Plaintiffs' theory and ignore anything else that doesn't fit into Plaintiffs' theory by the way you're doing your survey, true? Like, if you did an open-ended question and somebody said, 'What is the product communicating to you?' and they say that it can be used for play, you get that in an open-ended, but, here, you're only testing Plaintiffs' theory, so you're not getting a full gamut of what the packaging is actually conveying to consumers. […] A. **I – I don't disagree with your point. I mean, every – every Plaintiffs' expert or Defendants' expert has an assignment related to what the allegations are.** And, again, if I were doing a generic market research study and Fisher-Price were to hire me and they asked me to help them think about how to make improvements to the product packaging, I would design a different survey." [Emphasis added]).

[99] Such alternative perceptions are consistent with the named Plaintiffs' deposition testimony (*see, e.g.*, Cuddy Deposition, pp. 155 & 182 – 184; Hanson Deposition, pp. 104 – 105 & 139 – 142; Huey Deposition, pp. 127 – 129, 134 – 135, & 173 – 174; Nowlin Deposition, pp. 188 – 189 & 197; Simmonds Deposition, pp. 95 – 96 & 106 – 108) and with testimony from Fisher-Price marketing executives (*see, e.g.*, Ford Deposition, pp. 178 – 180; Stephens Deposition, p. 171).

98.    *Third*, the Dennis Survey presented a sequence of "perception" questions that repeatedly probed participants about a similar topic (*i.e.*, whether the stimulus communicates that the product is safe or will not lead to adverse health effects for babies). This repeated probing was leading and generated a demand effect, given that such repetition makes the survey's purpose obvious and suggests to participants that the researcher is searching for a "correct" answer.

99.    For example, a participant who indicated that the packaging communicates that the product "won't cause a baby to be hurt" would be highly likely to also indicate that the product "will not cause a baby to develop health problems," "is safe for babies to use," and "is stable and won't turn over because of the baby's movements." Consistent with academic research on reason-based choice[100] and impression management,[101] survey respondents typically desire to appear reasonable and consistent (among other self-enhancement motives) and tend to select answers that are justifiable, easily explainable, and internally coherent.

100.    As a chapter on survey design states:[102]

[…] **persistent probing by asking for further responses to the same questions may lead the respondent to believe that the interviewer is looking for a "correct" answer** that the respondents has not yet given and even an open-ended question may provide cues as to what the "correct" answer may be.

101.    Rather than measuring perceptions and inferences that consumers may spontaneously form from the disputed products' packaging, or at minimum testing *both* the Plaintiffs' allegations and the Fisher-Price's position, the Dennis Survey led participants to confirm their agreement with an incomplete and biased list of supposed consumer "perceptions."  The resulting "perception" estimates are highly unreliable,

---

[100] Research on reason-based choice has found that decision makers tend to construct (and seek) reasons to justify a given choice.  *See, e.g.*, Shafir, Eldar, Itamar Simonson, and Amos Tversky (1993), "Reason-Based Choice," *Cognition*, 49(1-2), 11 – 36; Kivetz, Ran (1999), "Advances in Research on Mental Accounting and Reason-Based Choice," *Marketing Letters*, 10(3), 249 – 266.
[101] *See, e.g.*, Fiske and Taylor (1991).
[102] Keller (2012), pp. 189 - 190.

invalid, and inflated. Consider a consumer who does not pay attention to or form any belief about the alleged "sleep-related" misrepresentations when making an actual purchase (*e.g.*, because that consumer instead chooses based on brand, packaging aesthetics/appeal, other package representations and images, or other product benefits and attributes). That consumer, when faced with Dr. Dennis's highly biased and leading "perception" questions, would nevertheless be likely to choose the "expected" answer to each question, because the consumer would be led by the survey's closed-ended questions and answer choices.

C.3.4. *The Dennis Survey's "Perception" Questions Suffered from Severe "Yea-Saying" and Order Biases*

102.    In addition to their leading nature, Dr. Dennis's "perception" questions suffered from severe "yea-saying" (or acquiescence) and order biases. Recall that participants chose among "The packaging is communicating this," "The packaging is <u>not</u> communicating this," and "Don't know / Not sure" as response options for each of Questions 1_1 through 1_9. As Professor Diamond notes, closed-ended "yes/no"-type questions (such as the Dennis Survey's Q.1_1 through Q.1_9) are "seriously problematic" due to the potential for yea-saying:[103]

> One form of closed-ended question format that typically produces some distortion is the popular agree/disagree, true/false, or yes/no question. Although this format is appealing because it is easy to write and score these questions and their responses, the format is also seriously problematic. With its simplicity comes acquiescence, **"[T]he tendency to endorse any assertion made in a question, regardless of its content," is a systematic source of bias** that has produced an inflation effect of 10% across a number of studies. **Only when control groups or control questions are added to the survey design can this question format provide reasonable response estimates**. [Emphases added]

103.    The absence of any filter questions further contributes to the demand bias in the Plaintiffs' favor, because of individuals' well-documented "yea-saying" tendency to agree when they do not have an opinion about a given topic. Participants who do not

---

[103] Diamond (2011), p. 394.

have an existing opinion are likely to simply agree to what has been suggested (*e.g.*, yea-saying) as an easy way to complete the survey.

104.    Importantly, yea-saying is even more likely in the Dennis Survey because, as indicated in the survey's programmer instructions, Dr. Dennis deliberately chose to *not* randomize (counterbalance or rotate) the order of the response options.[104] That is, the affirmative option ("The packaging is communicating this") *always* appeared before the negative option ("The packaging is <u>not</u> communicating this") for each of the nine "perception" questions.

105.    An absence of randomization creates an order bias in the Plaintiffs' favor due to participants' tendency to choose the first option available, particularly when guessing.  The order in which participants are presented with information in a survey can influence their evaluation and weighing of that information.[105] For example, to avoid the well-known "primacy" effect, whereby survey participants are more likely to select or assign more importance to earlier response options, a basic principle of survey design is to counterbalance the order of the answer choices presented to participants in closed-ended questions.[106]

106.    Moreover, with the exception of Question 1_1,[107] the rest of the "perception" questions were all positively valenced—that is, framed in terms of

---

[104] Dennis Declaration, Attachment B, p. 15 ("DO NOT RANDOMIZE RESPONSE LISTS.").  At his deposition, Dr. Dennis testified that he did not randomize or rotate the order of the response options due to the question being worded using an "is-or-is-not" format; Dennis Deposition, pp. 305 – 306.  However, such reasoning is *not* justified in light of the severe biases resulting from a failure to rotate the order of the affirmative and negative answer choices.

[105] As Dr. Dennis acknowledged at his deposition: "[…] randomization of response options and questions, to the extent that it's feasible, is a good idea in surveys in case there is any so-called – what's called 'primacy bias' or, the flip side of that, is called 'recency effects'"; Dennis Deposition, pp. 293 – 294.

[106] *See, e.g.*, Murdock Jr, Bennet B. (1962), "The Serial Position Effect of Free Recall," *Journal of Experimental Psychology*, 64(5), 482 – 488; Klatzky, Roberta L. (1975), *Human Memory: Structures and Processes*, San Francisco, CA: W.H. Freeman & Co.; Malhotra, Naresh K. (2004), *Marketing Research*, Upper Saddle River, NJ: Prentice Hall; Diamond (2011), pp. 395 – 396; *see also* Dhar, Ravi and Itamar Simonson (1992), "The Effect of the Focus of Comparison on Consumer Preferences," *Journal of Marketing Research*, 29(4), 430 – 440.

[107] That is, corresponding to the statement "The product is designed to be used for babies"; *see, e.g.*, Dennis Declaration, Attachment B, p. 14.

"positive" attributes or features offered by the product (*e.g.*, "The product won't cause a baby to be hurt"). Together with the lack of rotation of "affirmative" and "negative" answer choices, the consistent positive valence of the statements themselves exacerbated the Dennis Survey's (already severe) yea-saying bias.

C.3.5. *The Dennis Survey's "Perception" Questions were Vague and Confusing, Thereby Increasing Guessing Behavior and Survey "Noise"*

107.   A fundamental survey design principle is that a survey's task and questions must be clear. One of the primary causes of guessing is a survey with a task or questions that are confusing and/or that participants do not understand.[108]  The Federal Judicial Center's *Manual for Complex Litigation* specifies that it is necessary in a properly conducted survey that "the questions [be] clear and not leading."[109]  In her survey treatise (cited by Dr. Dennis in his declaration), Professor Diamond writes the following:[110]

> When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question.  If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey.

108.   Participant confusion is particularly likely to arise when a question's phrasing or structure is unnecessarily verbose, complex, or compound (such as a double-barreled question—that is, a single question that attempts to address two issues).[111]  A double-barreled question that introduces more than one idea or dependency between

---

[108] When a survey question is unclear or ambiguous, it can induce greater guessing behavior (*e.g.*, a participant may not fully understand the question but nevertheless volunteer their "best guess") and give rise to different interpretations across participants that reflect their idiosyncratic beliefs, attitudes, or background knowledge pertaining to the subject or topic at issue.  Such heterogeneity (variation) across participants in how they interpret or understand the question elevates survey error or "noise" (*i.e.*, random error affecting the measurement of a variable of interest).  Survey noise can arise from guessing behavior, participants' background knowledge and prior experiences, "yea-saying," and/or any flaws inherent in a survey's methodology and questions.  *See, e.g.*, Jay, E. Deborah (2013), "Ten Truths of False Advertising Surveys," *The Trademark Reporter*, 103(5), 1116 – 1171 (p. 1140); Rappeport, Mike (2012), "Design Issues for Controls," in Diamond, Shari S. and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys*, Chicago, IL: American Bar Association, pp. 220 – 221.
[109] *Manual for Complex Litigation* (2004), p. 103.
[110] Diamond (2011), p. 388.
[111] *See, e.g.*, Malhotra (2004).

ideas is susceptible to participants' idiosyncratic interpretations.[112] That is, participants are left to form their own assumptions or interpretations of different conceptual features or relationships highlighted in the question posed.

109. For example, the statement provided in Question 1_2 ("The product is intended for babies to be able to sleep and nap in it") is unclear, introducing the concepts of sleeping and napping without distinguishing between short versus prolonged (*e.g.*, overnight) sleep. Question 1_2 also inappropriately asked participants to guess the manufacturer's intentions rather than draw their own conclusions from the packaging.

110. Question 1_2 ("The product is safe for babies for use") is vague and overly broad, without any specification of what is meant by "safe" or for what uses. Hence, if consumers do not intend to use the disputed product for *any* sleeping purposes, then they may reasonably agree with the proffered statement, even though such consumers would not be misled according to the Plaintiffs' theory of liability (which I understand to be tied specifically to sleep, according to the Complaint).[113]

111. Further, as mentioned previously, four of the six statements that Dr. Dennis deemed as mapping to the Plaintiffs' allegations relate to some aspect of safety (*i.e.*, Q.1_2, Q.1_4, Q.1_6., 7 Q.1_7). Thus, it is likely that some, if not many, participants in the Dennis Survey would have combined or associated in their minds these four statements with each other in different ways (depending on the order in which they viewed the questions). For instance, a participant who first read the statement "The product is stable and won't turn over because of the baby's movements" (Q.1_4) may then interpret the statement "The product won't cause a baby to be hurt" in terms of the

---

[112] *See* Alreck, Pamela L. and Robert B. Settle (2004), *The Survey Research Handbook (3rd ed.)*, New York, NY: McGraw-Hill/Irwin; Malhotra (2004).

[113] *See, e.g.*, *Complaint*, ¶¶ 185 & 190 – 191. For example, the Plaintiffs allege: "Defendants' deceptive marketing of the product as a 'Sleeper' that is safe for infant sleep, including overnight or prolonged sleep, is material to consumers' decisions to purchase and/or own the product, because it causes consumers to reasonably believe the product is safe. Defendants should not have marketed the product as a 'Sleeper' suitable for infant sleep, including prolonged or overnight sleep"; *id.*, ¶ 190.

stability or durability of the product. By contrast, a participant who had previously read "The product will not cause a baby to develop health problems" (Q.1_6) may interpret "The product won't cause a baby to be hurt" in terms of potential medical conditions. Such variance in potential interpretations of the same statement inflates survey noise, further undermining the validity and reliability of the Dennis Survey's "perception" test.

112. Finally, it is important to note that Dr. Dennis's inclusion of a "Don't know / not sure" answer option in each of the nine "perception" questions cannot eliminate the severe bias caused by the survey's leading questions. Although "don't know" or "no opinion" options can reduce some participant guessing, their presence (without a proper control) does *not* account for "noise" due to flaws inherent in the survey itself, such as leading questions and biased research designs.[114] Further, academic research on conversational norms has found that participants typically want to be perceived as helpful and knowledgeable; therefore, they tend to avoid "don't know," "not sure," and "no opinion" responses and try instead to select the "expected" answers.[115] Such a pattern is especially likely if questions are phrased in a leading way, as the Dennis Survey's questions were.

C.4. <u>The Dennis Survey's "Meaning-Specific Materiality" Questions were Extremely Leading and Created Severe Demand Effects and Focalism</u>

113. Dr. Dennis's sequence of "meaning-specific materiality" questions suffered from similar fatal flaws as his "perception" questions. Dr. Dennis claims to have obtained "materiality rates"[116] for each of the nine "meanings" presented to participants, describing the design of these questions as follows:[117]

> For respondents indicating that that the packaging is communicating a specific meaning, I asked a follow-up survey question to measure whether the specific perception was material

---

[114] *See, e.g.*, Diamond, Shari S. (2012), "Control Foundations: Rationales and Approaches," in Diamond, Shari S. and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys*, Chicago, IL: American Bar Association.

[115] *See, e.g.*, Grice (1975), pp. 41 – 58; Schwarz (1994).

[116] Dennis Declaration, ¶ 101.

[117] *Id.*, ¶ 100.

> to consumers' purchasing decision. The questions ask the respondent about how likely or not likely are the [*sic*] to purchase the product because of their specific understanding of the packaging.

However, as explained next, such a methodology is extremely leading, nonstandard, and conducive to demand effects and focalism. Further, the Dennis Survey's "meaning-specific materiality" questions do *not* allow for valid and reliable estimates of "materiality rates" that are attributable to the "meanings" suggested to participants by Dr. Dennis (let alone to the alleged misrepresentations in this litigation).

114. *First*, the direct elicitation approach used by Dr. Dennis—in which he directly asked participants for their purchase interest *based on* their own previously expressed "perceptions"—is *not* a scientifically established or standard methodology. As noted previously, consumers often lack (conscious) insight into the true influence, if any, of factors and stimuli (such as various challenged packaging claims) on their purchase decisions.[118] Particularly when a survey's questions are leading, participants are likely to ascribe importance to factors when asked directly about them, even if in the actual marketplace such factors have no meaningful impact on purchase decisions.

115. Considerable research in consumer behavior and social cognition demonstrates that people often do not have insights into the factors underlying their preferences, perceptions, decision making, and behavior. In such cases, consumers provide erroneous information regarding the factors that may or may not drive their decisions, regarding the importance (or lack thereof) of different purchase considerations, and regarding their preferences and expectations.[119] Relatedly, voluminous research in social cognition, marketing, and consumer behavior has shown that consumers routinely make incorrect predictions or projections about their responses to different variables, including their responses to various factors in the marketplace.[120]

---

[118] *E.g.*, Nisbett and Wilson (1977); Wilson and Gilbert (2003); Wilson and Schooler (1991).
[119] *See*, *e.g.*, Nisbett and Wilson (1977).
[120] *E.g.*, Wilson and Gilbert (2003); Snell, Jackie, Brian J. Gibbs, and Carol Varey (1995), "Intuitive Hedonics: Consumer Beliefs About the Dynamics of Liking," *Journal of Consumer Psychology*, 4(1), 33

116.    As I have taught my Ph.D. students at Columbia University Business School, consumers' lay theories or projections regarding the effect of a particular factor on attitudes, perceptions, expectations, preferences, and behaviors are often systematically different from consumers' real reactions in the marketplace.  Consumer responses in the actual marketplace can be reliably studied using a survey that approximates marketplace conditions and uses a proper methodology that exposes participants to essential experiential stimuli or a valid representation of those stimuli in context, as they would typically appear to consumers in the marketplace.  For example, the Dennis Survey could have exposed a group of "test" participants to a disputed package (containing allegedly deceptive claims) and a separate group of "control" participants to a modified package that removes the alleged deception, and then measured and compared their actual perceptions (using the same set of questions).

117.    *Second*, consistent with academic research on conversational norms[121] and order effects,[122] participants are also likely to provide responses that are perceived as consistent with their prior answers.  Recall that the Dennis Survey's "meaning-specific materiality" questions (which were only shown to those who indicated that the packaging did communicate a given "meaning") asked about participants' purchase interest in the product *because of* their previously-stated "understanding" of the packaging:[123]

> Materiality 1_# How <u>likely</u> or <u>not likely</u> are you to purchase this product because of your understanding that the packaging is communicating this message:
>
> **[INSERT STATEMENT CORRESPONDING TO Q.1_1 – Q.1_9 ABOVE]**
>
> o   Extremely unlikely
> o   Unlikely
> o   Neither likely nor unlikely
> o   Likely
> o   Extremely likely

---

– 60; Simonson, Itamar (1990), "The Effect of Purchase Quantity and Timing on Variety-Seeking Behavior," *Journal of Marketing Research*, 27(2), 150 – 162; Wilson and Schooler (1991).

[121] *See*, *e.g.*, Grice (1975); Schwarz (1994).

[122] *See, e.g.*, Strack (1992).

[123] Dennis Declaration, p. 19.  *See also id*., Attachment C, pp. 123 – 128.

118.    Dr. Dennis's question wording, which repeatedly reminded participants of their prior "perceptions" or "understanding," led participants to give the "expected" answer—namely, that they would be likely (or extremely likely) to purchase the product based on the various "understandings" they had (or were reminded of having) regarding the product packaging.  The fact that the "meaning-specific materiality" questions were conditioned on various "perceptions" selected by Dr. Dennis—which suffered already from a host of one-sided biases (*see* Subsection C.3)—compounds the leading nature of the Dennis Survey.

119.    *Third*, Dr. Dennis's "meaning-specific materiality" test failed to assess the effect on purchase decisions of consumers' perceptions about the disputed Fisher-Price packaging *as tied to the alleged affirmative misrepresentations at issue in this litigation*. My understanding is that the Plaintiffs allege, inter alia, that the disputed Fisher-Price products contained misrepresentations on the packaging that specifically positioned the product as suitable for *sleep* (*e.g.*, as a "Sleeper") and which were therefore material to consumers' purchase decisions.[124]  However, given that the Dennis Survey elicited participants' "perceptions" only with regard to the packaging *as a whole* rather than to specific claims on the packaging,[125] Dr. Dennis's "meaning-specific materiality"

---

[124] In a section titled "False and Misleading Representations on the Boxes," the Plaintiffs reference specific "marketing statements" on the disputed products' packaging that are allegedly misleading because they (individually and collectively) communicate that the product is suitable for *sleep*.  *See Complaint*, ¶¶ 185 – 191.  Such allegedly deceptive statements or misrepresentations include: "Baby can sleep at a comfortable incline all night long!" (*id.*, ¶ 187); "Extra-plush fabrics for extra-comfy sleep" (*id.*, ¶ 188); and "Sleeper" (*id.*, ¶ 190).  (Note that each of the aforementioned statements or claims appeared on the disputed Fisher-Price My Little Snugapuppy Deluxe Rock 'n Play Sleeper package—the product tested in the Dennis Survey.)  *See also id.*, ¶ 191 ("Defendants' deceptive marketing of the Rock 'n Play Sleeper as a 'Sleeper' […] induced consumers who would not have otherwise purchased the product to purchase it, own, and use it when they would not have otherwise owned and used it, and/or to pay a higher price than they would have otherwise paid for the product if it was not falsely and misleadingly advertised as a 'Sleeper' suitable for sleep, including prolonged or overnight sleep.").  Indeed, when asked about his understanding of the alleged misrepresentations at his deposition, Dr. Dennis identified descriptors and imagery that were specifically related to sleep; *see, e.g.*, Dennis Deposition, pp. 100 – 101.

[125] *See, e.g.*, Dennis Declaration, ¶ 97 ("My survey then asked the respondent to consider nine possible meanings communicated by the product packaging").  *See also* Dennis Deposition, pp. 286 ("Q. And you

questions (which were conditioned on participants' responses to the "perception" questions) likewise cannot isolate any effects due to specific alleged misrepresentations.

120.    The Dennis Survey's lack of "claims-level" data (*i.e.*, the absence of any survey evidence that implicates individual alleged misrepresentations on the disputed products' packaging) was reaffirmed several times in Dr. Dennis's deposition testimony:[126]

Q. […] You don't know from your survey whether or not the name "sleeper" in the name – the word "sleeper" in the name Rock 'N Play Sleeper was material to anyone?

[…]

THE WITNESS: I – I – I don't have specific data on that, Counsel.

[…]

Q. Okay. Do you think the fact that the Rock 'N Play Sleeper contains a packaging statement, quote, "Baby can sleep at a comfortable incline all night long" would be material to consumers?

A. Counsel, I think I can save us some time here. I mean, my survey provides information that is suggestive that these descriptors matter just by looking at the consumer perception results here for statements that map to sleep, you know, nap, that kind of thing, but I don't have conclusive data because I did not design the survey to provide data at what you called the "claims level."

[…]

Q. Do you think the fact that the Rock 'N Play Sleeper contains the packaging statement "Extra plush fabrics for comfy sleep" would be material to consumers?

A. Do I think it would be? Again, I don't have data on that. That would be a – potentially a conjoint survey to address that.

[…]

Q. Do you think the fact that the Rock 'N Play Sleeper contains various images of sleeping babies would be material to consumers?

A. Same answer.

[…]

---

didn't ask the respondents to describe what any particular advertising claim was conveying to the respondents; is that correct?  A. That's true.") & 297 – 298 ("Q. And in the nine questions that you came up with, it's true, isn't it, that none of them test any particular claim that's on the pa- – product packaging? […] THE WITNESS: I think you asked this in a different format before, and I answered that the tests here are in relation to the product package and not to a specific descriptor.  BY MR. KANNY: Right. And I just want to make sure that the answer for the additional materiality question also applied to these nine questions that you asked.  A. Counsel, that's accurate, and if I could just put on the record that my survey question wording is based on the product packaging, comma. So every question that I ask of this type in consumer perceptions involves an instruction to the respondent to answer with respect to the package.  Q. Right. The overall package, not any particular claim – advertising claim on the package?  A. That's the distinction I'm making. Thank you.").

[126] Dennis Deposition, pp. 312 – 315.

Q. Do you think the fact that the Rock 'N Play Sleeper contains various images of moms laying down in bed next to their baby would be material to consumers?

A. No. I measured the cumulative impact – or, I should say, better put, the impact of the cumulative images and descriptors/claims that you described.

Q. Right. So on that question, with respect to that particular claim, you don't have any evidence of that, that that particular claim would be material to consumers?

A. I – I do not.

121.    Thus, the Dennis Survey's "meaning-specific materiality" test *cannot* be used to derive any estimates of the materiality of the affirmative packaging misrepresentations alleged by the Plaintiffs.

122.    *Finally*, as with the "perception" questions, the Dennis Survey's "meaning-specific materiality" questions lacked *any* external control stimulus or internal control questions to serve as a benchmark or comparison against Dr. Dennis's obtained "materiality rates" (*see* Subsection C.6 for a discussion of the Dennis Survey's lack of controls).  This is another reason why the Dennis Survey's "meaning-specific materiality" questions cannot, and do not, provide valid or reliable "materiality rates."

C.5.    <u>The Dennis Survey Violated Marketplace Conditions by Presenting Truncated, Distorted Stimuli and by Artificially Focusing Consumers on the Disputed Packaging</u>

123.    A fundamental principle of survey design is that a survey's methodology must mirror the situation in which consumers encounter the mark, packaging, advertisement, or claim at issue and should reflect marketplace conditions as closely as possible.[127]  For example, the packaging, advertisement, and stimuli that consumers face in a survey used for litigation should be as similar as possible to what consumers encounter in the actual marketplace.  When a survey does not mirror important marketplace conditions, its results have low predictive validity (*i.e.*, they are inaccurate in predicting real consumer perceptions or preferences), and the survey does not allow reaching reliable conclusions about the issues being tested.

---

[127] *See, e.g.*, *McCarthy* (2007), §32:163.

124.     Critically, consumers' perceptions or interpretations of a package claim (such as the challenged "sleep-related" misrepresentations on the disputed Fisher-Price products) depend on consumers' exposure, and attention, to that claim *given the context of the stimulus (e.g., package)* in which the claim appears.  The importance of analyzing consumer perceptions of packaging and advertising claims in the full (and relevant) context in which the claims appear is underscored by seminal research in cognitive psychology and decision making.  For example, academic research indicates that human perception is dependent on the *general context* provided by words and/or visual stimuli, which drive people's interpretations.[128]

125.     Context is critical in determining consumer perceptions of product offerings, as demonstrated in the widely-cited phenomenon of "context effects."[129]  In adversarial proceedings, the *National Advertising Division of the BBB National Programs (NAD)* has often stated that it "evaluates advertising claims in the context in which they appear."[130]  Similarly, it is necessary to "analyze the message conveyed in full context," "view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other," and "consider context, [but] not assume context."[131]  Indeed, Swann cites "'fatal' marketplace distortions" as one of two "[…] flaws that should lead to survey exclusion without extensive analysis or

---

[128] *See, e.g.*, Anderson, John R. (1985), *Cognitive Psychology and its Implications*, New York, NY: W.H. Freeman and Company.

[129] Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004a), "Alternative Models for Capturing the Compromise Effect," *Journal of Marketing Research*, 41(3), 237 – 257 (Lead article); Simonson, Itamar and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," *Journal of Marketing Research*, 29(3), 281 – 295.

[130] See, *e.g.*, *NAD*'s decision in Case #4919 (08/28/08; pp. 1 & 15; FN 18), which states that "NAD noted that its task in any given proceeding is limited to evaluating the challenged claims in the context of the advertising in which they appear" (p. 15).

[131] Quoted in *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242 (11th Cir. 2002).

data,"[132] and consumer perception surveys have been discredited for such distortions of the tested advertising claim or representation.[133]

126.    Dr. Dennis's survey displayed the disputed Fisher-Price packaging in a manner that violated marketplace conditions and, consequently, does *not* permit drawing any reliable or valid conclusions regarding either consumer perceptions about the disputed packaging or its materiality for consumers' purchase decisions.  In particular, the Dennis Survey did *not* show participants an actual package of the disputed Fisher-Price products on which the alleged (*i.e.*, challenged) "sleep-related" misrepresentations appear.  Instead, as enumerated below, Dr. Dennis's survey suffers from major deficiencies that resulted from distorted, out-of-context stimuli as well as artificial and biased instructions.

127.    *First*, the Dennis Survey failed to test either the materiality of, or consumers' perceptions regarding, the alleged "sleep-related" (affirmative) misrepresentations at issue.  That is, both Dr. Dennis's "materiality" and "perception" questions measured participants' responses to the packaging *as a whole* (and as discussed further below, not even the entirety of the actual packaging).[134]  Because the Dennis Survey only (purportedly) tested the alleged omission in this litigation (*i.e.*, the absence of a statement or "disclaimer" on the disputed products' packaging), any conclusions derived from the survey cannot implicate the specific affirmative packaging misrepresentations at issue in this litigation.

---

[132] Swann, Jerre B. (2012), "Survey Critiques," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: American Bar Association, pp. 373–374.

[133] "Consumer perception surveys have been discredited for showing test group respondents an advertisement that has a different 'graphic presentation' from the challenged advertisement or an advertisement that is not the same as the challenged advertisement" [FN omitted]; Jay (2013), p. 1148.

[134] *See, e.g.*, Dennis Declaration, ¶¶ 94 ("I then asked the first survey question, which measures the materiality of the product packaging as a whole […].  The questions ask the respondent directly about whether the respondent is likely or is not likely to purchase the product based on the product packaging") & 97 ("My survey then asked the respondent to consider nine possible meanings communicated by the product packaging").  *See also* Dennis Deposition, pp. 286, 297 – 298, 312 – 315, & 317.

128. *Second*, Dr. Dennis failed to show participants the actual disputed products' packaging in its entirety, instead presenting only selected portions of *some* panels from the disputed package. Erroneously, the Dennis Survey's instructions represented to survey participants that they were viewing "the front of the product packaging"[135] and could examine "the rest of the product package."[136] However, in actuality, participants were shown truncated or cropped images from selected panels of the Fisher-Price My Little Snugapuppy Deluxe Rock 'n Play Sleeper product (reproduced in Figures 4a – 4b below).

**Figure 4a: Screenshot of the Dennis Survey's Stimulus (Cropped Package Front)** [137]



**Figure 4b: Screenshot of the Dennis Survey's Stimulus (Portions of Other Panels from Package)** [138]



---

[135] *See, e.g.*, Dennis Declaration, Attachment C, p. 100.
[136] *See, e.g., id.*, p. 102.
[137] *See* Dennis Declaration, Attachment B, p. 7.
[138] *Ibid*.

129.    By comparison, Figures 5a through 5e depicts the six panels of an actual Fisher-Price My Little Snugapuppy Deluxe Rock 'n Play Sleeper package as sold in the marketplace,[139] while Figure 6 depicts the corresponding package flat.[140]

**Figure 5a: Front Panel of Actual Disputed Fisher-Price Product**



**Figure 5b: Back Panel of Actual Disputed Fisher-Price Product**



---

[139] *See* Exhibit F.1 to my June 16, 2021 *Expert Report*, which depicts screenshots of angles corresponding to the six panels of the disputed Fisher-Price package (via a three-dimensional, 360-degree interface) tested in my empirical survey (*i.e.*, as shown to participants randomly assigned to the "test" condition).
[140] *See* Exhibit G.1 to my June 16, 2021 *Expert Report*, which shows the package flat that was used to construct the 360-degree image of the "test" Fisher-Price package.

**Figure 5c: Top Panel of Actual Disputed Fisher-Price Product**



**Figure 5d: Bottom Panel of Actual Disputed Fisher-Price Product**



**Figure 5e: Identical Left- and Right-Side Panels of Actual Disputed Fisher-Price Product**

 

**Figure 6: Package Flat of Actual Disputed Fisher-Price Product** [141]

130. As Figures 5 and 6 illustrate, the entire package contains myriad representations and claims that may affect consumers' purchase decisions and perceptions. Such packaging representations (both textual and visual), which Dr. Dennis prevented his survey participants from seeing, include, inter alia: (*i*) a large image of a smiling baby,

[141] The portion of the package flat containing the back panel appears upside-down in the actual package flat and has therefore been inverted in Figure 6. *See also* Exhibit G.1 to my June 16, 2021 *Expert Report*.

with open eyes, playing with a toy (left hand side of the top panel);[142] (*ii*) a "More to Love" section containing three images illustrating other features of the product (*e.g.*, portable, machine washable; bottom left side of the front panel); (*iii*) two images illustrating the incline and "calming vibrations" features of the product (bottom of the left and right panels); and (*iv*) the instruction to "Use only with an infant unable to roll over or pull up on sides, whichever comes first" (bottom right side of the front panel). Notably, Dr. Dennis omitted multiple parts of the packaging that communicate features or benefits of the product that are unrelated to sleep.

131.    By deliberately omitting the aforementioned contextual information from his survey's stimuli, Dr. Dennis eliminated any opportunity for participants to form perceptions of, or make purchase decisions based on, the packaging *in the context of* various other relevant considerations that consumers have access to in the marketplace, such as product benefits, features, and imagery unrelated to sleep (*e.g.*, related to uses such as entertainment, play, portability, and versatility).

132.    *Third*, the Dennis Survey's instructions likely distorted participants' (reported) perceptions by explicitly asking participants to "base [their] answers only on the product packaging"[143] while answering the various "materiality" and "perception" questions.  Such a directive is highly leading and unrealistic, effectively prompting participants to ignore (or, indeed, suppress) any preexisting attitudes or opinions that they may hold about a given product and its packaging claims.  Rather than measuring consumers' purchase intentions based on, and interpretations of, the alleged packaging misrepresentations *over and above* the existence of any background knowledge or

---

[142] When asked at his deposition why he excluded a photo of an awake baby playing with a toy, Dr. Dennis testified that he "made a judgment call" (Dennis Deposition, p. 277), asserting (without substantiation) that "very few respondents will click on a thumbnail" and that there would be no effect on his survey's reliability: "Q. Okay. And part of the – what you decided to exclude from what a consumer would – from what a respondent would see in your survey was the photo of the awake baby staring at you, playing with a toy?  A. That was a decision I made. It was only a thumbnail. Very few respondents will click on a thumbnail anyway. There's no impact on reliability of my survey."); *id.*, p. 283.
[143] *See, e.g.*, Dennis Declaration, ¶ 91.  Emphasis in the original.

attitudes, the Dennis Survey instead artificially inflated participants' attention—along with ascribed importance—to the portion of the packaging deemed relevant by Dr. Dennis, thereby biasing the results in the Plaintiffs' favor.

133. In fact, Dr. Dennis's contention that telling his participants to "base [their] answers <u>only</u> on the packaging" is "the appropriate instruction"[144] is *inconsistent* with the underlying source that he cites (a 2011 article by Professor Diamond) to support his point.[145] As further detailed in the next subsection, Professor Diamond's article does *not* "recommend this technique"[146] to account for participants' preexisting beliefs, but instead discusses the need to include survey controls (*e.g.*, in an experimental design) as a solution for such preexisting beliefs.[147] Had Dr. Dennis followed the guidelines set forth in Professor Diamond's 2011 treatise, he would have implemented a survey control in order to properly account for consumers' preexisting beliefs.

134. *Fourth*, as discussed in Subsection C.2, the Dennis Survey's "disclaimer" is highly unrealistic, disassociated from any packaging context, and fails to approximate anything that a consumer would typically encounter in the marketplace.

135. Overall, the Dennis Survey's failure to reflect marketplace conditions—by presenting distorted and biased stimuli out of context, as well as artificially focusing participants on the packaging—led participants to respond in a manner that differed from consumers' actual perceptions and information processing in the marketplace. This renders the survey inappropriate and does *not* allow for measuring any valid or reliable consumer purchase decisions, perceptions, or "deception" attributable to the alleged packaging misrepresentations at issue.

---

[144] *Ibid.*

[145] *Ibid.* & FN 38 ("Professor Diamond also recommends this technique in an effort to neutralize the potential impact of respondents' pre-existing attitudes about the products and brands in a survey. S.S. Diamond. 2011. "Reference Guide on Survey Research." <u>Reference Manual on Scientific Evidence</u>, pp. 397-398.").

[146] *Ibid.*

[147] *See* Diamond (2011), pp. 397 – 401.

C.6.    The Dennis Survey Failed to Include Any Survey Control

136.    A fundamental principle of survey design is that a study designed to test for consumers' perceptions and likelihood of deception must include a proper control.[148]  A control is used to measure the extent of "noise" or "error" in the survey.  That is, an estimate of a consumer perception at issue or the likelihood of deception (after accounting for "noise") can be derived by subtracting the control estimate from the corresponding estimate in the "test" group or "test" question.  Without a proper control, there is no benchmark for evaluating whether the estimate of deception derived from the survey actually results from the packaging, advertisement, or claim(s) at issue or whether that estimate results from factors other than the packaging, advertisement, or claim(s)— that is, from "noise."  Such "noise" can arise from guessing behavior; participants' preexisting beliefs and attitudes (*e.g.*, including lay theories, prior knowledge, and past experiences); leading survey procedures and questions; acquiescence bias and "yea-saying" tendencies; and/or any other flaws inherent in the survey's methodology and (closed-ended) questions.

137.    Thus, in a survey intended to test for the effect of a variable (*e.g.*, a packaging or advertising claim or representation) on consumers' perceptions, as well as other such cause-effect experiments, the inclusion of a proper control group or a control question is critical.[149]  In both litigation and academic contexts, studies that fail to employ adequate controls are often rejected or excluded for that reason alone.  One treatise, for example, characterizes a "survey without a control cell or with a fundamentally inadequate control stimulus" as one of two "[…] flaws that should lead to survey exclusion without extensive analysis or data."[150]  The same treatise author further writes:[151]

> A control cell and stimulus are necessary to filter "noise" and/or preconceptions from test cell results, to produce reliable net percentages.

---

[148] Dennis Declaration, ¶ 51.
[149] *Ibid*.
[150] Swann (2012), pp. 373 – 374.
[151] *Ibid*.

And:[152]

> Nonetheless, surveys are still offered without a control cell or with a fundamentally inadequate control stimulus, and such surveys should be excluded or (in a bench trial) wholly discounted. One criterion for survey admissibility is that it have a known error margin, and without a scientific design and a defensible control stimulus, a survey cannot satisfy the reliability mandate.

138. Given all of the flaws and biases inherent in the Dennis Survey's methodology, stimuli, and closed-ended questions (as discussed in the preceding subsections of this *Rebuttal Expert Report*), it was critical to include a proper control to measure the extent of "noise" or "error" in the surveys. Inexplicably, however, Dr. Dennis failed to include *any* control condition or stimulus to test either consumers' perceptions or purchase decisions regarding the disputed products' packaging. Dr. Dennis did not, for example, include a ("control") version of a Fisher-Price package from which the alleged misrepresentations are either removed or replaced with corresponding "control" representations. Nor did Dr. Dennis employ any internal control question to "net out" responses to his "perception" or "materiality" questions.

139. The failure to include any (external) control stimulus or (internal) control question is a severe flaw in the Dennis Survey, rendering its results uninterpretable, unreliable, and unscientific. Dr. Dennis provides no explanation or justification for this serious omission in his declaration.

140. When asked at his deposition about his survey's lack of a control group, Dr. Dennis testified that a control is unnecessary in his survey because he used a "different method"[153] than the experimental design methodology used in the Kivetz Survey. When asked how the Dennis Survey controls for preexisting beliefs, Dr. Dennis similarly opined that his survey design "is very different" and "is not dependent on controlling for preexisting conditions."[154] However, Dr. Dennis's above-quoted arguments are not only

---

[152] *Id.*, p. 374; *see also* Diamond (2011), p. 401.
[153] Dennis Deposition, p. 214 ("Q. So you didn't have a test group and a control group? A. No, I did not. I used a different method.").
[154] *Id.*, p. 216.

unsubstantiated but are also erroneous and fundamentally misrepresent the purpose of a survey control.[155] In fact, Dr. Dennis's opinions regarding survey controls and preexisting beliefs are *directly contradicted* by the same sources and authorities he references.

141. For example, contrary to Dr. Dennis's claims in his declaration and at his deposition,[156] Professor Diamond's 2011 survey treatise does *not* endorse an approach of directing participants to base their answers solely on the stimulus in order to "neutralize" the effect of participants' preexisting beliefs. Rather, the portion of Professor Diamond's text referenced by Dr. Dennis is in a larger section that discusses the *necessity of survey controls* in order to clearly test the causal impact of a stimulus by, inter alia, *controlling for preexisting beliefs*:[157]

> Some surveys attempt to reduce the impact of preexisting impressions on respondents' answers by instructing respondents to focus solely on the stimulus as a basis for their answers. Thus, the survey includes a preface (e.g., "based on the commercial you just saw") or directs the respondent's attention to the mark at issue (e.g., "these stripes on the package"). **Such efforts are likely to be only partially successful.** It is often difficult for respondents to identify accurately the source of their impressions. […]

> It is possible to adjust many survey designs so that **causal inferences about the effect of a trademark or an allegedly deceptive commercial become clear and unambiguous. By adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus.** In the simplest version of such a survey experiment, respondents are assigned randomly to one of two conditions. For example, respondents assigned to the experimental condition view an allegedly deceptive commercial, and respondents assigned to the control condition either view a commercial that does not contain the allegedly deceptive material or do not view any commercial. Respondents in both the experimental and control groups answer the same set of questions about the allegedly deceptive message. […] If 40% of the respondents in the experimental group responded that they received the

---

[155] I further discuss Dr. Dennis's misunderstanding of survey controls (including their relationship to participants' preexisting beliefs) in my response to Dr. Dennis's critique of my empirical survey; *see* Section D of this *Rebuttal Expert Report*.

[156] *See* Dennis Declaration, ¶ 91 ("The survey introduction makes clear the respondents are to 'base your answers <u>only</u> on the packaging that we showed you.' This is the appropriate instruction since the intent of the research is to measure consumers' perceptions of the product packaging. FN 38: Professor Diamond also recommends this technique in an effort to neutralize the potential impact of respondents' pre-existing attitudes about the products and brands in a survey. [Citation omitted]"). *See also* Dennis Deposition, ¶ 241 ("Q. Why did you instruct participants in your survey to consider only the product's packaging? A. I'm following the practices outlined by Professor Diamond, and I wanted to have, as much as possible, the consumers relying on the actual packaging that's in front of them in the survey as the basis for their responses to my questions.").

[157] Diamond (2011), pp. 397 – 401 (*i.e.*, the section entitled "If the Survey Was Designed to Test a Causal Proposition, Did the Survey Include an Appropriate Control Group or Question?").

deceptive message […], whereas only 8% of the respondents in the control group gave that response, the difference between 40% and 8% (within the limits of sampling error) can be attributed only to the allegedly deceptive message. **Without the control group, it is not possible to determine how much of the 40% is attributable to respondents' preexisting beliefs or other background noise (e.g., respondents who misunderstand the question or misstate their responses). Both preexisting beliefs and other background noise should have produced similar response levels in the experimental and control groups.** In addition, if respondents who viewed the allegedly deceptive commercial respond differently than respondents who viewed the control commercial, the difference cannot be merely the result of a leading question, because both groups answered the same question. The **ability to evaluate the effect of the wording of a particular question makes the control group design particularly useful in assessing responses to closed-ended questions,** which may encourage guessing or particular responses. […] [Emphases added; FNs omitted]

142.    The section of Professor Diamond's treatise concludes:[158]

Every measure of opinion or belief in a survey reflects some degree of error. **Control groups and, as a second choice, control questions are the most reliable means for assessing response levels against the baseline error of error associated with a particular question.** [Emphasis added]

143.    Elsewhere in the same chapter, Professor Diamond cautions against *exactly the type of surveys such as the Dennis Survey*, which lack a control and do *not* account for preexisting beliefs:[159]

This survey design—without a control—is what is referred to as a One-Group Posttest-Only Design. […]

**To see how the weaknesses of this design also apply in a deceptive advertising context**, consider X as an allegedly deceptive commercial claiming the virtues of an antacid product and allegedly implying (although not explicitly stating) that the ingredient beryllium used in the product of its chief competitor is harmful. […] Consumers are shown the commercial and then […] the follow-up survey questions them on their beliefs about the competitor's product and its ingredients, based on the commercial. If 28 percent of respondents report that the beryllium in the competitor's product makes it dangerous, has the survey demonstrated […] that the commercial has caused this belief? […]

**Respondents come to products, trademarks, trade dress, and commercials with expectations and beliefs and those expectations and beliefs influence their survey responses.** Consumers who have previously been exposed to negative news stories on the dangers of beryllium and those who assume it is dangerous based only on the name "beryllium" (e.g., sounds like radium) view the commercial with a jaundiced eye. […] **Neither the research using a research design that lacks a control nor the court evaluating the results can know how many of the responses reporting that beryllium in the competitor's product makes it dangerous are due to these preexisting beliefs, how many are due to spontaneous responses to the ingredient's name, and how many are due to a false implied message of dangerousness in the commercial.** Note that

---

[158] *Id.*, p. 401.

[159] *Id.*, pp. 207 – 208.

although the survey question asks the respondent to answer "based on the commercial," it is difficult for respondents to follow this direction because it requires respondents to be able to accurately gauge the basis of beliefs that may have multiple sources, a standard problem of human inference. **Even highly motivated respondents may be unaware of what influences their response.** […]

144.    The fact that the Dennis Survey relied on highly leading, closed-ended questions (*see* Subsections C.3 and C.4) makes a proper control *even more* necessary. This is because an adequate control stimulus or control question can potentially account for not only participants' preexisting beliefs, inattention, and guessing behavior, but also for flaws *in the survey itself,* such as leading closed-ended questions. As Dr. Rappeport writes in his chapter on design issues *for controls* (the same chapter cited in the Dennis Declaration[160]):[161]

> When used in the context of survey research, "leading" is usually defined as a question that leads the respondent to select a 'specific' answer. This commonly occurs because, intentionally or otherwise, the desired answer is included or implied either in the question itself, or in the possible answers. […] **In even the best designed survey, the very fact that a question is being posed may "lead" some respondents to in effect say to themselves, "Why would the researcher bother asking questions that have no answers?"** That is, it is natural for a great many respondents to think that *there must be* an answer to at least some of the questions, an answer that they should either know, or have an opinion about. **In other words, respondents are "led" to believe that at least some of the questions they are asked have answers, and moreover that they should be able to give those answers.** [FN omitted; emphases added]

Dr. Rappeport then proceeds—in a section entitled "Good Design—the Concept of Controls"—to describe the need for survey controls using an experimental design as a way to account for the "leadingness" of survey questions.[162]

---

[160] Dennis Declaration, ¶ 55.

[161] Rappeport (2012). *See also* Jacoby, Jacob (2013), "The Fundamental of Scientific Research," in *Trademark Surveys: Designing, Implementing, and Evaluating Surveys (Vol. 1),* Jacoby, Jacob (ed.), Chicago, IL: American Bar Association, p. 221 ("[C]ontrol questions typically are comparable in form to test questions and designed to provide direct comparisons between the respondents [*sic*] answers to the test question and his or her answers to the control question. Controls are what enable us to estimate error rates, a requirement of *Daubert*.").

[162] Rappeport (2012), pp. 223 – 224. Despite referencing the above text in his declaration and at his deposition, Dr. Dennis testified that he did not know of any method in survey research to "check on leading or not"; Dennis Deposition, pp. 218 – 219 ("Q. Do you have any controls for assessing whether your survey was leading or not? A. I – I'm actually unfamiliar with any discipline in survey research for measuring leading. I don't – I mean, we all have the goal, in designer [*sic*] surveys, not to have so-called leading or biasing questions or – or questions -- Q. And that's where filter questions come in, right? A. Filter – that's what I was talking about earlier with the control questions. So, I mean, to answer your

145. The Dennis Survey includes a question about whether the "packaging" shown to participants communicates the message that "[t]he product is designed to be used for babies"[163] (Q.1_1). This question is neither (*i*) an adequate control, nor (*ii*) a means to "disguise the study's research objectives."[164] Such a question resembles a "quality assurance" measure or "attention check," and—contrary to Dr. Dennis's claim at his deposition[165]—is *not* an internal control question. For example, although Question 1_1 could potentially indicate guessing behavior, the question would not be able to correct or adjust for any systematic biases due to inherent flaws in the Dennis Survey, such as a leading question structure.

146. Without a survey control, Dr. Dennis's "materiality" and "perception" questions do *not* allow for a proper test of materiality and consumer perceptions, respectively. For example, Dr. Dennis claims that his first ("baseline") purchase intention question measures "the materiality of the product packaging as a whole,"[166] and that his last ("disclaimer") purchase intention question was "a second overall measurement of the materiality of the Defendants' packaging."[167] Yet, setting aside the fact that the Dennis Survey failed to test *any* of the alleged "sleep-related"

---

question, I'm not aware of identifying a method to check on leading or not. What we do is – what I did is I provided 'Don't know' and "not sure' response option. I give the respondent options of a balanced response list, and we design the survey questions as well as we can.").

[163] *See, e.g.*, Dennis Declaration, Attachment B, p. 19.

[164] Dennis Declaration, ¶ 85. When asked at his deposition how his survey would account for error or noise, Dr. Dennis testified that his first consumer "perception" question served as a "control" to account for noise ("Q. Do you have – did you have any controls in your survey to account for error or noise? A. Yes, Counsel. That's what I was referring to earlier with that first consumer perception question. That was my attempt to identify or at least measure the extent to which I have respondents that are just putting in erroneous responses."); Dennis Deposition, p. 217. However, Dr. Dennis's first "perception" question (*i.e.*, Q.1_1) is *not* a survey control question.

[165] Dr. Dennis erroneously characterized his first "perception" question (Q.1_1) as a "control question" at his deposition, conflating "control questions" with attention/comprehension checks in a survey; *see* Dennis Deposition, pp. 214 – 215.

[166] Dennis Declaration, ¶ 94.

[167] *Id.*, ¶ 102.

misrepresentations at issue in this litigation,[168] Dr. Dennis's "materiality questions" *cannot* address the crucial and relevant issue of whether the disputed products' packaging and the alleged misrepresentations are in fact "material" purchase drivers (or generate specific "misperceptions") *relative to* a meaningful counterfactual (*e.g.*, a Fisher-Price package in a world in which the alleged packaging misrepresentations were remedied).

147. It is important to recognize the compounding effect of employing a severely flawed methodology that relied on leading closed-ended questions and violated marketplace conditions, while simultaneously failing to adopt an adequate control. This combination made the Dennis Survey redundant, because there should have been no doubt about the "findings" that would be produced. The absence of any control guaranteed that no meaningful correction can be made for the "noise" arising from the numerous and acute biases that, as previous detailed, were inherent in the Dennis Survey.

C.7. The Dennis Survey's Results, if Anything, Demonstrate a *Lack* of Commonality and Therefore are *Not* Consistent with the Plaintiffs' Position in this Litigation

148. The preceding subsections delineate the numerous and fatal flaws inherent in the Dennis Survey's methodology, questions, stimuli, and lack of any control. It is striking, therefore, that despite the survey's leading and biased nature, among other severe defects, the Dennis Survey's results, if taken at face value, nevertheless contradict the Plaintiffs' position in this litigation.

149. *First*, notwithstanding its leading nature, Dr. Dennis's "materiality" test involving his "disclaimer" yielded results that are *not* consistent with the Plaintiffs' position. In particular, the Dennis Survey's findings regarding the effect of Dr. Dennis's "disclaimer" on purchase intentions demonstrate a substantial lack of commonality in consumers' decisions and the supposed effects of such a "disclaimer." Recall that Dr. Dennis observed that 86.7% and 58.5% of participants who answered the first

---

[168] I discuss the significance of this point in relation to the Dennis Survey's violation of marketplace conditions (*see* Subsection C.5).

("baseline") and second ("disclaimer") materiality questions, respectively, indicated that they were either likely or extremely likely to purchase the Fisher-Price product they examined (*i.e.*, "top 2 box" purchase interest). From these results, Dr. Dennis concludes that "the material effectiveness of the product packaging is reduced by 28.2 percentage points (32.5% actual loss) as a result of a single disclaimer."[169] In the Dennis Declaration's conclusion section, Dr. Dennis similarly characterizes his "materiality" test as showing that "a simple warning disclaimer on the products [*sic*] packaging would cause a substantial decrease in consumers' interest in purchasing the products."[170]

150.    Despite its extremely leading and biased nature, Dr. Dennis's "materiality" test of his "disclaimer," if anything, contradicts the Plaintiffs' position in this litigation. Nearly *60%* of participants (*i.e.*, 36% + 22.5%), when confronted with such a leading and unrealistic scenario (or "disclaimer"), still did *not* select the answer choice that supports the Plaintiffs' position. Specifically, a *majority* of the Dennis Survey's participants reported that they would either be likely or extremely likely to purchase the displayed product even if it came with a "warning label" that stated that "**THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS**" (*see* Figure 7 below).[171] By contrast, as shown in Figure 7, only about 30% of participants (*i.e.*, 20.4% + 9.9%) indicated that they would be unlikely or extremely unlikely to purchase the product with Dr. Dennis's "disclaimer."

---

[169] Dennis Declaration, ¶ 105. Note that Dr. Dennis's 32.5% "actual loss" figure is obtained by dividing the aggregate drop in purchase intention by the aggregate "baseline" purchase intention (*i.e.*, 28.2% / 86.7%). However, the characterization of this figure as an "actual loss" is misleading, as the magnitude of such a so-called "loss," as calculated using Dr. Dennis's approach, can appear (misleadingly) large depending on the initial ("baseline") purchase intention. For example, had Dr. Dennis obtained a "baseline materiality" (*i.e.*, "top 2 box" purchase interest) of 10% and observed a "top 2 box" purchase interest of 7% after showing the "disclaimer," this small drop of 3% would appear as a 30% "loss" according to Dr. Dennis.

[170] *Id.*, ¶ 127. When asked at his deposition what would constitute a "substantial drop" in purchase intention, Dr. Dennis adopted the perspective of reduced sales from a company's or business owner's perspective, stating that a 28.2% drop "looks like a big drop" to him, that such determinations were "all judgment calls," and that there was no specific "cut-off point" to make such determinations. *See* Dennis Deposition, pp. 334 – 335.

[171] *See, e.g.*, Dennis Declaration, ¶ 104.

**Figure 7: Screenshot of the Dennis Declaration's Reported Results for the "Disclaimer Materiality" Question** [172]

| Responses | No. of Responses | Percent |
|---|---|---|
| Extremely unlikely | 118 | 20.4% |
| Unlikely | 57 | 9.9% |
| Neither likely nor unlikely | 65 | 11.2% |
| Likely | 130 | 22.5% |
| Extremely likely | 208 | 36.0% |
| *Subnet Likely/Extremely likely* | **338** | **58.5%** |
| Total | 578 | 100.0% |

151.    The above findings contradict the Plaintiffs' position in this litigation, because they demonstrate a clear *lack* of commonality in participants' purchase decisions (consistent with the findings of my survey) and in participants' responses to a "disclaimer" warning them about infant fatalities and serious health problems due to the product.  Moreover, the fact that a majority of the Dennis Survey's participants indicated that they *would* purchase a product with Dr. Dennis's "disclaimer" is at odds with the opinions of the Plaintiffs' expert, Mr. Silverman.[173]

152.    *Second*, the results of Dr. Dennis's "meaning-specific materiality" test— which was intended to test the effect of the nine selected "meanings" or "perceptions" on consumers' purchase decisions—likewise contradict the Plaintiffs' position in this litigation.  Despite the leading nature of these questions (as discussed in Subsection C.4), considerable proportions of participants still failed to select the answer choice that is represented by Dr. Dennis as supporting the Plaintiffs' allegations.  Further, the findings demonstrate heterogeneity (lack of uniformity) in "materiality rates" across the selected

---

[172] *Id.*, ¶ 105.

[173] The Silverman Report was submitted on behalf of the Plaintiffs in this litigation and is evaluated in Section E of this *Rebuttal Expert Report*.  In his report, Mr. Silverman states: "[Fisher-Price] did <u>not</u> convey that an inclined sleep product was, in the eyes of the leading pediatric physician organization in the country, inappropriate for infant children and potentially very dangerous.  In my opinion, that fact alone would have been material to a reasonable consumer, and most likely would have resulted in the product not being purchased.  After all, who would want to purchase a product that posed a serious risk for use by an infant child?"); Silverman Report, ¶ 133.

"meanings"—including those classified by Dr. Dennis as relating to the Plaintiffs' allegations (*see* Figure 8 below).

**Figure 8: Screenshot of the Dennis Declaration's Reported Results for the "Meaning-Specific Materiality" Questions** [174]

**Materiality Rate by Specific Meanings Tested in the Survey**

| Plaintiff's Key Allegations about Packaging's Meanings | Base No. of Responses | Materiality Rate |
|---|---|---|
| Safe for babies to use | 582 | 82.5% |
| Stable and won't turn over because of the baby's movements | 582 | 72.2% |
| Intended for babies to be able to sleep and nap in it | 581 | 85.2% |
| Product will not cause a baby to develop health problems | 581 | 54.2% |
| Product won't cause a baby to be hurt | 583 | 70.2% |
| Designed to be used for babies | 583 | 87.5% |
| **Other Packaging's Meanings** | | |
| Help babies feel better when they have colic | 581 | 54.2% |
| Made with high quality materials | 581 | 80.9% |
| Portable (for when you are "on the go") | 583 | 73.8% |

153.    For example, nearly 30% of participants indicated that they would *not* buy (*i.e.*, they were neither likely, nor extremely likely, to purchase) the product because of their "understanding" that the packaging communicates that the product "won't cause a baby to be hurt." Approximately 13% of participants reported that they would *not* buy the product based on their "understanding" from the packaging that the product is "designed to be used for babies." Further, nearly *half* (46%) of participants indicated that they would *not* buy the product based on their "understanding" from the packaging that the product "will not cause a baby to develop health problems."

154.    Thus, the Dennis Survey's results demonstrate a lack of commonality in supposed purchase decisions based on specific "meanings" or "perceptions" suggested to

---

[174] Dennis Declaration, ¶ 105.

participants by Dr. Dennis;[175] these findings contradict the Plaintiffs' position in this litigation.

155.    Critically, unlike the Dennis Survey's leading "within-subjects" design, the empirical consumer survey that I conducted in this litigation[176] used a standard (cause-effect) "between-subjects" design to test whether the alleged "sleep-related" misrepresentations and omission on Fisher-Price product packaging exert a common material effect on consumers' purchase decisions.  Specifically, approximately half of the participants in my survey were randomly assigned to a "test group" and viewed an allegedly deceptive Fisher-Price product package, which displayed the alleged "sleep-related" misrepresentations and did *not* include any "disclaimer" about sleep.  The remaining half of the participants were randomly assigned to a "control group" and viewed a revised Fisher-Price product; this control package was identical to the test package except that it did *not* display the alleged "sleep-related" misrepresentations and *did* include a (realistic) "disclaimer" or statement on the package's front panel about sleep (*i.e.*, "This product is not intended for sleeping").

156.    Unlike the Dennis Survey, my survey followed fundamental scientific principles, including: (*i*) using standard, non-leading, and neutral closed-ended (*e.g.*, purchase intention) and open-ended (*e.g.*, purchase reasons) questions; (*ii*) approximating marketplace conditions by presenting a disputed Fisher-Price product in its entire and full packaging context and in a manner that replicates consumers' experience when shopping at retail stores; and (*iii*) employing a proper control condition (stimulus).

157.    As discussed in Section D of my June 16, 2021 *Expert Report*, the results of my survey indicate that there was *no* statistically significant difference in the likelihood of purchasing the Fisher-Price product between test and control group participants.  In other words, the presence of the "sleep-related" misrepresentations (and the

---

[175] *See, e.g., id.*, ¶ 104.

[176] *See* Sections C and D of my June 16, 2021 *Expert Report*.

corresponding absence of a "not intended for sleeping" statement) do *not* increase consumers' likelihood of purchasing the disputed Fisher-Price product. Participants' explanations of their purchase decisions also strongly support the conclusion that the alleged misrepresentations and omission are *not* common or material factors that drive consumers to purchase the disputed Fisher-Price products.

C.8.     The Dennis Survey is Fatally Flawed: Conclusion

158.     In sum, based on my experience as a researcher, educator, and business consultant, and having conducted, supervised, and evaluated well over 1,000 marketing research studies, it is my professional opinion that the Dennis Survey is fatally flawed in multiple respects with regard to critical survey elements, including, but not limited to: (*i*) the use of a highly leading and biased "materiality" test involving a supposed "disclaimer"; (*ii*) the reliance on extremely leading, repetitive, confusing, and biased closed-ended "perception" questions; (*iii*) the reliance on extremely leading and biased "meaning-specific materiality" questions; (*iv*) the violation of marketplace conditions and presentation of a truncated, distorted stimulus; and (*v*) the failure to employ any survey control. These major survey flaws individually and collectively biased the survey's "findings"; nevertheless, the Dennis Survey's results, if anything, demonstrate that Dr. Dennis's "disclaimer," as well as the selected "perceptions" he tested, do *not* have a common material effect on consumers' purchase decisions. The severe deficiencies in the Dennis Survey mean that there is *no* scientific basis for Dr. Dennis's conclusions about consumers' perceptions or the supposed materiality of the alleged misrepresentations and omission with respect to consumers' purchase decisions.

D.     **RESPONSE TO THE DENNIS DECLARATION'S CRITICISMS AND CLAIMS REGARDING THE KIVETZ SURVEY**

159.     In his declaration, Dr. Dennis criticizes the consumer survey that I conducted in this litigation. My June 16, 2021 *Expert Report* in this matter details the objectives, methodology, findings, and conclusions of that survey.

160. The Dennis Declaration lists a number of criticisms and claims regarding the Kivetz Survey.[177] Specifically, Dr. Dennis: (*i*) criticizes the Kivetz Survey's framing of the relevant research question; (*ii*) claims that the Kivetz Survey failed to control for participants' preexisting beliefs regarding the disputed products; (*iii*) criticizes the Kivetz Survey's control; (*iv*) claims that I should have conducted a choice-based conjoint ("CBC") survey as the appropriate methodology; and (*v*) raises other supposed criticisms of the Kivetz Survey without any explanation. In the following subsections, I respond to Dr. Dennis's criticisms and claims.

## D.1. Response to the Dennis Declaration's Criticisms of the Research Question Tested in the Kivetz Survey

161. Dr. Dennis claims that the Kivetz Survey investigated the "wrong research hypothesis,"[178] stating as follows:[179]

> Dr. Kivetz chose to not frame his research in terms of Plaintiffs' allegations that the Products are inherently dangerous and are unsafe, despite the Plaintiffs' clear allegations that the Products are unsafe to be used for babies.[5] In short, Dr. Kivetz's survey fails to test Plaintiffs' claim that the Defendants' products were marketed and advertised as a *safe* infant sleep product when it is not.[6]
>
> [5] Consolidated Amended Complaint, October 28, 2019, ¶¶3-5.
> [6] Consolidated Amended Complaint, ¶75, ¶¶183-205. Dr. Kivetz also stated his survey "was not about safety per se. It was about sleep-related issues" Kivetz Deposition Transcript at 293:8-20.

162. However, the (operative) Complaint in this litigation demonstrates that the Plaintiffs allege that Fisher-Price advertised (*e.g.*, via the product packaging) the disputed products as being suitable (or safe) for *sleep* specifically, as opposed to being safe in general (for *any* type of use). In particular, the Plaintiffs accuse a number of *sleep-related* affirmative representations as having commonly misled the putative class members into buying, and paying a higher price for, the disputed products.[180] For

---

[177] *See* Dennis Declaration, ¶ 39. The various criticisms and claims (listed in items (a) through (k) of paragraph 39) can be categorized along five themes.
[178] *Id.*, ¶ 22.
[179] *Id.*, ¶ 23. Emphasis in the original.
[180] *See, e.g.*, *Complaint*, ¶¶ 185 & 190 – 191.

example, in a section titled "False and Misleading Representations on the Boxes,"[181] the Plaintiffs reference specific, allegedly misleading statements, including: "Baby can sleep at a comfortable incline all night long!";[182] "Extra-plush fabrics for extra-comfy sleep";[183] and "Sleeper."[184] The Complaint further states:[185]

> Defendants' deceptive marketing of the product as a **"Sleeper"** that is safe for infant **sleep**, including overnight or prolonged **sleep**, is material to consumers' decisions to purchase and/or own the product, because it causes consumers to reasonably believe the product is safe. Defendants should not have marketed the product as a **"Sleeper" suitable for infant sleep**, including prolonged or overnight **sleep**.
>
> Defendants' deceptive marketing of the Rock 'n Play **Sleeper** as a **"Sleeper"** when **its use as such** conflicts with the applicable medical guidelines and recommendation induced consumers who would not have otherwise purchased the product to purchase it, own, and use it when they would not have otherwise owned and used it, and/or to pay a higher price than they would have otherwise paid for the product if it was not falsely and misleadingly advertised as a **'Sleeper' suitable for sleep**, including prolonged or overnight **sleep**. [Emphases added]

163. Similarly, the Plaintiffs claim in their *Class Certification Motion*:[186]

> Between October 1, 2009 […] and April 12, 2019 […], Defendants consistently marketed their **Sleeper** across all media using a single, overarching marketing message – that the **Sleeper** was **fit for infant sleep**, including overnight and prolonged **sleep**. The word **"sleeper"** is part of the product's name, as is the word "rock," an obvious reference to rocking a baby to **sleep**. […] *All* of the **Sleepers'** packaging included at least one statement that the **Sleeper** could be used for nighttime **sleep**, including taglines such as "Baby can **sleep** at a comfortable incline all night long!" and "Extra-plush fabrics for extra-comfy **sleep**." In more than 90% of packaging with imagery used in the United States, the largest image on the front of the box depicted a **baby sleeping** in the product next to a **bed**. Every version of the **Sleepers'** packaging included imagery of either a **sleeping baby** in the **Sleeper** or the product placed next to a **bed**. In the majority of the packaging, a mother was pictured in the **bed**, next to her baby in the **Sleeper**. […]
>
> Plaintiffs allege this persistent and uniform marketing message portraying the Fisher-Price Rock 'n Play Sleeper as safe for infant **sleep**, including for overnight and prolonged **sleep** (the "Safety Message"), was dangerously false, misleading, deceptive and unfair. [Bolding added; italics in the original; FNs omitted]

---

181 *See, e.g., id.*, ¶¶ 185 – 191.
182 *See, e.g., id.*, ¶ 187.
183 *See, e.g., id.*, ¶ 188.
184 *See, e.g., id.*, ¶ 190.
185 *Id.*, ¶¶ 190 – 191.
186 *Class Certification Motion*, pp. 1 – 2.

And:[187]

> Here, there is little question that the Defendants' misrepresentation of the RNPS as a **"sleeper"** and being "safe" for infant **sleep** would be material to reasonable consumers […]. [Emphases added]

164.     Regarding the omission alleged in the present litigation, the Plaintiffs similarly complain about sleep:[188]

> While touting itself as a brand for safe **sleep** solutions, Fisher-Price never informed consumers, including Plaintiffs, that the RNPS was unsafe for **overnight sleep**. Indeed, at no point did Defendants communicate or even suggest that their **Sleeper** should not be used for **overnight sleep** to the public or to consumers. Thus, consumers reasonably believed the **Sleeper** was safe for **overnight sleep** as advertised and that their infant could **sleep** safely in the product. [Emphases added; FNs omitted]

165.     As the aforementioned discussion and citations demonstrate, a key, relevant research question in this litigation is whether the alleged "sleep-related" packaging misrepresentations and omission led consumers to be more likely to purchase the products *compared to* a counterfactual scenario in which these "sleep-related" misrepresentations and omission were "remedied." The Kivetz Survey appropriately tested exactly this hypothesis.

166.     At his deposition, Dr. Dennis testified that he interpreted the Plaintiffs' theory of liability in terms of "the safety of the products, period,"[189] referencing paragraphs 3 through 5 of the Complaint as the basis for his opinion.[190] These excerpts, however, are consistent with my understanding of the Plaintiffs' theory of liability in this litigation, as they pervasively implicate *sleep* in connection to Fisher-Price's allegedly deceptive marketing of the disputed products.[191] When asked about whether he

---

[187] *Id.*, p. 30.

[188] *Id.*, p. 12.

[189] Dennis Deposition, pp. 150 – 151.

[190] Regarding his citation of these paragraphs, Dr. Dennis testified: "I thought this was an adequate footnote" (*id.*, p. 151) and "I was satisfied that I found a basis for my understanding of the plaintiffs' theory by looking at those paragraphs"; *id.*, p. 152.

[191] For example, the Plaintiffs allege that (emphases added): "The Rock 'n Play Sleeper is inherently unsafe **as a sleeper** and **unfit for its intended use**" (*Complaint*, ¶ 3); "[T]he design of the **sleepers** can lull infants into a deeper **sleep** than normal **sleep** […] (*ibid.*)"; "[…] Defendants advise parents to keep babies strapped in restraints **overnight while sleeping** on an incline […] (*ibid.*)"; "[D]ue to these known dangers, in 2011, regulators in Canada and Australia did not allow Defendants to **sell the Rock 'n Play Sleeper in their countries as a 'sleeper'**" (*id.*, ¶ 4); and "Ignoring these documented safety concerns,

understands if the disputed products are unsafe for non-sleep purposes, such as supervised play, Dr. Dennis testified that he did not have an opinion and that his task did not require him to understand the Plaintiffs' allegations "to that level of specificity."[192]

167.   In multiple other instances, however, Dr. Dennis appears to recognize the Plaintiffs' allegations as specific to "sleep-related" misrepresentations and omissions.  For example, Dr. Dennis identified descriptors and imagery related to *sleep* as the "infringing elements" at his deposition.[193]  Further, when asked to describe his understanding of the alleged misrepresentations, Dr. Dennis again named elements related to sleep:[194]

> Q.  What are the alleged misrepresentations – what is your understanding, reading the complaint, of the alleged misrepresentations and omissions?
>
> […]
>
> THE WITNESS. The – my understanding of the case here is that the – the very name of the product, having the word "sleeper" in it, is conveying a message that the – the product is acceptably used to help the baby sleep. So I think that's probably point one. Point two, there's a – a descriptor about referring to the baby sleeping all night long. I'm not getting the wording exactly right, but there's a basic there about sleeping all night for the child. So I think that was an important descriptor. And there's similar themes when you look at the product packaging that – that convey that the product is safe to be used for sleep.

---

Defendants knowingly marketed and sold the Rock 'n Play Sleeper in the United States as an **infant sleeper** suitable for infant **sleep**, including prolonged or overnight **sleep**" (*ibid.*).

[192] Dennis Deposition, pp. 99 – 100 ("Q. So if I – is it your understanding that the Rock 'N Play Sleeper is unsafe for use of supervised play with a parent? So if the parent puts the baby in the Rock 'N Play Sleeper and is playing with it, is the product unsafe for that purpose? […]  THE WITNESS: Yeah, I don't have an opinion on that.  BY MR. KANNY: Q. Is it your understanding if the baby is placed in the Rock 'N Play Sleeper and sitting next to his father awake, supervised, watching football, would the Rock 'N Play Sleeper be unsafe for that purpose? […]  THE WITNESS: Again, my obligation here, and assignment, does not require me to understand Plaintiffs' allegations to be more general, and those – and I did my best job representing those in my statements that I crafted for the survey.").

[193] *Id.*, p. 212 ("Q. What is your understanding of a survey control?  A. […] A survey control is an attempt to provide a comparison – it could be a product – that does not have the so-called infringing elements. In this case, the infringing elements are the "sleeper" descriptors and some of the imagery we've talked about. I think the "all night long" language, maybe, would be an infringing descriptor, and the control is to create an identical product as the test product but not having the infringing elements. Q. And what is the purpose of having a survey control?  A. Ideally, it permits the isolation of the causal impact of the infringing elements.").

[194] *Id.*, pp. 100 – 101.

168.    Likewise, in his declaration, Dr. Dennis calls attention to specific *sleep-related* representations on the packaging.  For example, he highlights the following examples:[195]

> Dr. Kivetz opines that sleep-related misrepresentations and omissions are not material to consumers' purchasing decisions even though the product is literally named a "sleeper" product, showing a sleeping baby on the front of the package.  The product's actual name emphasizes the sleep benefit, as follows:



> [Citation omitted]

And:[196]

> Furthermore, an actual descriptor on the front of the packaging emphasizes the product is made for babies to use for sleep "all night long":



> [Citation omitted]

169.    As explained in Subsection D.3, the aforementioned elements, among multiple other elements identified by the Plaintiffs as allegedly deceptive representations, are exactly those tested by the Kivetz Survey.  For example, the portions of the packaging panels emphasized by Dr. Dennis in his declaration's introduction were modified in my control stimulus to appear as follows (*see* Figures 9a and 9b below):

**Figure 9a: Cropped Image of the Kivetz Survey's Control Package Depicting the (Revised) Product Name [197]**



---

[195] Dennis Declaration, ¶ 26.
[196] *Id.*, ¶ 27.
[197] *See* Exhibit G.2 to my June 16, 2021 *Expert Report*.

**Figure 9b: Cropped Image of the Kivetz Survey's Control Package Depicting a (Revised) Statement on the Package Front** [198]

Baby can be soothed at a comfortable **incline** anytime!

D.2.     Response to the Dennis Declaration's Claim that the Kivetz Survey Failed to Control for Participants' Preexisting Beliefs and Prior Experience

170.     Dr. Dennis opines that the Kivetz Survey "has a fatally flawed foundation."[199]  The crux of Dr. Dennis's argument centers on the contention that my survey does not control for participants' "preexisting beliefs" regarding (and prior experience with) the disputed Fisher-Price products and the Fisher-Price brand.[200] According to Dr. Dennis:[201]

> The crux of the matter is that Dr. Kivetz's experimental design does not control for pre-existing attitudes, beliefs, and preferences of the consumers who participated in his survey. As a result, Dr. Kivetz's survey design results in a systematic distortion in his data.

And:[202]

> Dr. Kivetz's survey contains several flaws which individually and combined render his data useless for addressing issues in the litigation.

> Of those flaws, Dr. Kivetz's fatal mistake was not to control for the preconceptions and preexisting beliefs and attitudes of his respondents were omissions [*sic*] predisposed to believe the Defendants' products are safe for babies.  This failure resulted in a systematic distortion in the answers that Dr. Kivetz's respondents provided his [*sic*], in my expert opinion.

171.     However, Dr. Dennis's argument that the Kivetz Survey failed to control for participants' preexisting beliefs is completely unsubstantiated and mistaken.  Dr. Dennis's contention also reveals a fundamental lack of understanding of key elements of survey design, including the importance of, inter alia: (*i*) sampling the relevant consumer universe; (*ii*) employing adequate survey controls; and (*iii*) approximating marketplace

---

[198] *See ibid*.
[199] Dennis Declaration, p. 11.
[200] Throughout this *Rebuttal Expert Report*, I use "preexisting beliefs" to refer to participants' preconceived (background) notions, including opinions, attitudes, knowledge, expectations, and/or familiarity regarding the company/brand, products, and/or product category at issue.
[201] Dennis Declaration, ¶ 52.  Emphasis in the original.
[202] *Id*., ¶¶ 73 – 74.

conditions. As explained in the subsections below, Dr. Dennis's various assumptions and claims regarding preexisting beliefs are erroneous and contradicted by multiple sources (including those cited and relied upon by Dr. Dennis).

D.2.1. *A Cause-Effect Experimental Design was the Appropriate and Proper Survey Methodology in this Litigation*

172.    Dr. Dennis objects to the cause-effect experimental design used in the Kivetz Survey, describing my approach as a "dose-response study"[203] and asserting that I "misapplied" the "established tradition of experimental design."[204] In his declaration, Dr. Dennis states that "[p]ublications in the popular science and medical journals are commonly based on the experimental method which involves the random assignment of study participants to 'control' and 'test' groups."[205] However, as Dr. Dennis acknowledged and conceded at his deposition,[206] the same cause-effect experimental method is not solely within the purview of the natural sciences and medicine. In fact, a test versus control experimental design for assessing causality is a widely-used approach in both industry and academic (including seminal, Nobel-prize-winning) research related to marketing, economics, psychology, and consumer behavior.[207] The cause-effect experimental (test vs.

---

[203] *Id.*, ¶ 37.

[204] *Id.*, ¶ 47.

[205] *Id.*, ¶ 45.

[206] *See* Dennis Deposition, p. 187 ("Q. Are you aware of any peer-published publications in the marketing and consumer behavior research that are based on experimental cause-and-effect design? A. Of consumer behavior studies? Q. Yes. A. Yes. Yes.").

[207] *See, e.g.*, Kahneman, Daniel and Amos Tversky (1982), "The Psychology of Preferences," *Scientific American*, 246(1), 160 – 173; Kahneman, Daniel, Jack L. Knetsch, and Richard H. Thaler (1990), "Experimental Tests of the Endowment Effect and the Coase Theorem," *Journal of Political Economy*, 98(6), 1325 – 1348; Campbell, Margaret C. and Ronald C. Goodstein (2001), "The Moderating Effect of Perceived Risk on Consumers' Evaluations of Product Incongruity: Preference for the Norm," *Journal of Consumer Research*, 28(3), 439 – 449; Kozup, John C., Elizabeth H. Creyer, and Scot Burton (2003), "Making Healthful Food Choices: The Influence of Health Claims and Nutrition Information on Consumers' Evaluations of Packaged Food Products and Restaurant Menu Items," *Journal of Marketing*, 67(2), 19 – 34; Sela, Aner, Itamar Simonson, and Ran Kivetz (2013), "Beating the Market: The Allure of Unintended Value," *Journal of Marketing Research*, 50(6), 691 – 705; Gershoff, Andrew D., Ran Kivetz, and Anat Keinan (2012), "Consumer Response to Versioning: How Brands' Production Methods Affect Perceptions of Unfairness," *Journal of Consumer Research*, 39(2), 382 – 398; Rottenstreich, Yuval and Ran Kivetz (2006), "On Decision Making without Likelihood Judgment," *Organizational Behavior and Human Decision Processes*, 101(1), 74 – 88; Kivetz, Ran and Itamar Simonson (2003), "The

control) methodology that I used in my survey on this litigation is routinely employed in surveys conducted for litigation and adversarial proceedings to study consumers' preferences and perceptions regarding packaging and/or advertising claims.

173.    As set forth in Section C of my June 16, 2021 *Expert Report*, I employed a standard, cause-effect experimental methodology that is well-established and has been used in countless consumer research studies, including in many of the hundreds of academic and consulting studies that I have conducted.  Such an experiment allows measuring the purchase likelihood of a challenged product among "test group" participants (who are shown an allegedly deceptive Fisher-Price package that contains the alleged "sleep-related" misrepresentations and omission) compared to "control group" participants (who are shown an otherwise identical Fisher-Price package except with the alleged "sleep-related" misrepresentations and omission removed or "remedied").

174.    Indeed, experimental research is widely recognized as a major means for assessing the potential causality of a marketing action on a consumer outcome.  As a leading marketing management textbook states, "[t]he most scientifically valid research is experimental research, designed to capture cause-and-effect relationships by eliminating competing explanations of observed findings."[208]

175.    When asked at his deposition about his claim that the Kivetz Survey "was predestined to result in results favorable to the Defendant,"[209] Dr. Dennis stated that he based his opinion in part on his personal experience in witnessing the results of other experimental designs.[210]  However, I and other scholars have used the same "test-control" experimental methodology many times to assess the materiality (or lack thereof) of challenged claims on consumer decisions, and I can testify to the fact that such a design

---

Idiosyncratic Fit Heuristic: Effort Advantage as a Determinant of Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40(4), 454 – 467.

[208] Kotler, Philip and Kevin L. Keller (2009), *Marketing Management* (13th Ed.), Upper Saddle River, NJ: Pearson Prentice Hall, p. 95.

[209] Dennis Declaration, ¶ 47.

[210] Dennis Deposition, pp. 191 – 192.

is capable of detecting (and does detect) whether a claim (and alleged misrepresentation) is or is not commonly material.

176.    In criticizing the Kivetz Survey's methodology, Dr. Dennis then draws a nonsensical and false analogy[211] to COVID-19 vaccines, arguing that participants in the Kivetz Survey had already "made up their minds" to purchase the disputed products.[212]

177.    Dr. Dennis offers *no* substantiation that participants in the Kivetz Survey were akin to patients who have been already immunized against COVID-19.  Instead, appealing to his own "expert opinion,"[213] Dr. Dennis claims (or rather assumes) that participants in the Kivetz Survey were "already inoculated against and resistant to [the] intervention"[214] and were "immunized against [the] packaging altering interventions."[215] However, as further explicated in the next two subsections, Dr. Dennis's assumptions are not only unfounded but also erroneous.

D.2.2. *The Kivetz Survey Sampled the Relevant Consumer Universe, and Dr. Dennis's Assumption that the Kivetz Survey's Participants were Familiar with and Predisposed to Purchase the Disputed Products is Unsubstantiated and Erroneous*

178.    A key (erroneous) assumption underlying Dr. Dennis's claim that the Kivetz Survey did not control for preexisting beliefs relates to the survey's consumer universe.  According to the Dennis Declaration:[216]

> Dr. Kivetz surveyed consumers who were already interested in the Products and intended to purchase products of this type in the next six months.  Dr. Kivetz, therefore, surveyed consumers familiar with the litigated products and with consumers that were already, by definition, pre-disposed to purchase the Products.

179.    Dr. Dennis apparently agrees that the appropriate consumer universe in this litigation consists of prospective purchasers of baby products "to put a baby to lay, sit,

---

[211] A false analogy is defined as "a type of informal fallacy or a persuasive technique in which the fact that two things are alike in one respect leads to the invalid conclusion that they must be alike in some other respect"; *see* https://dictionary.apa.org/false-analogy.
[212] Dennis Declaration, ¶¶ 48 – 49.
[213] *Id.*, ¶ 47.
[214] *Ibid.*
[215] *Ibid.*
[216] *Id.*, ¶ 50.

sleep, be soothed, or play in",[217] as his survey used (virtually) the *same primary screening criteria* as those of the Kivetz Survey.[218]  Indeed, describing his survey's sample, Dr. Dennis writes:[219]

> First, I created a sampling plan designed to survey respondents whose responses would be projectable to the study's target population of purchasers of the Products.

And:[220]

> I, therefore, employed a screening procedure based on the Defendants' consumer survey, selecting U.S. adult consumers who state they will purchase a product similar to the litigated products in the next six months.

180.    Dr. Dennis similarly acknowledged at his deposition that the Kivetz Survey sampled the relevant consumer universe in this litigation.[221]  Hence, consumers who are in the market for a baby product "to put a baby to lay, sit, sleep, be soothed, or play in"[222] constitute the appropriate sample, one that approximates the state of mind of the putative class members when they made the decision to purchase the Fisher-Price Rock 'n Play Sleeper products.  As described in Subsection C.2 of my June 16, 2021 *Expert Report*, the primary or "key" screening questions consisted of the following:[223]

---

[217] *See* the Kivetz Survey's "screener" questions in Exhibit D of my June 16, 2021 *Expert Report*.

[218] *See, e.g.*, Dennis Declaration, ¶ 83.  *See also id*., Attachment C, pp. 91 – 92.

[219] Dennis Declaration, ¶ 80.

[220] *Id.*, ¶ 85.  Note that the Dr. Dennis does not mention in his declaration whether he employed age and gender quotas in order to obtain a representative sample.  By contrast, the Kivetz Survey appropriately employed "screening quotas" using "click balancing," whereby the screening procedure was based on screening for qualified respondents in proportion to the age and gender distribution of the U.S. adult population (according to the U.S. census).

[221] *See, e.g.*, Dennis Deposition, pp. 253 ("Q. Okay. In paragraphs 83 through 85, you talk about how you came up with selecting your participants; is that correct?  A. That's right.  Q. And I think we talked about, earlier, this was a similar process that Dr. Kivetz used?  A. It was.  Q. Do you believe that this is the right demo- – demographic group of respondents for a consumer survey related to the advertising of a Rock 'N Play Sleeper? […]  A. I – I think it's the right – I think it's a perfectly workable definition for the sample.") & 188 ("His screening protocol – Dr. Kivetz' [*sic*] screening protocol, which I adopted for my own survey, does focus on collecting, in my view, the – the – the correct population.").

[222] *See* Exhibit D of my June 16, 2021 *Expert Report*, p. 4 (Q.10 – Q.11).

[223] *See ibid*.  For both Questions 10 and 11, the order of the first three response options was randomized; participants who did *not* select the second response option were terminated from the survey; and the "None of the above" and "Don't know" response options were "single response" (*i.e.*, if participants selected that option, no other option could simultaneously be selected).

Q.10  During the <u>next</u> six (6) months, which of the following products, if any, do you
think that you personally will purchase?  (Please select all that apply.)

- o  Art supplies for a child who is, or will be, three to five years old
- o  Baby supplies for a baby who is, or will be, zero to three months old
- o  Home improvement products for a house or apartment
- o  None of the above
- o  Don't know

Q.11  During the <u>next</u> six (6) months, which of the following baby products, if any, do
you think that you personally will purchase for a baby who is, or will be, zero to
three months old?  (Please select all that apply.)

- o  Baby toy to entertain or educate a baby
- o  Baby product to put a baby to lay, sit, sleep, be soothed, or play in
- o  Baby clothing
- o  None of the above
- o  Don't know

181.  The screening questions in the Kivetz Survey guaranteed that only
respondents who intended to purchase products in the relevant category during the next
six months were eligible to qualify for the main questionnaire.  Surprisingly, however,
Dr. Dennis contends that this screening criteria "therefore" means that the surveyed
consumers in the Kivetz Survey must have already been "familiar with the litigated
products" and were "already, by definition, pre-disposed to purchase the Products."[224]
Similarly, Dr. Dennis concludes that participants in the Kivetz Survey, by virtue of the
screening criteria, were "already familiar with the Defendants' packaging" and were
"tainted by their past exposure to and awareness of the Defendants' Products."[225]

182.  Dr. Dennis's above-cited claims consist of logical leaps that do *not* follow
from the above-cited screening criteria and are *not* supported by any rationale or
empirical evidence.  On the contrary, consumers who are in the market for products *such
as* the disputed products may not necessarily be familiar with the disputed products.
Likewise, consumers who are familiar with the disputed products or brand need not be
"predisposed" to purchase the products, but may instead base their purchase decisions on

---

[224] Dennis Declaration, ¶ 50.
[225] *Id*., ¶ 51.  Puzzlingly, in his declaration's footnote 13, Dr. Dennis cites to an excerpt from the Kivetz
Deposition transcript (pp. 132 – 134) and to Exhibit 3 from the Kivetz Deposition.  However, *neither* the
cited excerpt nor exhibit demonstrate or support Dr. Dennis's claim that the Kivetz Survey's sample of
participants was "tainted by their past exposure to and awareness of the Defendants' Products."

other factors (*e.g.*, personal needs, cost considerations, preference for other brands, recommendations from family or friends, etc.). At his deposition, Dr. Dennis admitted that he had *no* empirical substantiation for his claim that the Kivetz Survey's participants were familiar with the Fisher-Price brand or had already made up their minds to purchase the disputed products:[226]

> Q. And anything – other than what we've already talked about in terms of some of your educated assumptions about who may have seen Fisher-Price products in the past or generational loyalty, do you have any evidence that people who participated in [Dr.] Kivetz's survey had already previously made up their minds to purchase the products?
>
> A. Well, we all know the answer. I don't – have not done a survey on that point.

183. The Kivetz Survey properly screened for prospective purchasers of the disputed products, defining the relevant product category in terms of baby products "to put a baby to lay, sit, sleep, be soothed, or play in."[227] Hence, the Kivetz Survey did *not* limit in any way its sample to participants already familiar with the Fisher-Price and/or Mattel brands.

184. Appropriately, the Kivetz Survey did *not* exclude participants who could have been familiar with Fisher-Price and/or Mattel (including those who have purchased Fisher-Price products and/or the disputed Rock 'n Play Sleeper products before), as doing so would have led to an underinclusive and overly narrow universe.[228] Indeed, my survey's results and the named Plaintiffs' deposition testimony indicate that the putative class members consist of both first-time *and* repeat purchasers of the disputed Fisher-Price products.[229]

185. Although Dr. Dennis fails to offer any basis for his speculation regarding the presumed familiarity of the Kivetz Survey's participants with the disputed products

---

[226] Dennis Deposition, p. 205; *see also*, pp. 188 – 191.
[227] *See* Exhibit D to my June 16, 2021 *Expert Report*, p. 4 (Q.10 – Q.11).
[228] *See, e.g.*, Diamond (2011). As Professor Diamond writes: "If the sampling frame does not include important groups in the target population, there is generally no way to know how the unrepresented members of the target population would have responded" [FNs omitted]; *id.*, p. 379.
[229] *See, e.g.*, Hanson Deposition, pp. 100, 103, & 111; Kaden Deposition, pp. 93 & 116 – 117; Nadel Deposition, pp. 158 – 160; Pasternacki Deposition, pp. 48 & 51 – 53.

(or Fisher-Price brand), an examination of responses to the survey's open-ended questions provides a test of Dr. Dennis's speculation. If participants in the Kivetz Survey were in fact motivated to purchase the disputed products due to brand recognition or brand loyalty (as consumers may do in the actual marketplace), then this factor would be highly likely to be detected by the pair of questions eliciting participants' explanations or reasons for their purchase decision.[230]

186. As Table 2 to Exhibit J of my June 16, 2021 *Expert Report* shows, 28% of participants in the "test" group (*i.e.*, who saw an original, allegedly deceptive Fisher-Price package) mentioned brand equity or recognition as a positive reason for purchasing the product, and 26% of participants in the "control" group (*i.e.*, who saw a revised Fisher-Package with the alleged "sleep-related" misrepresentations and omission removed or remedied) did so.[231] Hence, although the brand name (including prior awareness, familiarity, and usage) was evidently an important purchase factor among *some* of the Kivetz Survey's participants—consistent with academic literature in marketing[232]—mentions of the brand did not rise to levels that would justify Dr. Dennis's assertion that I only "surveyed consumers familiar with the litigated products and with consumers that were already, by definition, pre-disposed to purchase the Products."[233]

---

[230] *See* Exhibit D to my June 16, 2021 *Expert Report*, p. 9 (Q. 40 & Q.41). Participants in the Kivetz Survey also had an opportunity to indicate awareness of or familiarity with the Fisher-Price brand in any one of the four other open-ended questions in the survey (*i.e.*, the pair of questions asking about information sources [Q.51 & Q.52] and the pair of questions that probed for any prior awareness of any issues related to the disputed products [Q.61 & Q.62]).

[231] *See* Exhibit J to my June 16, 2021 *Expert Report*, Table 2, pp. 1 – 2. The 2.1% difference between the proportions of test group and control group participants who indicated that they would buy the product (*i.e.*, definitely would buy or probably would buy) was *not* statistically significant ($\chi^2 = .424$, $df = 1$, $p > .51$, *n.s.*).

[232] As I discuss in my June 16, 2021 *Expert Report*, the literature in marketing demonstrates that brand name is a highly prominent attribute (and sometimes a dominant choice heuristic) when consumers make purchase decisions involving consumer-packaged goods (CPGs); *see, e.g.*, Aaker, David A. (1991), *Managing Brand Equity*, New York, NY: Free Press; Hoyer, Wayne D. and Steven P. Brown (1990), "Effects of Brand Awareness for a Common Repeat-Purchase Product," *Journal of Consumer Research,* 17(2), 141 – 198; Keller, Kevin Lane (2008), *Strategic Brand Management*: *Building*, *Measuring*, *and Managing Brand Equity*, Upper Saddle River, NJ: Pearson Prentice Hall.

[233] Dennis Declaration, ¶ 50.

### D.2.3. *The Kivetz Survey Did Control for Preexisting Beliefs, in Accordance with Standard Survey Principles Prescribed by Multiple Survey Treatises (Including Those Cited in the Dennis Declaration)*

187.     Dr. Dennis's "core" criticism rests on the claim that the Kivetz Survey did not control for (or "neutralize")[234] participants' preexisting beliefs[235] and therefore yielded "systematic distortion in responses caused by consumers' reliance on preconceptions about the Fisher-Price-branded products."[236]   However, Dr. Dennis's contention is erroneous, misunderstands or misrepresents the purpose of a survey control, and mischaracterizes the underlying sources cited in his declaration.   These sources instead support the Kivetz Survey's approach of employing a proper control stimulus to account for preexisting beliefs.

188.     It is well-established that (external) control groups and, when appropriate, (internal) control questions are a standard and accepted methodology for consumer surveys, and can provide a measure and control for participants' preexisting beliefs.[237]  As recognized by survey treatises and authorities, the purpose of a (proper) survey control is *precisely* to protect against threats to validity arising from such factors as preexisting beliefs, yea-saying, random guessing, and systematic error due to leading questions or question structure.[238]  That is, the function of a control is to isolate the causal effect of challenged claims and/or omissions (*e.g.*, the alleged "sleep-related" misrepresentations and omission) *above and beyond* any "noise" due to, inter alia, preexisting beliefs and prior knowledge that participants may have about the product, brand, or product category.  For example, surveys that employ cause-effect experimental designs and *randomly assign* participants to either a test or control group ensure that any

---

[234] *See, e.g.*, Dennis Deposition, pp. 211 – 212.
[235] *See, e.g.*, Dennis Declaration, ¶¶ 52 & 74.
[236] *Id.*, ¶ 61.
[237] *See, e.g.*, Diamond (2011, 2012); Keller (2012); Jacoby (2013); Jay (2013); Rappeport (2012); Swann (2012).
[238] *See, e.g.*, Diamond (2012).

preexisting beliefs held by consumers would be present at *statistically equivalent* levels across the test and control groups.[239]

189.     The aforementioned design—which holds constant all other aspects between the two groups except for the focal element at issue—allows the researcher to isolate and measure the impact of challenged claims *over and above* the impact of participants' background knowledge and preconceptions.  As explained earlier, the Kivetz Survey used exactly such a design.

190.     The Dennis Declaration's citations to survey treatises and articles selectively quote from, and thus mischaracterize, the underlying sources.  In fact, the two sources that Dr. Dennis cites to supposedly support his claim that the Kivetz Survey failed to control for preexisting beliefs—chapters on survey controls by Professor Diamond and by Dr. Rappeport[240]—are *inconsistent with* Dr. Dennis's criticisms and with his survey's approach.  Instead, these chapters from a survey treatise on trademark and deceptive advertising surveys substantiate the Kivetz Survey's control methodology.

191.     Consider, for example, Dr. Dennis's appeal to an excerpt about "noise" and "preconceived notions" from Professor Diamond's chapter:[241]

> As explained by Professor S. Diamond in <u>Trademark and Deceptive Advertising Surveys: Law, Science, and Design</u>, the first general category of "noise" that threatens the validity of surveys:
>
>> [N]oise that systematically distorts the pattern of responses, as, for example, when consumers have preexisting views about the product and respond based on those views rather than responding to the content of the commercial being tested (Diamond, "Control Foundations," p. 202).
>
> Diamond continues:
>
>> All respondents answer questions against a background of preconceived notions. They may include general beliefs about the nature of trademarks

---

[239] That is, assuming that the survey employs a proper procedure with sufficient sample sizes.  *See also, e.g.*, Diamond (2011), p. 398 & FN 175 ("[…] When respondents are assigned randomly to different treatment groups (e.g., respondents in each group watch a different commercial), the procedure ensures that within the limits of sampling error the two groups of respondents will be equivalent except for the different treatments they receive. […]").

[240] *See* Dennis Declaration, ¶¶ 53 – 57, citing Diamond (2012) and Rappeport (2012).

[241] Dennis Declaration, ¶ 53.

(e.g., all products in a category are really made by the same company) and commercials (e.g., all commercials claim that their products have positive features [*sic*]. They may include specific beliefs about the particular characteristics of a mark or a product, **such as an awareness of the name of the best-selling brand in a particular product category** or a belief that a particular substance is harmful. **These preconceived notions naturally condition how the respondents will interpret and answer questions about the trademark or commercial they are shown in the course of an interview** (( [*sic*] Diamond, 2012, p. 204, emphasis added).

192.     I agree with the quoted excerpts above, which identify preexisting beliefs as one source of survey error or noise.  However, Dr. Dennis fails to acknowledge that in the same chapter—consistent with my survey approach and inconsistent with that of Dr. Dennis's—Professor Diamond then proceeds to describe *how a proper control group addresses exactly the potential problem of preexisting beliefs*.  Indeed, in the *very same paragraph* as the one excerpted above, Professor Diamond concludes with the following sentences (which Dr. Dennis omitted from his report):[242]

> In order to know whether an allegedly infringing trademark or an allegedly deceptive commercial is the cause of the respondent's answer, it is necessary to rule out these preexisting notions as alternative explanations for the answer.  **That is, we need a control that will provide a measure of preexisting notions.**  [Emphasis added]

193.     The following pages of Professor Diamond's chapter analyze research designs without controls versus ones with controls.[243]  Notably, Professor Diamond states that although preexisting beliefs can be problematic *when a survey lacks a control*, they are properly accounted for (*i.e.*, "ruled out" as an alternative explanation) *when a control is present*:[244]

> Fortunately, surveys in trademark and deceptive advertising litigation never need to rely on the weak preexperimental designs described above in order to test the relevant causal questions that arise in these cases.  The **primary solution is an experimental design in which survey respondents are randomly assigned either to the test cell or to a control cell** (or one of a number of control cells).  […] By subjecting one group to a treatment (the test cell) and the other(s) to no treatment or to different treatments (the control cell(s)), the only explanation for any difference observed between the groups on the post-test measure would be the treatment.  **The design rules out the possibility that, for example, preexisting attitudes or beliefs or differences in the composition of various [sets of people] could be responsible**, because the groups on average (before treatment) were

---

[242] Diamond (2012), p. 204.

[243] *Id.*, pp. 206 – 210 ("A Closer Look at Survey Design Without and With Controls").

[244] *Id.*, p. 209.

equivalent as a result of the random assignment to the test and control conditions. [Emphases added; FNs omitted]

194.    Finally, Professor Diamond concludes her chapter as follows:[245]

Controls play a central role in enabling a survey to rule out threats to valid causal inference. **A control group design that includes an appropriate control is the best way to ensure that noise from preexisting beliefs, yea-saying, and guessing (both random and biased) cannot explain away or undermine evidence of confusion or deception** reflected in the responses of survey participants. […] Designing an appropriate control is thus an analytic rather than a mechanical task, one that is **crucial in a valid trademark or deceptive advertising survey**.  [Emphases added]

195.    A proper control is even more necessary when a survey uses leading, closed-ended questions (*see* Subsections C.2 through C.4 for a discussion of the Dennis Survey's leading methodology and questions).  This is because a control stimulus or control question can account for not only participants' background knowledge, inattention, and guessing behavior, but also for flaws in the survey itself (a source of systematic error or noise).  In his chapter entitled "Design Issues for Controls" (a chapter cited by Dr. Dennis[246]), Dr. Rappeport explains various factors that *necessitate a survey control*, such as the inherent "leadingness" of (even well-designed) survey questions.[247]

196.    Dr. Dennis's citation of Dr. Rappeport's chapter concerning preexisting beliefs is misleading, as the Dennis Declaration fails to mention that Dr. Rappeport discusses the "problem" of preconceptions precisely in the context of *how controls address this problem and why employing proper survey controls is necessary*.  For example, after discussing preexisting beliefs, the cited chapter expounds on the purpose of controls in a section entitled "Good Design—The Concept of Controls":[248]

Whether talking about line-ups or medical tests or evidentiary surveys, the key design idea that allows us to account for the artifacts introduced by the experiment or test is **for the methodology used for the control stimulus to incorporate all the experimental artifacts that also occur in the methodology used for the test stimulus, but remove the effect of the test stimulus itself**. Therefore, a comparison of the results for the test stimulus and control stimulus situations allows the following syllogism:

---

[245] *Id.*, p. 216.
[246] Dennis Declaration, ¶¶ 55 – 56, citing to Rappeport (2012).
[247] Rappeport (2012), pp. 219 – 220.
[248] *Id.*, pp. 223 – 224.

- The results using the test stimulus measure consumer reactions to all aspects of the survey design and questionnaire, including **the effect of the stimulus at issue, any survey artifacts (including the "leading" inevitable in any survey), and any preconceptions of interest**.
- The results using the control stimulus measure consumer reactions to the same survey design and questionnaire, except not including the effect of the stimulus at issue.
- The difference between the two predicts *with reasonable reliability* what the difference in the effects of the test and control stimuli would be in the real world.

In other words, since the survey procedures are the same in all other aspects, any difference in the results for the test and control can reasonably be attributed to the claimed infringing or misleading aspects of the test stimulus. As a result, **if we subtract the control stimulus results from the test stimulus results, we are left with a reasonably reliable prediction of the degree to which the test stimulus is infringing or misleading**. Corresponding to the idea that any guessing and/or other survey artifacts can be understood as "noise" in the experiment, the calculated result is generally described as "net of noise." [Emphases added]

197. Dr. Rappeport also discusses the importance of controls in the context of false advertising, noting that "in false advertising cases control cell designs are appropriate, and indeed are by far the most-used approach."[249] In cases where "preconceptions are believed to play a critical role in consumer perceptions"[250] of an advertisement (*e.g.*, a series of TV commercials run by Wendy's that "were extremely memorable for a wide audience"[251]), Dr. Rappeport similarly prescribes the inclusion of a control stimulus (or stimuli), such as a modified commercial that removes the ad's allegedly misleading aspects.[252]

198. Multiple additional sources and survey treatises provide further commentary on the necessity of survey controls (including specifically as a means of accounting for, or "separating out,"[253] preexisting beliefs), while cautioning against surveys that lack controls.[254]

---

[249] *Id.*, p. 228.

[250] *Id.*, p. 229. Note that Dr. Dennis provides no substantiation or empirical evidence for why preconceptions (or preexisting beliefs) are a concern in the Kivetz Survey.

[251] *Id.*, p. 230.

[252] *Id.*, pp. 229 – 231.

[253] *See, e.g.*, Keller (2012), pp. 182 – 183.

[254] In the interest of brevity, I reference, rather than discuss in greater detail, these sources below: *see, e.g.*, Swann (2012), pp. 373 – 374; Diamond (2011), p. 401; Jacoby (2013), "The Fundamental of Scientific Research," pp. 219 & 221; Jacoby, Jacob (2013), "Settings, Stimuli, and Tasks," in *Trademark Surveys: Designing, Implementing, and Evaluating Surveys (Vol. 1)*, Jacoby, Jacob (ed.), Chicago, IL: American Bar Association, p. 530; Jay (2013), pp. 1140, & 1144 – 1146; Keller (2012), pp. 182 – 184.

199.     Overall, Dr. Dennis's argument that the Kivetz Survey's cause-effect (or "test-control") experimental design did not control for preexisting beliefs is not only *unsubstantiated* but is directly *contradicted* by multiple survey treatises and sources, including those referenced (and relied upon) in the Dennis Declaration.

**D.2.4.** *Dr. Dennis's Proposed "Corrective Steps" for the Kivetz Survey are Inappropriate, Would Result in a Flawed and Biased Survey, and Evinces Dr. Dennis's Fundamental Misunderstanding of Survey Design*

200.     Dr. Dennis proposes a number of what he calls "known corrective steps"[255] that I should have supposedly taken in order to account or control for consumers' preexisting beliefs.  However, as detailed below, taking such supposed "corrective steps" would be fundamentally inappropriate and would give rise to a flawed and biased survey.

201.     *First*, Dr. Dennis's suggestion to use a "fictitious" or "brand-neutral" product is completely improper.  In his declaration, Dr. Dennis asserts:[256]

> To control for respondents' prior personal experience with and beliefs about the Defendants' products, Dr. Kivetz could have created a brand-neutral product packaging as an alternative to the Fisher-Price-branded product packaging he used. By this means, Dr. Kivetz could have avoided the systematic distortion in responses caused by consumers' reliance on preconceptions about the Fisher-Price-branded products.

202.     As an initial matter, Dr. Dennis did not use a brand-neutral stimulus in his own survey, instead presenting incomplete, truncated panels from the same disputed Fisher-Price product tested in the Kivetz Survey.[257]  When asked at his deposition why he did not use a brand-neutral stimulus in his survey, Dr. Dennis claimed that he did not need to because he is "not using experimental design methodology."[258]  Such an argument is completely unfounded, erroneous, and unscientific.  I am unaware of any

---

[255] Dennis Declaration, ¶ 42.

[256] *Id.*, ¶ 61.

[257] *See* Subsection C.5 of this *Rebuttal Expert Report*.

[258] Dennis Deposition, pp. 240 – 241 ("Q. […] Why is it unimportant for you not to use a fictitious product name in your survey?  A. Because my design's very different. I'm not using a dose response. I'm not using experimental design methodology. I'm actually trying to collect direct measurement of what consumers think of this product packaging directly as it is. I'm not – I don't have the cause-and-effect methodology design that Dr. Kivetz has.").

survey treatise or academic literature that prescribes the use of brand-neutral stimuli for experimental designs (let alone *exclusively* for experimental designs).[259]

203.    Contrary to Dr. Dennis's suggestion, it is nonstandard and completely inappropriate for a researcher to use fictitious or "brand-neutral" brands in order to control for participants' preexisting beliefs in a survey designed to test the impact of alleged misrepresentations and omissions on consumers' perceptions and purchase decisions.  In the present litigation, the research question at issue concerns the effect of the alleged "sleep-related" misrepresentations and omission on *the disputed Fisher-Price products and packaging as they were sold in the actual marketplace.*  Consumers' acquired beliefs about and attitudes toward the Fisher-Price brand and product packaging are entirely relevant to the research question and any deception that allegedly occurred in the marketplace, and thus should *not* be "sterilized."  In other words, participants *should* enter a survey with whatever attitudes, opinions, or expectations about the Fisher-Price brand they may hold—just as the putative class members may have had preconceptions regarding Fisher-Price when they encountered the disputed products in the marketplace.

204.    To the extent that a consumer has preconceptions of a particular brand, the causal effect for that consumer of any given representation on that brand's product packaging could be different than the effect of the same representation on the package of an unbranded product.  However, this is exactly why challenged claims and representations must be tested in the context of the full packaging on which they appear.  Removing brand indicia from a packaging stimulus would violate the fundamental principle that a survey and its stimuli approximate marketplace conditions.[260]  Further, as explained in the preceding subsection, the necessity of testing a stimulus, such as a disputed product's

---

[259] While Dr. Dennis alluded vaguely to seeing "references before in the literature to the use of fictitious brands as a way to control for preexisting attitudes and opinions" (*id.*, p. 185), he failed to name or identify a single source that substantiates his claim.
[260] *See, e.g.*, *McCarthy* (2007), §32:163.

packaging, *in context* (*i.e.*, while accounting for the importance of brand and other preexisting beliefs to consumers) is one reason why a survey control is necessary.

205.    *Second*, Dr. Dennis's suggestion of "statistically controll[ing] for past experience and brand favorability"[261] is inappropriate and unnecessary given the test-control experimental design that the Kivetz Survey employed.  Because participants in the Kivetz Survey were randomly assigned to either the test or control groups, the level and type of preexisting beliefs, as well as "past experience and brand favorability," would be present at *equivalent* levels (and therefore, be controlled for) across the test and control groups.

206.    The fact that some survey participants may not have been, as Dr. Dennis claims, "sensitive to the use of one or more litigated claims"[262] is precisely the point: To the extent that consumers in real life purchase baby products based on factors *other than* the alleged "sleep-related" misrepresentations—such as the Fisher-Price brand or packaging appeal—then the alleged misrepresentations are *not* material to their purchase decisions in the actual marketplace.  Indeed, the results of the Kivetz Survey demonstrate that, consistent with academic and industry research, consumers rely on multiple factors unrelated to the alleged "sleep-related" misrepresentations—including brand equity—when considering products such as the disputed Fisher-Price products.[263]  As Dr. Dennis recognizes,[264] consumers who already hold positive brand associations with Fisher-Price are less likely to be affected by the alleged "sleep-related" packaging misrepresentations. Dr. Dennis characterizes these consumers as participants who are "tainted by their past exposure to and awareness of the Defendants' products."[265]  However, the opinions of such consumers—who represent the state of mind of at least some putative class

---

[261] Dennis Declaration, ¶ 60.
[262] *See*, *e.g., ibid.*
[263] *See* Subsection D.2 of my June 16, 2021 *Expert Report*.
[264] *See* Dennis Declaration, ¶ 60.
[265] *Id.*, ¶ 51.

members—are directly relevant to the materiality (or lack thereof) of the alleged "sleep-related" misrepresentations and omission, and should be included in the analysis.

207. *Third*, Dr. Dennis's suggestion that the Kivetz Survey should have instructed participants to "base their answers exclusively on the product images"[266] is highly improper; such a leading instruction would induce a focalism bias and grossly violate marketplace conditions.[267]  In a survey intended to test for the materiality of alleged packaging misrepresentations and/or omission (such as the Kivetz Survey), it is *not* appropriate to artificially focus participants on the product packaging, or to direct participants to base their answers solely on the packaging.  The Kivetz Survey appropriately and adequately exposed participants to the package stimulus, in accordance with how the putative class members had typically encountered the challenged packages in the marketplace.[268]

208. *Fourth*, Dr. Dennis's suggestion of using a "manipulation check" is inappropriate when applied to the Kivetz Survey.  In his declaration, Dr. Dennis opines, citing from two sources:[269]

> Researchers using experimental designs commonly use "manipulation checks" to assure that their designs have internal validity:
>
> > A manipulation check is a test used to determine the effectiveness of a manipulation in an experimental design. Researches [*sic*] incorporate manipulation checks when using experiments to ensure participants perceive, comprehend, and/or react as expected to the portion of the manipulation of interest contained within the independent variable.
> >
> > If a manipulation check fails…, this result indicates that the researchers did not make the manipulation of interest obvious enough to

---

[266] *Id.*, ¶ 65.

[267] *See* Subsection C.5 for a discussion of the severe problems with such an approach.

[268] In the introduction to the Kivetz Survey's main questionnaire, participants were instructed to, among other things, "examine the baby product, just as you would if you were considering buying such a product" and to "[t]ake as much time as you would normally do when considering buying such a product." Participants were then shown a 3-dimensional, 360-degree rendering of a Fisher-Price package (either a "test" or "control" package) and given instructions on how to rotate and view other sides of, move, and enlarge or reduce the size of, the package.  *See* Exhibit D (pp. 6 – 7) to my June 16, 2021 *Expert Report*. While answering the purchase likelihood question (Q.30), participants were free to examine the product again by clicking on a link that opened a pop-up window on the same screen; *see id.*, p. 8.

[269] Dennis Declaration, ¶ 63.

participants…. [I]t does suggest that participants were not aware of the subtleties of the stimulus they encountered.

Since Dr. Kivetz did not conduct a manipulation check (such as those noted above), there is no assurance that Dr. Kivetz's attempted manipulation was "powerful enough to allow testing" of his hypothesis that the litigated claims were not material to purchase likelihood. [FNs omitted]

209.    Dr. Dennis's above assertions are erroneous and reveal a fundamental misunderstanding of what manipulation checks are and when they should be used in survey research.[270]   In fact, the two aforementioned sources cited in the Dennis Declaration do *not* state that manipulation checks are appropriate for *all* experimental designs as a general rule, as Dr. Dennis claimed at his deposition.[271]   For example, the 2017 Hoewe chapter cited by Dr. Dennis describes the following example of a situation in which a manipulation check is relevant:[272]

[A] researcher might want to determine the influence of music on individuals' enjoyment of an advertisement. Participants in the control condition might watch an advertisement with music the researcher deems to be neutral (or no music at all), while participants in the experimental condition would watch the same advertisement but with music the researcher believes should make people happy. […] An appropriate manipulation check would have asked participants if the music had an influence on their mood states (e.g., made them happy). If individuals who listened to the happy-mood-inducing music did not rate themselves as happier than participants who listened to neutral or no music, the study's manipulation was not successful. In this case, it would be inaccurate for the researcher to state that music does not influence individuals' enjoyment of advertisements. In fact, the researcher can only confidently conclude that the music he or she selected was not effective in altering the mood state of participants.

---

[270] Dr. Dennis's deposition testimony similarly indicates a striking lack of understanding regarding what a manipulation check is as well as why/when they are used in survey research.  *See* Dennis Deposition, pp. 243 – 245 ("Q. What is a 'manipulation check'?  A. It's – it's something that's in the experimental methods – in the literature, it's pretty clear that it's a – it's a useful thing to do. The idea is to collect supplemental information in the survey to verify, or not, that the consumers are behaving in ways that are consistent with their preferences and their beliefs. So in the experimental design that Dr. Kivetz employed, there is one product that's got that 'sleeper' message in it, right? So the hypothesis is that, for those research subjects that saw the 'sleeper' message, that would – and also they indicated a high purchase likelihood for the product; that to – to see if that hypothesis is true that the 'sleeper' content caused the purchase likelihood, it's useful to have some supplemental data collected on the extent to which people rate 'sleeper' as – as an important attribute to them. So it's a way to verify, or not, whether their responses to the purchase likelihood questions are consistent with a parallel data collection on the consumer's preferences.").
[271] *Id.*, p. 243 ("Q. When are manipulation checks appropriate?  A. My understanding is that it's appropriate for the experiment design. I think the quotation I put in here makes exactly that point.").
[272] Hoewe, Jennifer (2017), "Manipulation Check," in *The International Encyclopedia of Communication Research Methods*, Matthes, Jörg, Christine S. Davis, and Robert F. Potter (ed.), John Wiley & Sons, Inc., p. 2.

The author then writes, in a passage ignored by Dr. Dennis:[273]

> Despite the potential benefits of including manipulation checks in experiments, there are instances when they may not be advantageous. **If the manipulated independent variable contains a distinction that is determined to be better assessed by the researcher's own measurement of it, participants' assessment of that manipulation may be unnecessary.** For example, if a researcher is interested in the effects of message length, the researcher can gauge the actual length of the communicated message without consulting participants. That is, **the researcher can control the actual length of the message (e.g., number of words, length of time) and know for certain that the desired manipulation was achieved.** On the other hand, the researcher may be interested in participants' *perception* of the length of the message. In this case, a manipulation check would allow the researcher to examine if participants considered the message length in accordance with the message's actual length. Either way, it is up to the researcher to decide if a manipulation check is advantageous for the study.  [Emphases added]

210.    Similarly, the Dennis Declaration's citation to a 2008 article by Royne[274] selectively quotes from the underlying source, removing a crucial caveat that appears in between the sentences quoted by Dr. Dennis.  The full paragraph of the article reads as follows (with the sentence omitted by Dr. Dennis highlighted in bold text):[275]

> In the quest for internal validity, one key aspect of control is the manipulation.  That is, there must be a strong and realistic manipulation that is an accurate representation of the phenomenon being studied.  **Consequently, a manipulation and/or a confound check becomes extremely important when the manipulation is latent.**  If a manipulation check is not conducted, there is no assurance that an actual manipulation even existed, let alone a manipulation that is powerful enough to garner variation to allow for testing of the stated hypotheses.  [Emphasis added]

211.    The aforementioned excerpts clarify the role of manipulation checks, refuting Dr. Dennis's claim that manipulation checks are categorically necessary for experimental research designs.  The academic literature indicates that manipulation checks can be appropriate in situations involving *hypothetical constructs*,[276] such as when a manipulation

---

[273] *Id.*, pp. 3 – 4.

[274] Dennis Declaration, ¶ 42 & FN 18, citing to Royne, Marla B. (2008), "Cautions and Concerns in Experimental Research on the Consumer Interest," *Journal of Consumer Affairs*, 42(3), 478 – 483 (pp. 479 – 480).

[275] Royne (2008), pp. 479 – 480.

[276] A hypothetical construct, frequently studied in experimental psychology, is a variable that "tend[s] to designate unobserved cognitive states, process, or dispositions, which may provide explanations for an observable cognitive or behavioral phenomenon"; Gruijters, Stefan (2021), "Making Inferential Leaps: Manipulation Checks and the Road Towards Strong Inference," *Journal of Experimental Social Psychology*, 98, 1 – 9 (p. 2).  *See also* Lovasz, Nathalie and Kathleen L. Slaney (2013), "What Makes a Hypothetical Construct 'Hypothetical'? Tracing the Origins and Uses of the 'Hypothetical Construct' Concept in Psychological Science," *New Ideas in Psychology*, 31(1), 22 – 31; MacCorquodale, Kenneth

is intended to change an internal mood state or other psychological variable. However, when a manipulation is *not* latent, is directly observable, and is under the control of the researcher, manipulation checks are unnecessary and may even be problematic.[277]

212. Figure 10 below illustrates a conceptual model based on Hoewe's example (whose chapter is cited by Dr. Dennis), which depicts a case in which a manipulation check is appropriate. Here, the researcher is interested in the causal impact of mood (specifically, a happy compared to neutral mood) on rated enjoyment of an advertisement, but cannot be sure that playing happy music in an advertisement will sufficiently induce a happy mood among the "test" group participants (compared to playing neutral or no music for the "control" group participants). In this case, it is useful to conduct a manipulation check to assess whether the manipulation had the desired effect (*i.e.*, that playing happy compared to neutral music during an ad indeed stimulated happier moods).

**Figure 10: A Conceptual Model of Testing the Causal Impact of Mood on Ad Enjoyment**



and Paul E. Meehl (1948), "On a Distinction Between Hypothetical Constructs and Intervening Variables," *Psychological Review*, 55(2), 95 – 107. Examples of hypothetical constructs include concepts such as guilt, fear, perceived effort, choice conflict, and perceived product similarity. In my own research, I have studied such hypothetical or psychological constructs and have used manipulation checks *when necessary and appropriate*. *See, e.g.*, Rom Schrift, Ran Kivetz, and Oded Netzer (2016), "Complicating Decisions: The Work Ethic Heuristic and the Construction of Effortful Decisions," *Journal of Experimental Psychology: General*, 145(7), 807 – 829 (Lead article); Schrift, Rom, Oded Netzer, and Ran Kivetz (2011), "Complicating Choice," *Journal of Marketing Research*, 48(2), 308 – 326 (*Winner*, 2010 *Best Competitive Paper Award, Society of Consumer Psychology*); Gershoff, Andrew, Ran Kivetz, and Anat Keinan (2012), "Consumer Response to Versioning: How Brands' Production Methods Affect Perceptions of Unfairness," *Journal of Consumer Research*, 39(2), 382 – 398.

[277] *See, e.g.*, Hauser, David J., Phoebe C. Ellsworth, and Richard Gonzalez (2018), "Are Manipulation Checks Necessary?", *Frontiers in Psychology*, 9, 1 – 10.

213. By contrast, a manipulation check would have been entirely redundant and inappropriate for the Kivetz Survey. This is because for a survey such as the Kivetz Survey, the question of the materiality of specific packaging claims is exactly what Hoewe indicates that the researcher can "confidently conclude."[278] Specifically, as set forth in my June 16, 2021 *Expert Report*, the Kivetz Survey tested the materiality of the alleged "sleep-related" misrepresentations and omission by showing participants either a "test" or "control" package (*i.e.*, the "manipulation") and comparing participants' purchase intentions (*i.e.*, the "dependent variable"). The "control" stimulus remedied the alleged "sleep-related" misrepresentations and omission by (*i*) removing from the disputed packaging all textual and visual references to sleep; and (*ii*) adding a statement to the front of the package that read: "This product is not intended for sleeping."[279]

214. The Kivetz Survey was designed to test *whether* the presence (vs. absence) of the alleged packaging misrepresentations affects consumers' purchase intentions. Dr. Dennis presumably is suggesting that the Kivetz Survey is only valid if more participants perceive the test package (compared to the control package) to communicate "sleep-related" messages and/or that such messages are important. Thus, using a manipulation check in this case would (inappropriately and tautologically) *assume* the Plaintiffs' allegations rather than *test* these allegations.

215. To conduct a manipulation check for the "manipulation" employed in the Kivetz Survey would be entirely redundant and nonsensical, as it would be tantamount to checking whether "test" participants were indeed exposed to the "test" stimulus (*i.e.*, an original, allegedly deceptive Fisher-Price package), while "control" participants were indeed exposed to the "control" stimulus (*i.e.*, an otherwise identical Fisher-Price package except with the allegedly deceptive elements removed). The fact that the intended stimuli changes were made and shown to participants is easily observed and independently

---

[278] Hoewe (2017), p. 2.
[279] *See* Subsection C.4 and Exhibits G.1 and G.2 of my June 16, 2021 *Expert Report*.

verifiable, and does *not* require any input from participants.  Overall, contrary to Dr. Dennis's suggestion, it would be highly nonstandard, improper, tautological, and possibly leading to include a manipulation check for a survey such as the Kivetz Survey.

D.3.  Response to the Dennis Declaration's Criticism of the Kivetz Survey's Control

216.  Dr. Dennis argues that the Kivetz Survey used an "improper control stimulus"[280] that fails to make "radical"[281] enough changes and that "shares the same false and deceptive characteristics as the original packaging of the Defendants' products."[282] Contrary to Dr. Dennis's contention, the Kivetz Survey used a proper control stimulus, one that followed standard survey principles and that appropriately isolated the impact of the alleged "sleep-related" misrepresentations and omission on consumers' purchase decisions.  Further, as enumerated below, Dr. Dennis's objections and claims regarding the Kivetz Survey's control are unjustified, erroneous, and at odds with both the Plaintiffs' allegations and with the opinions of Mr. Silverman.

217.  *First*, Dr. Dennis claims that the Kivetz Survey's control stimulus made only "slight changes"[283] and "minor alterations"[284] to the Fisher-Price packaging, without any substantiation for how or why such changes were "slight" or "minor."  As documented in Subsection C.4 of my June 16, 2021 *Expert Report*, the Kivetz Survey's "control" stimulus was modified in numerous respects relative to the "test" stimulus (which consisted of an original, allegedly deceptive Fisher-Price product package).  Figures 11a and 11b below reproduce the package flats corresponding to the test and control packages, respectively, used in the Kivetz Survey (the red ovals highlight differences between the test vs. control packages).

---

[280] Dennis Declaration, ¶ 67.
[281] *Id.*, ¶ 68.
[282] *Id.*, ¶ 69.
[283] *Id.*, ¶ 59.
[284] *Id.*, ¶ 69.

**Figure 11a: Package Flat of the "Test" (*i.e.*, Allegedly Deceptive and Unaltered) Fisher-Price Package [285]**



[285] *See* Exhibit G.1 to my June 16, 2021 *Expert Report*.

**Figure 11b: Package Flat of the "Control" (*i.e.*, Revised) Fisher-Price Package** [286]

[286] *See* Exhibit G.2 to my June 16, 2021 *Expert Report*.

218.    The table below summarizes all of the changes made to the control package (vis-à-vis the test package) in the Kivetz Survey.

**Revisions Made to the Original (*i.e.*, Allegedly Deceptive) Fisher-Price "Test" Package to Construct the "Control" (*i.e.*, Revised) Package in the Kivetz Survey**

| "Test" (*i.e.*, Allegedly Deceptive) Package | "Control" (*i.e.*, Allegedly Deceptive) Package | Location on Package | Number of Revised Instances |
|---|---|---|---|
| Rock 'n Play Sleeper | Rock 'n Play Soother | Front, top, left and right sides, bottom | 5 |
| sleeper(s) | soother(s) | Back | 2 |
| Extra-plush fabrics for extra-comfy sleep | Extra-plush fabrics for extra-comfy soothing | Front | 1 |
| Baby + Sleep = Happier, Healthier Baby (& Parents)! | Baby + Soothing = Happier, Healthier Baby (& Parents)! | Diagonal corners | 2 |
| […] for playtime and sleep | […] for playtime and soothing | Back | 1 |
| Baby can sleep at a comfortable incline all night long! | Baby can be soothed at a comfortable incline anytime! | Front | 1 |
| […] help baby get the rest they need | […] help baby get the soothing they need | Back | 1 |
| […] for a successful night's sleep! | […] for successful soothing anytime! | Back | 1 |
| Image of baby with eyes closed | Image of baby with eyes open | Front, top, back | 4 |
| Image of bed | Image of sofa | Front, top, left and right sides, back | 6 |
| Image of mom laying in bed | Image of mom sitting on sofa | Front, top, back | 3 |
| Use only with an infant unable to roll over or pull up on sides, whichever comes first. | This product is not intended for sleeping. Use only with an infant unable to roll over or pull up on sides, whichever comes first. | Front | 1 |

219.    As I later discuss in Section E, it is noteworthy that Plaintiffs' expert, Mr. Silverman, conjectured that virtually *every* one of the aforementioned "sleep-related" representations and imagery would be "material" to consumers' purchase decisions.  For example, Mr. Silverman opines as follows:[287]

> Specifically, I am of the opinion that the following statements or images, each of which appears on Defendants' packaging and marketing communications, would be material to a reasonable consumer when considering whether or not to purchase a Rock 'n Play product:
>
>   a.   The name "Rock 'n Play Sleeper" defines the product.  The words "rock" and "play" are adjectives; "sleeper" is a noun.  Simply stated, it is a SLEEPER.

---

[287] Silverman Report, ¶ 34.

Further, "Rock 'n Play Sleeper" would convey must more to consumers than just the name of Defendants' product; it would convey a material benefit to them;

b. The claim "Baby can sleep at a comfortable incline all night long!", would be material to consumers;

c. The claim "Extra-plush fabrics for extra-comfy sleep," would be material to consumers;

d. The claim "Nighttime sleeper and playtime seat" would be material to consumers;

e. The images of infants sleeping in Rock 'n Play Sleepers, as well as images of a mom curled up in her bed immediately next to a sleeping infant in a Rock 'n Play Sleeper, would be material to consumers; and

f. The Fisher-Price logo displayed on the Rock 'n Play Sleeper packaging would be material to consumers.

g. The safety information Plaintiffs allege was omitted from Defendants' packaging and other marketing communications, including messaging conveyed to consumers by its influencers, would have been material to consumers.

220. According to Mr. Silverman's reasoning, the Kivetz Survey's control package—which removed numerous elements, including numerous elements deemed by Mr. Silverman as "material" on their own—could hardly be characterized as a stimulus with only "slight" changes.

221. Dr. Dennis's argument that changing a product's name, as well as *all* of a package's textual and visual references to sleep, amounts to only "slight" changes is not only unsubstantiated and contradicted by the opinions of Mr. Silverman, but also misses the point of a survey control. I constructed the Kivetz Survey's control stimulus following standard, fundamental principles of survey design. In particular, I modified *only* those aspects of the disputed Fisher-Price packaging that pertained to the "sleep-related" misrepresentations and omission *alleged by the Plaintiffs*. The fact that the Kivetz Survey's test and control stimuli were otherwise identical allows for the researcher to isolate the impact attributable to the alleged misrepresentations and omission. Notably, it is well-recognized that a survey's control stimulus should be as similar as possible to the test stimulus but for the element at issue (here, the challenged

packaging misrepresentations and omissions).  As Professor Diamond states regarding

the construction of proper controls:[288]

> The general principle for choosing an appropriate control is easily stated: It should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.

Similarly, the late Professor Jacoby indicated in a treatise on trademark surveys:[289]

> Strong controls are those that maximize the similarity between the control stimulus and the test stimulus.

222.  *Second*, Dr. Dennis criticizes the Kivetz Survey as "inappropriately us[ing]

a control stimulus that contains the same false and deceptive characteristic as the original

packaging of the Product."[290]  In particular, Dr. Dennis makes the following assertions:[291]

> […] Dr. Kivetz's use of the "soother" word to replace the "sleeper" descriptor falls well short of the cure of what is needed to create a product packaging that no longer communicates that the product is safe for sleeping. The fact is, as every parent who has raised children knows, babies sleep a lot. To get them to settle down for sleep, the first step is to calm and "soothe" them. "Soothing" is on the critical path of obtaining sleep for babies. […] By replacing the word "sleeper" with "soothing," Dr. Kivetz did not change the product to such a radical extent that it no longer communicates that the product is not intended to achieve the ultimate objective of a calm, resting, and sleeping baby.

And:[292]

> Without any scientific basis and defying all we know about the role of advertising in our economy, Dr. Kivetz actually assumed that the impact of decades of consumers' exposure to the test-group packaging could be erased by his minor alterations to the control group packaging, as if replacing "sleeper" with "soother" could undo decades of advertising promising a product that helps babies sleep – and sleep safely.

223.  At his deposition, Dr. Dennis similarly testified:[293]

> I think my objections still stand about "soother." Even if Dr. Kivetz's survey legitimately tests for the impact of sleep-related representations versus soother, I think I would still have the same opinion because soother, in my opinion, and the act of soothing a child inevitably does lead to the sleep outcome.

224.  The aforementioned assertions, however, are purely speculative.  Dr.

Dennis provides *no* empirical evidence or scientific analysis for any of the following

---

[288] Diamond (2012), p. 210.
[289] Jacoby (2013), "Settings, Stimuli, and Tasks," p. 506.
[290] Dennis Declaration, ¶ 39(f).
[291] *Id.*, ¶ 68.
[292] *Id.*, ¶ 70.
[293] *Id.*, ¶ 148.

hypotheses: (*i*) that "the act of soothing a child inevitably does lead to the sleep outcome";[294] (*ii*) that consumers would perceive a "soother" and a "sleeper" to both communicate that the product is "intended to achieve the ultimate objective of a calm, resting, and sleeping baby";[295] (*iii*) that consumers who participated in the Kivetz Survey were impacted by "decades of […] exposure to the test-group packaging";[296] (*iv*) that the changes made to the Kivetz Survey's control stimulus amounted to "minor alterations";[297] and (*v*) that "decades of advertising" communicated to participants a common message of a product that "helps babies sleep – and sleep safely."[298]

225.    For example, Dr. Dennis's speculation about the effect of "decades of advertising" on my survey's participants is not only unsubstantiated but also implausible. Dr. Dennis appears to argue that participants in the Kivetz Survey were so familiar with the disputed Fisher-Price products' packaging that they were desensitized to the multiple packaging modifications that I made to the control stimulus.  However, such an argument would mean that consumers assumed that Fisher-Price baby products offered the alleged "sleep-related" misrepresentations based purely on prior exposure or experience, *whether or not* a package actually displays such claims.  This amounts to an assumption that when consumers evaluate a branded product, they can remember the packaging and advertising claims they have encountered in the past for that brand and they presume that these past claims still apply (regardless of the recency of the information presented).

226.    Academic literature on the limitations of human memory[299] casts further doubt on Dr. Dennis's above speculation.  Research has shown that memory decays over time, even when the event or behavior is important and distinctive.  For example, while

---

[294] *Ibid*.
[295] *Ibid*.
[296] *Ibid*.
[297] *Ibid*.
[298] *Ibid*.
[299] Academic research demonstrates that human memory is rather limited and systematically decreases with time.  *See, e.g.*, Anderson (1985).

only 3% of respondents fail to recall their hospitalization when interviewed within ten weeks of the hospitalization, 42% fail to do so when interviewed after one year.[300]  The behaviors and outcomes at issue in the present litigation (*i.e.*, purchasing durable baby products) are not more important or unique relative to a hospitalization episode.  Thus, the degree of forgetting among consumers about baby products purchased (and any advertising or packaging claims seen) in the past 12 years[301] is likely to be much greater than among people interviewed one year after an episode of hospitalization.  Indeed, many of the named Plaintiffs in this litigation testified that they did not see or could not recall specific claims about the disputed products via either the product packaging or advertising seen prior to the purchase.[302]

227.    In addition, participants' verbatim responses in the Kivetz Survey refute Dr. Dennis's conjecture.  In particular, *very few* participants in my survey (*i.e.*, only 11.5% and 4.3% of "test" and "control" participants, respectively) mentioned anything related to the product being suitable or good for sleep as a reason to purchase the product.[303]  If, as Dr. Dennis suggests, consumers had previously learned that the product was primarily for sleep, and then applied that knowledge to the product regardless of the current packaging, then we would expect the majority of participants to mention sleep in their purchase explanations in both the test and control conditions.  Instead, very few participants in either condition mentioned sleep.

228.    Moreover, Dr. Dennis's speculation regarding preexisting beliefs and "decades of advertising" and exposure to the disputed products' packaging would *not* apply to first-time purchasers who may never have seen or even heard of the disputed

---

[300] *See* Schwarz, Norbert and Daphna Oyserman (1992), "Asking Questions About Behavior: Cognition, Communication, and Questionnaire Construction," *American Journal of Evaluation*, 22(2), 127 – 160.
[301] The putative class period extends from 2009 to the present; *see Complaint*, ¶¶ 244 – 261.
[302] *See, e.g.*, Barton Deposition, pp. 213 – 219; Drover Deposition, pp. 61 – 67; Hanson Deposition, pp. 104 – 108; Huey Deposition, pp. 135 – 138; Mandley Deposition, p. 86; Mulvey Deposition, pp. 47 – 48; Pasternacki Deposition, pp. 59 – 60; Simmonds Deposition, pp. 88 – 89; Wray Deposition, pp. 152 – 153.
[303] *See* my June 16, 2021 *Expert Report*, Exhibit J, Table 2, pp. 8 – 9.

products. Given that the products at issue are durable and not frequently purchased by the same consumer, many of the putative class members were likely to be first-time purchasers of the disputed products.

229. The Dennis Declaration's assertion that "soother" and "sleeper" would communicate similar messages to consumers is also unsubstantiated. Indeed, at his deposition, Dr. Dennis admitted that he was neither aware of, nor conducted any, research on whether consumers perceive the "soother" and "sleeper" product descriptors to be similar, and that he instead based his opinion on his "own parental experiences."[304]

230. *Third*, Dr. Dennis's contention that the Kivetz Survey's "Soother" control package is insufficiently distinct from the test "Sleeper" package is not only unsubstantiated, but also inconsistent with the Plaintiffs' allegations, as well as with the report and testimony of Mr. Silverman. For example, the Complaint specifically contrasts the Rock 'n Play *Sleeper* with the Rock 'n Play *Soother*, citing to a proposed re-positioning of the products as a "Soother" in Australia:[305]

> In March 2011, Defendants' affiliate in Australia provided new box graphics to the Queensland Fair Trading Office eliminating references to overnight sleeping and proposing to call the product a "Soother" instead of a "Sleeper."

> Ultimately, however, Defendants decided, rather than to change their marketing, to withdraw the product from sale in Australia.

---

[304] Dennis Deposition, p. 247 ("Q. Have you done any testing to determine whether consumers understand 'soothe' to be the same as 'sleep'? […] A. No, I have not. It's based on the experience that I – I mentioned earlier and – yeah, I think we've covered that ground. BY MR. KANNY: Q. This – well, jog my memory because I don't know that I actually got that experience that we talked about earlier. A. Well, we had a back-and-forth where **I relied on my own parental experiences that soothing a child inexorably leads to their actually sleeping, and I, of course, am not a sleep expert in children**. [Emphasis added]) . *See also id*., pp. 163 – 164 ("A. […] In my expert opinion, there was not enough daylight between those two concepts [a sleep-related representation versus a soother] to provide an adequate comparison and test of the plaintiffs' theory. Q. And do you have any empirical evidence that supports your conclusion? […] THE WITNESS: No. I would need to probably do a survey about soother as a representation and – BY MR. KANNY: Q. Are you aware of any academic research that supports your conclusion? A. No, not at this time. Q. Are you aware of any studies performed by others that support your conclusion? A. I'm not aware of research done on this topic specifically. Q. And you have done no research on this specific topic either, correct? […] THE WITNESS: I have not done that yet").

[305] *Complaint*, ¶¶ 135 – 136.

231.    The Plaintiffs similarly contrast Fisher-Price's marketing of the disputed products as a "Soothing Seat" in Canada with the allegedly deceptive marketing of the products as a "Sleeper" in the U.S.:[306]

> The Rock 'n Play is available in Canada but is not called a "sleeper." Defendants market and sell it in Canada as the "Rock 'n Play Soothing Seat."

> Fully aware of the AAP's guidelines and the objections of Australia and Canadian regulators, Defendants continued to market the product in the U.S. as an overnight sleeper even after 2011. […]

232.    Dr. Dennis's position that a product described as a "soother" is not sufficiently distinguished from one described as a "sleeper" is also diametrically opposed to Mr. Silverman's opinions in this litigation.  In his report, Mr. Silverman stated that he viewed soothers and sleepers as "two, <u>completely differently positioned products</u>,"[307] further opining:[308]

> A "soother" is not a sleeper; its primary purpose is to soothe a cantankerous infant. If you Google "baby soothers," you will not see sleepers. […] While a "soother" may help settle a baby and therefore invite sleep, it is not a "sleeper."

And:[309]

> […] the Rock 'n Play Sleeper line probably generated more than $280 million dollars in retail sales before the products were recalled in 2019. Would a Rock 'n Play *Soother* have done as well? In my opinion, probably not.

233.    *Fourth*, the Dennis Declaration's criticisms of the Kivetz Survey's disclaimer are erroneous and unjustified.  Recall that in creating the control stimulus, I not only removed from the disputed product's package all textual and visual references to "sleep," but also added to the packaging front the (disclaimer) statement, "This product is not intended for sleeping."[310]

---

[306] *Id.*, ¶¶ 139 – 140.
[307] Silverman Report, ¶ 139.  Emphasis in the original.
[308] *Id.*, ¶ 141.
[309] *Id.*, ¶ 147.
[310] *See also* Exhibit G.2 to my June 16, 2021 *Expert Report*.  Note that the statement "This product is not intended for sleeping" was added to appear immediately above the text on the lower right of the packaging front: "Use only with an infant unable to roll over or pull up on sides, whichever comes first."

234.    The Kivetz Survey used an appropriate, non-leading, and realistic (*e.g.*, commercially viable) disclaimer that is representative of what consumers would typically (if at all) encounter in the marketplace.[311]  Indeed, my disclaimer is conservative in that, unlike the statements appearing on competitor inclined baby products, the disclaimer I chose: (*i*) is presented on the front panel of the package (*i.e.*, as opposed to on the back or bottom panels); and (*ii*) uses language that covers *all* sleep (*i.e.*, as opposed to specifying "prolonged periods of sleeping" or "overnight sleep").  Moreover, my disclaimer is also consistent with the Plaintiffs' alleged omission theory in this litigation, which pertains to the use of the disputed products for *sleep*.[312]

235.    By contrast, a disclaimer of the type that Dr. Dennis espouses—namely, one that warns about the product's alleged inherent danger and safety risks (and which Dr. Dennis inappropriately used in his survey)—would be highly improper and biased. Such a disclaimer not only fails to resemble what consumers would realistically encounter in the relevant marketplace, but it is also extremely leading (*see* Subsection C.2 for a discussion of the multiple serious flaws in the Dennis Survey's "disclaimer").

236.    *Finally*, Dr. Dennis's criticism regarding the Kivetz Survey's control is circular: Because "test" and "control" participants in my survey did not significantly differ in their likelihood of purchasing the disputed products, then Dr. Dennis assumes, based on the results, that participants must not have been sufficiently sensitive to the alleged misrepresentations and omission due to their preexisting beliefs.  Yet, the Kivetz

---

[311] *See* Subsection C.2 of this *Rebuttal Expert Report* for examples of sleep-related disclaimers or warning statements on inclined baby products in the marketplace.

[312] *See, e.g., Complaint*, ¶¶ 140 ("Defendants did not change the package, the user manual, or any of their marketing materials to disclose that the Rock 'n Play Sleeper should not be used for prolonged or overnight sleep and thereby knowingly exposed American babies to the grave risk of injury or death") & 291 ("Defendants also misrepresented facts and made misleading statements and omissions concerning the fitness of the product for safe infant sleep, including prolonged and overnight sleep […]"); *see also Class Certification Motion*, p. 12 ("While touting itself as a brand for safe sleep solutions, Fisher-Price never informed consumers, including Plaintiffs, that the RNPS was unsafe for overnight sleep. Indeed, at no point did Defendants communicate or even suggest that their Sleeper should not be used for overnight sleep to the public or to consumers. Thus, consumers reasonably believed the Sleeper was safe for overnight sleep as advertised and that their infant could sleep safely in the product." [FNs omitted]).

Survey's materiality test was designed exactly to evaluate consumers' sensitivity (or lack thereof) to the alleged "sleep-related" misrepresentations and omission. The Kivetz Survey was capable of detecting and could have found (but empirically did *not* find) a significant difference in participants' purchase intentions.

D.4.  Response to the Dennis Declaration's Claim that a Choice-Based Conjoint Survey Would be the Appropriate Methodology in this Litigation

237.    Rather than the empirical consumer survey that I conducted in this litigation, Dr. Dennis contends that I "should have conducted a choice-based conjoint survey as the appropriate survey-based approach for answering [my] research questions."[313]

238.    Setting aside the fact that Dr. Dennis himself did not conduct such a choice-based conjoint ("CBC") survey to test for the "materiality" (or lack thereof) of the alleged packaging misrepresentations and omission at issue, the Dennis Declaration fails to provide *any* substantiation for the opinion that a CBC survey would be appropriate for this litigation. Instead, Dr. Dennis points to the prior use of conjoint surveys in other applications,[314] and broadly asserts, without any substantiation:[315]

> In my expert opinion, a properly conducted conjoint could have provided more accurate and reliable information than Dr. Kivetz's purchase likelihood survey using a test-control group framework.

239.    Dr. Dennis did not justify or explain why a conjoint survey would have yielded "more accurate and reliable information"[316] compared to the Kivetz Survey. In fact, I was asked in this matter to evaluate whether the alleged "sleep-related" misrepresentations and omission were *commonly material* to the putative class members' purchase decisions regarding the disputed Fisher-Price products. A conjoint survey, which attempts to quantify how much consumers are willing to pay (*i.e.*, consumers'

---

[313] Dennis Declaration, ¶¶ 39(k) & 71.
[314] *Id.*, ¶ 71.
[315] *Id.*, ¶ 76.
[316] *Ibid.*

willingness-to-pay, or "WTP") for a given product attribute or feature,[317] would *not* be an appropriate test of the above research question in this litigation.

D.5. <u>Response to the Dennis Declaration's Other (Unelaborated and Unsubstantiated) Claims Regarding the Kivetz Survey</u>

240.    The summary section of the Dennis Declaration makes a number of other claims regarding the Kivetz Survey.  However, Dr. Dennis never explains or discusses any of these claims or opinions, which I quote below:[318]

- "Dr. Kivetz failed to measure whether his surveys [*sic*] included any class members."
- "Dr. Kivetz inappropriately relies on an open-ended survey question to measure consumers' reasons for their purchase decisions."
- "Respondents' answers to the open-ended survey question show that their answers were conditioned by pre-existing attitudes and feelings about the Fisher-Price brand and products."
- "Dr. Kivetz did not appropriately pretest his surveys."

Although Dr. Dennis fails to discuss (let alone provide any rationale for) the aforementioned criticisms in his declaration, I briefly address each in turn.

241.    *First*, Dr. Dennis's criticism that I failed to measure whether the Kivetz Survey included any class members is misplaced, unjustified, and *contradicted* by Dr. Dennis's claims regarding his own survey.  As discussed in Subsection D.2.2, the relevant consumer universe in this litigation consists of prospective purchasers of baby products such as the disputed products—which (appropriately) include both first-time *and* repeat purchasers of Fisher-Price's Rock 'n Play Sleeper products.[319]  Participants' purchase explanations in the Kivetz Survey also reflect the fact that some consumers were past purchasers of the disputed products (representing putative class members' purchase

---

[317] *See, e.g.*, Orme, Bryan K. (2010), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research (2nd Ed.)*, Madison, WI: Research Publishers LLC.

[318] Dennis Declaration, ¶ 39.

[319] At his deposition, Dr. Dennis admitted that the putative class members consist of both first-time and repeat purchasers of the disputed products; *see, e.g.*, Dennis Deposition, p. 222 ("Q. […] Would – would you agree that some putative class members could have been first-time purchasers of the Rock 'N Play Sleeper?  A. I – I would expect so, yes.  Q. Would you also agree that some of the putative class members could have also been second- or third-time purchasers of the Rock 'N Play Sleeper?  A. Sure.  In consumer surveys, that happens all the time.").

behavior in a repeat purchase situation), while some were first-time buyers (representing putative class members' purchase behavior in a first-time purchase situation).

242.     The criticism that the Kivetz Survey did not measure the inclusion of actual putative class members is incompatible with the sampling criteria used in Dr. Dennis's own survey, as well as Dr. Dennis's own statement (which I agree with) that the sampling frame must survey participants "whose responses would be projectable to the study's target population of purchasers of the Products."[320]

243.     *Second*, Dr. Dennis states but never explains his conclusion that my survey "inappropriately relie[d] on an open-ended survey question to measure consumers' reasons for their purchase decisions."[321]  As explained in Subsection C.3.1, open-ended questions have a number of advantages over closed-ended questions.[322]  Open-ended questions are commonly used in consumer surveys, and have key benefits (over closed-ended questions) of both being less likely to lead or "steer" the participant *toward* certain options, and as well as being less likely to lead the participant *away* from options that are not listed.  By eliciting participants' spontaneous perceptions and explanations, open-ended questions allow consumers to express a wide range of opinions (that differ across consumers) where appropriate, as opposed to putting ideas in participants' minds that they may otherwise not have thought about.  Further, contrary to Dr. Dennis's (unelaborated) criticism, using open-ended questions to assess purchase reasons or explanations is highly standard and is the correct approach.

244.     Further, it is noteworthy that the main "materiality" question in the Kivetz Survey, Question 30, was a *closed-ended* purchase intention question.

245.     *Third*, Dr. Dennis provides *no* substantiation for his claim that in the Kivetz Survey's open-ended questions, participants' "answers were conditioned by pre-existing

---

[320] Dennis Declaration, ¶ 80.
[321] *Id.*, ¶ 39(h).
[322] *See, e.g.*, Diamond (2011); Keller (2012).

attitudes and feelings about the Fisher-Price brand and products."[323]  For example, Dr.

Dennis fails to cite any examples of participants' verbatim responses from the Kivetz

Survey that support his contention.  Nor does Dr. Dennis elaborate on what criteria he

would use to determine whether an answer was "conditioned" or not by such preexisting

attitudes.

246.    Dr. Dennis's above criticism is also rendered irrelevant because, as

explained in Subsection D.2.3, the Kivetz Survey's control stimulus accounted exactly

for participants' preexisting beliefs.

247.    *Fourth*, the Dennis Declaration mentions in passing that the Kivetz Survey

should have used "thorough pretesting,"[324] without any further details or explanation.[325]  In

summarizing his own pretest that he conducted for the Dennis Survey, Dr. Dennis states:[326]

> The pretest survey is, in a sense, a dress rehearsal for the data collection.  The pretest was
> conducted online using the same sampling and data collection procedures that I
> subsequently employed for the full data collection.  I conducted the pretest for the
> following purposes: (i) for quality control and quality assurance testing of the survey
> instrument, (ii) to validate that the survey questionnaire was programmed correctly to my
> specifications, (iii) to identify any survey questions that were unclear to respondents, and
> (iv) to analyze the data to identify any problems, such as unexpected missing data.

248.    As an initial matter, pretesting a survey in the manner described above does

*not* control for participants' preexisting beliefs.  Moreover, by Dr. Dennis's definition,

the Kivetz Survey *did* in fact include a pretest.  Specifically, consistent with my practice

in conducting litigation surveys, after launching my survey, I first verified the quality of

the data (based on a small sample of participants) before resuming data collection.  Such

a "pretest" (or "soft launch")[327] is a standard procedure and is not typically reported

separately.

---

[323] Dennis Declaration, ¶ 80.
[324] *Id.*, ¶ 42.
[325] *Id.*, ¶¶ 39(j) & 42.
[326] *Id.*, ¶ 112.
[327] *See, e.g.*, Kivetz Deposition, pp. 150 – 153.

## E.     EVALUATION OF THE SILVERMAN REPORT

249.    The Silverman Report makes a number of claims regarding (*i*) the materiality, and consumers' perceptions, of the alleged "sleep-related" packaging misrepresentations and omission in this litigation; and (*ii*) the Kivetz Survey. Specifically, Mr. Silverman:

- opines on the general effectiveness of packaging as a medium for promoting products;

- speculates about the meaning conveyed to consumers, and the impact on their purchase decisions, of product packaging elements, including the product name ("Rock 'n Play Sleeper"), packaging claims ("Baby can sleep at a comfortable incline all night long!", "Extra-plush fabrics for extra-comfy sleep," "Nighttime sleeper and playtime seat"), various images, and the Fisher-Price logo;

- hypothesizes that displaying a safety information message on the disputed product's package would have a material effect on consumers' purchase decisions; and

- briefly critiques the Kivetz Survey.

250.    Mr. Silverman did *not* conduct any survey in this litigation as a basis for his conclusions. In addition, Mr. Silverman does *not* cite to any academic research that is relevant to his specific conclusions; instead, he cites two textbooks regarding general points that do not substantiate his opinions in this litigation. As I explain in this *Rebuttal Expert Report*, Mr. Silverman fails to provide any scientific basis for his opinions regarding consumer perceptions or purchase intentions. Consequently, Mr. Silverman's conclusions regarding the alleged packaging misrepresentations and omission are unsubstantiated and unscientific. Mr. Silverman's opinions regarding the Kivetz Survey are likewise unsubstantiated, unscientific, and evince his lack of survey expertise. I develop these points in the following three subsections.

### E.1.    Mr. Silverman Fails to Provide Any Scientific Basis for His Opinions Regarding Consumer Perceptions or Purchase Intentions

251.    To reach scientific conclusions about consumer behavior, an expert must employ a well-established scientific method, such as conducting a (valid and reliable)

empirical survey, analyzing existing secondary (*e.g.*, market) data, analyzing academic and industry research, or relying on fundamental principles in consumer behavior and marketing that apply to the particular facts of this litigation. In stating his opinions and conclusions, Mr. Silverman fails to employ *any* of the aforementioned scientific methodologies (or any other systematic or objective methodology). Having conducted, supervised, and evaluated well over 1,000 marketing research studies—including many related to consumer behavior and decision making, consumer deception, class actions, sales promotions, marketing strategies, branding, packaging, and advertising issues—I have rarely encountered such completely unsubstantiated and unscientific opinions as those offered by Mr. Silverman.

252.    In his report, Mr. Silverman claims to have used a "process for evaluating the materiality of the advertising messages at issue in this matter."[328] However, instead of implementing a scientific methodology, such a "process" is purely subjective and *relies exclusively* on Mr. Silverman's own *judgment and opinions* (*i.e.*, what he "considers" and "evaluates," and his "knowledge").[329] It should be noted that Dr. Dennis, the Plaintiffs' other expert, did *not* endorse Mr. Silverman's approach to determining the materiality of claims or images. In particular, Dr. Dennis testified at his deposition that

---

[328] Silverman Report, ¶ 29.

[329] *Ibid*. At his deposition, Mr. Silverman pointed to his experience as the basis for each "step" of the "process" outlined in Paragraph 29 of his report; *see* Silverman Deposition, pp. 239 – 241 & 245 – 251 (*e.g.*, "Q. [...] What standards do you use to determine whether a consumer will find the totality of the packaging engaging? A. Well, again, it's based on my experience. One of the things for sure in advertising – well, I guess I should never say for sure. Consumers look at babies in general. They like to see babies. But especially people who are buying products for babies like to see babies. And they like to see babies portrayed in a way that they would hope their baby would sort of fit. I think everybody would love their baby to be pretty. I think they would like their baby to look happy. [...] Q. Do you have an objective standard that you use in connection in determining whether consumers will find the totality of the package engaging, or are you basing it on your years of experience and opinions? A. I'm basing it on my years of experience and what I was taught during my years of experience. Q. And different ad executives could have different opinions regarding the appropriateness of the packaging; correct? [...] THE WITNESS: I could only speculate"; pp. 249 – 251).

his own survey is *not* capable of determining the materiality of individual claims and images on the disputed products' packaging.[330]

253.    Mr. Silverman fails to provide any review or analysis of relevant academic literature to provide a scientific basis for his opinions.  Mr. Silverman cites *no* peer-reviewed academic research to substantiate any of his conclusions.  The "Exhibits and Other Material Reviewed" section of the Silverman Report lists only three sources, which Mr. Silverman entitles "Industry and Learned Texts"[331] and which consist of two textbooks on advertising and one industry trade book.[332]  The Silverman Report refers to these sources only in the context of definitions of marketing terms and general characterizations;[333] these sources do *not* substantiate any of Mr. Silverman's conclusions in this litigation.  Mr. Silverman also did not analyze any existing secondary (*e.g.*, market) data, and he did not conduct any empirical survey in this matter.

254.    Mr. Silverman's approach is diametrically opposed to basic scientific standards.  For example, according to Professors Hoyer and MacInnis, to determine whether or not an advertisement misleads consumers, researchers must assess what messages the advertisement actually communicates to consumers.[334]  If it were possible to determine the factors influencing consumers' perceptions and purchase decisions solely by reviewing (or "eyeballing") the advertising or packaging claim at issue (as Mr. Silverman attempts to do)—without conducting any research or scientific analysis—then

---

[330] Dennis Deposition, pp. 312 – 315 (*e.g.*: "Q.  Do you think the fact that the Rock 'N Play Sleeper contains the packaging statement 'Extra plush fabrics for comfy sleep' would be material to consumers?  A. Do I think it would be? Again, I don't have data on that.  That would be a – potentially a conjoint survey to address that").
[331] Silverman Report, Exhibit A, pp. 56 – 57.
[332] *Ibid*.  William F. Arens, Michael F. Weigold, Christian Arens, *Contemporary Advertising and Integrated Marketing Communications, 13th Edition,* New York, McGraw Hill Irwin, 2011; David Ogilvy, *Ogilvy on Advertising*, New York, Crown Publishers, Inc., 1983; Thomas C. O'Guinn, Chris T. Allen, Richard J. Semenik, *Advertising and Integrated Brand Promotion*, Third Edition, Cincinnati, OH, South-Western Cengate Publishing, 2009.
[333] *E.g.*, the role of packaging in marketing (¶ 39), the importance of positioning (¶¶ 45 & 72), the use of photographs in advertising (¶ 79), and the definition of a brand (¶ 91).
[334] Hoyer, Wayne D. and Deborah J. MacInnis (2004), *Consumer Behavior*, Boston, MA: Houghton Mifflin Company.

there would be no need for companies to conduct consumer research in the normal course of their business (or in the context of litigation), yet they routinely do.[335]

255.    To derive valid and reliable conclusions regarding the influence, if any, of packaging claims on consumers' perceptions or purchase decisions, it is *not* appropriate to merely speculate or assume "results" (while appealing only to personal background and experience). Instead, a rigorous scientific analysis and/or an empirical research study of customers' perceptions, expectations, and/or purchase decisions should be conducted.[336]

256.    Professor Diamond explains the qualifications needed for a survey expert to be appropriately skilled and experienced to design, conduct, or analyze surveys:[337]

> Experts prepared to design, conduct, and analyze a survey generally should have graduate training in psychology (especially social, cognitive, or consumer psychology), sociology, political science, marketing, communication sciences, statistics, or a related discipline; that training should include courses in survey research methods, sampling, measurement, interviewing, and statistics. In some cases, professional experience in teaching or conducting and publishing survey research may provide the requisite background. In all cases, the expert must demonstrate an understanding of foundational, current, and best practices in survey methodology, including sampling, instrument design (questionnaire and interview construction), and statistical analysis. Publication in peer-reviewed journals, authored books, fellowship status in professional organizations, faculty appointments, consulting experience, research grants, and membership on scientific advisory panels for government agencies or private foundations are indications of a professional's area and level of expertise. [FNs omitted]

---

[335] Mr. Silverman asserts, without *any* substantiation, that "major advertising agencies rarely use surveys to evaluate the various claims that appear in the final version of an ad or label"; Silverman Report, ¶ 30. It is unclear how this assertion can be reconciled with his statement that during his career in advertising agencies he "professionally benefited from the information and insights derived from *the thousands of quantitative surveys* developed and implemented by my colleagues in the research department" [emphasis added]; *id.*, ¶ 138 (*see also id.*, ¶ 142). In fact, message testing, including assessments of persuasiveness and sales response, are standard approaches used in industry (*see* Andrews, J. Craig and Terrence A. Shimp (2018), *Advertising, Promotion and Other Aspects of Integrated Marketing Communication*, 10th Edition, Boston, MA: Cengage Learning;, Chapter 17), and survey-based tests of materiality are widely used in false advertising cases (*see, e.g.*, Keller 2012).

[336] At his deposition, Mr. Silverman testified that survey results are not necessarily more reliable than his opinions, citing to the notion that sometimes the methodology in a survey is "really good" or "is completely dubious," whereas his own opinions are "valid"; *see* Silverman Deposition, pp. 163 – 164. Mr. Silverman also testified that his "opinions aren't quantified" as a general rule; *id.*, p. 162.

[337] Diamond (2011), p. 375.

257. By his own admission,[338] Mr. Silverman is not a survey expert. In describing his own experience, Mr. Silverman does not claim to have first-hand experience or expertise with surveys, stating that he benefitted from surveys *conducted by others*.[339]

258. Despite his lack of survey expertise, in his report, Mr. Silverman nevertheless analyzes and opines on surveys. As I discuss in Subsection E.3 of this *Rebuttal Expert Report*, Mr. Silverman also presents opinions about the Kivetz Survey that are unsubstantiated, unscientific, erroneous, and further demonstrate his lack of survey expertise.

259. For example, Mr. Silverman relies on the 2011 Research[340] from Fisher-Price to support his claims,[341] which I analyzed in detail in my June 16, 2021 *Expert Report*[342] and found to be "incapable of generating reliable and valid estimates,"[343] but whose results, if anything, were inconsistent with the Plaintiffs' contentions in this litigation.[344] Mr. Silverman fails to present any rebuttal to my expert assessment of the 2011 Research, instead deferring to "Plaintiffs' survey expert."[345] Mr. Silverman defends the 2011 Research by drawing a distinction between using a survey to "learn something" and "prove something,"[346] seeming to argue (consistent with my critique) that the 2011

---

[338] *See, e.g.*, Silverman Report, ¶¶ 142 & 146 (deferring to "Plaintiffs' survey expert"); Silverman Deposition, p. 159 ("Q. Let me switch gears and ask you some – a different line of questioning. So it's fair, you don't consider yourself a survey expert; is that right? A. No, I don't consider myself a survey expert").
[339] Silverman Report, ¶ 138 ("During my years in the agency business, I professionally benefited from the information and insights derived from the thousands of quantitative surveys developed and implemented by my colleagues in the research department, as well as from the many focus group sessions I personally observed and later reviewed with the group's moderator").
[340] FSH0004127.
[341] *Id.*, ¶¶ 61 & 145 – 148.
[342] *See Kivetz Expert Report*, ¶¶ 98 – 119 & 125.
[343] *See, e.g., id.*, ¶ 125 ("[…] the 2011 Research is incapable of generating reliable and valid estimates of consumers' intentions to purchase the disputed products due to the alleged 'sleep-related' misrepresentations and omission […]").
[344] *See id.*, Subsection E.2.
[345] "Dr. Kivetz's issues with that survey appear to be primarily process-oriented, **which I leave to Plaintiffs' survey expert to opine on**" (emphasis added); Silverman Report, ¶ 146.
[346] *Ibid.*

Research *fails to provide proof of anything* (*i.e.*, fails to provide reliable and valid estimates). However, Mr. Silverman then speculates that: (*i*) Fisher-Price "learned that consumers preferred the name Rock 'n Play Sleeper, not Rock 'n Play Soother"[347] from the 2011 Research, and made a decision to keep the product name based on that research;[348] and (*ii*) that the 2011 Research "most likely resulted in Defendants' avoiding a costly mistake,"[349] as a "Rock 'n Play Soother" would not have generated as many sales as a "Rock 'n Play Sleeper."[350]

260.    Throughout his report, instead of providing any dispositive evidence, Mr. Silverman extensively relies on aphorisms and "clichés," along with his own opinions and speculations. For example, Mr. Silverman presents the following adages as support for his conclusions (emphases added):

- As is often true of clichés, the portrayal of packaging as a brand's "**silent salesperson**" is correct. (Silverman Report, ¶ 39)

- **Some things simply do not change**. (*Id*., ¶ 50)

- As much as I believe **most parents want the best for their infant children**, they also have their own needs – which includes getting some sleep. (*Id*., ¶ 51)

- Sometimes **a picture is worth a thousand words**. (*Id*., ¶ 56)

- "Plush fabrics for extra-comfy sleep" also reiterates the other "sleep" promises displayed on the Rock 'n Play packages; as I learned years ago from Mr. Ogilvy, "**The more you tell, the more you sell**." (*Id*., ¶ 77)

- As an advertising professional who created hundreds of magazine and newspaper ads, I can attest that there is great truth in the old axiom, "**A picture is worth a thousand words**." (*Id*., ¶ 79)

261.    The Silverman Report also uses extensive speculation and circular reasoning. For example, Mr. Silverman states:[351]

In this case, **I find it hard to believe** that consumers bought a product marketed as a nighttime sleeper for any reason other than that it was a sleeper. Yes, the Rock 'n Play

---

[347] *Ibid*.

[348] *Id*., ¶ 147 ("The 2011 survey, which appears to have played a significant role in Fisher-Price's decision to not rename the Rock 'n Play Sleeper […]").

[349] *Ibid*. *E.g.*, "Would a Rock 'n Play Soother have done as well? In my opinion, probably not" ¶ 147.

[350] *Ibid*. ("Would a Rock 'n Play *Soother* have done as well? In my opinion, probably not [emphasis in the original]").

[351] *Id.*, ¶ 143.

Sleeper had other attributes which provided consumers with additional reasons to purchase it, but **in my opinion** those attributes were secondary to the product's primary purpose. [Emphases added]

In the above-quoted statement, Mr. Silverman opines about what attributes of the disputed products would motivate consumers' purchase decisions based on what he personally finds plausible rather than on any empirical evidence.[352]

262.    Numerous other examples of speculation and/or circular reasoning appear throughout the Silverman Report, purportedly substituting for empirical or scientific evidence (emphases added):

- **It is evident to me** that Fisher-Price positioned the products at issue in this matter as "sleepers." (*Id.*, ¶ 46)

- **It is evident** that consumers are familiar with and understand what a "Sleeper" is in the context of baby goods. (*Id.*, ¶ 47)

- And **it is evident to me** that positioning the Rock 'n Play Sleepers as sleepers would have strongly resonated with many parents of infant children. (*Id.*, ¶ 48)

- So a product name that promises a benefit that serves both the infant and his or her parents would, **in my opinion**, impress and motivate consumers. The name "Rock 'n Play Sleeper" **most likely did just that**. (*Id.*, ¶ 51)

- In my experience, **well-crafted claims and relevant graphic images** on packages – **claims and images that are responsive to consumer wants and needs** – help close the sale by providing the rationales consumers need to make an informed purchase decision. (*Id.*, ¶ 66)

- Given the millions of Rock 'n Play Sleepers that Defendants sold since it was introduced in 2009, **I think it is fair to say** that the incline design feature was very important to consumers. (*Id.*, ¶ 70)

- The fact that the respondents favored the Rock 'n Play Sleeper's incline design feature **tells me that they most likely** were unaware that the American Academy of Pediatrics'[…] (*Id.*, ¶ 71)

- "Extras," **if expressed creatively in an ad**, nearly always motivate consumers, especially **if they think the feature is not going to cost them very much more** than the normal price. (*Id.*, ¶ 77)

- "Nighttime Sleeper" is **about as clear a statement as I have ever seen** as to how it defines what a product is for […] **In my opinion**, a reasonable consumer would see that as a material benefit." (*Id.*, ¶ 78)

- **In my opinion**, the "story" communicated by the images of a sleeping baby is something **I believe** (and Fisher-Price obviously believed) **almost every new**

---

[352] As Mr. Silverman conceded at his deposition, he has not done any empirical research or analysis "as to whether a reasonable consumer would conclude that the primary purpose of a Rock 'n Play Sleeper is for sleep"; Silverman Deposition, p. 238.

**parent would love to personally experience** at home; a beautiful baby sleeping peacefully. (*Id.*, ¶ 81)

- Those images are **most certainly as powerful, if not more so**, than the written "sleep claims" previously discussed. (*Id.*, ¶ 82)

- **As I see it, the "story" conveyed by this image** is that mom either just woke up after a good night's sleep or is about to go to sleep knowing that her baby will soon be off to dreamland. (*Id.*, ¶ 84)

- **It is evident to me that most moms would like to see themselves** much the same way the moms on the Rock 'n Play packages are portrayed; as loving, caring and not frazzled. (*Id.*, ¶ 86)

- The images on Defendants' packages present consumers with a solution to a problem, one that **in my opinion** would be material to a reasonable consumer. (*Id.*, ¶ 88)

- **It has been my experience** that American consumers are particularly brand conscious when it comes to products that may pose safety risks to them or their family members. (*Id.*, ¶ 94)

- **In my experience**, when consumers say they trust a brand, **they are also saying** they think the product or service the brand defines is safe. (*Id.*, ¶ 101)

- **In my opinion** they did not need to spend a lot of money on media advertising because they were able to effectively deliver their marketing messages to consumers via the Rock 'n Play Sleeper packaging and attendant instore merchandising, as well as via the Fisher-Price and retailer websites. **It is likely that** Defendants' most effective advertising was on social media (e.g., Facebook), which boomed during the period the Rock 'n Play Sleeper products were marketed. (*Id.*, ¶ 113)

- **In my opinion**, that fact alone would have been material to a reasonable consumer, and **most likely would have resulted** in the product not being purchased. (*Id.*, ¶ 133)

- **I cannot help but wonder** if some, if not many of those tender lives, would have been saved had a warning label large enough to be easily noticed and read was prominently displayed on the front panel of the package. (*Id.*, ¶ 136)

- Would a Rock 'n Play Soother have done as well? **In my opinion, probably not**. (*Id.*, ¶ 147)

- […] Defendants' 2011 survey **appears to have generated very useful information** that Fisher-Price actually relied upon, and that at the end of the day, **most likely contributed to** the sales success of the Rock 'n Play Sleeper product line. (*Id.*, ¶ 148)

263. As the aforementioned excerpts indicate, Mr. Silverman relied on his own subjective opinions, experience, and speculation, in lieu of scientific evidence or relevant substantiation, to draw multiple conclusions regarding: (*i*) consumers' understanding of

"sleeper(s)";[353] (*ii*) consumers' reactions to specific product positioning and claims;[354] (*iii*) consumers' specific needs/desires, and the importance to consumers of specific product features;[355] (*iv*) consumers' knowledge (or lack thereof) of safety guidelines;[356] (*v*) consumers' interpretation of packaging claims and images;[357] (*vi*) the supposed effects of hypothetical product warnings or the brand name on consumers' purchase decisions;[358] (*vii*) Fisher-Price's marketing activities, intentions/knowledge, and decisions;[359] and ultimately (*viii*) the materiality of the alleged "sleep-related" packaging representations.[360]

264. Mr. Silverman reaches overarching conclusions about how the various claims and images on the package influenced purchasers of the disputed products (*i*) without any review of the scientific literature on marketing and consumer behavior, (*ii*) without any empirical study of perceptions or preferences among a sample of relevant consumers, and (*iii*) without any other reliable empirical evidence. Instead, Mr. Silverman essentially assumes and reiterates the Plaintiffs' allegations based on his own subjective impression. I have not observed any evidence in the present litigation that would allow Mr. Silverman to reach such sweeping (and unfounded) conclusions.

E.2. Mr. Silverman's Conclusions Regarding Packaging in General and the Alleged Packaging Misrepresentations and Omission are Unsubstantiated and Unscientific

265. As I detail in the following subsections, Mr. Silverman's conclusions are either irrelevant to the Plaintiffs' allegations, wholly unsubstantiated, or unsupported by his cited sources. Not only are Mr. Silverman's conclusions directly contradicted by the testimony of the Plaintiffs' other expert, Dr. Dennis, and the results of the empirical consumer survey that I conducted in this matter, but also they are inconsistent with

---

[353] *See, e.g., id.*, ¶¶ 44 – 51, 61 – 62, 78, & 140.
[354] *See, e.g., id.*, ¶¶ 67, 78, & 110.
[355] *See, e.g., id.*, ¶¶ 51, 66, 69 – 70, 78, 82, 86.
[356] *See, e.g., id.*, ¶ 71.
[357] *See, e.g., id.*, ¶¶ 62, 81, 110, & 133.
[358] *See, e.g., id.*, ¶¶ 109, 133, & 136.
[359] *See, e.g., id.*, ¶¶ 46, 57, 102, 106, & 118.
[360] *See, e.g., id.*, pp. 14, 22, 24, & 26.

academic literature, industry research, the declaration of Fisher-Price's senior marketing manager, and deposition testimony (including of the named Plaintiffs) in this litigation.

### E.2.1. *Mr. Silverman's Conclusions Regarding the General Effectiveness of Packaging are Inaccurate and Irrelevant to the Plaintiffs' Allegations*

266.    Mr. Silverman writes that packaging is a "silent salesperson"[361] and "one of the most effective methods marketers can use to promote products that are sold at brick-and-mortar stores and/or via the websites of on-line retailers."[362]  Based on these opinions, Mr. Silverman concludes that the alleged misrepresentations on the product packaging were "material" to consumers.

267.    Because Mr. Silverman's stated opinion is inappropriately general and incomplete, it is erroneous:  While packaging *can be* effective, it is *not always* effective.  For example, as Mr. Silverman himself indicates in his report, it is only when claims and images are "well-crafted," "relevant," and "responsive to consumer wants and needs" that packaging is effective.[363]  Such an opinion—whereby *effective* packaging is effective—is a tautology and is *not* dispositive about the effects of the alleged "sleep-related" misrepresentations and omission on the disputed Fisher-Price packaging.

268.    It is well-established in marketing literature that not all packaging is effective at motivating consumer purchases and that designing effective packaging is quite difficult; thus, product packaging cannot simply be assumed to be a positive purchase driver but instead must be *tested* with consumers.  As Professors Kotler and Keller write in their classic text, *Marketing Management*:[364]

> To achieve the marketing objectives for the brand and satisfy the desires of consumers, marketers must choose the aesthetic and functional components of packaging correctly[…].  After the company designs its packaging, it must test it […] [C]onsumer tests, [ensure] that buyers will respond favorably.

---

[361] *Id.*, ¶ 39.
[362] *Id.*, ¶ 33.  *See also* ¶¶ 37 – 40.
[363] *Id.*, ¶ 66.
[364] Kotler and Keller (2009), p. 340.

Likewise, academic research has identified situations in which packaging decisions can backfire, resulting in negative consumer perceptions.[365]

269. Along the same lines, Mr. Silverman cites Geoffrey Hollows[366] as substantiation for the opinion that the disputed packaging did communicate the alleged message (*i.e.*, that the product was safe for infant sleep) to consumers. Hollows also notes, however: "Second, there is the psychological function and **that is the one you have got to get right.**"[367] Thus, by citing Hollows, Mr. Silverman concedes that packaging may *not* "get it right." In fact, the *Marketing Week* article cited in the Silverman Report is actually about how *challenging* it is to design packaging that communicates the brand's message.[368]

270. Mr. Silverman's professional involvement in unrelated packaging projects and his subjective opinions about the "best practice[s]" supposedly used in those projects[369] do *not* substantiate his conclusion that Fisher-Price's packages "strongly communicate that the product is safe for infant sleep, including overnight sleep and

---

[365] *See, e.g.*, Dörnyei, Krisztina R. and Renaud Lunardo (2001), "When Limited Edition Packages Backfire: The Role of Emotional Value, Typicality and Need for Uniqueness," *Journal of Business Research*, 137, 233 – 243; Han, Yegyu and Mario Pandelaere (2021), "All that Glitters is Not Gold: When Glossy Packaging Hurts Brand Trust," *Marketing Letters*, 32(2), 191 – 202.

[366] Geoffrey Hollows is referred to as a consultant at Heawood Research; *see, e.g.*, https://www.marketingweek.com/the-silent-salesman-2/.

[367] Silverman Report, ¶ 38 (emphasis added).

[368] For example, the article states: "Ford certainly thinks the environment is tougher for marketers. 'We expect brands to connect to us on an individual level compared with a mass offering. That is a huge challenge for brands and packaging, which has to communicate the brand's message,' he says." The article also discusses consumers' increasing sophistication and knowledge of marketing tactics, noting that the effects of package design are subtler than the effects of advertising. *See* https://www.marketingweek.com/the-silent-salesman-2/?ct_5aa9aa1f33d68=5aa9aa1f33e0a.

[369] Mr. Silverman states: "I was involved in dozens of packaging projects during my long agency career for many different kinds of products, including beverages, condiments, automotive products such as motor oil and, relevant to this matter, products primarily purchased by parents for use by children"; Silverman Report, ¶ 40. At his deposition, however, Mr. Silverman testified that he does *not* have experience specific to baby durables (or baby gear) such as the disputed products in this litigation; *see, e.g.*, Silverman Deposition, pp. 246 – 247 ("Q. […] We testified – you testified earlier that you have never worked on a campaign or for manufacturers or retailers of durable baby products; is that correct? A. That's correct. Q. Okay. So you have no experience in connection with baby – durable baby products; correct? […] A. That's correct."); *see also* Silverman Deposition, p. 172.

naps."[370]  Just as actual salespeople cannot all be assumed to be effective in communicating messages or motivating consumers to make purchases, a specific packaging design cannot be presumed to be an *effective* "silent salesperson," *absent specific consumer tests of that packaging.*  Even if a marketer intends the packaging to have a particular effect on consumers, that does *not* mean that the packaging claims and representations will necessarily (*i*) convey a specific (allegedly deceptive) message commonly across consumers, or (*ii*) be material to consumers' purchase decisions.

E.2.2.  *Mr. Silverman's Opinion that the Product Name ("Rock 'n Play Sleeper") Would Convey a Material Benefit to Consumers is Unsubstantiated and Inconsistent with Academic Literature, Industry Research, and the Kivetz Survey's Results*

271.    Mr. Silverman opines, without substantiation, that  the presence of the noun "sleeper," the product's name ("Rock 'n Play Sleeper"), in and of itself, "would convey much more to consumers than just the name of Defendant's product; it would **convey a material benefit** to them."[371]  Mr. Silverman characterizes "Rock 'n Play Sleeper" as a "descriptive name."[372]  He then argues that the name will (*i*) communicate sleep as the primary benefit,[373] (*ii*) identify the product as a member of a defined category of products,[374] and (*iii*) distinguish the product from other products (baby swings or bouncers)[375] in consumers' minds.  However, these arguments are purely speculative.

272.    Mr. Silverman provides no evidence that consumers commonly interpret product names in a literal manner.  He provides no evidence that consumers perceive sleep as the primary benefit of the disputed Fisher-Price products.  He also provides no evidence that "sleepers" is a "defined category" (or that, even if it is a "defined category" for manufacturers, that consumers understand it as such) for his characterization of the

---

[370] Silverman Report, ¶ 40.
[371] *Id.*, ¶ 34 (emphasis added).  *See also id*., ¶¶ 41 – 67.
[372] *Id.*, ¶ 44.
[373] *Ibid*.
[374] *Id.*, ¶ 47.
[375] *Id.*, ¶ 48.

supposed category as "products in which infants can (presumably safely) sleep for protracted periods,"[376] or for his assertion that "consumers are familiar with and understand what a "Sleeper" is in the context of baby goods."[377] The fact that retailers carry other products with "sleeper" in the name[378] does not constitute evidence for any of the aforementioned conclusions. Finally, Mr. Silverman provides no evidence that the word "sleeper" distinguishes in consumers' minds the disputed Fisher-Price's products from baby swings or bouncers. Instead, Mr. Silverman simply asserts these conclusions as "evident."[379]

273. Essentially, Mr. Silverman argues that it is self-evident that (*i*) consumers would perceive a product with the word "sleeper" in its name as providing safe sleeping as the product's primary benefit, and (*ii*) this benefit would be material to consumers' purchase decisions. However, consumers would not necessarily interpret a word in a product's name to communicate that product's primary benefit and would not necessarily find that benefit to be important and material.

274. Consider the case of Arm & Hammer Baking Soda. By Mr. Silverman's reasoning, it would be self-evident both that the primary benefit to consumers is that the product provides an *ingredient (soda) for baking*, and that the baking-ingredient benefit is uniformly material to purchasers of the product. To the contrary, many consumers instead adopted the product for a non-baking use—that is, as a refrigerator deodorizer, which in reality became a widespread reason for purchasing the product (*e.g.*, with half of U.S. homes putting an Arm & Hammer Baking Soda box in their refrigerator).[380] This example contradicts Mr. Silverman's unsubstantiated assumption that consumers' understanding of products' names is exclusively literal.

---

[376] *Id.*, ¶ 47.
[377] *Ibid.*
[378] *Ibid.*
[379] *Id.*, ¶ 48.
[380] *See* Kotler and Keller (2009), p. 305.

275.   Mr. Silverman also argues that the product was *positioned* by Fisher-Price as a "sleeper"[381] and that the products' positioning was defined by the name.[382] Relatedly, he characterizes the use of the word "sleeper" in a 2013 Fisher-Price internal email,[383] as well as references to sleep in a projected retail display and in marketing materials for retailers,[384] as indicating that Fisher-Price "considered the products at issue to be 'Sleepers.'"[385]  Mr. Silverman's contention is that because the product was supposedly positioned as a "sleeper," the product was intended to "'fit' in the consumer's mind"[386] as a product "in which infants can (presumably safely) sleep for protracted periods, be it at night or during daytime naps."[387]

276.   Mr. Silverman's aforementioned argument fails for two main reasons. *First*, Mr. Silverman fails to provide evidence that the product was consistently positioned as primarily or exclusively a "sleeper," as opposed to being positioned as a product with multiple uses, as testified to by Fisher-Price marketing executives.[388] *Second*, Mr. Silverman fails to provide any evidence that just because a firm attempts to position a product in a particular way, consumers will interpret the product in the intended way.  Marketers' *intentions* are not the same, and do not necessarily affect, consumer *perceptions* or *purchase behaviors*, and these concepts must be distinguished when evaluating consumer behavior.

277.   The importance of distinguishing marketers' intentions from consumers' actual responses to marketing actions is underscored by the fact that marketing, advertising, and packaging can be, and often are, ineffective in driving purchase behavior.  While marketers often attempt to employ best practices and engage in

---

[381] *Id.*, ¶¶ 44 – 46, 48, 57, & 61.
[382] *Id.*, ¶ 44.
[383] *Id.*, ¶ 46.
[384] *Id.*, ¶¶ 57 – 60.
[385] *Id.*, ¶ 57.
[386] *Id.*, ¶44.
[387] *Id.*, ¶47.
[388] *See, e.g.*, Ford Declaration, ¶ 16; Ford Deposition, pp. 178 –180; Stephens Deposition, p. 171.

marketing research (including conducting or commissioning surveys), not all marketing makes a material impact on consumers' perceptions or purchase decisions. Entire books have been written about effective and ineffective marketing, advertising, and packaging.[389] Nevertheless, marketing practitioners recognize that marketing actions carry the inherent risk that customers may not respond as desired. There are countless examples of marketing, advertising, and packaging that have not increased consumers' purchase likelihoods.[390]

278. Mr. Silverman cites Professor O'Guinn and his co-authors' textbook regarding the concept of positioning:[391]

> The importance of positioning can be understood by recognizing that **consumers create a perceptual space** in their minds for all the brands they might consider purchasing. A perceptual space is how one brand is seen **on any number of dimensions** – such as quality, taste, price, or social display value – in relation to those same dimensions in other brands.

Thus, according to these authors, it is the consumer, *not* the marketer, who creates the perceptual space, and the brand may be defined by the consumer on multiple dimensions, not only a single supposed primary use. Later in the textbook, in a section ignored by Mr. Silverman, the authors describe the "tremendous challenge" involved in attempts to position a product:[392]

> Regarding internal consistency, **everything must work in combination** to reinforce a distinct perception in the consumers' eyes about what a brand stands for….

> Consistency in positioning is important because **consumers have perceptual defenses that allow them to screen or ignore most of the ad messages** they are exposed to.

---

[389] Gray, Rob (2014), *Great Brand Blunders: The Worst Marketing and Social Media Meltdowns of All Time*, Bath, UK: Crimson Publishing Limited; Haig, Matt (2003), *Brand Failures: The Truth About the 100 Biggest Branding Mistakes of All Time*, Philadelphia, PA: Kogan Page Limited; Kotler, Phillip (2004), *The Ten Deadly Sins of Marketing*, Hoboken, NJ: John Wiley and Sons Inc.

[390] Bart, Yakov, Andrew T. Stephen, and Miklos Sarvary (2014), "Which Products are Best Suited to Mobile Advertising? A Field Study of Mobile Display Advertising Effects on Consumer Attitudes and Intentions," *Journal of Marketing Research*, 51(3), 270 – 285; Collins, Glenn (1996); "Chief of McDonald's Defends Arch Deluxe to Franchisees," *The New York Times*; Gray (2014), pp. 88 – 91; Haig (2003), pp. 10 – 15 & 29; Yarow, Drake B. (2014), "22 of the Most Epic Product Fails in History," *Business Insider*.

[391] Silverman Report ¶ 45; *see* Thomas C. O'Guinn, Chris T. Allen, Angeline Close Scheinbaum, Richard J. Semenik (2019), *Advertising and Integrated Brand Promotion*, Eighth Edition, Cincinnati, OH: South-Western Cengate Publishing, p. 18.

[392] O'Guinn et al. (2019), p. 138.

> Breaking through the clutter and establishing what a brand stands for is a **tremendous challenge** made easier by consistent positioning.

Thus, the actual views in the textbook cited by Mr. Silverman are in fact *inconsistent* with his assumption that positioning will automatically result in consumers adopting a specific understanding. Contrary to Mr. Silverman's characterizations, even if a firm intends to convey a narrow and specific positioning, if everything does *not* "work in combination"[393] or if consumers' perceptual defenses lead them to screen information out or react against the marketer's messaging,[394] then consumers' actual perception of the product may differ from the intended positioning.

279. Mr. Silverman attempts to bolster his argument by citing various sources for the (irrelevant) assertion that insufficient sleep is a problem for many parents.[395] However, parents' need for sleep is not directly relevant to the alleged misrepresentations and omission in this litigation. In particular, the fact that parents may need and want sleep does not validate Mr. Silverman's claims regarding how consumers interpreted the benefits of the specific disputed product at issue and whether specific packaging claims on the product were material to consumers' purchasing decisions.

280. Further, Mr. Silverman briefly cites the 2011 Research[396] to support his contention that the word "sleeper" in the product name is material to consumers, without providing any detailed analysis of this research or its results.[397] This market research

---

[393] *Ibid.*

[394] Consumer behavior and decision-making research shows that consumers often react to marketing communications and promotions. That is, consumers are often aware that marketers provide information in an attempt to influence them to make a purchase, and customers regularly counteract such influence tactics. *See, e.g.*, Kivetz, Ran (2005), "Promotion Reactance: The Role of Effort-Reward Congruity," *Journal of Consumer Research*, 31(4), 725 – 736 (This article won the 2005 "Ferber Award" from the Association for Consumer Research, which is the largest association of consumer researchers in the world); Friestad, Marian and Peter Wright (1994), "The Persuasion Knowledge Model: How People Cope with Persuasion Attempts," *Journal of Consumer Research*, 21(1), 1 – 31; Wright, Peter (1985), "Schemer Schema: Consumers' Intuitive Theories about Marketers' Influence Tactics," *Advances in Consumer Research*, 13, UT: Association for Consumer Research, 1 – 3.

[395] Silverman Report, ¶¶ 49 – 54.

[396] *Id.*, ¶ 61.

[397] Mr. Silverman provides only selective quotations of qualitative study results, while failing to provide any quantification or significance testing of these results; *see ibid.*

report is the only source Mr. Silverman cites regarding consumers' views of and reactions to the disputed Fisher-Price product and packaging. As set forth in my June 16, 2021 *Expert Report*,[398] the 2011 Research did *not* conform to fundamental standards of scientific consumer research and is therefore *not* reliable for assessing whether the alleged "sleep-related" misrepresentations and omission were a common and material factor in the putative class members' purchase decisions. Regardless, despite its various methodological shortcomings, the 2011 Research refutes Mr. Silverman's opinions regarding the alleged materiality of the disputed product's name (*i.e.*, that the word "sleeper" in the name caused consumers to purchase the product).[399]



281. *Finally*, it is noteworthy that Mr. Silverman's opinion regarding the materiality of the "Rock 'n Play Sleeper" name is inconsistent with the testimony of the Plaintiffs' other expert, Dr. Dennis, who stated that even his survey (which asked participants about the product packaging as a whole) could not isolate the effect of the "sleeper" name.[401]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

[398] *Kivetz Expert Report*, ¶¶ 98 – 119. Specifically, the 2011 Research failed to use random assignment (and was demonstrably confounded as a result), violated marketplace conditions, was subject to demand effects and focalism bias, and used inadequate controls.
[399] Silverman Report, ¶¶ 61 – 62.
[400] *See Kivetz Expert Report*, ¶ 109.
[401] Dennis Deposition, p. 312 ("Q. […] You don't know from your survey whether or not the name "sleeper" in the name – the word "sleeper" in the name Rock 'N Play Sleeper was material to anyone? […] THE WITNESS: I – I – I don't have specific data on that, Counsel.").

*Mr. Silverman's Opinion that the Claim "Baby can sleep at a comfortable incline all night long!" Would be Material to Consumers is Unsubstantiated*

282.    The Silverman Report likewise provides no substantiation for his conclusions regarding the materiality of specific packaging claims.  Mr. Silverman argues that the (high) sales of the disputed product indicate that the packaging claim *"Baby can sleep at a comfortable incline all night long!"* is material.[402]  Such reasoning is fallacious: The fact that a product sells well means *something* about the product was persuasive and appealing to consumers, not necessarily that any specific packaging claim or product feature drove consumers' purchase decisions.

283.    Mr. Silverman also cites to a 2018 qualitative study report[403] in an attempt to substantiate his assertion that the product's incline was appealing to consumers.  This study consisted of three focus groups, in which participants were *instructed* to attend to and form opinions about the product features,[404] which is a highly leading and biased study procedure.[405]  Further, no information on the exact questions asked, sample size, sample representativeness, or quantitative breakdown of the results was provided in the report, rendering the study uninformative in determining the materiality (or lack thereof) of the incline product feature or the packaging claim *"Baby can sleep at a comfortable incline all night long!"*  Even if consumers liked the incline design of the product, such a feature—which is visible in the product photos and can be used for purposes *not* related to sleep—is

---

[402] Silverman Report, ¶ 70.

[403] *Ibid.*, citing to FSHR0012663.

[404] *See* FSHR0012663, p. 2 ("Moms were **asked to compare** each of the five concepts explored and **identify which** was most appealing, new & different, best use of materials, etc. […]" [emphasis added]).

[405] More generally, focus groups and other qualitative interview-based approaches (which employ small sample sizes) do not typically aim to (nor can they) test causal propositions and derive empirical evidence that generalizes to a target population of interest.  Rather, these research methods are exploratory in nature, whereby the interviewer's goal is to explore and derive insights from the mind of the participant.  Such an approach lacks the objectivity, neutrality, and scientific rigor that characterizes (properly designed) cause-effect experiments.  In qualitative interviews, the interviewer may often—subconsciously, even if not intentionally—steer or lead the participants toward certain responses.  Therefore, data from qualitative interviews obtained from small samples cannot serve as the major scientific evidence for a hypothesized effect (*e.g.*, the influence of the alleged "sleep-related" misrepresentations and omission on consumer perceptions or purchase intentions).

not informative as to the materiality of the specific alleged "sleep-related" misrepresentation on the package.

284.    As Dr. Dennis, the Plaintiffs' other expert, stated at his deposition, without a survey designed to "provide data at […] the 'claims level,'"[406] the researcher or expert cannot draw "conclusive data" on whether individual descriptors or representations "matter" or not.[407]

### E.2.4.  *Mr. Silverman's Opinion that the Claim "Extra-plush fabrics for extra-comfy sleep" Would be Material to Consumers is Unsubstantiated*

285.    In his report, Mr. Silverman opines that the packaging claim *"Extra-plush fabrics for extra-comfy sleep"* is material to consumers' purchase decisions.[408]  Mr. Silverman attempts to substantiate this opinion by quoting five "verbatim comments"[409] about product usage from a 2018 Fisher-Price document.[410]  However, *none* of these quotes relate to the *"Extra-plush fabrics for extra-comfy sleep"* claim or to its supposed materiality.  Further, the cited 2018 document does *not* provide any details on the meaning or interpretation of the aforementioned quotes, which are apparently not from a study but rather taken from product reviews.[411]  This document therefore cannot substantiate Mr. Silverman's opinion that the "Extra-plush fabrics for extra-comfy sleep" packaging claim is material.

286.    Mr. Silverman also discusses his subjective impression that the use of the word "Extra" in the claim motivates customers.[412]  This opinion is not only unsubstantiated and inconsistent with the Plaintiffs' other expert's testimony,[413] but also

---

[406] Dennis Deposition, p. 313.
[407] *Ibid.*
[408] *See, e.g.*, Silverman Report, p. 24.
[409] *Id.*, ¶ 76.
[410] FSHR0025939, p. 1.
[411] The document states "Data is based on 2017-2018 reviews"; *ibid.*
[412] Silverman Report, ¶ 77.
[413] Dennis Deposition, pp. 314 – 314 ("Q. Do you think the fact that the Rock 'N Play Sleeper contains the packaging statement 'Extra plush fabrics for comfy sleep' would be material to

irrelevant: My understanding is that the Plaintiffs do not challenge the "extra-plush" and "extra-comfy" elements of the claim in this litigation.

### E.2.5. *Mr. Silverman's Opinion that the Claim "Nighttime sleeper and playtime seat!" Would be Material to Consumers is Unsubstantiated*

287.    As with the previous packaging claims, Mr. Silverman provides no substantiation for his opinion that the *"Nighttime sleeper and playtime seat!"* packaging claim is material.[414]  Instead, he simply asserts that this packaging claim is material because it contains the words "Nighttime Sleeper" and because sleep is important to parents.[415]  This reasoning is again fallacious, as it presupposes the conclusion, while simultaneously ignoring any importance that parents could potentially attach to the words "Playtime Seat."  Indeed, as previously discussed in Section D of this *Rebuttal Expert Report*, I understand that the disputed products were marketed to be used, and used in actuality (including by the named Plaintiffs), in ways *not* related to sleep, such as play and entertainment.[416]

### E.2.6. *Mr. Silverman's Opinion that the Images of Sleeping Infants and a Mom "Curled Up in Her Bed" Would be Material to Consumers is Unsubstantiated*

288.    In his report, Mr. Silverman describes images he has observed on the disputed products' packaging that include sleeping infants and moms laying in bed next to a sleeping infant,[417] as well as his own subjective interpretation of these images:[418]

> As I see it, the "story" conveyed by this image is that mom either just woke up after a good night's sleep or is about to go to sleep knowing that her baby will soon be off to dreamland.

---

consumers?  A. Do I think it would be? Again, I don't have data on that. That would be a – potentially a conjoint survey to address that. […]").
[414] Silverman Report, p. 26.
[415] *Id.*, ¶ 78.
[416] *See, e.g.*, Ford Declaration, ¶ 16; Ford Deposition, pp. 178 – 180; Cuddy Deposition, pp. 155 & 182 – 184; Hanson Deposition, pp. 104 – 105 & 139 – 142; Huey Deposition, pp. 127 – 129, 134 – 135, & 173 – 174; Nowlin Deposition, pp. 188 – 189 & 197; Simmonds Deposition, pp. 95 – 96 & 106 – 108.
[417] *See, e.g.*, Silverman Report, p. 26 & ¶¶ 81 – 84.
[418] *See, e.g., id.*, ¶ 84.

289.    Mr. Silverman argues that these images would be material in consumers' purchase decisions by appealing to a variety of non-scientific sources, including the adage "A picture is worth a thousand words."[419]  Mr. Silverman also cites the opinion of his mentor, David Ogilvy, on the role of photographs in advertising.[420]  Notably, the Ogilvy quotation does *not* state that all photography in advertising is material, but instead that photographs "that arouse the reader's curiosity" are the most effective.[421]  Given that Mr. Silverman does *not* present any evidence that the photographs on the disputed Fisher-Price product packaging indeed aroused consumers' curiosity, his reliance on Ogilvy's (itself unsubstantiated) opinion is inappropriate and irrelevant to this litigation.

290.    Mr. Silverman again attempts to support his conclusion about materiality by appealing to parents' need for sleep, citing unspecified focus group sessions "over the years"[422] and a 2017 Fisher-Price study which purportedly documented parents' desire for more sleep.[423]  Mr. Silverman then makes a logical leap, arguing that because parents desire sleep, then a picture of a sleeping infant would necessarily be material to consumers purchasing the disputed products.  This conclusion requires assuming as fact key issues in this litigation, including that consumers: (*i*) noticed the images, (*ii*) perceived the images to convey a message about using the product for sleep, and (*iii*) relied on that alleged perception when making their purchase decisions.[424]  Mr. Silverman supplies *no* evidence that any of these assumptions hold.

---

[419] *Id.*, ¶ 79.

[420] *Ibid.*

[421] Olgilvy is quoted in the Silverman Report as stating: "The kind of photographs **which work hardest** [in advertisements] **are those that arouse the reader's curiosity**" (emphasis added; *ibid.*).

[422] *Id.*, ¶ 86.

[423] *Id.*, ¶ 87, citing FSHR0057798.

[424] In order for consumers to perceive, and subsequently rely on, a given message, they must first notice and comprehend that message.  Academic research indicates that consumers' decision processes involve several distinct mental processes: interpreting relevant information to which they attend, recalling product knowledge from memory, and integrating both remembered and interpreted information to form an overall assessment of a product under consideration.  In the process of interpreting relevant information, consumers determine the subjective meanings of such information and develop their own personal beliefs about products.  *See, e.g.*, Peter, J. Paul and Jerry C. Olson (2008), *Consumer Behavior and Marketing Strategy* (8th ed.), Boston, MA: McGraw-Hill/Irwin, pp. 48 – 50, 109 – 110, & 119 – 120.  In particular,

*E.2.7.* *Mr. Silverman's Opinion that the Presence of the Fisher-Price Logo on the Package Would be Material to Consumers is Unsubstantiated and Irrelevant*

291.    Mr. Silverman's opinion that the "Fisher-Price logo displayed on the Rock 'n Play Sleeper packaging would be material to consumers"[425] is not only unsubstantiated, but it is also irrelevant to the present litigation.  My understanding is that the Plaintiffs challenge the alleged "sleep-related" misrepresentations and omission on the disputed product's packaging.[426]  Correspondingly, my understanding is that the Plaintiffs do *not* challenge the Fisher-Price logo or brand.  Even if the Fisher-Price logo and/or brand were material (*e.g.*, if consumers are more likely to purchase the disputed product when its package displays—as opposed to omits—the Fisher-Price name mark or logo), this would *not* be directly relevant to the "sleep-related" allegations at issue.

292.    In his section on the materiality of Fisher-Price's logo, Mr. Silverman discusses the history of brands, the textbook definition of a brand, and the notion that a brand is more than a logo.[427]  These broad characterizations, as well as Mr. Silverman's citations for these general points, do *not* substantiate his specific opinion regarding the Fisher-Price logo.  For example, Mr. Silverman's statement that "what comes to mind when consumers see a logo is a significant factor in how consumers not only differentiate brands, but what those brands mean to them"[428] cannot be applied to this litigation without an understanding of what the brand means to consumers.

293.    Mr. Silverman then argues that the Fisher-Price brand communicates trustworthiness and safety to the consumer.  However, what meanings and messages the Fisher-Price brand communicates to consumers is an empirical question, and Mr.

---

as Peter and Olson write: "**Interpretation processes** require exposure to information and involve two related cognitive processes: attention and comprehension.  **Attention** governs how consumers select which information to interpret and which information to ignore.  **Comprehension** refers to how consumers determine the subjective meanings of information and thus create personal knowledge and beliefs" [emphases in the original]; *ibid.*

[425] Silverman Report, ¶ 34.

[426] *See, e.g.*, *Complaint*, ¶¶ 185 & 190 – 191.

[427] Silverman Report ¶¶ 90 – 92.

[428] *Id.*, ¶ 93.

Silverman fails to provide any substantiation for the presumed "safety" and "trust" interpretation. The sources cited by Mr. Silverman are largely irrelevant,[429] and the only evidence presented for the notion that *consumers* believe Fisher-Price to be trustworthy is based on the BrandSpark awards—which were given for Baby Toys and Children's Learning Toys (not for baby durables or baby gear).[430]

294. Throughout his discussion on the Fisher-Price logo and brand, Mr. Silverman conflates (or inappropriately equates) Fisher-Price's messaging about product safety with *consumers' actual beliefs* about the level of safety potentially communicated by Fisher-Price.[431] However, Mr. Silverman fails to provide any data or evidence that the Fisher-Price messaging had the assumed effect on consumer beliefs. Assuming arguendo that the Fisher-Price brand name and/or logo conveyed safety-related messages to consumers, the Silverman Report presents no evidence that consumers perceived such messages as pertaining specifically to the safety of using the product for infant sleep. That is, consumers may have assumed that the product was safe to use to temporarily "park" a baby, to entertain or play with a baby, or to soothe a baby (while the baby is awake), as indicated by the named Plaintiffs' reported uses of the product.[432]

295. Mr. Silverman's opinions about the Fisher-Price logo all rest on empirically testable assumptions about consumers' beliefs, perceptions, and inferences; however, Mr. Silverman fails to empirically test these assumptions or support them using existing

---

[429] That is, Mr. Silverman refers to: (*i*) his own experience with unspecified focus groups for unrelated product categories, such as financial services (*id.*, ¶ 97); (*ii*) a graph from a study purportedly finding that most U.S. consumers say that they "sometimes" or "almost always" look for brand names when purchasing food items (*id.*, ¶ 94), which does not mention data on trust; and (*iii*) Fisher-Price's company description on their website and internal documents (*id.*, ¶¶ 95 – 98).

[430] *Id.*, ¶¶ 99 – 100.

[431] For example, Mr. Silverman cites a Fisher-Price email and statements on the Fisher-Price website as support for his argument that Fisher-Price had a reputation specifically for safe products; *see id.*, ¶¶ 102 – 105. He also elaborates on internal Fisher-Price discussions of a potential "Safe for overnight sleep" claim that, if it was never added to the packaging, could not possibly have impacted consumers' beliefs or purchase decisions; *see id.*, ¶¶ 106 – 108.

[432] *See, e.g.*, Cuddy Deposition, pp. 155 & 182 – 184; Hanson Deposition, pp. 104 – 105 & 139 – 142; Huey Deposition, pp. 127 – 129, 134 – 135, & 173 – 174; Nowlin Deposition, pp. 188 – 189 & 197; Simmonds Deposition, pp. 95 – 96 & 106 – 108.

literature or research. For example, Mr. Silverman writes that "In [his] experience it would have been virtually impossible for consumers to ignore the overall message conveyed by the various marketing statements, photographs, and presence of the Fisher-Price logo on the Rock 'n Play Sleeper packages […]."[433] This assertion is directly contradicted by the large academic literature on information overload and advertising clutter, including Professor O'Guinn and his co-author's textbook (cited in the Silverman Report), which states as follows:[434]

> Consumers simply get too much information and confront too many choices to be able to comprehensively and effectively apply all that information to the choice task[…]. Even if a person wanted to, it would be impossible to process and integrate every advertising message that he or she is exposed to each day.

Mr. Silverman *cannot* know whether the Fisher-Price logo on the disputed product's packaging conveyed anything about the safety of using the product for sleep or whether the logo was material to consumers' decisions to purchase the product.

### E.2.8. *Mr. Silverman's Opinion that "Omitted" Safety Information Would Have Been Material to Consumers is Unsubstantiated*

296.    Mr. Silverman criticizes the lack of a warning label regarding sleep on the outside of the product's package.[435] After discussing prior events where sales of products in other categories (*e.g.*, automotive and medical) declined after product safety issues became highly publicized, Mr. Silverman opines that the disclosure of safety concerns involving the disputed Fisher-Price products would have been material and "would have resulted in the product not being purchased."[436]

297.    However, Mr. Silverman's argument is anecdotal and speculative. The examples he discusses (*e.g.*, involving Suzuki Samurai SUV rollovers, Volkswagen emissions software, and Tylenol tampering) relate to negative publicity and are not dispositive with regard to whether and how an on-package safety warning would impact

---

[433] Silverman Report ¶ 110.
[434] O'Guinn et al. (2019), p. 114. *See also* Peter and Olson (2008).
[435] *Id.*, ¶¶ 126 – 129.
[436] *Id.*, ¶ 133.

consumers' purchase decisions. Further, such examples do not constitute an unbiased, systematic analysis that can be generalized to other product categories (such as the products at issue in this litigation), and Mr. Silverman ignores any situation in which safety concerns had little effect on consumers.

298.    Importantly, Mr. Silverman never specifies what the omitted information is that he believes would be material if presented on the product package. Mr. Silverman presumably recognizes that the effects, if any, of a warning label on consumers' purchase decisions depend on the specifics of the label, based on his experience with tobacco product labeling and his understanding "that the Canadian warning labels have been found to be far more effective than the U.S. labels."[437] He speculates about a hypothetical warning label "large enough to be easily noticed and read [that] was prominently displayed on the front of the package," stating that its message "needed to include clear, direct and accurate information about the possible dangers posed by the product, including that they posed a risk of death."[438] However, the Silverman Report does not test or even present a clear warning label that he would consider material.

299.    Mr. Silverman's claims about the materiality of a warning label seemingly do *not* apply to an industry-standard or commercially viable warning label or a label clarifying intended usage, but only to a label that is *sufficiently extreme*.[439] In fact, the Dennis Survey

---

[437] *Id.*, ¶ 133.

[438] *Id.*, ¶ 136.

[439] In his report, Mr. Silverman couches his opinion regarding a "disclaimer" in curiously speculative terms: "**I cannot help but wonder if** some, if not many of those tender lives, would have been saved had a warning label large enough to be easily noticed and read was prominently displayed on the front panel of the package"; *id.*, ¶ 136 (emphasis added). Such an opinion is not informative to the question of materiality in this litigation, as an exaggerated warning conveying a sufficiently extreme message would presumably be material when added to the packaging of *any* product, no matter how safe the product is in actuality. At his deposition, Mr. Silverman appeared to acknowledge the lack of commercial viability (as well as existence) of extreme "disclaimers" that warn of inherent danger; *see, e.g.*, Silverman Deposition, pp. 291 ("Q. In your 50 years of experience, is there any baby product you can think of where the packaging communicates that it's not safe to use with a baby? A. I can't think of any.") & 209 – 210 ("THE WITNESS: […] If I'm understanding your question, you're asking whether or not it would be appropriate to put a warning or a disclaimer on a package of a product that makes no references, whatsoever, to sleep, that product – you know, that the product is used for sleep. If the product – if the product is inherently dangerous, a product for an infant is inherently dangerous, if it poses a danger, I

(conducted on behalf of the Plaintiffs) tested one such "extreme" label, in the form of a "disclaimer" that read: "**THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS**."[440]  Yet, as discussed in Subsection C.7 of this *Rebuttal Expert Report*, even faced with such a leading and biased "disclaimer," the *majority* (nearly 60%) of participants in that survey nevertheless indicated that they would be likely or extremely likely to purchase the product (whereas 30% of participants indicated that they would unlikely or extremely unlikely to purchase the product).  Such findings are directly at odds with Mr. Silverman's opinion that a disclosure about safety risks "would have been material to a reasonable consumer, and most likely would have resulted in the product not being purchased"[441] (because, as Mr. Silverman writes rhetorically, "After all, who would want to purchase a product that posed a serious risk for use by an infant child?").[442]

### E.3. <u>Mr. Silverman's Opinions Regarding the Kivetz Survey are Unsubstantiated, Unscientific, and Evince Mr. Silverman's Lack of Survey Expertise</u>

300.    Contrary to Mr. Silverman's unsubstantiated opinions, the Kivetz Survey provides direct empirical evidence that the alleged "sleep-related" packaging misrepresentations and omission are *not* a common or material factor in consumers' decisions to purchase the disputed Fisher-Price products.  In fact, the Kivetz Survey tested *exactly* the alleged misrepresentations (except for "Nighttime sleeper and playtime seat!", which did not appear on the tested package) and omission deemed by Mr. Silverman to be material.[443]  The Kivetz Survey's findings demonstrate that these alleged

---

suppose it would be appropriate to put a warning on it, that this product could result in – in – in harming the infant or worse.  The – if that's the case, I'm not quite sure why the product is being marketed at all.").
[440] As noted earlier, the Dennis Survey went further by highlighting actual deaths allegedly associated with the disputed products, instructing participants to "[s]uppose the manufacturer of the product put this warning label on the front of the packaging because of actual injuries and fatalities that occurred in real life"; *see* Dennis Declaration, Attachment C, p. 130.
[441] Silverman Report, ¶ 133.
[442] *Ibid*.
[443] That is, inter alia, the Kivetz Survey's control package replaced, wherever appearing on the test (*i.e.*, allegedly deceptive) package: (*i*) the name "Rock 'N Play Sleeper" with "Rock 'n Play Soother"; (*ii*) the

misrepresentations and omission are *not* common or material purchase drivers.[444] However, rather than providing a scientific analysis or critique of the Kivetz Survey, the Silverman Report merely dismisses the Kivetz Survey and its findings as "flawed."[445] As explained next, Mr. Silverman's explanation for why he considers the survey flawed relies on subjective opinions, a presumption of the Plaintiffs' allegations, and fundamental misunderstandings of the Kivetz Survey and of fundamental principles of survey design.

301. *First*, by his own admission, Mr. Silverman is not a survey expert.[446] Mr. Silverman has also not demonstrated an understanding of best practices in survey methodology, and his opinion regarding the Kivetz Survey is not based on expertise in, or analysis of, sampling, instrument design, or statistical analysis. Instead, as detailed next, Mr. Silverman's view of the Kivetz Survey relies on his speculation and a lack of understanding of research methods.

302. *Second*, Mr. Silverman asserts that the comparison between the Kivetz Survey's test and control packages "was based on an apples to oranges comparison" that "makes little sense to [him]."[447] He bases this criticism on what he "find[s] hard to believe"[448] and what he "find[s] ironic,"[449] and offers his own speculation for what "most likely explains the counter-intuitive results of Dr. Kivetz's survey."[450] However, what Mr. Silverman finds intuitively (un)appealing (and his apparent lack of familiarity with

---

phrase "Baby can sleep at a comfortable incline all night long!" with "Baby can be soothed at a comfortable incline anytime!"; (*iii*) the phrase "Extra-plush fabrics for extra-comfy sleep" with "Extra-plush fabrics for extra-comfy soothing"; (*iv*) images of sleeping babies with images of the same babies except with eyes open; and (*v*) images of a mom laying in bed with images of the same mom sitting on a sofa. For a complete description of the changes made to the control stimulus vis-à-vis the test stimulus, *see* Subsection C.4 of my June 16, 2021 *Expert Report*.

[444] *See Kivetz Expert Report*, ¶ 62 & Table 1.
[445] Silverman Report ¶¶ 35 & 139.
[446] *See, e.g.*, Silverman Deposition, pp. 159 & 165. For example, as Mr. Silverman admitted, he does not have any formal academic training in survey research methods, sampling, measurement, interviewing, and/or statistics; does not have any experience teaching survey methods; and has not conducted and published peer-reviewed (survey, marketing, or other) research; *see id*., pp. 32 – 39, 63, & 160.
[447] Silverman Report, ¶ 139.
[448] *Id.*, ¶ 143.
[449] *Id.*, ¶ 148.
[450] *Id.*, ¶ 144.

"test versus control" experimental research designs)[451] cannot form a scientific basis for an opinion.

303.    As noted earlier, the Kivetz Survey tested whether the alleged "sleep-related" packaging misrepresentations and omission increased consumers' likelihood of purchasing the disputed product (per the Plaintiffs' hypothesis), compared to a counterfactual scenario in which these "sleep-related" misrepresentations and omission were "remedied."  Specifically, my survey tested nearly all of the packaging elements claimed by Mr. Silverman to be material for consumers.  For example, Mr. Silverman asserts at various points (emphases added):

- And it is evident to me that positioning the **Rock 'n Play Sleepers as sleepers** would have strongly resonated with many parents of infant children.[452]

- So a **product name** that promises a benefit that serves both the infant and his or her parents would, in my opinion, impress and motivate consumers. The **name "Rock 'n Play Sleeper"** most likely did just that.[453]

- The claim **"Baby can sleep at a comfortable incline all night long!"** would be material to consumers […]  [A] message that **a baby would be able to sleep comfortably all night long in a Rock 'n Play Sleeper** would be, in my opinion, seen as a material benefit by a reasonable consumer.[454]

- **"Plush fabrics for extra-comfy sleep"** also reiterates the other "sleep" promises displayed on the Rock 'n Play packages; as I learned years ago from Mr. Ogilvy, "The more you tell, the more you sell."[455]

- Those **images [of a mom on a bed overlooking her sleeping baby]** are most certainly as powerful, if not more so, than the written "sleep claims" previously discussed. In my opinion they would be difficult for the parents of a newborn child (or friends and/or relatives looking for a gift for parents of a newborn) to resist.[456]

- The **images on Defendants' packages** present consumers with a solution to a problem, one that in my opinion would be material to a reasonable consumer.[457]

---

[451] *See, e.g.*, Diamond (2012), pp. 206 – 210.  *See also* Subsection D.2 of this *Rebuttal Expert Report*, which discusses how a (cause-effect) experimental design with a proper control can assess causal propositions and account for preexisting beliefs.
[452] Silverman Report, ¶ 48.
[453] *Id.*, ¶ 51.
[454] *Id.*, p. 22 & ¶ 69.
[455] *Id.*, ¶ 77.
[456] *Id.*, ¶ 82.
[457] *Id.*, ¶ 88.

304.    Mr. Silverman's assertions provide a testable prediction: If not for the presence of the challenged elements of the packaging, the product would not have "resonated with,"[458] "impress[ed] and motivate[ed],"[459] and "present[ed] consumers with a solution to a problem,"[460] who then would not have been as "responsive"[461] and not found the product "difficult…to resist."[462]  In short, using Mr. Silverman's terms, without the challenged package elements that supposedly "tell" the consumer about the alleged "sleep-related" benefit, the product would "sell"[463] less.  Extending the logic of Mr. Silverman's argument that (*i*) sleep-deprived parents purchased the product primarily for their infants to sleep in for prolonged periods,[464] as well as that (*ii*) a "soother" is completely different from a "sleeper"[465] (an opinion that the Plaintiffs' other expert, Dr. Dennis, does not share given his criticisms of the Kivetz Survey's control),[466] leads to the conclusion that a product that only promised to "soothe" an infant would not solve parents' sleep-deprivation problem, and they would therefore be much less likely to buy the product.  Mr. Silverman's opinions therefore imply that if the challenged sleep-related elements were removed from the package (either entirely, or replaced with corresponding soothing-related elements), then consumers would be substantially less likely to buy the product.  That is precisely what the Kivetz Survey tests.

305.    Mr. Silverman appears to primarily object to the Kivetz Survey's control package.  Characterizing the Kivetz Survey's comparison of test versus control packages as "based on an apples to oranges comparison of two, <u>completely differently positioned products</u>,"[467] he opines that "Dr. Kivetz altered the package design of the real product to

---

[458] *Id.*, ¶ 48.
[459] *Id.*, ¶ 51.
[460] *Id.*, ¶ 88.
[461] *Id.*, ¶ 78.
[462] *Id.*, ¶ 82.
[463] *Id.*, ¶ 77.
[464] *See id.*, ¶¶ 49 – 56, 69 – 70, 74 – 78, & 81 – 88.
[465] *See, e.g., id.*, ¶¶ 139 & 141 – 142.  *See also* Dennis Deposition, pp. 259 – 260.
[466] *See* Subsection D.3 of this *Rebuttal Expert Report*.
[467] Silverman Report, ¶ 139.  Emphasis in the original.

conduct a comparison to a product that consumers would normally not see as an alternative to each other."[468]  (By contrast, Dr. Dennis argues that the Kivetz Survey did not go *far enough* in changing the test "Sleeper" package to construct the control "Soother" package).

306.    Mr. Silverman is making a paradoxical argument for a standard of evidence that would render his opinions *untestable.*  On the one hand, he argues that the product was purchased by parents because the package communicated that it was for sleep and the product would not have been purchased *but for* that allegedly communicated benefit. On the other hand, he also argues (with no basis) that it is not valid to compare the actual package to a control package with exactly those alleged misrepresentations corrected, because the control package would then not communicate the benefit (*i.e.*, it is "a product that consumers would normally not see as an alternative to each other,"[469] "not a 'sleeper,'"[470] "a product intended to serve a completely different purpose"[471]).  Yet, a comparison between a package that contains the alleged "sleep-related" misrepresentations and a corresponding package that does *not* contain the same alleged misrepresentations is exactly how the causal impact of the challenged claims can be evaluated.

307.    As he is admittedly not a survey expert, Mr. Silverman is evidently unaware of widely accepted standards for (as well as fundamental aspects related to) the use of survey controls in academic, industry, and litigation surveys.[472]  For example, Professor Diamond states:[473]

> The general principle for choosing an appropriate control is easily stated: It should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.

---

[468] *Ibid.*
[469] *Id.*, ¶ 139.
[470] *Id.*, ¶ 141.
[471] *Id.*, ¶ 142.
[472] *See, e.g.*, Silverman Deposition, p. 305.
[473] Diamond (2012), p. 210.

Although presented as criticism, Mr. Silverman's characterization of the Kivetz Survey's control stimulus in fact *supports* the soundness of the research method. Mr. Silverman presumably agrees that the challenged claims—which allegedly communicate a "sleep-related" positioning (*i.e.*, the characteristic whose influence is being assessed)—are absent in the control, as they should be.

308. *Third*, it is noteworthy that Mr. Silverman *defends* the 2011 Research comparing a "Rock 'n Play Sleeper" positioning to a "Rock 'n Play Soother" positioning (without addressing *any* of the Kivetz Report's methodological criticisms of the 2011 Research).[474] ███████████████████████████████████████

████████████████████████████████████████[475] Mr. Silverman speculates that Fisher-Price "learned that consumers preferred the name Rock 'n Play Sleeper," that the survey "appears to have played a significant role in Fisher-Price's decision to not rename the Rock 'n Play Sleeper, most likely resulted in Defendants' avoiding a costly mistake,"[476] and that it "appears to have generated very useful information that Fisher-Price actually relied upon, and that at the end of the day, most likely contributed to the sales success of the Rock 'n Play Sleeper product line."[477] Mr. Silverman presents *no* substantiation for any of these speculations about Fisher-Price's decision making process.

309. The apparent contradiction between Mr. Silverman's rejection of the Kivetz Survey and his defense of the 2011 Research indicates a tendency by Mr. Silverman to assume as fact the Plaintiffs' assertions, regardless of any existing empirical evidence to the contrary.[478] In criticizing the Kivetz Survey, Mr. Silverman argues that the product

---

[474] Silverman Report, ¶ 49. Mr. Silverman states "But as a marketing and advertising professional, I find his conclusion that the 2011 survey was seriously flawed to be without merit" (*ibid*.) without addressing any of my detailed criticisms of the survey methods, as set forth in the *Kivetz Expert Report*.
[475] *Kivetz Expert Report*, ¶ 109.
[476] Silverman Report, ¶ 146.
[477] *Id.*, ¶ 148.
[478] A great deal of research on social-cognition has demonstrated that people often exhibit "confirmation bias," particularly when they are motivated to confirm a particular hypothesis. *See, e.g.*, Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427 – 448; Kunda, Ziva (1990), "The Case for Motivated Reasoning,"

"was positioned as a device in which babies – first and foremost – could <u>sleep</u>." He proceeds to argue that the Kivetz Survey must be wrong, precisely because it did not find evidence that alleged "sleep-related" packaging misrepresentations and omission are material:[479]

> [F]rom my perspective as a professional who has reviewed the results of thousands of surveys intended to determine why consumers prefer one product or another, I have never seen one designed to prove consumers are indifferent to **the prime reason a product exists** by comparing it to a product intended to serve a completely different purpose.
>
> In this case, **I find it hard to believe** that consumers bought a product marketed as a nighttime sleeper for any reason other than that it was a sleeper. Yes, the Rock 'n Play Sleeper had other attributes which provided consumers with additional reasons to purchase it, but in my opinion **those attributes were secondary to the product's primary purpose**. [Emphases added]

Because Mr. Silverman *assumes* that the primary purpose of the product for consumers was for infant sleep, and because he *assumes* that package elements communicating a primary purpose must be material, he rejects without basis the Kivetz Survey (whose results show otherwise) while accepting without basis the 2011 Research (whose results he *erroneously* believes are consistent with his assumptions).

310.     Mr. Silverman makes a highly revealing statement, arguing for a reliance on an (unspecified) "practical and pragmatic methodology typically used by sophisticated marketers" instead of academic standards for experimental research:[480]

Marketers use surveys to <u>learn something</u>, not <u>prove something</u>.

Mr. Silverman's subjective and unsubstantiated opinions are in line with his preferred approach of conveying what he believes he has learned. At his deposition, Mr. Silverman admitted that *he would not change his opinion* based on empirical evidence from a survey:[481]

---

*Psychological Bulletin,* 108(3), 480 – 498; Lord, Charles G., Lee Ross, and Mark R. Lepper (1979), "Biased Assimilation and Attitude Polarization: The Effects of Prior Theories on Subsequently Considered Evidence," *Journal of Personality and Social Psychology,* 37, 2098 – 2109; Wason (1960), "On the Failure to Eliminate Hypotheses in a Conceptual Task," *Quarterly Journal Experimental Psychology,* 12, pp. 129-140.
[479] Silverman Report, ¶¶ 142 & 143.
[480] *Id.*, ¶ 146.
[481] Silverman Deposition, pp. 162 – 163.

Q. If you did see a report that – a survey that was inconsistent with your opinions, would – how would that affect your opinions in the case, in your – in your mind?

A. It wouldn't change my opinions. My opinions are my opinions.

311.    In other words, even in the face of evidence to the contrary, Mr. Silverman testified that he would not revise his opinions in this matter.  Such an elevation of one's own opinions (no matter how unsubstantiated they may be) over proof-worthy scientific evidence renders Mr. Silverman's analyses and conclusions non-dispositive and unreliable.


312.    I reserve the right to supplement and/or revise my opinion and this report in response to any further information provided by the parties and/or in light of additional documents or testimony, which may be brought to my attention after the date of my signature below.

313.    This *Expert Report* is to be used only for the purpose of this litigation and may not be published, distributed, or used for any other purpose without my prior written consent.


| | |
|---|---|
| December 13, 2021 | _R. Kivetz_ |
| Date | Dr. Ran Kivetz, Ph.D. |

## EXHIBIT A: CURRICULUM VITAE OF DR. RAN KIVETZ

### Dr. Ran Kivetz
*Academic Curriculum Vitae – December 2021*

Graduate School of Business, Columbia University, 3022 Broadway, NY, NY 10027
Tel: (212) 854-4555 | e-mail:  rk566@columbia.edu

**Education:**

Ph.D., Stanford University, Graduate School of Business
Marketing, September 1996 – June 2000

M.A., Stanford University, Department of Psychology
Psychology, June 2000

B.A., Tel Aviv University
Economics and Psychology, June 1995

**Academic Employment:**

Philip H. Geier, Jr., Professor of Marketing, Columbia University Business School, 2008
– present

Professor of Business, Columbia University Business School, 2006 – 2008

Sidney Taurel Associate Professor of Business, Columbia University Business School,
2004 - 2006

Associate Professor, Columbia University Business School, 2003 – 2004

Assistant Professor, Columbia University Business School, 2000 – 2003

**Publications:**

Weiss, Liad and Ran Kivetz (2019), "Opportunity Cost Overestimation," *Journal of
Marketing Research*, 56(3), 518-533.

Simonson, Itamar and Ran Kivetz (2018), "Bringing (Contingent) Loss Aversion Down
to Earth – A Comment on Gal & Rucker's Rejection of "Losses Loom Larger Than
Gains," *Journal of Consumer Psychology*, 28(3), 517-522.

Kivetz, Ran, Rachel Meng, and Daniel He (2017), "Hyperopia: A Theory of Reverse
Self-Control," in *Handbook of Self-Control in Health and Well-Being*, de Ridder, Denise,
Marieke Adriaanse, and Kentaro Fujita (eds), Routledge.

Kivetz, Ran and Yuhuang Zheng (2017), "The Effects of Promotions on Hedonic versus
Utilitarian Purchases," *Journal of Consumer Psychology*, 27(1), 59-68.

**Publications:** (continued)

Keinan, Anat, Ran Kivetz, and Oded Netzer (2016), "The Functional Alibi," *Journal of the Association for Consumer Research*, Special Issue on the Science of Hedonistic Consumption, 1(4), 479-496. (Lead article)

Rom Schrift, Ran Kivetz, and Oded Netzer (2016), "Complicating Decisions: The Work Ethic Heuristic and the Construction of Effortful Decisions," *Journal of Experimental Psychology: General*, 145(7), 807-829. (Lead article)

Sela, Aner, Itamar Simonson, and Ran Kivetz (2013), "Beating the Market: The Allure of Unintended Value," *Journal of Marketing Research*, 50(6), 691-705.

Gershoff, Andrew, Ran Kivetz, and Anat Keinan (2012), "Consumer Response to Versioning: How Brands' Production Methods Affect Perceptions of Unfairness," *Journal of Consumer Research*, 39(2), 382–398.

Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: American Bar Association, pp. 243-259.

Keinan, Anat and Ran Kivetz (2011), "Productivity Mindset and the Consumption of Collectable Experiences," *Journal of Consumer Research*, 37(6), 935-950. (*Winner*, 2011 *Ferber Award*)

Schrift, Rom, Oded Netzer, and Ran Kivetz (2011), "Complicating Choice," *Journal of Marketing Research*, 48(2), 308-326. (*Winner*, 2010 *Best Competitive Paper Award*, *Society of Consumer Psychology*)

Urminsky, Oleg and Ran Kivetz (2011), "Scope Insensitivity and the 'Mere Token' Effect," *Journal of Marketing Research*, 48(2), 282-295.

Levav, Jonathan, Ran Kivetz, and K. Cecile Cho (2010), "Motivational Compatibility and Choice Conflict," *Journal of Consumer Research*, 37(3), 429-442.

Keinan, Anat and Ran Kivetz (2008), "Remedying Hyperopia: The Effects of Self-Control Regret on Consumer Behavior," *Journal of Marketing Research*, 45(6), 676-689.

Kivetz, Ran, Oded Netzer, and Rom Schrift (2008), "The Synthesis of Preference: Bridging Behavioral Decision Research and Marketing Science," *Journal of Consumer Psychology*, 18(3), 179-186.

Keinan, Anat and Ran Kivetz (2008), "When Virtue Is a Vice," *Harvard Business Review*, July-August.

**Publications:** (continued)

Kivetz, Ran, "Farsightedness (2007)," in *International Encyclopedia of the Social Sciences*, 2nd Edition, Darity Jr., William (ed.), Detroit: Macmillan/Thomson Gale.

Kivetz, Ran, Oleg Urminsky, and Yuhuang Zheng (2006), "The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," *Journal of Marketing Research*, 43(1), 39-58. (*Finalist*, 2011 *William O'Dell Award*; *Finalist*, 2007 *Paul Green Award*)

Kivetz, Ran and Anat Keinan (2006), "Repenting Hyperopia: An Analysis of Self-Control Regrets," *Journal of Consumer Research*, 33(2), 273-282. (*Finalist*, 2009 *Best Article Award* for a paper published in *JCR* in 2006)

Kivetz, Ran, and Yuhuang Zheng (2006), "Determinants of Justification and Self-Control," *Journal of Experimental Psychology: General*, 135(4), 572-587.

Rottenstreich, Yuval, and Ran Kivetz (2006), "On Decision Making without Likelihood Judgment," *Organizational Behavior and Human Decision Processes*, 101(1), 74-88.

Kivetz, Ran (2005), "Promotion Reactance: The Role of Effort-Reward Congruity," *Journal of Consumer Research*, 31(4), 725-736. (*Winner*, 2005 *Ferber Award*)

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004), "Alternative Models for Capturing the Compromise Effect," *Journal of Marketing Research*, 41(3), 237-257. (Lead article) (*Finalist*, 2009 *William O'Dell Award*; *Finalist*, 2005 *Paul Green Award*)

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004), "Extending Compromise Effect Models to Complex Buying Situations and Other Context Effects," *Journal of Marketing Research*, 41(3), 262-268.

Kivetz, Ran (2003), "The Effects of Effort and Intrinsic Motivation on Risky Choice," *Marketing Science*, 22(4), 477-502.

Kivetz, Ran and Itamar Simonson (2003), "The Idiosyncratic Fit Heuristic: Effort Advantage as a Determinant of Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40(4), 454-467.

Kivetz, Ran and Itamar Simonson (2002b), "Self-Control for the Righteous: Toward A Theory of Pre-Commitment to Indulgence," *Journal of Consumer Research*, 29(2), 199-217. (*Finalist*, 2005 *Best Article Award* for a paper published in *JCR* in 2002)

Kivetz, Ran and Itamar Simonson (2002a), "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," *Journal of Marketing Research*, 39(2), 155-170. (*Finalist*, 2007 *William O'Dell Award*)

**Publications:** (continued)

Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427-448. (*Finalist*, 2005 *William O'Dell Award*)

Kivetz, Ran (1999), "Advances in Research on Mental Accounting and Reason-Based Choice," *Marketing Letters*, 10(3), 249-266.

**Work Under Review or Under Revision in Peer-Reviewed Journals:**

Kivetz, Ran and Rachel Meng, "Circular Self-Rewards vs. Cash (Dis)Incentives: Motivating Effort, Goal Pursuit, and Positive Habits."

Pocheptsova, Anastasiya, Ran Kivetz, and Ravi Dhar, "Consumer Decisions to Rent versus Buy."

**Manuscripts in Preparation:**

Danziger, Shai, Liat Hadar, Ran Kivetz, and Itzhak Gnizy, "Price Quote Format and Inferred Artisanship and Marketing Orientation."

He, Daniel and Ran Kivetz, "Being in the Moment: The Effects of Ephemeral Communication in Social Media."

Kivetz, Ran and Yifat Kivetz, "Reconciling Mood Congruency and Mood Regulation: The Role of Psychological Distance."

Shamis, Asaf and Ran Kivetz, "From Colonialism to Networked Colonialism: Personalized Networked Communications and Habermas's Theory of Modern Society."

**Working Papers:**

"Democracy between Private Space, Public Space, and Cyberspace," with Asaf Shamis.

"The Behavioral Economics of Incentives."

"Exercising Self-Control Through Self-reward," with Rachel Meng.

**Selected Research-In-Progress:**

"The Surprising Robustness of Prospect Theory in the Long Run."

"The Effects of Reward Programs," with Ricardo Montoya and Oded Netzer.

"The Bounded Rationality of Effort-Reward Choices: When Principles Overshadow Expectancies," with Oleg Urminsky.

"The Intersection of Behavioral Economics and Political Science."

"A Republic of Selfies: Personalizing Public Messages in Digital Media," with Asaf Shamis & Daniel He.

"Tie Signaling in Social Media," with Daniel He.

"Consumer Search."

**Academic Honors and Awards:**

Finalist, 2016 William O'Dell Award for the Journal of Marketing Research article published in 2006 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Faculty Fellow of the Institute for Social and Economic Research and Policy, 2002-2015

Ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2010–2014

Finalist, 2014 Best Article Award for the Journal of Consumer Research article published in 2011

Ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2009-2013

Finalist, 2011 William O'Dell Award for the Journal of Marketing Research article published in 2006 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Winner of the 2010 Best Competitive Paper Award granted by the Society of Consumer Psychology

**Academic Honors and Awards:** (continued)

Rated as the third most prolific scholar in the leading marketing journals during 1982-2006 (Seggie, S. H. and D. A. Griffith, 2009; "What Does It Take to Get Promoted in Marketing Academia? Understanding Exceptional Publication Productivity in the Leading Marketing Journals," Journal of Marketing, 73(1), 122-132.)

Finalist, 2009 William O'Dell Award for the Journal of Marketing Research article published in 2004 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice."

Finalist, 2009 Best Article Award for the Journal of Consumer Research article published in 2006

Winner of the 2007 Early Contribution Award from the Society of Consumer Psychology

Finalist, 2007 William O'Dell Award for the Journal of Marketing Research article published in 2002 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Finalist, 2007 Paul Green Award for the Journal of Marketing Research article published in 2004 that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing"

Winner of the 2005 Ferber Award granted to the "best interdisciplinary dissertation article published in the latest volume of the Journal of Consumer Research"

Finalist, 2005 William O'Dell Award for the Journal of Marketing Research article published in 2000 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Finalist, 2005 Best Article Award for the Journal of Consumer Research article published in 2002

Finalist, 2005 Paul Green Award for the Journal of Marketing Research article published in 2004 that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing."

Winner of the 2005 Columbia Business School Dean's Award for Innovation in the Curriculum

Lang Faculty Research Fellowship in Entrepreneurship, 2005

Lang Faculty Research Fellowship in Entrepreneurship, 2004

Outstanding Reviewer Award, Journal of Consumer Research, 2003-2004

**Academic Honors and Awards:** (continued)

Invited as Faculty Presenter, 2004 Association for Consumer Research Doctoral Symposium

Young Scholars Program, Marketing Science Institute, 2003

Research Grant, Columbia Center for Excellence in E-Business, 2003

Seed Grant, Institute for Social and Economic Research and Policy, 2001

Doctoral Consortium Fellow, American Marketing Association, 1999

Ph.D. Merit Award, Stanford Graduate School of Business, 1999

Graduate Fellow and Grant, Stanford Center on Conflict and Negotiation, 1997-1998

Jaedicke Award Scholar (in recognition of outstanding academic performance), Stanford Graduate School of Business, 1996-1997

Dean's Honor List with Distinction, Faculty of Social Sciences (Economics), Tel Aviv University, 1995

*****************

**Teaching:**

Winner of the Columbia Business School 2005 Dean's Award for Innovation in the Curriculum

*Ph.D. Courses*

Bridging Behavioral Economics with Marketing Science (Fall 2019)
Student Evaluation 4.9 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Spring 2018)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Spring 2016)
Student Evaluation 4.2 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2013)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2011)
Student Evaluation 4.7 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2008)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2005)
Student Evaluation 4.8 on 5-point scale

Consumer Behavior – I (Fall 2005)
Student Evaluation 4.7 on 5-point scale

Multidisciplinary Approaches to Human Decision Making (Spring 2004)

Bridging Behavioral Decision Research with Marketing Science (Spring 2003)
Student Evaluation 4.8 on 5-point scale

Multidisciplinary Approaches to Human Decision Making (Spring 2002)

Totally Eclectic Seminar in Marketing (Spring 2001)
Student Evaluation 6.2 on 7-point scale

*****************

**Teaching:** (continued)

*High-Technology Entrepreneurship (Executive MBA Elective)*

Spring 2019 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2018 (1 section)
Student Evaluation 4.6 on 5-point scale

Spring 2017 (1 section)
Student Evaluation 4.5 on 5-point scale

*High-Technology Entrepreneurship (Executive MBA & MBA Elective)*

Spring 2016 (1 section)
Student Evaluation 4.6 on 5-point scale

Spring 2009 (Master Class: 1 section)
Student Evaluation 4.7 on 5-point scale

Spring 2008 (Master Class: 1 section)
Student Evaluation 4.4 on 5-point scale

*High-Technology Marketing and Entrepreneurship (Executive MBA Elective)*

Spring 2008 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2006 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2005 (1 section)
Student Evaluation 4.9 on 5-point scale

Spring 2004 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2003 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2001 (1 section)
Student Evaluation 6.5 on 7-point scale

*High-Technology Marketing and Entrepreneurship (MBA Elective)*

Spring 2007 (1 section)
Student Evaluation 4.3 on 5-point scale

Spring 2006 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2004 (1 section)

**Teaching:** (continued)

Student Evaluation 4.9 on 5-point scale

Spring 2003 (1 section)
Student Evaluation 4.4 on 5-point scale

Spring 2002 (1 section)
Student Evaluation 6.4 on 7-point scale

Spring 2001 (1 section)
Student Evaluation 6.4 on 7-point scale

*Marketing Strategy and Management (Core Executive MBA Course)*

Spring 2021 (2 sections)
Student Evaluations 4.1 and 4.1 on 5-point scales

Fall 2020 (2 sections)
Student Evaluations 4.0 and 3.7 on 5-point scales

Spring 2020 (2 sections)
Student Evaluations 3.8 and 3.7 on 5-point scales

Fall 2019 (1 section)
Student Evaluation 4.9 on 5-point scale

Spring 2019 (2 sections)
Student Evaluations 4.2 and 3.2 on 5-point scales

Fall 2018 (1 section)
Student Evaluation 4.8 on 5-point scale

Spring 2016 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2012 (2 sections)
Student Evaluations 4.7 and 4.9 on 5-point scales

*Marketing Strategy (Core MBA Course)*

Fall 2013 (3 sections)
Student Evaluations 4.1, 3.8, and 4.1 on 5-point scales

Fall 2012 (3 sections)
Student Evaluations 3.9, 3.1, and 3.2 on 5-point scales

Fall 2011 (3 sections)
Student Evaluations 4.4, 3.8, and 4.1 on 5-point scales

**Teaching:** (continued)

*Marketing Strategy (Core MBA Course)*

Fall 2010 (3 sections)
Student Evaluations 4.5, 3.7, and 4.2 on 5-point scales

Fall 2009 (3 sections)
Student Evaluations 4.4, 4.3, and 4.2 on 5-point scales

*Marketing Management (Undergraduate Course)*

Fall 2019 (1 section)
Student Evaluations 4.3 on 5-point scale

Spring 2019 (1 section)
Student Evaluations 4.4 on 5-point scale

Fall 2018 (1 section)
Student Evaluations 4.7 on 5-point scale

Spring 2017 (1 section)
Student Evaluations 4.8 on 5-point scale

Spring 2014 (1 section)
Student Evaluations 4.7 on 5-point scale

*The Marketing of a Nation: Israel (Master Class)*

Spring 2009 (1 section)
Student Evaluation 4.8 on 5-point scale

*Columbia Business School Global Immersion Program*

Global Immersion Israel: Leadership & Innovation (March 2018)

*Columbia Business School Executive Education Program*

Design Your Innovation Blueprint (March 2017)

Innovate on Demand (November 2014; November 2015)

Innovation and Entrepreneurship (IE) @Columbia (February 2013; February 2014)

Columbia Senior Executive Program (May 2010; October 2010; May 2011; July 2012)

Marketing and Innovation (June 2013; June 2014; November 2014)

Customer Centricity (May 2010; September 2010; October 2011; February 2012)

New Product Development and Innovation (October 2002; June 2003)

Marketing Management: Strategies, Processes & Tools for Today's Challenges (Sep. 02; Apr. '03)

Marketing Management (April 2002)

Marketing Management in the New Economy (April 2001)

**Main Advisor for:**

Daniel He, Assistant Professor at the National University of Singapore (NUS)

Anat Keinan, Associate Professor at Boston University (formerly Associate Professor at Harvard Business School)

Rachel Meng

Rom Schrift, Associate Professor at Indiana University (formerly Assistant Professor at Wharton; co-advisor with Oded Netzer)

Oleg Urminsky, Full Professor at Chicago Booth School of Business

Yuhuang Zheng, Associate Professor at Tsinghua University

**Doctoral Committee Member for:**

Tamar Avnet, University of Toronto

Josko Brakus, University of Rochester

Cecile Cho, University of California Riverside

Yael Karlinsky-Shichor, Northeastern University

Yaoli Mao, Autodesk, Inc.

Valentina Melnyk, Tilburg University

Anirban Mukhopadhyay, Hong Kong University of Science and Technology (HKUST)

Qitian Ren, Chinese University of Hong Kong (Shenzhen)

Aner Sela, University of Florida

Kavita Srivastava, Indian Institute of Technology

Liad Weiss, University of Wisconsin – Madison

**Conference Publications:**

Danziger, Shai, Liat Hadar, Ran Kivetz, and Itzhak Gnizy (2019), "Price Quote Format and Inferred Artisanship and Marketing Orientation," special session paper presented at Society for Consumer Psychology Conference (SCP), Savannah, GA.

He, Daniel and Ran Kivetz (2017), "Technology-Driven Consumption," special session presented at Society for Consumer Psychology Conference (SCP), San Francisco, CA.

He, Daniel and Ran Kivetz (2016), "Ephemeral Messaging: Intimacy, Spontaneity, and Creativity in Fleeting Experiences," competitive paper presented at Association for Consumer Research Conference (ACR), Berlin, Germany.

**Conference Publications:** (continued)

Meng, Rachel and Ran Kivetz (2016), "Motivating Choices and Performance: Beyond Monetary Incentives," Association for Consumer Research Conference (ACR), Berlin, Germany.

He, Daniel and Ran Kivetz (2015), "Tie Signaling," in *NA - Advances in Consumer Research* Volume 43, eds. Kristin Diehl and Carolyn Yoon, Duluth, MN: Association for Consumer Research.

Netzer, Oded, Ran Kivetz, and Rom Schrift (2015), "Complicating Decisions: the Effort-Outcome Link and the Construction of Effortful Decision Processes," in *NA - Advances in Consumer Research* Volume 43, eds. Kristin Diehl and Carolyn Yoon, Duluth, MN: Association for Consumer Research.

Weiss, Liad and Ran Kivetz (2014), "Following-Through Opportunities: the Effects of Incidental Versus Inherent Choices," in *NA - Advances in Consumer Research* Volume 42, eds. June Cotte and Stacy Wood, Duluth, MN: Association for Consumer Research.

Simonson, Itamar, Aner Sela, and Ran Kivetz (2013), "Beating the Market: Competitive Mindset and the Allure of Unintended Value," in *NA - Advances in Consumer Research* Volume 41, eds. Simona Botti and Aparna Labroo, Duluth, MN: Association for Consumer Research.

Weiss, Liad and Ran Kivetz (2011), "When Not Redeeming a Coupon Feels Like Missing More Than Its Value," in *E - European Advances in Consumer Research* Volume 9, eds. Alan Bradshaw, Chris Hackley, and Pauline Maclaran, Duluth, MN: Association for Consumer Research.

Schrift, Rom, Ran Kivetz, and Oded Netzer (2011), "Creating the Illusion of Choice Through Selective Information Search and Retrieval," in *NA - Advances in Consumer Research* Volume 39, eds. Rohini Ahluwalia, Tanya L. Chartrand, and Rebecca K. Ratner, Duluth, MN: Association for Consumer Research.

Schrift, Rom, Oded Netzer, and Ran Kivetz (2010), "Complicating Choice," in *NA - Advances in Consumer Research* Volume 37, eds. Margaret C. Campbell, Jeff Inman, and Rik Pieters, Duluth, MN: Association for Consumer Research.

Sela, Aner, Itamar Simonson, and Ran Kivetz (2010), "Negative Effects of Explicit Customization on Perceptions of Opportunity," in *NA - Advances in Consumer Research* Volume 37, eds. Margaret C. Campbell, Jeff Inman, and Rik Pieters, Duluth, MN: Association for Consumer Research.

**Conference Publications:** (continued)

Keinan, Anat, Ran Kivetz, and Oded Netzer (2009), "Functional Alibi," in *NA - Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Kivetz, Ran and Anat Keinan (2009), "Hyperopia: A Theory of Reverse Self-Control," in *NA - Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Zheng, Yuhuang and Ran Kivetz (2009), "The Differential Promotion Effectiveness on Hedonic Versus Utilitarian Products," in *NA - Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Pocheptsova, Anastasiya, Ran Kivetz, and Ravi Dhar (2008), "Consumer Decisions to Rent Vs. Buy," in *NA - Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Keinan, Anat and Ran Kivetz (2008), "Productivity Mindset and the Consumption of Collectable Experiences," in *NA - Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Levav, Jonathan, Ran Kivetz, and Cecile Cho (2008), "Too Much Fit? How Regulatory Fit Can Turn Us Into Buridan's Asses," in *NA - Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Keinan, Anat and Ran Kivetz (2007), "Remedying Hyperopia: the Effects of Self-Control Regret on Consumer Behavior," in *NA - Advances in Consumer Research* Volume 34, eds. Gavan Fitzsimons and Vicki Morwitz, Duluth, MN: Association for Consumer Research.

Urminsky, Oleg and Ran Kivetz (2007), "Scope Insensitivity in the Service of the Rational Self: the 'Mere Token' Effect," in *NA - Advances in Consumer Research* Volume 34, eds. Gavan Fitzsimons and Vicki Morwitz, Duluth, MN: Association for Consumer Research.

Zheng, Yuhuang and Ran Kivetz (2007), "Effort, Excellence and Income Stinginess: How Do People Justify Self-Gratification?," in *E - European Advances in Consumer Research* Volume 8, eds. Stefania Borghini, Mary Ann McGrath, and Cele Otnes, Duluth, MN: Association for Consumer Research.

<center>*****************</center>

**Conference Publications:** (continued)

Kivetz, Ran and Drazen Prelect (2006), "Goal Distance and Consumer Choice," in *NA - Advances in Consumer Research* Volume 33, eds. Connie Pechmann and Linda Price, Duluth, MN: Association for Consumer Research.

Kivetz, Ran and Klaus Wertenbroch (2006), "Emerging Perspectives on Self-Control," in *NA - Advances in Consumer Research* Volume 33, eds. Connie Pechmann and Linda Price, Duluth, MN: Association for Consumer Research.

Chernev, Alexander and Ran Kivetz (2005), "Goals and Mindsets in Consumer Choice," in *NA - Advances in Consumer Research*, eds. Gita Menon and Akshay Rao, Volume 32, Provo, UT: Association for Consumer Research.

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2002), "Alternative Models for Capturing the Compromise Effect," in *NA - Advances in Consumer Research*, ed. Punam Anand Keller and Dennis Rook, Volume 30, Provo, UT: Association for Consumer Research.

Kivetz, Ran (2001), "Consumer Preferences Towards Frequency Programs," in *NA - Advances in Consumer Research* Volume 28, eds. Mary C. Gilly and Joan Meyers-Levy, Valdosta, GA : Association for Consumer Research.

Kivetz, Ran and Michal Strahilevitz (2001), "Factors Affecting Consumer Choices Between Hedonic and Utilitarian Options," in *NA - Advances in Consumer Research* Volume 28, eds. Mary C. Gilly and Joan Meyers-Levy, Valdosta, GA : Association for Consumer Research.

Kivetz, Ran (2000), "Hedonic and Utilitarian Motivations in Consumer Choice," in *NA - Advances in Consumer Research* Volume 27, eds. Stephen J. Hoch and Robert J. Meyer, Provo, UT: Association for Consumer Research.

Kivetz, Ran (1999), "Advances in Research on Mental Accounting and Reason-Based Choice," in HEC Symposium on *Advances in Choice Theory*, Conference Summary, Report No. 99-121, Gilles Laurent (ed.), Marketing Science Institute.

Chakravarti, Agnish, Susan Chiu, Ran Kivetz, and Itamar Simonson (1999), "Regret and Self-Congratulation From the Head and From the Heart," Advances in Consumer Research, ed. Eric J. Arnould and Linda M. Scott, Volume 26, Provo, UT: Association for Consumer Research.

<center>******************</center>

**Selected Conference Presentations:**

"Self-Rewards and Cash (Dis)Incentives," with Rachel Meng, Marketing Analytics Symposium, Sydney, Australia, February 2020.

"Change – Attention – Shift," with Rachel Meng, 11th Triennial Invitational Choice Symposium, May – June 2019.

"Self-Rewards and Cash (Dis)Incentives," 4th Coller Conference on Behavioral Economics, Tel Aviv, Israel, June 2019.

"Self-Rewards and Cash (Dis)Incentives" with Rachel Meng, INFORMS Marketing Science Conference, Rome, Italy, June 2019.

"Technology-Driven Consumption," with Daniel He, Society for Consumer Psychology Conference (SCP), San Francisco, CA, 2017.

"The Consumption of Digital Live Content: How Live Streaming Enhances Engagement in Uninteresting Content," with Daniel He and Jonathan Hurwitz, Association for Consumer Research Conference (ACR), San Diego, CA, 2017.

"The Compensation-Driven Nature of Monetary Rewards," with Rachel Meng, Society for Consumer Psychology Conference (SCP), San Francisco, CA, 2017.

"Ephemeral Messaging: Intimacy, Spontaneity, and Creativity in Fleeting Experiences," with Daniel He, Association for Consumer Research Conference (ACR), Berlin, Germany, 2016.

"Motivating Choices and Performance: Beyond Monetary Incentives," with Rachel Meng, Association for Consumer Research Conference (ACR), Berlin, Germany, 2016.

"Consumer Decisions to Rent versus Buy," with Anastasiya Pocheptsova and Ravi Dhar, Association for Consumer Research Conference, Berlin, Germany, 2016.

"Motivating Choices and Performance: Beyond Monetary Incentives," with Rachel Meng, Society for Judgment and Decision Making, Boston, Massachusetts, 2016.

"Opportunity Cost Overestimation in Choices among Opportunities versus Alternatives," with Liad Weiss, Society for Judgment and Decision Making, Boston, Massachusetts, 2016.

"Consumer Behavior in Social Media" with Daniel He, Association for Consumer Research Conference, New Orleans, LA, October 2015.

"Illusions of Preference Construction," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, New Orleans, LA, October 2015.

**Selected Conference Presentations:** (continued)

"Creating the Illusion of Choice through Selective Information Search and Retrieval," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, St. Louis, MO, October 2011.

"Seeing-Through Opportunities: The Effects of Incidental versus Inherent Choices" with Liad Weiss, Judgment and Decision Making Conference, Seattle, WA, November 2011.

"The Effects of Reward Programs" with Ricardo Montoya and Oded Netzer, INFORMS Marketing Science Conference, Rice University, Houston, TX, June 2011.

"Complicating Choice," with Rom Schrift and Oded Netzer, Society for Consumer Psychology Conference, St. Pete Beach, FL, February 2010.

"Complicating Choice," with Rom Schrift and Oded Netzer, Judgment and Decision Making Conference, Boston, MA, November 2009.

"Using Survey Controls Effectively," NAD Annual Conference: What's New in Comparative Advertising, Claim Support and Self-Regulation?, New York, NY, October 2009.

"Complicating Choice," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, Pittsburgh, PA, September 2009.

"Hyperopia: A Theory of Reverse Self-Control," with Anat Keinan, Association for Consumer Research Conference, San Francisco, CA, October, 2008.

"The Functional Alibi," with Anat Keinan and Oded Netzer, Association for Consumer Research Conference, San Francisco, CA, October 2008.

"The Impact of Marketing Promotions on Hedonic versus Utilitarian Purchases," with Yuhuang Zheng, Association for Consumer Research Conference, San Francisco, CA, October 2008.

"The Functional Alibi," with Anat Keinan and Oded Netzer, 11th Biennial Behavioral Decision Research in Management Conference, San Diego, CA, April 2008.

"From Diligence to Hindrance," with Rom Schrift and Oded Netzer, Marketing in Israel Conference, Tel Aviv University, Tel Aviv, Israel, December 2008.

"Hyperopia," University of Pennsylvania (Wharton), Philadelphia, PA, June 2007.

"Consumer Decisions to Rent versus Buy," with Anastasiya Pocheptsova and Ravi Dhar, Association for Consumer Research Conference, Memphis, TN, October 2007.

**Selected Conference Presentations:** (continued)

"Productivity Mindset and the Consumption of Collectable Experiences," with Anat Keinan, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Too Much Fit? How Regulatory Fit Can Turn Us into Buridan's Asses," with Jonathan Levav and K. Cecile Cho, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Remedying Hyperopia: The Effects of Self-Control Regret on Consumer Behavior," with Anat Keinan, 10th Biennial Behavioral Decision Research in Management Conference, Los Angeles, CA, June 2006.

"Scope Insensitivity and The Mere Token Effect," with Oleg Urminsky, 10th Biennial Behavioral Decision Research in Management Conference, Los Angeles, CA, June 2006.

"Hyperopia: A Theory of Reverse Self-Control", Symposium on "Self-Control Processes: New Theoretical and Empirical Directions," Society for Personality and Social Psychology Annual Meeting, Palm Springs, California, 2006.

"The Psychology of Rewards: Principles of Expectancies?," with Oleg Urminsky, Judgment and Decision Making Conference, Toronto, Canada, November 2005.

"Repenting Hyperopia: An Analysis of Self-Control Regrets," with Anat Keinan, Judgment and Decision Making Conference, Toronto, Canada, November 2005.

"Goal Distance and Consumer Choice" (Session Co-Chair), and "The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Emerging Perspectives on Self-Control" (Session Co-Chair), and "Determinants of Justification and Self-Control," with Yuhuang Zheng, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Repenting Hyperopia: An Analysis of Self-Control Regrets," with Anat Keinan, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Inducing Hyperopia through Inconsequential Early Rewards: A Consumer-Welfare-Enhancing Violation of the Invariance Axiom," with Oleg Urminsky, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," INFORMS Marketing Science Conference, Emory University, Atlanta, GA, June 2005.

**Selected Conference Presentations:** (continued)

"The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, INFORMS Marketing Science Conference, Emory University, Atlanta, GA, June 2005.

"The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, Judgment and Decision Making Conference, Minnesota, November 2004.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," Judgment and Decision Making Conference, Minnesota, November 2004.

Invited to present in session on "Goals, Impulses, and Self-Control," Association for Consumer Research Doctoral Symposium, Portland, Oregon, October 2004.

Discussion Leader for special session on "Simple Payments and Complex Rewards…," Association for Consumer Research Conference, Portland, Oregon, October 2004.

"Promotion Reactance: The Role of Effort-Reward Congruity," Association for Consumer Research Conference, Portland, Oregon, October 2004.

"Principles or Probabilities: When Value Overshadows Expected Value," with Oleg Urminsky, Association for Consumer Research Conference, Portland, Oregon, October 2004.

"How do Promotion Programs Affect Consumers' Purchase Decisions: A Behavioral Perspective," with Yuhuang Zheng, INFORMS Marketing Science Conference, Erasmus University, Rotterdam, The Netherlands, June 2004.

Discussion Leader for special session on "Understanding the Evaluation of Future Events," Association for Consumer Research Conference, Toronto, Canada, October 2003.

"Consumer Self-Control and Time-Discounting," with Oleg Urminsky, Judgment and Decision Making Conference, Vancouver, Canada, November 2003.

"Mindsets of Decision Making," with Yuval Rottenstreich, Judgement and Decision Making Conference, Vancouver, Canada, November 2003.

"Consumer Self-Control and Time-Discounting," with Oleg Urminsky, Association for Consumer Research Conference, Toronto, Canada, October 2003.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," Marketing Science Institute Young Scholars Program, Park City, UT, March 2003.

**Selected Conference Presentations:** (continued)

"Does the End Justify the Means? The Impact of Effort on Preferences toward the Certainty and Magnitude of Rewards," Association for Consumer Research Conference, Atlanta, GA, 2002.

"Alternative Models for Capturing the Compromise Effect," with Oded Netzer and V. Srinivasan, Association for Consumer Research Conference, Atlanta, GA, October 2002.

"Alternative Models for Capturing the Compromise Effect," with Oded Netzer and V. Srinivasan, Marketing Science Conference, Alberta, Canada, June 2002.

"Self-Control for the Righteous: Toward a Theory of Pre-Commitment to Indulgence," with Itamar Simonson, Four School Seminar, New York University, May 2002.

"Self-Control for the Righteous: Toward a Theory of Luxury Pre-commitment," with Itamar Simonson, Judgment and Decision Making Conference, Orlando, FL, November 2001.

"The Influence of Hedonic Concreteness on Mood Regulation versus Mood Congruency," with Yifat Kivetz, Association for Consumer Research Conference, Austin, TX, October 2001.

"Self-Control for the Righteous: Toward a Theory of Luxury Pre-commitment," with Itamar Simonson, UC Berkeley Choice Symposium, Monterey, CA, June 2001.

"Consumer Preferences Towards Frequency Programs" (Session Chair), and "The Effects of Effort and Idiosyncratic Fit on Preference Towards Frequency Programs," with Itamar Simonson, Association for Consumer Research Conference, Salt Lake City, Utah, October 2000.

"Consumer Choices between Hedonic and Utilitarian Options" (Session Co-Chair), and "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Towards Frequency Program Rewards," with Itamar Simonson, ACR Conference, Salt Lake City, Utah, October 2000.

"Hedonic and Utilitarian Motivations in Consumer Choice" (Session Chair), and "The Joyless Consumer: Using Self-Control Strategies to Increase Hedonic Consumption," with Itamar Simonson, Association for Consumer Research Conference, Columbus, Ohio, October 1999.

"The Effects of Incomplete Information on Consumer Choice," with Itamar Simonson, Association for Consumer Research Conference, Columbus, Ohio, October 1999.

**Selected Conference Presentations:** (continued)

"Regret and Self-Congratulation From the Head and From the Heart," with Chakravarti, Agnish, Susan Chiu, and Itamar Simonson, Association for Consumer Research Conference, Montreal, Canada, October 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, HEC Choice Symposium, Groupe HEC, Jouy-en-Josas (Paris), France, July 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, INFORMS Israel, Tel Aviv, Israel, June 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, Boulder-Colorado Behavioral Decision Theory Camp, Boulder, Colorado, October 1997.

"The Psychology of Versioning: Counterfactual Thinking as a Determinant of Fairness Perceptions and Choice," with Andrew Gershoff, ACR Conference, Toronto, Canada, October 2003.


**Selected Invited Talks:**

Vienna University of Economics and Business, forthcoming

5th Coller Conference on Behavioral Economics, forthcoming, Tel Aviv

Marketing Analytics Symposium – Sydney (MASS), February 2020

11th Triennial Invitational Choice Symposium, May-June 2019

4th Coller Conference on Behavioral Economics, June 2019, Tel Aviv

"Marketing Israel," Israeli-American Council.

Licensing Executives Society (LES) 2012 Winter Meeting. March 2012

American Bar Association Section of Antitrust Law. November 2010

Tel Aviv University, Recanati Graduate School of Business Administration. August 2010

The 2009 NAD Annual Conference: What's New in Comparative Advertising, Claim Support and Self-Regulation? October 2009

New York University psychology department. March 2009

Israel Business Conference. December 2008

**Selected Invited Talks:** (continued)

Stanford University, Graduate School of Business, marketing department. October 2008

Olin Business School at Washington University. May 2008

Duke University marketing department. April 2008

Yale University marketing department. April 2007

MIT marketing department. September 2006

University of Chicago marketing department. January 2006

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). January 2006

Tilburg University, Faculty of Economics and Business Administration and Tias Business School, Marketing Research Camp. December 2005

Northwestern University (Kellogg), Marketing Research Camp. September 2005

Stanford University, Graduate School of Business, marketing department. May 2005

University of Pennsylvania (Wharton), Philadelphia PA. November 2004

University of Florida marketing department, Winter Research Retreat. March 2004

Marketing Modellers Group, New York. March 2004

Center for the Decision Sciences, Columbia University. April 2003

Young Scholars Program, Marketing Science Institute. March 2003

MIT marketing department. February 2003

University of Chicago marketing department. January 2003

School of Business, Rutgers University – Camden Campus. November 2002

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). June 2002

Social Psychology Network, Columbia University. May 2002

Center for the Decision Sciences, Columbia University. April 2002

NYU marketing department. March 2002

UC Berkeley marketing department. November 2001

2001 UC Berkeley Invitational Choice Symposium. June 2001

University of Texas at Austin, marketing research camp. April 2001

**Selected Invited Talks:** (continued)

MIT marketing department. April 2001

Center for the Decision Sciences, Columbia University. February 2001

Northwestern University, Evanston Illinois. December 1999

Duke University, Durham NC. November 1999

University of Chicago, Chicago Illinois. November 1999

Cornell University, Ithaca NY. November 1999

Dartmouth College, Hanover, New Hampshire. November 1999

University of California, Berkeley, Berkeley CA. October 1999

Yale University, New Haven Connecticut. October 1999

University of Pennsylvania (Wharton), Philadelphia PA. October 1999

Columbia University, New York NY. October 1999

University of Southern California, Los Angeles CA. October 1999

Stanford University Psychology Department, Stanford CA. November 1998

1998 Groupe HEC Invitational Choice Symposium. July 1998

Boulder-Colorado Behavioral Decision Theory Camp, Boulder, Colorado. October 1997.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**External Professional Activities & Service:**

Guest Editor:

*Journal of Marketing Research*

Guest Area/Associate Editor:

*Marketing Science*
*Management Science*
*Association for Consumer Research*

Editorial Boards:

*Journal of Marketing Research*
*Applied Economics Research Bulletin*
*Marketing Letters*

Reviewer:

*Marketing Science, Quantitative Marketing and Economics, Journal of Experimental Psychology: General, Psychological Science, Journal of Consumer Research, Journal of Consumer Psychology, Journal of Marketing, International Journal of Research in Marketing, Organizational Behavior and Human Decision Processes, Journal of Behavioral Decision Making, Journal of Service Research, Journal of Economic Psychology, Association for Consumer Research, Society for Consumer Psychology, Behavioral Decision Research in Management Conference, National Science Foundation.*

Intel Science Talent Search, Advisor for:

Gregg Gefen, Great Neck North High School (Semi-finalist, 2002)

Jukay Hsu, Stuyvesant High School (Semi-finalist, 2001)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Internal Professional Activities & Service:**

Service to University:

M.S. in Entrepreneurship & Innovation Working Group, 2016

Co-chair of the Provost's Faculty Advisory Committee on Entrepreneurship, 2013-2014

Faculty Fellow of the Institute for Social and Economic Research and Policy (ISERP), 2002-2015

Guest Speaker, Columbia University & Columbia Business School Chicago Alumni Clubs

Panel Discussant, "The Psychology of Money," Columbia University Annual Alumni and Development Officers Retreat, July 15, 2009

Panel Discussant, "The Psychology of Money," GSAS Conversations with Alumni, Columbia University Graduate School of Arts and Sciences, April 20, 2009

Service to Business School:

Member of the Marketing Division Senior Faculty Recruiting Committee, 2018 – present

Junior Faculty Research Liaison Committee, 2015 - 2019

Columbia Business School's Conflict of Interest and Conflict of Commitment Policy Review Committee, 2017

Strategy Creation Committee, 2013 - 2014

Core-Coordinator Committee, 2012 - 2014

Committee on the Structure of the Core, 2012

Faculty Committee on the Core Curriculum, 2011-2012

Committee on Enhancing the Effectiveness of the Core Curriculum, 2011

Faculty Ad-Hoc Committee on Columbia Business School Budget Guidelines, 2009

Columbia Business School Green Committee, 2009

Project Adviser for MBA and Executive MBA Independent Projects, 2002-present

MBA Admissions Committee, 2002 - 2006

Finance (Real Estate) Division Faculty Search Committee, 2003-2004

Management Division Faculty Search Committee, 2001-2002

Student Faculty Academic Affairs Committee (SFAAC), 2000-2001

*****************

**Internal Professional Activities & Service:** (continued)

Service to Marketing Division:

Member of the Marketing Division Senior Faculty Recruiting Committee, 2018 – present

Member of the Marketing Division Faculty Recruiting Committee, 2020 – present

Chair of the Marketing Division Communications and Outreach Committee, 2019 – present

Member of the Marketing Division Senior Faculty Recruiting Committee, 2018 – present

Junior Faculty Research Liaison for the Marketing Division, 2015 – 2019

Member of the Marketing Division Faculty Recruiting Committee, 2016 – 2018

Member of the Marketing Division Ph.D. Committee, 2016 – 2018

Chair of the Marketing Division Faculty Recruiting Committee, 2015

Coordinator of the Marketing Strategy Core Course, 2011 – 2014

Chair of the Marketing Division Ph.D. Committee, 2011 – 2013

Co-chair of the Marketing Division Faculty Recruiting Committee, 2010

Member of the Marketing Division Faculty Recruiting Committee, 2002 – 2008

Chair of the Marketing Division Ph.D. Committee, 2006 – 2007

Member of the Marketing Division Ph.D. Committee, 2004 – 2006

Various Sub-committees, 2007 – present

Organizer of Columbia Marketing Research Camp, 2001 and 2002

**Selected Media Reports of Dr. Kivetz's Research (research covered by hundreds of print, electronic, and broadcast media outlets):**

"Losses. Loom. Large. And That, in Short, Explains Your Loss Aversion," *Marketplace*, November 10, 2020.

"Why We're All So Worried About Having Too Little Time," *TIME*, January 30, 2020.

"Use this Simple Psychological Trick if Productivity Culture has Made it Impossible for You to Relax," *Fast Firm*, October 7, 2019.

"Five Below is a Wonderland of Things No One Needs. It's Also One of the Most Successful Retailers in America," *Washington Post*, December 20, 2018.

"New Research From Columbia Business School Sheds Light On Factors Affecting Luxury Versus Practical Purchases," *Markets Insider*, November 15, 2017.

"The Psychology Behind Spending Big," *BBC News*, October 9, 2017.

"There's Power in All Those User Reviews," *The New York Times*, December 7, 2013.

**Selected Media Reports of Dr. Kivetz's Research:** (continued)

"A Closet Filled With Regrets," *The Wall Street Journal*, April 17, 2013.

"Why We Blunder When We Buy," *Chicago Tribune*, July 22, 2011.

"The Business of Weird: Why People Pay for Bizarre Experiences," *TIME*, November 22, 2010.

"The New Abnormal," (Cover Story), *Bloomberg Businessweek*, August 2, 2010.

"Reward, Regret and Consumer Behaviour," *ABC Radio National (Australia)*, July 12, 2010.

"To Achieve Your Goals, Focus on Reasons," *U.S. News & World Report*, July 1, 2010.

"Can a Vacation Help Boost Your Portfolio?" *SmartMoney*, June 25, 2010.

"Reasons—and Ways—to Splurge This Summer," *U.S. News & World Report*, June 23, 2010.

"Field Guide To The Tightwad: Saving Spree," *Psychology Today*, January 1, 2010.

"Club Class," *The Wall Street Journal*, December 3, 2009.

"Don't Work All the Time — You'll Live to Regret It," *Wired Magazine*, July 15, 2009.

"When the Bride Says I Do – to Cash," *The Globe and Mail*, July 9, 2009.

"It Makes Them Sick to Spend - Literally," *The Globe and Mail*, June 8, 2009.

"The Gift-Card Economy," *The Atlantic*, May, 2009.

"Technology Can Save You From Yourself," *Marketplace Public Radio*, April 17, 2009.

"Regret Saving Money," *CNN*, March 26, 2009.

"Oversaving, a Burden for Our Times," *The New York Times*, March 23, 2009.

"Are You a Victim of Saver's Remorse?" *The New York Times*, March 23, 2009.

"Giving in to Temptation," *CNN*, September 20, 2008.

"Splurge Now, Feel Great Later," *ABC News*, July 2008.

"Splurging is Good for Your Health," *The Wall Street Journal*, July 2008.

"Putting a Price on Rewards," *U.S. News & World Report*, June 24, 2007.

"Incentives - Naughty But Nice," *Management Today*, April 1, 2007.

"Hyperopia," *The New York Times*—one of the "Best Ideas in 2006"—Annual Year in Ideas.

**Selected Media Reports of Dr. Kivetz's Research:** (continued)

"Delaying Pleasure Results in Regret," *United Press International*, June 27, 2006.

"Why Cash Incentives Fail," *SalesForceXP*, Feature Story, September Issue, 2005.

"Professors Discover Why Business Loyalty Programs Work," *Sacramento Business Journal*, 8.16.2004.

"An Economics Problem: Joyless Consumers," by Peter Martin, *THE AGE*, January, 2004, Australia.

"Consumers Work Hard for Loyalty Programs", *Newswise*, August 16, 2004.

"Studies Question Value of Mass Customization, Find Consumers Work Hard for Loyalty Programmes," *MadeForOne*, August 23, 2004.

"Consumers Prefer Loyalty Programmes that 'Fit'," *The Wise Marketer*, December 10, 2003.

"Indulgence," *Radio National*, with Geraldine Doogue, March 2, 2003, Australia.

"Betty Crocker Coupon Program Spry After More than 70 Years," by Karren Mills, *Dow Jones Interactive*, February 23, 2002.

"Once a Loyalty Craze, S&H Tries to Remake Magic in Digital Age," by Justin Pope, *The New York Times*, November, 2001.

"Earning the Right to Indulge: Guilt about Consuming Luxury Items Plays an Important Role in Consumer Preference Toward Rewards," *Stanford Business Magazine*, August 14, 2001.

"Study: Luxury Rewards Evoke Consumer Guilt," by Kimberly Hill, *CRM Daily*, August 1, 2001. Also reported in *E-Commerce Times*, *Yahoo! News*.

"Stanford Business School Research Shows Guilt Plays a Role in What Loyalty Program Rewards Consumers Choose," *Transport News*, July 27, 2001. Also reported in *Business Wire*, *Yahoo! Finance*, *Sharper Media*, *The Timeshare Beat*.

"Consumers Still Buy When Info Incomplete," *Marketing News*, October 9, 2000.

**Professional Affiliations:**

American Marketing Association

Association for Consumer Research

International Trademark Association

Society for Consumer Psychology

Society for Judgment & Decision Making

**EXHIBIT B: LIST OF CASES IN WHICH DR. RAN KIVETZ PROVIDED
SWORN TESTIMONY IN DEPOSITION AND/OR TRIAL DURING THE PAST
FOUR YEARS**

*Allstate Insurance Company v. Kia Motors America, Inc., and Kia Motors Corporation*,
Case No. 2:16-CV-06108-SJO-AGR (C.D. Cal.)

*Dependable Sales and Service, INC., et al. v. Truecar, INC.,* Case No. 1:15-cv-01742-PKC
(S.D.N.Y.)

*Kristin Hall v. Rite Aid Corporation*, Case No. 37-2009-00087938-CU-OE-CTL (Superior
Court of the State of California In And For the County of San Diego)

*Rick Woods v. Google LLC*, Case No. 5:11-cv-01263-EJD (N.D. Cal.)

*Boltex Manufacturing Company, L.P. and Weldbend Corporation vs. Galperti Inc. and
Officine Nicola Galperti E Filgio S.P.A.*, Case No. 4:17-cv-01439 (S.D. Texas)

*City of Wyoming, Minnesota; Village of Holmen, Wisconsin; City of Elk River, Minnesota;
City of Mankato, Minnesota; City of Perham, Minnesota; City of Princeton, Minnesota; City
of Fergus Falls, Minnesota; Sauk Centre Public Utilities Commission; and Chisago Lakes
Joint Sewage Treatment Commission vs. Procter & Gamble Company; Kimberly-Clark
Corporation; Nice-Pak Products, Inc.; Professional Disposables International, Inc.; Tufco
Technologies Inc.; and Rockline Industries*, Case No. 15-cv-02101-JRT/TNL (D. Minnesota)

*Anne De Lacour, Andrea Wright, And Loree Moran v. Colgate-Palmolive Co., and Tom's
Of Maine Inc.*, Case No. 16 Civ. 08364 (RA) (AJP) (S.D. Cal.)

*Barry Allred and Mandy C. Allred v. Frito-Lay North America, Inc., and Frito-Lay, Inc.*,
Case No. 3:17-cv-01345 (S.D. Cal.)

*Sturm, Ruger & Co., Inc. v. American Outdoor Brands Corporation, Smith & Wesson
Cosrp., and Thompson/Center Arms Company, LLC*, Case No. 1:19-cv-00801-JL (D.N.H.)

*Camille Cabrera v. Bayer Healthcare LLC and Bayer Corporation*, Case No. 2:17-cv-08525 (C.D. Cal.)

*Veda Woodard, Teresa Rizzo-Marino, and Diane Morrison v. Lee Labrada et al.*, Case No. 5:16-cv-00189-JGB-SP (C.D. Cal.)

*JaM Cellars, Inc. v. The Wine Group LLC,* Case No. 4:19-cv-01878-HSG (N.D. Cal.)

*Hytera Communications Corp. Ltd. v. Motorola Solutions Inc.*, Case No. 1:17-cv-01794-DCN (N.D. Ohio Eastern Division)

*In Re: KIND, LLC "Healthy and All Natural Litigation"*, Case No. 1:15-md-02645-WHP (S.D.N.Y.)

*The People of the State of California v. Kohl's Department Stores, Inc. et al.*, Case No. BC643037 (Superior Court of the State of California, County of Los Angeles)

*American Customer Satisfaction Index, LLC v. ForeSee Results, Inc.*, Case No. 2:18-cv-13319 (E.D. Michigan Southern Division); and *CFI Group USA LLC v. Verint Americas Inc.*, Case No. 2:19-cv-12602 (E.D. Michigan)

*NIKE, Inc. v. Vans, Inc.*, Opposition No. 91253064 (US Patent and Trademark Office, TTAB)

*Willis et al. v. Colgate-Palmolive Co.*, Case No. 2:19-cv-08542-JGB (C.D. Cal.)

*In Re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, Case No. 1:19-md-2903 (W.D.N.Y.)

*La Fosse et al. v. Sanderson Farms, Inc.*, Case No. 19-CV-06570-RS (N.D. Cal.)

## EXHIBIT C: DOCUMENTS MADE AVAILABLE TO DR. KIVETZ IN CONNECTION WITH PREPARATION OF THIS *REBUTTAL EXPERT REPORT*

In addition to academic research and articles, and other materials specifically referred to in the enclosed *Rebuttal Expert Report*, I received documents produced in the action, and other documents, including without limitation the following:

**Publicly-Filed Documents**

- Order on Motion to Exclude Expert Witness (Doc. 168), *In re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 1:19-md-2903, dated October 19, 2021
- Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Class Certification, *In re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 1:19-md-2903, dated October 13, 2021
- Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (with Exhibit 18), *In re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 1:19-md-2903, dated February 8, 2021
- Defendants' Answer to Consolidated Amended Complaint, *In re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 1:19-md-2903, dated December 12, 2019
- Plaintiffs' Consolidated Amended Complaint (with Exhibits A – B), *In re: Rock 'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 1:19-md-2903, dated October 28, 2019
- Plaintiffs' Class Action Complaint, *Pasternacki v. Fisher-Price, Inc. and Mattel, Inc.*, No. 1:19-cv-00941, dated July 17, 2019

**Expert Reports**

- Report of Bruce G. Silverman (with Exhibits A – C and accompanying materials referenced and reviewed), dated October 13, 2021
- Rebuttal Declaration to Ran Kivetz, Ph.D. and Expert Report of J. Michael Dennis, Ph.D. (with Attachments A – C and Exhibits D – F), dated October 12, 2021
    - Dennis000001, Dennis000002, Dennis000003, Dennis000004, Dennis000009, Dennis000014, Dennis000021, Dennis000145
- Declaration of Colin B. Weir (with Exhibits 1 – 3), dated February 8, 2021

## Depositions

- Deposition transcript of the November 4, 2021 deposition of J. Michael Dennis, Ph.D.
- Deposition transcript of the October 28, 2021 deposition of Bruce Silverman
- Deposition transcript of the September 2, 2021 deposition of Dr. Ran Kivetz, Ph.D.
- Deposition transcript of the May 26, 2021 deposition of Renee Wray
- Deposition transcript of the April 28, 2021 deposition of Jena Huey
- Deposition transcript of the April 26, 2021 deposition of Megan Kaden
- Deposition transcript of the April 16, 2021 deposition of Jena Huey
- Deposition transcript of the April 15, 2021 deposition of Megan Kaden
- Deposition transcript of the April 14, 2021 deposition of Megan Kaden
- Deposition transcript of the April 13, 2021 deposition of Joshua Nadel
- Deposition transcript of the April 13, 2021 deposition of Emily Simmonds
- Deposition transcript of the April 13, 2021 deposition of Emily Barton
- Deposition transcript of the April 8, 2021 deposition of Samantha Jacoby
- Deposition transcript of the April 8, 2021 deposition of Rebecca Drover
- Deposition transcript of the April 6, 2021 deposition of Elizabeth Alfaro
- Deposition transcript of the April 6, 2021 deposition of Daniel Pasternacki
- Deposition transcript of the April 2, 2021 deposition of Karen Flores
- Deposition transcript of the April 1, 2021 deposition of Melanie Nowlin
- Deposition transcript of the March 30, 2021 deposition of Kerry Mandley
- Deposition transcript of the March 30, 2021 deposition of Cassandra Mulvey
- Deposition transcript of the March 25, 2021 deposition of Nancy Hanson
- Deposition transcript of the March 25, 2021 deposition of Megan Fieker
- Deposition transcript of the March 25, 2021 deposition of Katharine Shaffer
- Deposition transcript of the March 23, 2021 deposition of Luke Cuddy
- Deposition transcript of the March 23, 2021 deposition of Linda Black
- Deposition transcript of the March 23, 2021 deposition of Jessie Poppe
- Deposition transcript of the March 18, 2021 deposition of Josie Willis
- Deposition transcript of the February 1, 2021 deposition of Sarah Ford (with Errata)
- Deposition transcript of the September 23, 2020 deposition of Anthony DeSimone (with Errata)
- Deposition transcript of the September 23, 2020 deposition of Deirdre Stephens (with Errata)
- Deposition transcript of the December 10, 2020 deposition of Catherine Pilarz (with Errata)
- Deposition transcript of the December 11, 2020 deposition of Sarah Ford (with Errata)

- Deposition transcript of the December 17, 2020 deposition of Chuck Scothon (with Errata)

**Other Documents and Websites**

- https://www.fisher-price.com/en-us
- "Datasheet - 2-in-1 Gliders.docx"

**Bates-Stamped Documents**
- FSHR0011470
- FSHR0011471
- FSHR0011504
- FSHR0011505
- FSHR0011580
- FSHR0011639
- FSHR0011693
- FSHR0011773
- FSHR0011774
- FSHR0011778
- FSHR0011790
- FSHR0011793
- FSHR0011794
- FSHR0011813
- FSHR0011814
- FSHR0011818
- FSHR0011852
- FSHR0011853
- FSHR0011878
- FSHR0011881
- FSHR0011891
- FSHR0026008
- FSHR0026009
- FSHR0058950
- FSHR0012504
- FSHR0012565
- FSHR0012622
- FSHR0012624
- FSHR0012749
- FSHR0016368
- FSHR0017050
- FSHR0017462

- FSHR0017480
- FSHR0017737
- FSHR0024675
- FSHR0025048
- FSHR0025941
- FSHR0048089
- FSHR0048121
- FSHR0048124
- FSHR0048186
- FSHR0048199
- FSHR0048213
- FSHR0048227
- FSHR0048229
- FSHR0048275
- FSHR0048292
- FSHR0048362
- FSHR0049691
- FSHR0049848
- FSHR0057879
- FSHR0057886
- FSHR0011558
- FSHR0011694
- FSHR0000063
- FSHR0000083
- FSHR0000099
- FSHR0000119
- FSHR0000131
- FSHR0000143
- FSHR0000155
- FSHR0000175
- FSHR0000187
- FSHR0000203
- FSHR0000219
- FSHR0000235
- FSHR0000251
- FSHR0000271
- FSHR0000287
- FSHR0000315
- FSHR0000339
- FSHR0000351

- FSHR0000363
- FSHR0000383
- FSHR0000395
- FSHR0000411
- FSHR0000443
- FSHR0000459
- FSHR0000483
- FSHR0000495
- FSHR0000511
- FSHR0000535
- FSHR0000551
- FSHR0000571
- FSHR0000591
- FSHR0000615
- FSHR0000639
- FSHR0000649
- FSHR0000665
- FSHR0000681
- FSHR0000697
- FSHR0000721
- FSHR0000737
- FSHR0000757
- FSHR0000769
- FSHR0000789
- FSHR0000805
- FSHR0000825
- FSHR0001250
- FSHR0001266
- FSHR0001410
- FSHR0001426
- FSHR0001762
- FSHR0001764
- FSHR0001858
- FSHR0001874
- FSHR0001890
- FSHR0001906
- FSHR0001922
- FSHR0001954
- FSHR0001998
- FSHR0002014

- FSHR0002026
- FSHR0002038
- FSHR0002050
- FSHR0002062
- FSHR0002074
- FSHR0002086
- FSHR0002098
- FSHR0002114
- FSHR0002158
- FSHR0002174
- FSHR0002190
- FSHR0002210
- FSHR0002242
- FSHR0002258
- FSHR0002290
- FSHR0002346
- FSHR0002374
- FSHR0002406
- FSHR0002434
- FSHR0002450
- FSHR0002466
- FSHR0002498
- FSHR0002514
- FSHR0002530
- FSHR0002546
- FSHR0002562
- FSHR0002578
- FSHR0002594
- FSHR0002602
- FSHR0002634
- FSHR0002642
- FSHR0002662
- FSHR0002670
- FSHR0002682
- FSHR0002690
- FSHR0002714
- FSHR0002722
- FSHR0002730
- FSHR0002762
- FSHR0003718

- FSHR0003742
- FSHR0003758
- FSHR0004111
- FSHR0014188
- FSHR0012783
- FSHR0014187
- FSHR0014188
- FSHR0014225
- FSHR0014226
- FSHR0014227
- FSHR0016797
- FSHR0005103
- FSHR0005105
- FSHR0005120 – 9
- FSHR0005134
- FSHR0005138
- FSHR0005142
- FSHR0005146
- FSHR0005150
- FSHR0005154
- FSHR0005158
- FSHR0005162
- FSHR0005166
- FSHR0005170
- FSHR0005174
- FSHR0005178
- FSHR0005182
- FSHR0005186
- FSHR0005190
- FSHR0005194
- FSHR0005200 – 65
- FSHR0005269 – 710
- FSHR0005713
- FSHR0005723
- FSHR0006553
- FSHR0006556
- FSHR0006559
- FSHR0006562
- FSHR0006565
- FSHR0006567 – 8

- FSHR0006570 – 1
- FSHR0006573
- FSHR0006576
- FSHR0006579
- FSHR0006581 – 2
- FSHR0006585
- FSHR0006588
- FSHR0006590
- FSHR0006592
- FSHR0006595
- FSHR0006597
- FSHR0011469
- FSHR0011472 – 503
- FSHR0011506 – 10
- FSHR0011514 – 79
- FSHR0011581 – 628
- FSHR0011631 – 3
- FSHR0011636
- FSHR0011640
- FSHR0011642
- FSHR0011644 – 53
- FSHR0011655 – 63
- FSHR0011665
- FSHR0011667 – 92
- FSHR0011694 – 700
- FSHR0011715
- FSHR0011730 – 1
- FSHR0011736 – 72
- FSHR0011775 – 7
- FSHR0011779 – 89
- FSHR0011791 – 2
- FSHR0011795 – 812
- FSHR0011815 – 7
- FSHR0011819 – 51
- FSHR0011854 – 77
- FSHR0011879 – 80
- FSHR0011882 – 90
- FSHR0011892 – 940
- FSHR0011942 – 4
- FSHR0011947 – 51

- FSHR0011953 – 6
- FSHR0011959 – 74
- FSHR0011976 – 2013
- FSHR0024677
- FSHR0027425 – 6
- FSHR0027429
- FSHR0027431 – 2
- FSHR0003861
- FSHR0003862
- FSHR0004127
- FSHR0004150
- FSHR0014076
- FSHR0014078
- FSHR0014081
- FSHR0014083
- FSHR0014087
- FSHR0014094
- FSHR0014098
- FSHR0014100
- FSHR0014157
- FSHR0014159
- FSHR0014257
- FSHR0024684
- FSHR0063768
- FSHR0064163
- FSHR0065472
- FSHR0065473
- FSHR0074880
- FSHR0012772
- CMP94-0985-1101362921-DOM-POP-092816
- X7314-0912-1100710316-DOM-PKG-092816
- X7314-0980-1101362917-DOM-POP1-092816
- X7314-0981-1101362920-DOM-POP2-092816

**Figure D1: Bugaboo Donkey2 Stroller – Display and Packaging** [482]



---

[482] This stroller/reclined cradle was on display at a Buy Buy Baby store.  The packaging for this product was presented only in cardboard boxes at the bottom of the display shelf.

**Figure D1 (cont.): Bugaboo Donkey2 Stroller Packaging (With the Disclaimer: "The reclined cradle is not suitable for prolonged periods of sleeping")**



**Figure D2: Ingenuity Swing 'N Go Portable Swing Packaging Front Panel** [483]

[483] Packages of this swing were on display at a Buy Buy Baby store.

**Figure D2 (cont.): Ingenuity Swing 'N Go Portable Swing Packaging Back Panel (With the Disclaimer: "WARNING: This product is not intended for prolonged periods of sleeping")**



**Figure D2 (cont.): Ingenuity Swing 'N Go Portable Swing Close-Up of Packaging Back Panel (With the Disclaimer: "WARNING: This product is not intended for prolonged periods of sleeping")**



with one hand
- 5 swing speeds, 8 melodies and
  3 nature sounds
- WhisperQuiet™ operation for a
  virtually noiseless experience
- Easy to clean seat pad and head support
- Volume Control and 3 timer settings:
  30, 45 & 60 minutes
- Removable toybar with 2 plush toys
- Harness covers for your baby's comfort

**Use from birth until the child can sit unassisted.**
**CAUTION:** Contains small parts - adult assembly required. Tools required - Phillips head screwdriver (Not Included)
**WARNING:** Do not use this product once your child can sit up unaided or weighs more than 9 kg.
**WARNING:** This product is not intended for prolonged periods of sleeping.
**IMPORTANT:** Remove all packaging and fasteners before giving product to child. Retain this package for future reference. It contains important information. For single family use only. As an ongoing process, we are constantly improving and updating our products. Pictures on this package may sometimes differ from the product enclosed. **Requires: 4D/LR20.** Batteries not included. Product contains magnets.

designed with parent

**Figure D3: Ingenuity Inlighten Cradling Swing Twinkle Tails Packaging Front Panel** [484]

**Figure D3 (cont.): Ingenuity Inlighten Cradling Swing Twinkle Tails Close-Up of Packaging Bottom Panel (With the Disclaimer: "WARNING: This product is not intended for prolonged periods of sleeping")**



**Figure D4: BabyBjörn Bouncer Bliss Packaging Front Panel** [485]



---

[485] Packages of this bouncer were displayed at a Buy Buy Baby store.

**Figure D4 (cont.): BabyBjörn Bouncer Bliss Packaging Back Panel (With the Disclaimer: "This product is not intended for prolonged periods of sleeping")**



**Figure D4 (cont.): BabyBjörn Bouncer Bliss Close-Up of Packaging Back Panel (With the Disclaimer: "This product is not intended for prolonged periods of sleeping")**



**Figure D5: Bright Starts Disney Baby Mickey Mouse Take-Along Songs Infant to Toddler Rocker Packaging Front Panel** [486]



---

[486] Packages of this rocker were displayed at a Target store.

**Figure D5 (cont.): Bright Starts Disney Baby Mickey Mouse Take-Along Songs Infant to Toddler Rocker Bottom Panel (With the Disclaimer: "WARNING: This reclined cradle is not intended for prolonged periods of sleeping")**



**Figure De (cont.): Bright Starts Disney Baby Mickey Mouse Take-Along Songs Infant to Toddler Rocker Close-Up of Bottom Panel (With the Disclaimer: "WARNING: This reclined cradle is not intended for prolonged periods of sleeping")**



**Figure D6: Bright Starts Safari Fun Vibrating Bouncer Packaging Front Panel** [487]

---
[487] Packages of this rocker were displayed at a Burlington store.

Dr. Kivetz Rebuttal Expert Report
Confidential

MDL No. 1:19-md-2903
Page 199

**Figure D6 (cont.): Bright Starts Safari Fun Vibrating Bouncer Packaging Bottom Panel (With the Disclaimer: "WARNING: This reclined cradle is not intended for prolonged periods of sleeping")**



**Figure D6 (cont.): Bright Starts Safari Fun Vibrating Bouncer Close-Up of Packaging Bottom Panel (With the Disclaimer: "WARNING: This reclined cradle is not intended for prolonged periods of sleeping")**



**Figure D7: Ingenuity SmartBounce Automatic Bouncer Raylan Packaging Front Panel** [488]

[488] Packages of this bouncer were displayed at a Burlington store.

Dr. Kivetz Rebuttal Expert Report                                    MDL No. 1:19-md-2903
Confidential                                                          Page 201

**Figure D7 (cont.): Ingenuity SmartBounce Automatic Bouncer Raylan Packaging Bottom Panel (With the Disclaimer: "WARNING: This reclined cradle is not intended for prolonged periods of sleeping")**



**Figure D7 (cont.): Ingenuity SmartBounce Automatic Bouncer Raylan Close-Up of Packaging Bottom Panel (With the Disclaimer: "WARNING: This reclined cradle is not intended for prolonged periods of sleeping")**

